**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : |
| | : |
| TRANSCARE CORPORATION, *et al.*, | : |
| | : |
| | : |
| Debtors. | : |

Chapter 7
Case No. 16-10407 (SMB)
(Jointly Administered)

---------------------------------------------------------x

| | |
|---|---|
| SALVATORE LAMONICA, as Chapter 7 | : |
| Trustee for the Estates of TransCare | : |
| Corporation, *et al.*, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| LYNN TILTON, PATRIARCH PARTNERS | : |
| AGENCY SERVICES, LLC, PATRIARCH | : |
| PARTNERS, LLC, PATRIARCH PARTNERS | : |
| MANAGEMENT GROUP, LLC, ARK II CLO | : |
| 2001-1 LIMITED, TRANSCENDENCE | : |
| TRANSIT, INC., and TRANSCENDENCE | : |
| TRANSIT II, INC., | : |
| | : |
| Defendants. | : |

Adv. Proc. No. 18-01021 (SMB)

---------------------------------------------------------x

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Plaintiff*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

> Bijan Amini, Esq.
> Avery Samet, Esq.
> Jaime B. Leggett, Esq.
> Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Defendants*
Eleven Times Square
New York, NY 10036-8299

    Michael T. Mervis, Esq.
    Timothy Q. Karcher, Esq.
    Marissa Tillem, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

## INTRODUCTION

Salvatore LaMonica, Esq. ("Trustee") commenced this adversary proceeding on behalf of the estates (collectively, the "Estate") of the debtor TransCare Corporation and its debtor-affiliates (collectively, "TransCare" or the "Debtors") to recover damages and avoid certain transfers that occurred before or after the filing of the initial petitions in these cases. He also seeks other forms of relief. The Trustee's claims arise, for the most part, from two discrete though related transactions: (1) the strict foreclosure of the Debtors' most valuable assets by an entity controlled by an insider and immediate resale of those assets to another entity controlled by the same insider, and (2) the granting of a lien to yet another entity controlled by the same insider.

The Court conducted a multi-day bench trial and based upon the evidence adduced, respectfully recommends to the District Court that it enter a money judgment against defendant Lynn Tilton in the sum of $41.8 million. The Court finds and concludes that the transfer resulting from the strict foreclosure must be avoided, and the Estate is awarded a judgment in the amount of $39.2 million against PPAS, in addition to the Trustee's reasonable attorneys' fees. Finally, the lien granted to the insider must also be avoided and preserved for the benefit of the Estate.

# FINDINGS OF FACT[1]

## A.    The Parties

The Debtor TransCare Corporation is a Delaware corporation headquartered in Brooklyn, New York.  (Stipulation No. 1.)  TransCare Corporation, by and through its subsidiaries, provided ambulance services to hospitals and municipalities for both emergency and non-emergency patients, and paratransit services to the New York Metropolitan Transit Authority ("MTA") for individuals with disabilities.  (Stipulation No. 1.)  TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester, New York, (3) Hudson Valley, headquartered in Poughkeepsie, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout the City of New York (the "MTA Contract") using vehicles leased from the MTA.  On July 13, 2015,

---

[1]        This decision uses the following conventions:  "DX", "PX" and "JX" refer, respectively, to the Defendants' trial exhibits, the Plaintiff's trial exhibits and the parties' joint trial exhibits.

"Stipulation No." refers to the numbered paragraphs in the Stipulated Facts section of the May 14, 2019 Joint Pretrial Order (ECF Doc. # 85) at pages 6-15.  Unless otherwise indicated, the ECF references are to the electronic docket in this adversary proceeding.

"Tr. Month/Day" (*e.g.*, "Tr. 7/22") refers to the official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019.  "A.M." and "P.M." refer to the morning and afternoon sessions, respectively.

"Husson Tr. (*LaMonica*)" and "Husson Tr. (*Ien*)" refer to the designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in (i) this action and (ii) *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-01033 (SMB).

"Leland Tr." refers to the deposition testimony of Glenn Leland, TransCare's former CEO.  The Defendants requested that the Court review the video of Leland's deposition and not just the excerpts from the 731-page transcript, (*Defendants' Response to Trustee's Post-Trial Proposed Findings of Fact and Conclusions of Law* ("*Defendants' Response*"), dated Oct. 11, 2019, at 1 n. 3 (ECF Doc. # 137)), but have not explained why my review of the transcript is insufficient and I decline the Defendants' request.

In addition, the *Defendants' Response* included a chart, attached as Exhibit A that, at least in some cases, provided a basis for an objection to the designated Husson or Leland deposition testimony and/or cross-designated other testimony or evidence.  Where Exhibit A does not indicate a basis for an objection and cross-designates other testimony or evidence relating to the excerpt, I assume that the inclusion of the excerpt on Exhibit A was solely for the purpose of cross-designation and not to object.

TransCare New York, Inc. and the MTA executed a Modification to the MTA Contract which extended the MTA Contract through October 31, 2019.  (PX 158; Stipulation Nos. 29-30.)

At all relevant times, the Defendant Lynn Tilton served as the sole director of TransCare.  (Stipulation No. 2.)  The Defendant Ark II CLO 2001-1, Limited ("Ark II"), a Cayman Islands company, owns a 55.7% direct interest in TransCare, and Tilton owns 99% of Ark II.  (Stipulation Nos. 6, 8.)  Non-party Ark Investment Partners II, L.P. ("AIP"), a Tilton affiliate, owns 5.6% of TransCare's shares.  (Stipulation No. 9.)  Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owns outright, or manages, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626[2]), and the remaining 12.7% of TransCare is owned by various entities and individuals.  (ECF Case No. 16-10407 Doc. #132.)

The Defendants Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners") and Patriarch Partners Management Group, LLC ("PPMG") are Delaware limited liability companies, and the Defendants Transcendence Transit, Inc. ("Transcendence Transit") and its direct subsidiary, Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") are Delaware corporations.  (Stipulation Nos. 3-7.)  Tilton is the sole manager and ultimate indirect owner of PPAS, Patriarch Partners and PPMG, (Stipulation Nos. 3-5), and the sole director of both Transcendence entities.  (Stipulation No. 7.)  Lastly, PPAS, Patriarch Partners, PPMG and Ark II maintain their principal

---

[2]        In citing to the Bates-stamped page numbers, the Court will omit the prefix and refer to the last five or six digits of the Bates-stamped page number.

places of business at 1 Liberty Street, 35th Floor, New York, New York, (Stipulation Nos. 3-6), and the Transcendence entities have a mailing address at that location. (Stipulation No. 7.)

## B.   TransCare's Debt Structure

### 1.   Term Loan

TransCare Corporation, as borrower, the Term Loan Lenders (defined below), as lenders, and PPAS, as Administrative Agent, are parties to a Credit Agreement, dated as of August 4, 2003 (as amended, the "Term Loan").  From November 1, 2014 through February 24, 2016 (the "Relevant Period"), the lenders under the Term Loan were: (i) AIP, (ii) Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").[3]  (Stipulation No. 10.)  The Zohar Funds owned over 75% of the Term Loan debt.  (PX 209.)  Credit Suisse acted as collateral manager for First Dominion, (JX 1 at 00106; Tr. 7/22 P.M. 30:20-23), and Credit Suisse and First Dominion together owned approximately 18% of the Term Loan debt.  (PX 209.)  AIP owned approximately 7% of the Term Loan debt.  (PX 209.)

In connection with the Term Loan, TransCare Corporation executed a Security Agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders.  (Stipulation No. 12.)  In addition to the Security Agreement, the TransCare Corporation's subsidiaries,

---

[3]   The Term Loan is governed by New York law.  (Stipulation No. 11.)

debtors in these cases, executed a Guarantee, dated as of August 4, 2003, as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders.  (Stipulation No. 13.)

### 2.      Wells Fargo Credit Facility

TransCare Corporation, TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as Borrowers and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as Guarantors, entered into a Loan and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo"), dated October 13, 2006 (as amended, the "ABL").  The ABL is a syndicated asset-backed revolving credit facility, (Stipulation No. 14), and is governed by New York law. (Stipulation No. 15.)

Both the Term Loan and the ABL were secured by blanket liens on all of TransCare's assets.  (DX 3 at § 2; JX 2 at § 5.1.)  Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "2006 Intercreditor Agreement").  (Stipulation No. 16.)  Under the 2006 Intercreditor Agreement, PPAS received a first priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property (the "Term Loan Priority Collateral"), and Wells Fargo received a first priority lien on all other assets (the "ABL Priority Collateral"), including the Accounts (including accounts receivable) and general intangibles.  (JX 3 at §§ 1.26, 1.35, 2.2.)  Pursuant to an

irrevocable payment assignment, all of TransCare's receivables were paid to a lockbox controlled by Wells Fargo, including all of the payments received under the MTA Contract.  (PX 2.)

### 3.    Ark II Credit Agreement

TransCare Corporation and Ark II entered into a Credit Agreement, dated as of January 15, 2016 (the "Ark II Credit Agreement").  (Stipulation No. 17.)  The Ark II Credit Agreement is governed by New York law.  (Stipulation No. 18.)  In connection with the Ark II Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "Ark II Security Agreement"), (Stipulation No. 19), and on January 29, 2016, Ark II filed separate UCC-1 financing statements with the Delaware Department of State for TransCare Corporation and its subsidiaries.  Each UCC-1 financing statement provided that Ark II held a security interest in "All assets of the debtor . . . ."  (Stipulation No. 23.)  In addition to the Ark II Security Agreement, the TransCare Corporation's subsidiaries executed a Guaranty, dated as of January 15, 2016, in favor of Ark II (the "Ark II Guaranty").  (Stipulation No. 20.)  In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "2016 Intercreditor Agreement"), described in greater detail below, for which TransCare executed an acknowledgment.  (Stipulation No. 22.)

Notwithstanding the dates on these documents, the Ark II Credit Agreement, Ark II Security Agreement, Ark II Guaranty and the 2016 Intercreditor Agreement were not executed until on or about February 10 or 11, 2016.  (Stipulation Nos. 21, 22.)

**C.     Management of TransCare**

Glenn Leland served as TransCare's Chief Executive Officer ("CEO") from January 12, 2015 through January 8, 2016.  (Stipulation No. 24.)  Mark Bonilla served as TransCare's Chief Financial Officer ("CFO") from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016, (Stipulation No. 25), but per Tilton's instructions, Michael Greenberg, a Patriarch Partners credit officer, took on the responsibility for TransCare's finances.  (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24.)  Peter Wolf served as TransCare's Chief Operating Officer ("COO") from November 16, 2015 through February 24, 2016. (Stipulation No. 26.)

Under an Authority Matrix issued by Tilton as sole director of the Board, the officers of TransCare did not have authority to:  (a) approve an annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing or loan agreement;  (g) dispose of any unusable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force.  (PX 3; Tr. 7/23 P.M. 15:16-17:11.)  Some items below certain dollar amounts could be authorized by a "Designated Executive" or an "Annual

Plan," (PX 3), but during the Relevant Period there was no Designated Executive and no Annual Plan.  (*See* Leland Tr. 84:9-13;[4] JX 11.)

Accordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities.  Greenberg oversaw financial matters, payment of vendors and negotiations with Wells Fargo.  (Tr. 7/22 A.M. 14:10–16:15; Leland Tr. 59:5–60:16, 144:13–145:17, 245:22–246:24.)  Jean-Luc Pelissier, a platform leader at PPMG, oversaw operational matters.  (Tr. 7/22 A.M. 24:11-19; Tr. 7/23 A.M. 6:7-19; Leland Tr. 46:6-47:12.[5])  Brian Stephen, an attorney and senior director of legal at Patriarch Partners, supported Tilton in legal matters regarding all of the Patriarch entities.  (Tr. 7/23 P.M. 1:22–3:21.)  Finally, Randy Jones of Patriarch Partners oversaw hiring.  (Tr. 7/22 A.M. 24:22-24; Tr. 8/13 A.M. 53:22–54:1; Tr. 8/13 P.M. 47:23–48:2.)  These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare.  (*See* Tr. 7/22 A.M. 15:13-18 (Greenberg); Tr. 7/23 A.M. 7:15-17 (Pelissier); 7/23 P.M. 2:16-18 (Stephen).)

## D.   **TransCare's Growing Financial Problems**

Throughout the Relevant Period, TransCare experienced difficulties in funding employee payroll and paying vendors.  (Stipulation No. 27.)  TransCare did not have audited financials for 2014, (Tr. 7/22 P.M. 79:21–80:12), and had delayed transmitting

---

[4]    The Defendants objected to this excerpt from the Leland Deposition as irrelevant.  (*Defendants' Response*, Ex. A, item I.6.)  The testimony supports the finding for which it is cited and the finding is relevant to Tilton's control over TransCare.  The objection is overruled.

[5]    The Defendants objected to this excerpt from the Leland Deposition as irrelevant.  (*Defendants' Response*, Ex. A, item I.1.)  The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's control over TransCare.  The objection is overruled.

monthly financial statements to its lenders.  (Stipulation No. 28.)  On or about July 2, 2015, Wells Fargo informed TransCare that Wells Fargo was in an over-advanced position under the ABL facility and informed TransCare management that it would not fund TransCare's payroll for the week ending July 4, 2015.  (Stipulation No. 31.) Consequently, on July 3, 2015, TransCare missed payroll.  (Stipulation No. 32.)

In hindsight, the missed payroll marked the beginning of the end for TransCare. Following the missed payroll, Tilton negotiated a resolution with Wells Fargo to unblock the reserve, (Tr. 8/13 P.M. 43:20–44:5; DX 64), which involved, among other things, the Zohar Funds advancing an additional $2 million to TransCare.[6]  (DX 64; PX 227 at 47615.)  However, on October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice").  (DX 76; Stipulation No. 34.)  The Non-Renewal Notice stated that the ABL would expire on January 31, 2016, and Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements."  (DX 76 at 06336.)  The Non-Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016, (*see id.*), something which TransCare was in no position to do.  (Tr. 7/22 P.M. 93:6–11.)[7]

Needing Wells Fargo's financial support, Tilton tasked Greenberg to work with management at TransCare to prepare a 2016 budget that would be acceptable to Wells Fargo and convince it to extend the ABL.  (Tr. 7/22 A.M. 28:4-11, 31:14-20.)  She also

---

[6]    Between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to TransCare.  (PX 227 at 47615–16.)

[7]    The outstanding balance owed to Wells Fargo as of the initial petition date, February 24, 2016, totaled approximately $13 million.  (Tr. 7/24 159:19–22.)

directed Greenberg to develop a plan based upon his own assessment of TransCare's business.  (Tr. 7/22 A.M. 33:9-12.)  Working primarily with Pelissier, Greenberg submitted a presentation for Tilton's review and approval on November 14, 2015 to share with Wells Fargo at a meeting scheduled for two days later.  (JX 51; Tr. 7/22 A.M. 32:6-25.)  The 2016 plan conservatively estimated an $8.2 million growth in revenue, resulting in 2016 EBITDA of $11.5 million.  (JX 51; Tr. 7/22 A.M. 32:6-25.)  The plan called for forty-eight new ambulances (at $120,000 per vehicle, with a down payment of $30,000).  (JX 51 at 98488-89.)  It required $6.4 million in new capital ($2.8 million in lease payments, $2.8 million in new vehicle funding and $0.8 million in accounts payable reduction).  (JX 51 at 98489, 98535.)  Tilton agreed the plan could be shared with Wells Fargo, but never gave final approval to the plan and did not fund the new ambulances contemplated by the plan.  (Tr. 7/22 A.M. 31:21–32:25, 102:6-9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13-19.)

Meanwhile, starting in early 2015, TransCare received expressions of interest from other ambulance companies to acquire certain TransCare assets and business lines.  On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division.  (JX 12 at 04260; Leland Tr. 85:9–86:14.)  On March 3, 2015, Mike Weinberger, the Chief Operating Officer of Richmond County Ambulance Service ("RCA") emailed Tilton seeking to purchase all or part of TransCare.  (PX 44; Tr. 8/13 A.M. 45:7-15.)  Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement.  (PX 44 at 90486; Tr. 8/13 A.M. 45:7-15.)

Even after the payroll default, TransCare continued to receive expressions of interest.  American Medical Response ("AMR") called Leland seeking to purchase TransCare's Westchester operations.  (Leland Tr. 172:17-24.)  On July 8, 2015, Weinberger emailed Tilton again expressing RCA's interest in purchasing or operating TransCare.  (PX 73; Tr. 8/13 A.M. 45:17-24.)  On July 10, 2015, National Express emailed Leland a Letter of Intent offering to purchase the MTA Contract for $6 to $7 million and assume up to $2 million in liabilities.  (JX 40.)  On July 13, 2015, Greenberg received a message from another Patriarch credit officer that Alliance Capital Advisors representing National Express was interested in purchasing TransCare's paratransit business.  (PX 83; Tr. 7/22 P.M. 74:8-17.)

On July 31, 2015, Greenberg reported to Tilton on Envision Healthcare's purchase of Rural/Metro Corp., a regional ambulance operator, at a 10x multiple of EBITDA.  (DX 68 at 904469.)[8]  A few days later, Tilton forwarded Greenberg's analysis to Kurt Marsden of Wells Fargo and told him "Just to confirm the active M&A market in the ambulance space.  This is why it makes sense to let TransCare make its way back to normalized EBITDA." (DX 68 at 90469.)  Tilton wanted to get TransCare back to the $12-14 million of EBITDA that it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan.  (Tr. 8/13 A.M. 47:22–48:3.)

National Express continued to express an interest into December 2015.  On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express

---

[8]    Envision Healthcare's medical transportation segment was named American Medical Response. (DX 68.)

called him that morning about purchasing the paratransit business and asked whether he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M. 26:19-27:1.) On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that its offer to buy TransCare's paratransit contract was "still out there." (PX 124; Tr. 7/23 A.M. 50:22–51:3.)

According to Greenberg, Tilton specifically prohibited Leland, Greenberg, Pelissier or anyone else from speaking to any of these companies. (Tr. 7/22 A.M. 46:21–47:19.)

## E.    Events Leading to the Tilton Plan and Bankruptcies

On December 14, 2015, Pelissier informed John Husson of Wells Fargo that Tilton had decided to sell TransCare. Tilton was prepared to provide bridge financing until a sale could be consummated but wanted to inject the financing through Wells Fargo's ABL loan facility. (Husson (*LaMonica*) Tr. 48:11–49:21.)[9] On December 16, 2015, Kurt Mardsen of Wells Fargo wrote to Tilton confirming his understanding that she had determined to sell TransCare and inquired into her view about possibly running the sale through a bankruptcy proceeding. (PX 128.) He wanted to "get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity

---

[9]    The Defendants objected to this excerpt from the Husson (*LaMonica*) Deposition as irrelevant. (*Defendants' Response*, Ex. A, item II.1.) The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's reason for entering into the Ark II Security Agreement, described in the succeeding text, pursuant to which Ark II primed the Term Loan Lenders' lien. The objection is overruled.

challenges." (PX 128.)  Tilton understood that Wells Fargo was not going to stay in past January 31 absent a sale process.  (Tr. 8/13 A.M. 50:9-12.)

On December 21, 2015, Greenberg met with John Husson and Bob Strack of Wells Fargo concerning a deal to extend the ABL so as to facilitate a sale of TransCare. (DX 97; Tr. 7/22 A.M. 55:17–56:1.)  Prior to the meeting, Tilton requested a sixth-month time frame for the sale, or through to May or June 2016.  (Tr. 7/22 A.M. 54:20-22.)  On December 23, 2015, Wells Fargo transmitted a summary of proposed terms for a longer-term forbearance of the Wells Fargo ABL facility to Jean-Luc Pelissier and Michael Greenberg.  (Stipulation No. 35.)  The proposed terms included the engagement by TransCare of a third-party financial advisor and a budget for TransCare.  In response, on January 7, 2016, TransCare retained Carl Marks Advisory Group LLC ("Carl Marks") and entered into a consulting agreement.  (Stipulation No. 36.)

In the meantime, Tilton instructed Greenberg to obtain potential comparable transactions and comparable public companies that existed within the same or ancillary industries to TransCare.[10]  (Tr. 7/22 A.M. 42:16-23.)  She also instructed Greenberg to find investment bankers to market TransCare.  (Tr. 7/22 A.M. 41:6-13, 42:21-23; *see* DX 96.)  On December 18, 2015, Greenberg reported his findings to Tilton.  (JX 55.)  He identified six comparable transactions that occurred within the same sector as TransCare or related sectors.  (JX 55; Tr. 7/22 A.M. 48:2-3.)  For each comparable

---

[10]     Greenberg had experience in private equity investment and portfolio management, comparing companies within a particular set, evaluating capital structure alternatives for companies, and making strategic business assessments for companies.  (Tr. 7/22 A.M. 13:17–14:2.)  Greenberg also had extensive experience in valuation and modeling.  (Tr. 7/22 A.M. 14:7-9.)

transaction, Greenberg listed the date, whether it was completed or announced, and where available, the purchase price or enterprise value, last twelve-month ("LTM") revenue, LTM EBITDA, and the multiple of revenue/EBITDA needed to arrive at the purchase price.  (JX 55; Tr. 7/22 A.M. 48:22–50:13.)

Only two of the transaction comparables had sufficient public information to calculate EBITDA multiples.  AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple (*i.e.*, the purchase price was 10.7 times the LTM EBITDA) and KKR purchased Air Medical at a 10.0x multiple.  (JX 55.)  Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation."  (JX 55; Tr. 7/22 A.M. 48:3-5.)  Under "market value" for each market comp, Greenberg listed the market value of the equity of each public company plus the outstanding debt minus the cash on the balance sheet.  (JX 55; Tr. 7/22 A.M. 51:2-7.)  The rest of the entries were calculated in the same way as the transaction comps.  (Tr. 7/22 A.M. 51:8-10.)  Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI traded at a 3.5x multiple. (JX 55.)  However, Greenberg determined that PHI was an outlier, and reported the same to Tilton, because PHI had other business lines that were only tangentially related to TransCare's business.  (JX 55 at 41410; Tr. 7/22 A.M. 51:11-22.)

In his cover email to Tilton reporting on these transaction and market comparables, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x.  (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.)  Greenberg also identified several investment banks that had advised on ambulance transactions, including Barclays, Deutsche Bank and Royal Bank

of Canada.  (JX 55 at 41410; Tr. 7/22 A.M. 42:24–43:11.)  Finally, Greenberg informed
Tilton that Leland had received unsolicited calls from several potential purchasers in the
ambulance business including Falck, AMR, RCA, and Enhanced Equity and also from
National Express which was in the transit business.  (JX 55 at 41410.)

Greenberg followed up with more information six days later.  In a December 24,
2015 email to Tilton, he identified additional potential investment banks that had acted
as advisors in smaller transactions, including Avondale Partners, Benchmark
International, Provident Healthcare Partners, Genesis Capital and Carter, Morse &
Mathias.  (JX 61.)  He asked Tilton "whether we should begin to reach out to potential
investment banks to gather more information."  (*Id.*)  Greenberg undertook this
research for the purpose of negotiating a plan with Wells Fargo to fund TransCare
towards a potential sale.  (Tr. 7/22 A.M. 52:23–53:10.)  Tilton, however, never hired an
investment banker to pursue a possible sale.

Wells Fargo agreed that TransCare needed to be sold and understood that "it was
a matter of self preservation" to support TransCare through to a sale.  (Husson (*Ien*) Tr.
35:24–36:17.)  Between December 23 and December 31, 2015, Greenberg and Wells
Fargo negotiated a deal to extend the ABL to allow a sale of TransCare.  On December
23, 2015, Melissa Provost of Wells Fargo sent an email to Greenberg and Pelissier with a
proposed long-term forbearance agreement to fund TransCare through a sale.  (JX 59.)
The proposal required Patriarch Partners to provide additional funding in an amount to
be determined to help finance TransCare's Critical Expenses (*i.e.*, insurance, rent,
payroll, payroll tax obligations and other critical operating expenses).  (JX 59 at 75498.)
On December 31, 2015, Greenberg sent an email to Husson and Provost that included a

proposed timetable that addressed the hiring of an investment banker by February 15, 2016 and a sale closing by September 30, 2016.  (JX 65 at 00216.)  Wells Fargo had proposed the retention of an investment banker by January 31, 2016 and a sale closing by July 31, 2016.  (JX 65 at 00216.)  Husson responded to Greenberg later that same day that the milestones were acceptable except the sale had to close by August 15, 2016.  (JX 65 at 00215.)

### 1.  The January 7 Plan

On January 4, 2016, Tilton told Greenberg to prepare a budget to support a sale process that would minimize the capital TransCare would need.  (JX 67; Tr. 7/22 A.M. 64:12-22.)  Greenberg submitted a budget to Tilton the next day, and Tilton directed that it be sent to Carl Marks two days later (the "January 7 Plan").  (JX 67.)  Greenberg and Pelissier built the January 7 Plan working independently from TransCare's management and created a scenario they thought was more consistent with Tilton's stated parameters.  (Tr. 7/22 A.M. 69:14–70:5.)

The January 7 Plan projected 2016 revenues of $120 million (including $2 million in new services) and EBITDA of $6.9 million.  (JX 67 at 196574.)  The January 7 Plan projected a peak need of $4.5 million in new capital consisting of $2.2 million in immediate payment requirements (insurance, payroll, and taxes); $1.3 million in down payments on new vehicles; and $1 million in other past due accounts payable.  (JX 67 at 196575; Tr. 7/22 A.M. 70:22–72:3.)  After receiving Tilton's approval, Greenberg shared the January 7 Plan with Carl Marks, (Tr. 7/22 A.M. 77:4-9), but she never "approved" the January 7 Plan.  (Tr. 7/22 A.M. 80:16-21.)

Carl Marks provided a preliminary assessment to Tilton on January 14, 2016. Marc Pfefferle of Carl Marks stated that, among other things, TransCare needed a substantial amount of funding to survive, and the weekly cash flow was barely covering the payroll and payroll taxes.  (PX 165 at 00927.)  He also stated that all of TransCare's insurers had issued cancellation notices and urged immediate payments to numerous insurers.  (PX 165 at 00927.)  Tilton expressed concern about providing funding with no plan to restructure TransCare, (PX 165 at 00925–26), and warned that she did "not want to keep funding into a black hole that cannot be filled."  (PX 165 at 00925.) Pfefferle agreed with the latter concern adding it "[s]eems like there is a reason for the Company to exist, but the EBITDA numbers we were originally given are significantly overstated," and anticipated that a more complete picture would follow.  (PX 165 at 00925.)

Despite the absence of an approved plan, Tilton provided emergency funding in January 2016 to keep TransCare operating.  On January 15, 2016, Ark II wired $1,172,757.53 to PPAS to allow PPAS to make insurance payments on TransCare's behalf.  These included $221,122.00 to Zurich (auto insurance); $142,993.82 to IPFS (liability insurance); $334,802.76 to Aetna (health insurance); and $473,838.94 to the New York State Insurance Fund ("NYSIF") (workers' compensation insurance) (collectively, the "January 15 Payments").  (DX 112 (3:58 pm email).)  The January 7 Plan contemplated that these payments formed a portion of the $4.5 million in new capital contributions (although by this date the $4.5 million had increased to a plan of $6.5 million).  (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575; *see* PX 170 at 14549–50.)

That afternoon, Greenberg emailed Wells Fargo asking for its agreement to eight new conditions for the January 15 Payments, which Greenberg characterized as "part of a first funding under a go forward business plan being developed, of up to $6.5MM." (PX 170 (2:06 pm email).)  The conditions included that the $6.5 million business plan be supported by a credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL, but senior to Wells Fargo's lien on the collateral for the Term Loan debt. (*Id.*)  Wells Fargo did not agree to the proposed lien priority but was prepared to agree to allow the secured funding junior to all liens of Wells Fargo and subject to a new intercreditor agreement.  (PX 170 at 14549.)  Greenberg continued to negotiate the security for the January 15 Payments with Wells Fargo through the end of January.  (PX 174 at 22754, 22753; Tr. 7/22 A.M. 88:1–92:7.)

### 2.  The January 27 Executive Summary

Carl Marks produced its 2016 Plan Executive Summary ("Executive Summary") on or about January 27, 2016.  (PX 175.)  It listed a litany of significant problems with vendors, customers, landlords and equipment, (*see* PX 175 at 002111-12), and projected the need for an immediate pledge of financial support from Patriarch in excess of $7.5 million, (PX 175 at 002114), of which $3.5 million was needed over the next two weeks. (PX 175 at 002114.)  The Executive Summary included a series of action items Carl Marks thought TransCare could take to effect a turnaround, (PX 175 at 002114), and recommended against a TransCare bankruptcy predicting that it would provide no immediate financial benefit and jeopardize the customer base.  (*See* PX 275 at 002116.) On the other hand, if the action items were successfully implemented, the Executive Summary projected 2016 operating revenue of $100,532,000 and EBITDA of $4.97

19

million or 4.9% of operating revenue.[11]  (PX 175 at 002123.)  Tilton declined to provide

the funding required under the Executive Summary, (Tr. 8/13 P.M. 70:24–71:3),

although on January 28, 2016, she approved the purchase of two new ambulances (but

not the medical equipment) for a total of $195,975 that Ark II would own and lease to

TransCare, (DX 120 at 02162; DX 121 at 99194), and the next day, she directed PPAS to

advance $690,168.24 on TransCare's behalf to pay the NYSIF and certain TransCare

creditors (the "January 29 Payments," and together with the January 15 Payments, the

"January Payments").  (Tr. 8/13 A.M. 58:21–59:15; *see* DX 121 at 99192.)  According to

Tilton, she intended for Ark II to reimburse PPAS for the advance, (Tr. 8/13 P.M. 6:3–

6), but there is no evidence that it ever did.

### 3.  Negotiations with Credit Suisse

As of February 3, 2016, Tilton still had no agreement with either Wells Fargo or

Credit Suisse, the non-affiliated Term Loan Lender, for a new secured financing facility

to TransCare.  (Tr. 7/22 P.M. 8:17-22, 9:20-22.)  However, Greenberg reported to

Pfefferle earlier that day that Credit Suisse, which also represented First Dominion's

interest as a Term Loan Lender, wanted to see a plan that showed it was better off

agreeing to subordinate its position in favor of the new facility meaning the value had to

exceed Wells Fargo's debt plus the new facility.  (PX 185.)  Later that day, Greenberg

sent Alex Witkes of Credit Suisse a "Summary of Terms for New Facility."  (PX 189.)

The summary included a $6.5 million facility which would be junior in priority to Wells

---

[11]     On January 28, 2016, Greenberg emailed himself another set of projections that were not
materially different from the Executive Summary.  He projected 2016 operating revenue in the sum of
$102,262,000 and EBITDA of $5,176,000.  (PX 179 at 13262.)  There was no evidence presented at trial
that he shared these projections with anyone.

Fargo but senior to the Term Loan Lenders on the ABL Priority Collateral and would have a priority senior to the Term Loan Lenders on the Term Loan Priority Collateral. However, Greenberg never sent Credit Suisse a formal plan because Tilton never told him to do so.  (Tr. 7/22 P.M. 16:12-25.)  Nor had Wells Fargo been provided with a going-forward plan for TransCare.  (Tr. 7/22 P.M. 17:23–18:6.)

### 4.  The Tilton Plan

On or about February 5, 2016, Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company ("Tilton Plan"). (Tr. 8/13 A.M. 64:1-16.)  She planned to split TransCare in two.  PPAS, acting on behalf of the Term Loan Lenders, would foreclose through U.C.C. Article 9 on their TransCare collateral and transfer the collateral to "NewCo."  NewCo, which would become Transcendence, would continue to operate part of TransCare's business and save a substantial number of jobs.  The balance of TransCare, "OldCo," would wind down outside of bankruptcy for a period of 60-90 days and then commence a chapter 7 and collect the accounts receivable on which Wells Fargo had the first lien.  (Tr. 8/13 A.M. 65:3-16.)  Tilton sought a commitment from Wells Fargo to continue funding TransCare during its wind-down by over-advancing funds through the existing ABL, but she ultimately rejected Wells Fargo's proposal to over-advance as insufficient.  (Tr. 8/13 A.M. 68:14-22, 70:17-23.)

### a.     Creation of Transcendence

Tilton set her plan in motion on February 10, 2016.  Per her direction, Stephen caused the two Transcendence entities to be incorporated under Delaware law, (DX 133

at 15290, 15294; Tr. 7/23 P.M. 22:2–23:21; *see* Stipulation No. 37), and set up bank accounts, tax ID numbers, directors, and insurance for both companies.  (Tr. 7/23 P.M. 26:22–28:9, 103:4–104:23.)  The same day, Tilton became the sole director of Transcendence, issued a board resolution adopting the authority matrix and appointed Glen Youngblood, a senior vice president at TransCare, as President of Transcendence.[12] (PX 200; Stipulation No. 7.)

### b.   Retention of Counsel

On the evening of the previous day, Stephen had contacted the law firm Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to prepare to file a chapter 11 bankruptcy proceeding for certain TransCare entities, (JX 72 (10:06pm email); Tr. 7/23 P.M. 29:8–30:10), and by letter agreement dated February 10, 2016, TransCare engaged Curtis Mallet to advise on an out-of-court restructuring or in-court proceeding.  (JX 77; Stipulation No. 38.)  Tilton made the decision to hire Curtis Mallet without consulting anyone else from TransCare.  (Tr. 7/23 P.M. 33:11-20.)

Stephen excluded two of TransCare's subsidiaries — TransCare Pennsylvania and TC Hudson Valley — from the list of potential debtors.  By then, Tilton planned that "the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder of

---

[12]    Both certificates of incorporation authorized the Transcendence boards to issue 1,000 shares of common stock, but no shares were ever issued for either Transcendence entity.  (Tr. 7/23 P.M. 24:5-16; DX 133 at 15290, 15294.)

TransCare would be wound down, but it would still continue to operate." (Tr. 7/23 P.M. 30:24–31:13.)

### c.    The New Ark II Credit Facility

As noted earlier, Tilton was unwilling to fund any portion of TransCare's wind down Critical Expenses unless she received a security interest in the Term Loan Lenders' collateral that primed the Term Loan Lenders' lien.[13]  Greenberg had previously sought Credit Suisse's consent to what amounted to the subordination of its lien but had not received it.  Tilton decided instead to circumvent the Term Loan Lenders.  In a February 10, 2016 email, Peter Ruffini, a lawyer at Patriarch Partners, asked Greenberg (copying Stephen) to have TransCare sign four documents in connection with a new Ark II/TransCare facility: (1) the Ark II Credit Agreement, (2) the Ark II Security Agreement, (3) the Ark II Guaranty, and (4) the 2016 Intercreditor Agreement (collectively, the "Ark II Facility").  (PX 197 at 47308 (11:33 a.m. email).)[14] On February 11, 2016, Stephen emailed a fully executed copy of the Ark II Facility documents (all dated as of January 15, 2016) to Curtis Mallet, stating only "I attach documents with respect to another term loan for the company."  (JX 79 at 48966.)  No evidence was offered showing that Curtis Mallet had any participation in the negotiation, drafting or execution of these documents by TransCare.

The Ark II Credit Agreement, § 2.1, provided that Ark II would loan up to $6.5 million to TransCare, (JX 79 at 48976-77), but under § 2.5(b), prohibited TransCare

---

[13]     She also wanted the new facility to prime Wells Fargo, but Wells Fargo refused.

[14]     There was no administrative agent on the Ark II Credit Facility and PPAS had no connection to the Ark II Credit Facility other than agreeing to the 2016 Intercreditor Agreement.  (JX 197.)

from requesting loans under the Ark II Facility unless it first obtained the prior written consent of Ark II.  (JX 79 at 48978.)  The Ark II Security Agreement, § 2.2, granted Ark II a blanket security interest in TransCare's property.  (JX 79 at 49020-21.)  The 2016 Intercreditor Agreement (JX 79 at 49001) granted Ark II both structural and payment priority over the Term Loan Lenders.  (*See* JX 79 at 49004, § 2.2 (granting Ark II lien priority over the Term Loan Lenders' lien); JX 79 at 49005, § 2.2(a) (providing that the proceeds of any collateral would first be paid to Ark II); JX 79 at 49007, § 2.8(a) (stating that "only the party with the senior Lien in the collateral [*i.e.*, Ark II] shall have the right to restrict, permit or approve or disapprove, the sale, transfer or other disposition" of the TransCare collateral); JX 79 at 49008, § 2.9(a) (prohibiting PPAS from exercising any of its remedies upon a default); and JX 79 at 49008, § 2.9(a)(ii) (prohibiting PPAS from foreclosing on its TransCare collateral).)  Tilton signed the 2016 Intercreditor Agreement on behalf of PPAS, as agent for the Term Loan Lenders and Ark II, (JX 79 at 49015), and Peter Wolf signed an "acknowledgment" to the 2016 Intercreditor Agreement, providing that TransCare "acknowledges and agrees to the foregoing terms and conditions….[and] agrees that it will, together with its successors and assigns be bound by the provisions hereof."  (JX 79 at 49016.)

One day later, on February 11, 2016, Tilton crafted, (Tr. 7/22 P.M. 33:14-17), an email, (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email)), that Greenberg sent to Credit Suisse.  It warned Credit Suisse that because it would not agree to subordinate its Term Loan position to a new $6.5 million loan facility (a feat already accomplished through the 2016 Intercreditor Agreement), TransCare was going to be forced to file for bankruptcy.  (Tr. 7/22 P.M. 31:15-32:2.)  The email also advised Credit Suisse that as an

equity holder it would be responsible for paying TransCare's unpaid payroll and payroll taxes and its share could be between $1 million and $2 million.  (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email); Tr. 7/22 P.M. 32:15–33:17.)  Credit Suisse asked for details about the missing payroll and financial problems, (PX 249 at 77101 (Feb. 12, 2016 4:24 p.m. email)), but Greenberg never responded.  (Tr. 7/22 P.M. 34:20–35:3.)  No one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing.  (Tr. 7/22 P.M. 35:10-19.)

### d.    The Acquisition of Insurance

The procurement of insurance for Transcendence was the final missing element to the success of the Tilton Plan; Transcendence could not operate without insurance. (Tr. 7/22 A.M. 71:8-18; Tr. 7/23 A.M. 20:3-16; Tr. 8/13 A.M. 25:4–26:12.)  On February 10, 2016, Greenberg emailed several of TransCare's insurance brokers with a request to bind new insurance policies for Transcendence and provided the brokers with financial information about Transcendence.  (PX 196; Tr. 7/22 P.M. 43:8–47:22.)  He informed the brokers that Transcendence would operate five of TransCare's business units: (1) the paratransit division; (2) Pittsburgh; (3) Hudson Valley; (4) Maryland; and (5) Westchester.   (PX 196; Tr. 7/22 P.M. at 43:8–46:19.)  The financial information he sent projected $48 million in operating revenue for Transcendence during calendar year 2016 (it was already February) and $3.76 million in EBITDA.  (PX 196; Tr. 7/22 P.M. 47:9-22.)

On February 11, 2016, Tilton wrote to Bobby Siegel, an insurance broker, for the purpose of procuring insurance for Transcendence.  She explained that:

> [T]here is a smaller, less risky transit business that we would like to continue in a new company.  This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland.  It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017.  It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

(JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13.)  She understood that Siegel needed this financial information to bind insurance.  (Tr. 8/13 A.M. 39:5-8.)

### e.    The Revised Business Model

On February 13, 2016, Pelissier sent Tilton and Stephen the "Transcendence Go Forward Model" that he and Greenberg were preparing.  (PX 286.)  This model included the assets that would continue to operate as a going concern.  (Tr. 7/22 P.M. 53:17-23.) This model contemplated that Transcendence would operate six divisions of TransCare: (1) paratransit, (2) Pittsburgh; (3) Hudson Valley; (4) Maryland, and (5) Westchester and (6) Bronx 911/Montefiore 911.  (PX 286; Tr. 7/22 P.M. 54:8-13.)  The model projected that Transcendence would achieve consolidated 2016 operating revenues of $65 million and EBITDA of $5.1 million.  (PX 286 at 105517; Tr. 7/22 P.M. 55:1-7.)

Transcendence would have an "incremental funding need" of $8 million while the accounts receivable were paid down (ninety days for the ambulance divisions and forty-five days for the paratransit division), "which can be offset if a new ABL line is secured or by cash that builds through the year."  (PX 286 at 105517; Tr. 7/22 P.M. 56:18–57:4.) For this reason, the "incremental funding need" was not listed on the model cash flow

statement as a capital expenditure but instead, was listed as a financing adjustment. (PX 286 at 105522; Tr. 7/22 P.M. 56:22–57:2.)  The cash flow statement projected only $120,000 in capital expenditures for Transcendence in 2016.  (PX 286 at 105522; Tr. 7/22 P.M. 56:13-17.)

After finishing a telephone call with Tilton on February 14, 2016, and with Tilton's authorization, Pelissier circulated the operational plan for Transcendence to Greenberg, Pelissier, Stephen, Wolf, Youngblood, and others.  (PX 206; Tr. 7/23 A.M. 17:7-9.)  Tilton maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare.  (Tr. 7/23 A.M. 17:17-24.)  The operational plan included a detailed list of tasks and the assigned responsibility for those tasks.  Among other things, Stephen and another lawyer at Patriarch were tasked with preparing the foreclosure documents by February 11, 2016, and Stephen was to finalize the bankruptcy filing documents by February 14, 2016.  (PX 206 at 91292.) Stephen would also review which contracts could be assigned to the new company.  (Tr. 7/23 A.M. 25:20–26:8.)  Pelissier and Youngblood, the designated President of Transcendence and the most senior person after Wolf at TransCare, would be in charge of changing remittance forms and payment lock box accounts for Transcendence on day one.  (PX 206 at 91295.)  Pelissier and Youngblood would also be in charge of devising a system for the new company to generate payroll checks.  (PX 206 at 91296, 91297; Tr. 7/23 A.M. 24:2–25:1.)  Employees would need to receive WARN notices and be transferred to Transcendence, but no one had yet decided when to do this.  (Tr. 7/23 A.M. 19:11-22.)

### f.     TransCare's Final Days

TransCare continued to deteriorate.  On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland.  (DX 157 at 05291.)  Transcendence was to take over the Bronx Lebanon contract.  Tilton testified that the Bronx Lebanon and Montefiore contracts generated about $2.5 million of EBITDA and their loss was "a big hit" to the Tilton Plan.  (Tr. 8/13 P.M. 99:18–20.)  She feared that TransCare might continue to lose contracts.  (Tr. 8/13 P.M. 101:4–12, 100:18–100:23.)

## F.     The Foreclosure and Sale

Tilton continued waiting for the insurance for Transcendence to set the foreclosure in motion.  (Tr. 8/13 A.M. 74:5-7; DX 170 (3:49 P.M. email); DX 171 (4:44 P.M. email).)  Pelissier explained, "if we cannot insure, we cannot operate."  (Tr. 7/23 A.M. 30:8-24.)  On February 24, 2016, Tilton directed Greenberg to transmit Transcendence's projected 2016 financials to Todd Trent of Lockton, a potential insurer, for the purpose of procuring insurance.  (PX 228; Tr. 7/22 P.M. 62:15–63:7.)  The email suggests that the financial information was actually provided the previous day.  The projections encompassed the last few days of February and the remaining ten months of 2016 rather than a full year.  (PX 228 at 86223; Tr. 7/22 P.M. 64:7-15, 68:13-18; PX 233.)  The financials projected operating revenues of $36,379,000 and EBITDA of $3,204,500 during this approximate ten-month period.  (PX 228 at 86223.)  Tilton testified that EBITDA would increase to $4 million if annualized over a full twelve months.  (Tr. 8/14 A.M. 38:4-12.)  The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million

EBITDA shown on the earlier forecast, (PX 286), resulted from the decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions, (PX 286 at 105516), and "possibly also a slight difference in timing in terms of the beginning of the forecast." (Tr. 7/22 P.M. 65:4-8.)

Transcendence apparently received the insurance it needed to operate at some point on February 23, 2016 because Tilton authorized the foreclosure at 12:07 a.m. on February 24, 2016. (Tr. 8/13 A.M. 6:16-19.) Stephen immediately provided TransCare with (a) a Notice of Default and Acceleration (JX 96 at 43311) and (b) a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligations, (JX 96 at 43306; DX 174), but did not send the Notice of Default or Notice of Acceptance to Curtis Mallet. (JX 96; Tr. 7/23 P.M. 50:24-51:21.)

Both the Notice of Default and the Notice of Acceptance were signed by Tilton, on behalf of PPAS, the Zohar Funds, and AIP, but not by Credit Suisse or First Dominion. (JX 96 at 43308, 43313.) The Notice of Default declared a default arising from TransCare's failure to pay interest and accelerated all of TransCare's payment obligations under the Term Loan. (JX 96 at 43311.) By the Notice of Acceptance, PPAS accepted the collateral (the "Subject Collateral") in satisfaction of $10 million (of approximately $43 million) outstanding under the Term Loan. (JX 96 at 43307.) The Subject Collateral included all of TransCare's personal property (including the computer servers and related data), three specific contracts (MTA Contract, an equipment lease for ventilators and emsCharts Service Agreement dated Aug. 21, 2015) and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp. The Subject Collateral did not include the Accounts, as defined in the security

agreement associated with the Term Loan, or any lease or other contract that was not specifically identified.  (JX 96 at 43310.)  Peter Wolf, the Chief Operating Officer of TransCare, executed the Notice of Acceptance on behalf of TransCare.[15]  (DX 174 at 91200.)

As is evident from the documents, the Tilton Plan was not limited to the foreclosure and sale of NewCo's assets; it included OldCo's property as well.  The Subject Collateral was defined, with certain exceptions, as "[a]ll of the Debtors' personal property of every kind and description," and expressly included the MTA Contract, which was property of OldCo's TransCare New York, Inc., and the shares of capital stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp. and TC Ambulance Corp., which belonged to OldCo's TransCare Corporation.  (DX 174 at 91201.)  The Notice of Acceptance was directed to each of the fourteen Debtors, (DX 174 at 91197), was signed by Wolf on behalf of each of the fourteen Debtors, (DX 174 at

---

[15]    The parties had previously disputed whether the Subject Collateral included TransCare's Certificates of Need ("CONs").   The CONs were issued by the New York State Department of Health and were needed to operate the ambulances.  (Tr. 7/24 135:20-25; PX 255 (*Stipulation Respecting the Sale of Certain Personal Property*, dated Mar. 10, 2016 ("*Personal Property Stipulation*").)  Prior to February 24, 2016, TransCare held seven CONs, five were issued to Initial Debtors and two were issued to Subsequent Debtors.  (*Personal Property Stipulation* at 2.)

        PPAS originally took the position that it had foreclosed on the Subsequent Debtors' CONs and transferred them to Transcendence.  (*Id.* at 3.)  However, it now concedes that none of the CONs were included in the Subject Collateral.  (*Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*DPFC*"), at ¶¶ 223, 274 (ECF Doc. # 133).)  Moreover, the 2006 Intercreditor Agreement contains a schedule of the Term Loan Priority Collateral and the schedule does not include the CONs.  (JX 3, Ex. A at 00029.)  Rather, the CONs were part of the collateral retained as part of the ABL Priority Collateral.  Tilton nevertheless believed that by foreclosing on the stock of the Subsequent Debtors, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence.  (Tr. 8/14 A.M. 23:12–15.)  The Trustee eventually liquidated TransCare's seven CONs for an aggregate gross price of $12,250,000.  (*See* ECF Case No. 16-10407 Doc. ## 199-205.)

91200), and the Bill of Sale transferred all of these assets to Transcendence.  (*Compare* DX 174 at 91201 *with* JX 102 at 91207.)

The foreclosure complete, Tilton immediately moved on to the second stage — transferring the Subject Collateral to Transcendence.  On the morning of February 24, 2016, PPAS, as administrative agent, and Transcendence entered into a Bill of Sale, Agreement to Pay and Transfer Statement ("Bill of Sale") (JX 102), pursuant to which PPAS, as agent for the Term Loan Lenders, sold all of the Subject Collateral to Transcendence.  (JX 102; Stipulation No. 43.)  As consideration for the purchase of the Subject Collateral, Transcendence agreed to pay PPAS $10 million.  Ark Angels III, a Tilton affiliate, would finance the purchase under a Purchase Credit Agreement and was deemed to have loaned Transcendence $10 million.  (JX 101.)  The trial exhibit was unexecuted, but Tilton testified that (a) she was committed to this loan and (b) Transcendence borrowed $658,000 under the Purchaser Credit Agreement to pay NYSIF and the lessor of the paratransit facility on Foster Avenue.  (JX 101 at 8673; Tr. 7/22 P.M. 59:13–60:10; Tr. 8/13 A.M. 24:15-24.)  It does not appear that any portion of the $10 million purchase price was actually paid to PPAS or the Term Loan Lenders.

## G.    The Unraveling of the Tilton Plan

On February 24, 2016, TransCare Corp., TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc. and TransCare Harford County, Inc. (collectively, the "Initial Debtors") filed chapter 7 petitions in this Court. (Stipulation No. 44.)  The out-of-court and chapter 11 wind down plans had been

31

scrapped presumably due to lack of funding.  Salvatore LaMonica, Esq. was appointed as the interim chapter 7 trustee of the Initial Debtors' cases the next day.  (Stipulation No. 45.)  With the exception of the Accounts, the CONs and some property carved out of the Bill of Sale, all of TransCare's personal property was the subject of the foreclosure and was now owned by Transcendence.  The surviving entities, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation, whose operations were to continue through Transcendence, did not file bankruptcy at that time.

The filing of the chapter 7 ultimately spelled doom for Transcendence.  The most pressing problem was paying TransCare's drivers.  Forty-eight emergency ambulances that Transcendence now owned were on the road driven by former TransCare employees who were owed pay for the prior two weeks.  The payroll was scheduled to be disbursed the next day but TransCare was now in chapter 7.  PPAS's counsel advised the Trustee that Transcendence owned all of the ambulances but would be amenable to the Trustee's use of the ambulances to operate if they could reach an agreement.  (Tr. 7/24 134:11-22.)  There were three obstacles to this plan.  First, the Trustee had no money but even if he did, he could not pay pre-petition wages without a court order.  Second, Wells Fargo and PPAS were prepared to fund $1 million but the Trustee needed $1.2 million, (Tr. 7/24 138:2-22), and neither Wells Fargo nor PPAS were willing to come up with more money.  The Trustee refused to run TransCare if the employees were not going to be paid.  (Tr. 7/24 139:4-13.)  Third, PPAS needed TransCare's computers to process the payroll and wanted the Trustee to issue the checks using TransCare's payroll system but

the Trustee refused fearing employer tax and other obligations and potential liabilities. (Tr. 7/24 142:20-143:3, 148:22-149:22.)

Once the possibility of a funding agreement fell through, the Trustee arranged to shut down TransCare's 911 operations. (JX 104.) His concern was for the public's safety because the ambulances were furnished with narcotics and equipment. He spoke to the New York City Fire Commissioner and arranged for the drivers to return the ambulances to the nearest firehouse if they refused to return them to one of TransCare's garages. (Tr. 7/24 141:14-142:6.) In addition, the Trustee was concerned about the Estate's potential liability because the ambulances were still registered in TransCare's name and insured by TransCare. (Tr. 7/24 142:20-25.)

The Trustee's control of the TransCare computer server also hindered Transcendence's ongoing operations. The Subject Collateral included TransCare's server, (JX 96 at 43310), but the server was housed at the Hamilton Avenue address that was leased by one of the Initial Debtors. Tilton had apparently intended for Transcendence to take possession of the server which it needed to operate and would give access to TransCare under a Transition Services Agreement which was never executed.[16] (Tr. 8/13 A.M. 26:6-9.) However, the server contained TransCare's books and records and the Trustee was not about to surrender it. (Tr. 7/24 165:23-166:4.) According to Tilton, when Glen Youngblood, now President of Transcendence, showed

---

[16]     Greenberg had forwarded a draft Transition Services Agreement to Tilton on February 23, 2016. (JX 95.) Under the proposed agreement, Transcendence would provide TransCare with use of certain equipment including systems and software support. (JX 95 at 44010.)

up at TransCare's headquarters to seize the server, the Trustee threatened him with personal liability and Youngblood resigned.  (Tr. 8/13 A.M. 26:17-21.)

The MTA Contract was another problem.  Historically, the paratransit business was TransCare's second biggest revenue producer accounting for 26% of TransCare's operating revenue, (JX 67 at 106572), and $4 million of EBITDA.  (JX 12 at 04260.)  As a component of Transcendence, it would be the most valuable division with a projected annual operating revenue of $25 million.  (PX 196 at 27756; PX 286 at 105516.)  Furthermore, unlike the ambulance business, it demanded limited capital because the fleet was leased from the MTA.  (JX 12 at 04260.)  TransCare New York, Inc., destined for chapter 7, was the TransCare entity that was party to the MTA Contract.  (Stipulation No. 29; PX 229.)

On February 24, 2016, and before the filing of the chapter 7 cases, Pelissier forwarded the paperwork necessary to assign the MTA Contract which he had requested from the MTA to Stephen, Greenberg, Jones, Wolf and Thomas Fuchs of TransCare.  (JX 100 (1:34 p.m. email).)  Tilton signed a written consent as the sole board member of TransCare New York, Inc. that same day directing TransCare's COO to assign the MTA Contract to Transcendence II.  (PX 229.)  At 8:27 p.m. on February 24, 2016, fourteen minutes before the filing of TransCare New York's chapter 7 petition, Stephen circulated an executed Agreement of Assignment for the MTA Contract (the "MTA Assignment"), stating that the financial disclosures would need to be completed by someone else.  (JX 100.)  The MTA Assignment (and TransCare New York's consent to the MTA Assignment) was executed on behalf of TransCare by COO Peter Wolf.  (JX 100 at 77168.)  Counsel for TransCare was not consulted.  (Tr. 7/23 P.M. 81:16-23, 85:20-23.)

On February 25, 2016, Stephen confirmed to the MTA that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence and that nothing prevented Transcendence from servicing the MTA Contract.  He assured the MTA that the foreclosure had taken place and "[t]he bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement."  (PX 244 at 43521-22 (8:49 p.m. email) (underscoring in original).)  On February 26, 2016, Stephen wrote to the MTA asking it to agree on a "new agreement" with Transcendence II with certain conditions, including that the MTA terminate the MTA Contract with TransCare New York.  (PX 236.)  Stephen told the MTA that absent agreement to the new terms "we will, unfortunately, be forced to discontinue service at 5:00PM today."  (PX 236.)

At the same time, Randy Creswell (counsel to PPAS) asked the Trustee to consent to termination of the MTA Contract.  (JX 105.)  At trial, Tilton blamed Transcendence's loss of the MTA Contract on the Trustee's refusal to consent per the MTA's insistence,[17] (*see* Tr. 8/13 A.M. 26:21-25), but the Trustee was willing to consent to the termination of the MTA Contract as long as it was without prejudice to amounts due to TransCare, (JX 105), and informed the MTA's lawyer of his consent.  (Tr. 7/24 148:2-5.)

At 7:01 p.m., Stephen informed the MTA that after speaking with Tilton, Transcendence would not be continuing to provide services.  (PX 245.)  In that same email, Stephen provided the MTA with the termination notice that had been sent to

---

[17]     The MTA's insistence on the Trustee's consent may have been due to the concern that any attempt to terminate the MTA Contract without his consent could violate the automatic stay triggered by TransCare New York's chapter 7 case.

Transcendence's employees that day.  (PX 245 at 43517.)  The notice informed the employees that Transcendence had shut down operations effective "immediately" and instructed them to "secure your vehicles and operations and await further instruction from the court appointed Trustee."  (*Id.*)

Transcendence's predecessors, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (together, the "Subsequent Debtors") filed voluntary chapter 7 bankruptcy petitions in this Court on April 25, 2016.  LaMonica serves as Trustee of their estates as well, and the cases of the Initial Debtors and the Subsequent Debtors are being jointly administered.  (Stipulation Nos. 50-51.)

## H.     Post-Petition Events

At the time of the bankruptcy filing by the Initial Debtors, TransCare owed Wells Fargo approximately $13 million, which was paid in full through the liquidation of assets.  (Tr. 7/24 159:16-24.)  With the agreement of PPAS as set forth in the *Personal Property Stipulation*, the Trustee sold all of the property, including the Subject Collateral, and realized approximately $19.2 million through the liquidation of ambulances, equipment, accounts receivable and CONs owned or formerly owned by TransCare.  (Tr. 7/24 13:10-14.)  The sum of $5.7 million represented the proceeds of the liquidation sales of the Transcendence assets.  (Tr. 7/24 27:23-25.)  As noted, the Trustee also liquidated the seven CONs for the aggregate sum of $12,250,000 but the CONs were part of the ABL Priority Collateral and were not included in the Subject Collateral.

Pursuant to the *Personal Property Stipulation*, the Trustee distributed $800,000 of the sale proceeds to PPAS as agent for the Term Loan Lenders.  (Stipulation No. 49; Tr. 8/13 A.M. 36:13-24.)  PPAS did not credit the $800,000 to the Term Loan.  (JX 110 at ECF p. 9 of 9.)[18]  Instead, PPAS turned the $800,000 over to Ark II, and Ark II applied the $800,000 to its alleged secured claim against the Estate.  (Tr. 8/13 A.M. 36:19-24; JX 109 at ECF p. 5 of 9.)

On October 9, 2017, four Patriarch entities filed proofs of claim.  PPAS, as Administrative Agent for the Term Loan Lenders, filed proofs of claim in the sum of $35,090,492.76.  (Stipulation No. 54.)  The claims reflect a $10 million credit for "Acceptance of Collateral."  (JX 110 at pg. 9 of 9.)  Ark II filed proofs of claim against TransCare asserting a secured claim in the sum of $1,077,966.97 in connection with the Ark II Credit Agreement.  (Stipulation No. 53.)  The Ark II claims reflect a credit in the sum of $789,457.00 based on the proceeds received from PPAS.  (JX 109 at ECF p. 9 of 9.)  Patriarch Partners filed a proof of claim asserting an unsecured claim in the sum of $2,587.98 for advanced expenses.  (Stipulation No. 55; JX 111.)  Finally, PPMG filed proofs of claim against TransCare asserting an unsecured claim in the sum of $2,038,515.87 in management fees.  (Stipulation No. 56; JX 112.)

---

[18]     "ECF p. _" refers to the page number imprinted on the top of the page by the Court's electronic filing system.

## I.      This Adversary Proceeding

The Trustee's many claims have been narrowed during the course of this adversary proceeding.[19]  The parties' Joint Pre-Trial Order, dated May 14, 2019 ("JPTO") (ECF Doc. # 85), superseded the prior pleadings.  (JPTO p. 15 ("The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties").)  The overriding claim involved the damages to the Debtors through the execution of what has been described above as the Tilton Plan.  (JPTO p. 47.)  The JPTO identified the claims that remained from the Amended Complaint:

| Count | JPTO Reference (pp.) | Defendants | Nature of Claim |
|---|---|---|---|
| 1 | 48, 65-66 | Tilton | Breach of fiduciary duties of loyalty and good faith under Delaware law by executing the Transcendence transaction (*i.e.,* the Tilton Plan) resulting in the loss of going concern value and the incurrence of WARN Act liability |
| 3 | 50, 66 | PPAS, Ark II, PPMG and Patriarch Partners | Equitable subordination based on participation in the Transcendence transaction and violations of the automatic stay |
| 4 | 51, 66 | Ark II | Recharacterization its claim as equity |
| 7 | 49, 66 | PPAS, Ark II and Transcendence | Actual fraudulent transfer of the Subject Collateral |

---

[19]    *See LaMonica v. Tilton* (*In re TransCare Corp.*), 602 B.R. 234 (Bankr. S.D.N.Y. 2019) (dismissing certain claims asserted in the Amended Complaint); *LaMonica v. Tilton* (*In re TransCare Corp.*), 592 B.R. 272 (Bankr. S.D.N.Y. 2018) (dismissing certain claims in the initial Complaint).

| 9 | 53, 67 | All Defendants | Violation of the automatic stay based on the Defendants' active interference with the Trustee's ability to marshal the estate's assets |
| 10 | 52, 67 | Ark II | Preferential transfer based on the grant of a lien to secure an antecedent debt |
| 11 | 51-52, 67 | Ark II | Constructive fraudulent transfer based on the grant of a lien |
| 12 | 53, 68 | PPAS | Contractual subordination of PPAS's claim under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II lien, its preservation for the estate and Ark II's payment priority |
| 13 | 53-54, 68 | PPAS and Ark II | Limitation on liens under the "equities of the case" exception, 11 U.S.C. 552(b) |
| 14 | 54, 68 | PPAS and Ark II | Avoidance, recovery and turnover of the $800,000 post-petition transfer pursuant to the *Personal Property Stipulation* |

The Court conducted a six-day bench trial between July 22, 2019 and August 14, 2019.  At the conclusion of the trial, the Court dismissed the Trustee's claims for violation of the automatic stay (Count 9), equitable subordination against PPMG and Patriarch Partners (Count 3) and the actual fraudulent transfer claim against Ark II (Count 7).  (ECF Doc. # 131.)

## DISCUSSION

### A.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

Both sides consented to this Court's authority to enter a final judgment on any core claims but the Defendants did not similarly consent with regard to any non-core claims.[20]  (JPTO at pp. 5-6.)

The breach of fiduciary duty claim is non-core; it is related to the TransCare bankruptcy case but did not arise under the Bankruptcy Code or in this case.  The claim arose immediately prior to the filing of the chapter 7 petitions, is asserted under state law and seeks money damages to augment the Estate.  *See Iannacchino v. Ruzza* (*In re Iannacchino*), 15-cv-09408 (NSR), 2018 WL 1009279, at \*3 (S.D.N.Y. Feb. 20, 2018); *Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635, 639 (S.D.N.Y. 1996); *see Pension Fin. Servs., Inc. v. O'Connell* (*In re Arbco Capital Mgmt.*)*,* 479 B.R. 254, 266 (S.D.N.Y. 2012) (concluding that claims for breach of fiduciary duty and negligence "involve non-core proceedings and are indisputably private rights").  In addition, Tilton did not file a proof of claim.  Accordingly, the Court proposes findings and conclusions and does not make findings and conclusions with respect to the breach of fiduciary duty claim against Tilton.  *See* 28 U.S.C. § 157(c)(1).  The remaining claims are core and the Court makes findings and conclusions with respect to those claims.

---

[20]     The Trustee contended in the JPTO that the Defendants waived any objections to the Court's authority to enter a final order on all claims, based apparently on their failure to comply with Federal Bankruptcy Rule 7012(b)'s requirement to state whether the answering defendant consents to the entry of final orders by the bankruptcy court.  (*See* JPTO at pp. 5-6.)  The Defendants' original answer omitted the required allegation but their Amended Answer (p. 23) stated that "[t]o the extent the Trustee's claims are non-core, Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court with respect to such non-core claim or claims."  (ECF Doc. # 84.)  The Trustee did not repeat or brief his waiver argument in his post-trial submissions, and I deem it abandoned.  In any case, the Defendants' Amended Answer preserved the Defendants' position.

**B.      Count 1:  Breach of Fiduciary Duty Against Tilton**

Count 1 alleges that Tilton breached her fiduciary duties of loyalty and good faith (but not her duty of care).  The Trustee's breach of fiduciary duty claim consists of two components:  (1) the failure to maximize the value of TransCare beginning in December 2015 when Tilton decided to sell the company and (2) the formulation and execution of the Tilton Plan that culminated in the strict foreclosure by PPAS on most of TransCare's personal property and the sale of TransCare's more profitable assets and attendant operations to Transcendence.  The Debtors were incorporated under Delaware law and claims for breach of fiduciary duty are governed by Delaware law under the internal affairs doctrine.  *Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir.), *cert. denied*, 369 U.S. 885 (1962); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010).

Tilton, as the sole director of TransCare, owed fiduciary duties of loyalty as well as the duty of care to TransCare and its shareholders.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 99 (Del. 2007); *Guth v. Loft,* 5 A.2d 503, 510 (Del. 1939).  The duty of loyalty is violated where a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."  *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006) ("*Walt Disney II*") (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)); *accord In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).  This includes circumstances where there is "a financial or other cognizable fiduciary conflict of interest," or "where the fiduciary fails to act in good faith."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  The requirement to act in good

41

faith is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Orchard Enters.*, 88 A.3d at 32–33 (quoting *Stone v. Ritter*, 911 A.2d at 370). An officer or director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Stone v. Ritter*, 911 A.2d at 370 (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003)).

Although the business judgment rule protects directors through the presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), a director who "stands on both sides of a transaction . . . has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *accord Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) ("When a controlling shareholder or other insider engages in a self-dealing transaction that is not approved by an independent board (acting in accordance with certain standards), the transaction is unlawful unless the proponent thereof carries his burden of justifying it under the Delaware 'entire fairness' doctrine."); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). Here, the parties agree that entire fairness is the proper standard of review for the strict foreclosure and sale transaction (*i.e.*, the execution of the Tilton Plan) on February 24, 2016, and Tilton bears the burden of proving entire fairness. (*Plaintiff's Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*PPFC*") at ¶¶ 274-75 (ECF Doc. # 134); *DPFC* at ¶ 358.) They disagree, however, on whether entire fairness standard applies to the claim that Tilton failed to maximize

the value of TransCare once she decided to sell the entire company and before she switched to the Tilton Plan.

I conclude that the entire fairness standard does not apply to the period before Tilton pursued the Tilton Plan. As a result, the Trustee failed to overcome the business judgment rule and carry his burden of proving that Tilton failed to maximize the value of the entire TransCare. In mid-December 2015, Tilton determined that TransCare should be sold but also determined that it was not primed for a sale given its financial condition. She retained Carl Marks as TransCare's financial advisor and CFO and considered Carl Marks's conclusions and recommendations. By February 5, after having explored and evaluated a potential sale process, Tilton determined based on Carl Marks's work that a sale of the entire TransCare was not feasible, due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available. Although Wells Fargo had indicated a willingness to fund a wind down of the entire company, it conditioned its willingness on Tilton's partial funding on a subordinated basis. She was under no obligation to fund TransCare personally. The Trustee offered no evidence that her decision was tainted by any conflict or self-interest or that her actions or decisions were dictated by the goal to acquire the entire company or any part of it for her own benefit. Rather, she made a good faith determination that the company as a whole was not saleable.

The Trustee argues, quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), that once Tilton decided no later than December 15, 2015, that TransCare would have to be put up for sale, "[t]he duty of the board had thus

changed from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. . . . The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.* at 182. In *Revlon*, a complex case involving a hostile takeover, the Revlon board had adopted anti-takeover measures that benefitted noteholders at the expense of the company's shareholders. The Delaware Supreme Court noted, at one point in the decision, that the directors had breached their duty of loyalty because the benefit of the anti-takeover measures inured principally to the directors by avoiding their personal liability to a group of noteholders. "[W]hen a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors against a perceived threat of personal liability for consequences stemming from the adoption of previous defensive measures, the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct." *Id.* at 184 (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954-55 (Del. 1985)). In the end, however, the Supreme Court concluded that the Board's actions violated the duty of *care*:

> [I]n granting an asset option lock-up to Forstmann, we must conclude that under all the circumstances the directors allowed considerations other than the maximization of shareholder profit to affect their judgment, and followed a course that ended the auction for Revlon, absent court intervention, to the ultimate detriment of its shareholders. No such defensive measure can be sustained when it represents a breach of the directors' fundamental duty of care.

*Id.* at 185.

    *Revlon* is distinguishable. At most, Tilton arguably mismanaged the initial process of maximizing TransCare's assets by failing to retain a financial advisor in

December and instead, concluding that it was premature to do so or engage in any sale efforts until TransCare was stabilized.  But this was, at worst, a violation of her duty of care, a claim that the Trustee has not asserted.  As noted, the Trustee offered no proof that her efforts to maximize the value of the entire company were tainted by conflict or self-interest.

Accordingly, I turn to consideration of the Tilton Plan and whether Tilton has demonstrated its entire fairness.  The Tilton Plan involved splitting TransCare into OldCo and NewCo.  First, OldCo would be wound down in one of two ways: (i) outside of bankruptcy over ninety days followed by chapter 7 or (ii) through a chapter 11.  Second, PPAS would foreclose on the Subject Collateral and sell it to NewCo which would continue to operate as a going concern.  The foreclosure and sale to NewCo was the problem.

### 1.  Entire Fairness Review

"The 'entire fairness' standard is Delaware's most onerous standard and requires that the defendant prove that the transaction was the product of both fair dealing and fair price."  *Burtch v. Opus, LLC* (*In re Opus E., LLC*), 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, No. 15-346-RGA, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).  "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness.  Rather, the transaction itself must be objectively fair, independent of the board's beliefs."  *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del. Ch. 2006)).  While fair dealing and fair price are both elements of entire fairness, courts look at the entirety of the transaction in determining fairness.  *See*

*Weinberger*, 457 A.2d at 711; *William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011) ("While fair dealing and fair price are distinct concepts, the burden to establish them is not bifurcated.  Rather, this Court must evaluate a transaction as a whole to determine if the interested party has met his burden of establishing entire fairness.").

### a.    Fair Dealing

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."  *Weinberger*, 457 A.2d at 711.  Courts routinely analyze the relevant factors enumerated in *Weinberger* in assessing whether a majority shareholder or other insider met her burden of proving that a transaction was the product of fair dealing.  *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172-77 (Del. 1995) (applying the *Weinberger* factors in assessing the fair dealing element of entire fairness); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) ("*Bomarko I*") ("My analysis of the factors articulated in *Weinberger* also supports a finding of unfair dealing."), *aff'd*, 766 A.2d 437 (Del. 2000).

The cornerstone of fair dealing is a process implemented by the board that reflects arm's length bargaining and provides protections for the interests of all shareholders.  *See FrontFour Capital Grp. LLC v. Taube*, C.A. No. 2019-0100-KSJM, 2019 WL 1313408, at *26 (Del Ch. Mar. 11, 2019), as revised (Mar. 22, 2019) (holding that the defendants failed to prove fair dealing where "the timing, structure, initiation, and negotiation of the Proposed Transactions were conceived for the purpose of—and did—advance the [defendants'] interest at the expense of Medley Capital's other

stockholders."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 464 ("There was no dealing in this case that could be called 'fair.'  Procedural protections were not implemented, and no one bargained for the minority."); *Strassburger v. Earley*, 752 A.2d 557, 576–77 (Del. Ch. 2000), as revised (Jan. 27, 2000) ("[T]here was no fair dealing, because there was no advocate committed to protect the minority's interests, and because the players were either indifferent, or had objectives adverse, to those interests.").  Such procedures generally include an independent special committee formed to assess and negotiate the transaction; however, where there is no independent committee, fairness "'can be equated to conduct by a theoretical, wholly independent, board of directors.'"  *Pereira v. Cogan*, 267 B.R. at 509 (*quoting Weinberger*, 457 A.2d at 709-10 n. 7).  However, "'such frail support as the defendants' own evaluation of their innocence of wrongdoing and on the fairness of [the transaction]'" is insufficient to prove fair dealing.  *Id.* (*quoting Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986)).

Admittedly, TransCare was rapidly declining and time was running out.  Nevertheless, while the viability of the corporation may properly factor into a board's decision to sell substantially all of a corporation's assets, the directors must still follow a fair process in doing so.  *See Pereira v. Cogan*, 267 B.R. at 511 ("Self-dealing transactions are improper regardless of whether or not the corporation is solvent.").[21]  Whether a board explored alternatives to the challenged transaction, such as reaching

---

[21] The Defendants rely on *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) for the proposition that the Court should look beyond the procedural deficiencies in the process here because TransCare faced liquidation; however, the court in that case found that the defendants had failed to establish fair dealing where "there was no contemporaneous evidence suggesting that the directors set out to deal with the common stockholders in a procedurally fair manner." *Id.* at 56.

out to potential buyers, is relevant evidence of fair dealing.  *See Gesoff v. IIC Indus.*, 902 A.2d at 1148–49 (noting the defendants may have been able to prove fair dealing if they had sought "alternative, third-party buyers for the company, for example . . . ."); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (holding that the defendants met their burden of proving fair dealing where, among other things, "the decision to enter into the Snowbird Agreement was preceded by an active and aggressive search for a third-party buyer.").  Fiduciaries are liable when they tilt the playing field such that the only possible solution is a self-dealing transaction.  *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. CV 11802-VCL, 2018 WL 3326693, at *29 (Del. Ch. July 6, 2018) (fiduciary maneuvered the company into "the position of being the sole life line of the Company for money" by blocking alternative transactions), *aff'd sub nom.*, *Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 101 (Del. Ch.) ("RBC's self-interested manipulations caused the [sale] process to unfold differently than it otherwise would have."), *appeal dismissed*, 105 A.3d 990 (Del. 2014); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011) ("But for Barclays' manipulations, the [sale] process would have played out differently."); *Bomarko I*, 794 A.2d at 1184-85 (director's interference with company's attempts to obtain outside funding was not fair dealing).

There was nothing fair about the process through which Tilton effectuated the part of the Tilton Plan that involved the strict foreclosure and the sale to Transcendence. Acting through her affiliates, she foreclosed on the Subject Collateral, consented to the strict foreclosure, sold the foreclosed assets to herself and fixed the sale price.  Tilton

48

stood on every side of the transaction and controlled every aspect of the transaction with neither negotiation nor oversight nor approval by an unconflicted person.  Tilton did not retain a financial advisor to seek out possible third-party interest in purchasing the assets or investing in TransCare.  She did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice.  Moreover, she did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July.

Instead, she made the determination that no one other than herself would lend to NewCo or buy its assets even though she viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money.  (JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13, 44:5-10.)  Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value.  *Gentile v. Rossette,* C.A. No. 20213–VCN, 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion."); *see also In re Appraisal of Dole Food Co., Inc.,* 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their

49

beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument.") (quoting *In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n. 3 (7th Cir. 1987)).  In the end, she owned the same approximate amount of equity in Transcendence that she did in TransCare[22] unencumbered, however, by PPAS's foreclosed lien and TransCare's unsecured debt.[23]

### b.    Fair Price

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711.  The fair price analysis "is not itself a remedial calculation" but a determination of whether the price "fell within a range of fairness."  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 465; *see also Basho*, 2018 WL 3326693 at *36 ("For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness.") (internal citation and quotation marks omitted).  In determining whether a price was fair, courts consider "whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'"  *In re Dole Food Co., Inc. Stockholder Litig.*, No. CV 8703-VCL, 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015)

---

[22]    Ark II was to own 54.7% of Transcendence Transit with the balance of the equity allocated to the Term Loan Lenders.  In fact, no shares were ever issued to anyone. (Tr. 7/23 P.M. 23:17–24:16.)  Nor is there any evidence that Transcendence paid $10 million for the Subject Collateral or that the supposed proceeds of the sale to Transcendence were distributed to the Term Loan Lenders.

[23]    It is far from clear whether the foreclosure cut off Wells Fargo's subordinate lien in the personalty.  However, Wells Fargo satisfied its claim through a combination of the post-petition collection of the accounts receivable and the proceeds of the sale of the CONs by the Trustee.  (*See* Tr. 7/24 159:11-24.)

(*quoting Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

"Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process." *William Penn*, 13 A.3d at 758 (internal citation omitted). Where the fair dealing element of entire fairness reveals a process infected by the actions of directors, the defendant may be unable to show that any price was entirely fair. *See id.* ("The [defendants'] self interest in the transaction and their domination of the sales process tainted the entire transaction."); *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("But here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 467 ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."). In such a situation, the defendant fails to meet its burden of proving a price was fair without the need for assessing whether that price fell within a hypothetical range of fairness. *See Gesoff v. IIC Indus.*, 902 A.2d at 1154 (defendants failed to show that the tender offer price of $10.50 per share was fair in light of the dishonest process); *Bomarko I*, 794 A.2d at 1183 (defendants failed to carry their burden of proving $0.30 per share was a fair price where "the unfairness of the process also infects the fairness of the price.").

Given the tainted process and the complete absence of an independent analysis, review or approval, Tilton did not carry her burden of showing that the price was fair.

In addition, her attempts to justify the $10 million foreclosure credit showed that it was not.  At trial, she testified that in deriving the $10 million credit she began with TransCare's "December ['15] closing balance sheet."  (Tr. 8/13 P.M. 104:23–105:12; *see* PX 286 at 105523.)  She had originally contemplated that NewCo would operate five divisions in addition to the MTA Contract: (Hudson Valley, Westchester, Pennsylvania, Maryland, and Bronx 911/Montefiore 911), and the combined balance sheet consisted of a December 2015 closing balance sheet and going-forward projections for these five divisions.  (PX 286 at 105524; Tr. 8/13 P.M. 104:23–105:5.)  Tilton's calculation of book value of the assets of these five divisions included the accounts receivable which, at the time, she assumed she would purchase from Wells Fargo and contribute to Transcendence.  (PX 286 at 105524; Tr. 8/13 P.M. 107:19–108:3.)  The sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million.  (PX 286 at 105524; Tr. 8/13 P.M. 106:3–7.)  Tilton did not ultimately purchase the receivables from Wells Fargo.  (Tr. 8/13 P.M. 108:4–9.)  By removing the receivables from the equation, her calculation would have been reduced from $10 million to approximately $1.7 million.  (Tr. 8/13 P.M. 108:11–16.)

On February 22, 2016, Vikram Agrawal, a credit officer with Patriarch Partners (Tr. 8/13 P.M. 121:8–10), emailed Tilton an updated version of the NewCo model (the "February 22 NewCo Model").  (DX 166.)  The February 22 NewCo Model consisted of the paratransit business and three divisions (Hudson Valley, Paratransit and Pennsylvania) rather than the five in the earlier model.  (Tr. 8/13 P.M. 122:19–21.)  The combined balance sheet for the three divisions, (DX 166 at 110489), using the same assets as the previous model, totaled  $6.244 million and included $5.2 million in

receivables that were never transferred to NewCo.  If the receivables were excluded, the book value of the Subject Collateral, at least according to Tilton, would have been less than $1 million.  (Tr. 8/13 P.M. at 124:12–15.)

There were patent errors in the calculation of the $10 million credit.  First, the Subject Collateral on which PPAS foreclosed and sold to Transcendence was not limited to the three TransCare divisions that Transcendence would operate.  With some exceptions, notably the Accounts and the CONS, the Subject Collateral included all of the personal property owned by all fourteen Debtors.  (*See* JX 96.)  Using the book value for just the three Debtors destined for Transcendence undervalued the Subject Collateral.  The 13-week wind down plan valued OldCo's plant, property and equipment ("PPE") at approximately $3.6 million, and this did not account for the wind down value of the PPE owned by Maryland, Westchester and Bronx 911/Montefiore 911.  At the time of the wind down projections, these operations were slated for assumption by NewCo, not OldCo.  In addition, Tilton did not ascribe any value to the CONs owned by TC Hudson Valley or TC Ambulance Corp.  Although PPAS did not foreclose on the CONs, it foreclosed on the stock of these two entities and transferred the stock to Transcendence.  The CONs they owned allowed them to operate their ambulances and increased the value of their stock.  The Trustee sold the two CONs for the aggregate sum of $3.2 million at a *liquidation* sale after they filed for bankruptcy.  Thus, Tilton's valuation of the Subject Collateral ignored almost $7 million of book value.

Second, the use of book value to value the assets of the three divisions that Transcendence planned to operate undervalued those assets.  "[B]ook values are not ordinarily an accurate reflection of the market value of an asset."  *Lawson v. Ford*

*Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 36 (2d Cir. 1996); *accord In re Breitburn Energy Partners LP*, 582 B.R. 321, 344 (Bankr. S.D.N.Y. 2018).  "Book value can be an appropriate valuation method for a business that derives significant value from its physical assets," but "tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations."  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 476.  Book value may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors that were liquidating, but the strict foreclosure contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence.

Third, Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence.  Greenberg had attributed $25 million in annual revenues to the MTA Contract.  Tilton contends that the $22 million she attributed to the value of Transcendence reflected the value of the MTA Contract, (*DPFC* at ¶ 393 n. 22), but this explanation does not withstand scrutiny.  The $22 million figure was an arbitrary amount based on (1) the $10 million of value attributed to the Subject Collateral, (2) the loan up to $10 million Tilton was willing make through Ark Angels III and (3) the approximate $2 million representing prepaid insurance and the cost of two ambulances funded by PPAS and/or Ark II.  (*DPFC* at ¶¶ 209-12; PX 209.)

Accordingly, the Court finds that Tilton failed to sustain her burden of proving the entire fairness in connection with the formulation and execution of the part of the Tilton Plan involving the strict foreclosure and sale to Transcendence and breached her fiduciary duties of loyalty and good faith owed to TransCare.

### 2.  Damages

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly . . . .  The strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).  In the appraisal context, the damages remedy would equal the fair value as determined by the Court; however, "[u]nder the entire fairness test, the fair price measure would operate as an aspect of the standard review; it would not inherently require a damages award in that amount." *In re Orchard Enters.*, 88 A.3d at 43; *see Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 468 (noting that courts collapse the fair price and damages calculation in the context of an appraisal action but not in an entire fairness review); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993), as revised (Nov. 1, 1993) ("[W]e emphasize that the measure of any recoverable loss by [the plaintiff] under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings."), *modified in part on other grounds*, 636 A.2d 956 (Del. 1994).

Instead, the Court has broad power to fashion "equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("*Bomarko II*") (affirming a grant of rescissory damages based on the estimated value of the plaintiffs' shares at the time of the challenged merger if the defendant had not breached his fiduciary duties).  A court "has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when

assessing fair value in an appraisal action." *Bomarko II*, 766 A.2d at 441.  That is so
because "[t]he strict imposition of penalties under Delaware law are designed to
discourage disloyalty," *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 906 (Del.
Ch. 1999), and the award of damages is not merely compensatory but "should eliminate
the possibility of profit flowing to defendants from the breach of the fiduciary
relationship." *Bomarko II*, 766 A.2d at 441.  "An action for breach of fiduciary duty is a
prophylactic rule intended to remove all incentive to breach—not simply to compensate
for damages in the event of a breach." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173
F.3d 454, 465 (2d Cir. 1999) (quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
722 F.2d 988, 955-96 (2d Cir. 1983)).

Where fiduciaries acquire property through self-dealing, and "through a
combination of the taking and their subsequent use of the property, destroy[] its value
entirely[,]" they are liable for the value the property would have had absent the breach
of loyalty, not just its value immediately before the breach:

> The award differs from the usual concept of rescissory damages.
> Traditionally in Delaware, rescissory damages could come into play when
> a defendant fiduciary wrongfully took control of property, and the value of
> the property went up during the period of the fiduciary's control.  In that
> setting, the law does not limit the plaintiff beneficiary to the value of the
> property at the time of the taking, plus an award of interest.  The plaintiff
> beneficiary is entitled to recover the property itself or a measure of its full
> value.  In this case, the plaintiffs have invoked the reciprocal of these
> principles.  The defendant fiduciaries wrongfully took control of the
> property and, through a combination of the taking and their subsequent
> use of the property, destroyed its value entirely.  In both settings, the same
> overarching principle governs: The disloyal fiduciary who wrongfully takes
> property from the beneficiary is liable for changes in value while the
> wrongfully taken property is under the disloyal fiduciary's control.

*Basho*, 2018 WL 3326693, at *50.

The plaintiff alleging a breach of fiduciary duty bears the burden of proving its damages by a preponderance of the evidence.  *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC* (*In re HH Liquidation, LLC*), 590 B.R. 211, 273 (Bankr. D. Del. 2018) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010)).  In determining the amount of damages for a breach of fiduciary duty, "responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages" and any "uncertainties in awarding damages are generally resolved against the wrongdoer."  *Basho*, 2018 WL 3326693, at *50 (internal citation and quotation marks omitted); *Beard Research*, 8 A.3d at 613.  However, proof of such damages must be based on more than "mere speculation or conjecture."  *In re HH Liquidation, LLC*, 590 B.R. at 273.  Within these boundaries, the Court may take "a more liberal approach . . . [that includes] proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court."  *Weinberger*, 457 A.2d at 713.  Delaware law affords great weight to contemporaneous management projections in determining value, when available.  *See, e.g.*, *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n. 108 (Del. Ch. 2006) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.") (quoting *Doft & Co. v. Travelocity.com Inc.*, No. Civ. A. 19734, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004)); *Cede & Co. v. JRC Acquisition Corp.*, No. CIV. A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("Expert

valuations that disregard contemporaneous management projections are sometimes completely discounted.").[24]

### a.    NewCo/Transcendence

Greenberg's projections provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo.  At the time he issued them, he, along with Pelissier, were essentially functioning as TransCare's senior management reporting directly to Tilton.  On February 10, 2016, at inception of the Tilton Plan, Greenberg sent the insurance brokers financial information seeking coverage for Transcendence.  (PX 196.)  At that time, the plan provided for Transcendence to operate five TransCare divisions.  Greenberg projected operating revenue in 2016 of $48,404,000 and EBITDA in the amount of $3,761,000.  (PX 196 at 27760.)  Tilton was

---

[24]     The Defendants cited *In re PetSmart, Inc.*, C.A. No. 10782–VCS, 2017 WL 2303599 (Del. Ch. May 26, 2017) for the contrary proposition that the Court should not credit management projections prepared outside of the ordinary course of business.  (*DPFC* ¶ 411.)  *PetSmart*, an appraisal case, concerned the application of a discounted cash flow analysis.  The Court rejected five-year cash flow projections for four independent reasons: "(1) PetSmart management did not have a history of creating and, therefore, had virtually no experience with, long-term projections; (2) even management's short term projections frequently missed the mark; (3) the Management Projections were not created in the ordinary course of business but rather for use in the auction process; and (4) management engaged in the process of creating all of the auction-related projections in the midst of intense pressure from the Board to be aggressive, with the expectation that the projections would be discounted by potential bidders."  *Id.* at *33.  Three witnesses testified that the auction-projections "were designed to be aggressive because the Board [] [was] convinced that potential bidders would discount whatever projections were put in front of them."  *Id.* at *34.

     Here, the evidence showed that Greenberg, an experienced financial analyst, prepared numerous projections as did Carl Marks, a financial consulting firm.  Moreover, PPAS was involved with TransCare since 2003, and there was no evidence that any prior TransCare projections "frequently missed the mark." Next, the most relevant projections on or about February 24 were sent to an insurance broker to obtain coverage for Transcendence and the procurement of insurance was part of any ambulance company's ordinary course of business.  Unlike *PetSmart*, the projections were not part of an auction process; Tilton had foreclosed the possibility of an auction.  Finally, this is not an appraisal case; it is a breach of fiduciary duty case and the absence of any "better" financial information is ultimately attributable to Tilton, who exercised absolute control over TransCare.

even more optimistic.  Two days later, she wrote to Bobby Siegel, an insurance broker

from whom she was seeking assistance to procure insurance for Transcendence:

> The models show that this business in 2016 would be approximately
> $67mm with $4mm of EBITDA and would grow with the additional transit
> business under the contract to $79mm and $7mm of EBITDA in 2017.  It
> is because this new business makes sense that I would be providing all the
> new working capital for this business myself, personally.

(JX 80.)

On February 24, 2016, Greenberg sent another set of financial projections to

Todd Trent, an insurance broker.  (PX 228.)  By then, Transcendence was down to three

TransCare operating divisions.  Greenberg projected operating revenue for

approximately ten months in 2016 (late February-December) in the amount of

$37,188,400 and EBITDA of $3,204,500 but Tilton testified that a full year projection

would result in $4 million of EBITDA.

The Trustee's damages expert, Jonathan Arnold, developed an appropriate

multiple of EBITDA to apply to Transcendence's projections to determine the projected

value of the Transcendence business, and hence, TransCare's damages resulting from

the stripping of that business through an unfair, tainted process.  In December, Tilton

had asked Greenberg to identify comparable companies or transactions that could be

used to determine TransCare's sale value.  As discussed earlier, he identified six

comparable transactions that occurred within the same sector as TransCare or related

sectors but only two had sufficient public information to calculate EBITDA multiples.

AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple and KKR purchased

Air Medical at a 10.0x multiple.  (JX 55.)

Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5.) Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI at a 3.5x multiple, but Greenberg reported to Tilton that PHI was an outlier because it was engaged in other business lines that were only tangentially related to TransCare's business. (JX 55 at 41414; Tr. 7/22 A.M. 51:11-22.) In his cover email to Tilton, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x. (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.)

Armed with Greenberg's analysis, Dr. Arnold utilized the Comparable Company and Precedent Transaction methods, two standard valuation methods, to determine the value of the entire TransCare company ("WholeCo") and NewCo. (PX 282 at ¶ 66.) He did not use a discounted cash flow approach because the data was unavailable. (Tr. 7/24 14:5–15:20.) TransCare had no audited financials for 2014 and was not current in its monthly unaudited financials. (Tr. 8/13 A.M. 52:3–53:1.) Thus, the only reliable data from which to determine the value of TransCare or its separate business lines were the models that Greenberg prepared. (Tr. 7/24 106:14–107:4.) *See, e.g.*, *Bomarko I*, 794 A.2d at 1185 (finding the discounted cash flow methodology "too unreliable" when the expert had to extrapolate from management's one-year forecast).

The Comparable Company method determines the implied value of a company based on the trading prices of similar public companies. (PX 282 at ¶ 67.) Greenberg identified two reliable comparables that traded at multiples of between 8.2x and 11.3x LTM EBITDA. Dr. Arnold recalculated this range at between 7.1x and 12.2x EBITDA

apparently by adding the debt to the value of the common stock and subtracting cash. (Tr. 7/24 20:15-23.)  Applying this range of multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $22.7 million and $39.1 million for NewCo.  (PX 282 at ¶¶ 7, 80., Ex. 12a.)

The Precedent Transaction method implies a company's value based on the multiples paid in prior transactions.  (PX 282 at ¶ 68.)  Greenberg identified two reliable precedent transactions that sold at multiples of 10.0x and 10.7x EBITDA.  Applying multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $32.0 million and $34.3 million for NewCo.  (PX 282 at ¶¶ 7, 80, Ex. 12b.)  The combination of these valuation methods yielded an average mean multiple of 10.1x EBITDA and an implied value of $32.3 million for NewCo as of February 24, 2016.[25]

The Defendants criticized Dr. Arnold's approach on several grounds relying on their own expert, Jeffrey Dunn.  According to the Defendants, Dr. Arnold did not do any independent work and instead, relied exclusively on Greenberg's (and Carl Marks's) projections which were not appropriate for use in deciding value, (*DPFC* ¶¶ 287-302), he did not make his own assessment of risk which is required in determining value from projections of future performance or consider TransCare's historically declining performance, (*DPFC* ¶¶ 303-15), his (and Greenberg's) comparables were not

---

[25]     Dr. Arnold also performed a separate analysis based on expressions of interest that TransCare had received from third parties prior to the strict foreclosure.  (*See* PX 282, Ex. 12c.)  As they were too indefinite and never reached the stage of an actual offer (primarily because Tilton never followed them up), I do not credit them.

comparable, (*DPFC* ¶¶ 316-28), and he failed to account for the capital needs of NewCo. (*DPFC* ¶¶ 329-31.)

During rebuttal testimony, Dr. Arnold explained that he had investigated certain of the criticisms involving his use of Envision and Air Methods as comparable companies.  He looked for new guideline companies and created a larger database of a group of sixty-nine companies that he filtered down to a group of thirty-four, (Tr. 8/14 A.M. 48:4–24, 60:9–15, 64:21–65:1), which met his definition of being either smaller, distressed, low operating, or undercapitalized.  (Tr. 8/14 A.M. 52:19–53:25.)  He concluded that they confirmed Greenberg's analysis.  (Tr. 8/14 A.M. 54:19–55:1.)  The Defendants criticized the expanded set of comparables on the bases they were still not comparable and TransCare's financial condition was generally worse that the companies in any given subset.  (*DPFC* ¶¶ 338-42.)

Despite their many criticisms, the Defendants did not offer their own analysis or suggest an alternative damage assessment.  They did not identify companies that were more comparable; their expert did not identify a more appropriate EBITDA multiple; and Mr. Dunn did not make an adjustment based on his own, independent risk assessment.  Indeed, there was little need for any risk adjustment.  In Tilton's own words, she was funding Transcendence personally because it was smaller and less risky with good growth prospects.  (JX 80.)  Furthermore, if better financial information was unavailable, it is only because TransCare did not generate better financial information under Tilton's watch.  Dr. Arnold was making his best estimate of TransCare's damages in light of the best available financial information — financial information that Tilton thought sufficiently credible to send to insurance brokers to procure insurance for

Transcendence and commit to invest up to $10 million of her own funds through Ark

Angels III.  Facing similar criticisms of the plaintiff's damage evidence in a case under

the Fair Labor Standards Act, District Judge Engelmayer observed:

> [S]trikingly, defendants, for their part, have not come forward with any
> alternative method for calculating damages.  Defendants' expert, Dr. Paul
> White, instead devotes his expert report to criticizing Dr. Crawford's
> methodology and his client's own Clubtrax data.  However, he
> makes no effort to make his own calculation for class-wide damages.  The
> fact that defendants have failed to offer an alternative, let alone a superior,
> methodology is a relevant consideration under *Mt. Clemens. . . .*  Here,
> defendants have failed to provide any good reason to discredit Dr.
> Crawford's estimate of damages as other than "just and reasonable."  On
> the contrary, the absence of any alternative methodology is a telling
> indication that defendants, in attacking Dr. Crawford's report, can do no
> more than spot imperfections that would exist in any damages
> methodology given the imperfect Clubtrax data.

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).

I accept Dr. Arnold's higher intermediate figure of 11x EBITDA in determining an

amount of damages that will compensate the Estate for the lost opportunity caused by

Tilton's breach of fiduciary duty.  The unfair process prevented the possibility of selling

NewCo to a strategic buyer.  A strategic buyer would not incur some of the projected

operating expenses or would incur them in a lower amount and would recalculate its

projected operating expenses and EBITDA accordingly.  *See, e.g.*, *Merrill Lynch Bus.

Fin. Servs., Inc. v. Am. Reprographics Co., LLC* (*In re Louis Frey Co., Inc.*), Adv. No.

03–91486 (SMB), 2006 WL 2090083, at *18-19 (Bankr. S.D.N.Y. July 28, 2006)

(backing out expenses that a strategic buyer would not incur when computing what it

would have paid for the debtor's business).  For example, the February 24 financial

information projected management and administrative staffing expenses in the sum of

$3,074,600 and professional fees of $145,000.  (PX 228 at 86223.)  A strategic buyer

already running an ambulance or similar business with an existing infrastructure would have its own management, administrative and legal staff in place and might not have to pay additional staff inherent in Greenberg's projections.  In addition, Greenberg projected facility costs in the sum of $1,352,600, (PX 228 at 86223), but a strategic buyer would already have its own headquarters and garages, and while it might need additional garage space, it might not incur the incremental costs in the sum projected for Transcendence.  Finally, Greenberg projected payments to OldCo under the proposed Transition Services Agreement in the approximate sum of $250,000.  (PX 228 at 86223.)  It is unlikely that a strategic buyer would ever pay OldCo anything.  While Tilton would undoubtedly discount these savings as mere speculation, they are speculative only because Tilton never engaged in a fair process that might elicit interest from such buyers, particularly those who had reached out to TransCare during the preceding year.  Using the higher multiple (11x EBITDA) for purposes of computing damages captures the lost opportunity that Tilton usurped.

In addition, the use of an EBITDA of $4 million to calculate damages is also supported by the evidence.  On February 23 or 24, Greenberg computed a 2016 EBITDA of $3.2 million based on ten months and Tilton testified that it would increase to $4 million on an annualized basis.  Moreover, her earlier email to Bobby Siegel, (JX 80), predicted that NewCo, as then conceived, would grow to $7 million the following calendar year.  While Tilton contends that TransCare could not have sold the Subject Collateral without the secured parties' consent, at least outside of a bankruptcy sale under Bankruptcy Code § 363(f), she accomplished precisely that result by authorizing PPAS to foreclose and sell the assets to Transcendence without Credit Suisse's, and

apparently Wells Fargo's, consent.  Accordingly, the damages that the Debtors suffered

Tilton's breach of fiduciary duty totaled $44 million subject to certain adjustments.

The first adjustment relates to the working capital investment that a buyer might

have to make in NewCo.  The Executive Summary prepared by Carl Marks stated that

TransCare needed $7.2 million during the next three months, (PX 175 at 02115 (13 Week

Cash Forecast), 02116), and on February 13, 2016, Pelissier predicted that NewCo would

need an $8 million initial investment in working capital.  (PX 286 at 105517.)  At the

time, the Tilton Plan called for a Transcendence consisting of six TransCare divisions

rather than the three that Transcendence ultimately assumed.  A smaller NewCo would

presumably need less working capital but neither Greenberg nor Pelissier nor Carl

Marks computed that amount.

In addition, much of the funding was needed to pay TransCare's debts which a

third-party buyer would not pay.  For example, the thirteen-week forecast in the

Executive Summary budgeted $700,000 for past due payroll and $1.395 million for past

due payroll taxes.  (PX 175 at 02115-16.)  Carl Marks received a monthly fee of $135,000,

(DX 106 at 43440), and the thirteen-week cash flow forecast budgeted $405,000 to pay

Carl Marks.  Another large portion was attributable either to amounts past due to

vendors and landlords or ongoing payments on leases that a third-party buyer might not

need.

Finally, Greenberg's projections, (PX 228), showed positive net income without

any capital investment.  The cover email, (PX 228 at 86219), estimated that an

approximate $10 million revolver would ultimately be added to the *pro forma* financial

information, but some of it would be an unfunded revolver.  In fact, Jonathan Killion of

Carl Marks recalculated the necessary funding on February 10, 2016 at the inception of

the Tilton Plan and estimated that Transcendence would need about $3.2 million in

capital investment at a time when the plan involved five or six TransCare entities.  (DX

132.)

   At trial, the Court questioned Dr. Arnold as to whether it was appropriate to

deduct required funding from the purchase price a third party would be willing to pay.  I

assumed that a third party would have to provide the same funding and would

essentially treat it as part of the purchase price.  (Tr. 8/14 A.M. 78:9-21.)  Dr. Arnold

responded that the situation posited would be the "worst case" scenario that did not

apply for at least two reasons.  First, every company has a recurring program for making

capital expenditures and "I think its overstating it to subtract off the initial investment

dollar for dollar.  I think it's going to be some fraction of it."  (Tr. 8/14 A.M. 79:5-10.)

Second, Tilton was proposing to provide a revolving line of credit rather than invest

capital.  Under the circumstances, only a portion of the proposed revolver should be

deducted from the purchase price:

> THE WITNESS: . . . . If it goes in as permanent capital then I would be
> much more open to just subtracting it off dollar for dollar.  But if the idea
> that we're going to put it in, but in ten months the company is going to be
> generating four or five hundred thousand of EBITDA a month, in eleven
> months and that money can be returned its more in the form of a short to
> medium term loan which costs the shareholders some amount of money,
> but it's not a dollar for dollar dilution.

(Tr. 8/14 A.M. 79:15-22.)

   Greenberg's February 24 financial *pro forma* projected an average monthly

EBITDA of $400,000 during 2016, sufficient to fund operations and repay any advances

that Tilton might have made.  Given Dr. Arnold's unrefuted testimony and the fact that a substantial portion of TransCare's financing needs according to the Executive Summary would be used to pay TransCare debts that a buyer would not pay or would pay in a lesser amount, the Court concludes that it is appropriate to deduct $1 million from the value of the NewCo assets foreclosed upon and sold to Transcendence.

### b.    Post-Petition Liquidation

The next adjustment relates to the Trustee's liquidation of certain assets.  The Trustee liquidated all of the assets pursuant to the *Personal Property Stipulation* for $19.2 million net of sale expenses.  (PX 282, Ex. 13.)  Of the $19.2 million, $11.7 million (net) was attributable to the CONs and another $5.6 million was attributable to the collection of accounts receivable.  (PX 282, Ex. 13.)  Neither the CONs nor the accounts receivable were included in the Subject Collateral and were not part of the Term Loan Priority Collateral.  Only $2 million (net) was attributable to the sale of the physical assets, (*see* PX 282, Ex. 13), and the Trustee paid $800,000 of those proceeds to PPAS.[26]  Accordingly, the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million.  This sum represents a reduction in the amount of damages that TransCare suffered as a result of the strict foreclosure.[27]

### c.    $10 Million Credit

---

[26]    PPAS transferred the $800,000 to Ark II presumably under the 2016 Intercreditor Agreement and Ark II credited that transfer on its proof of claim.  As discussed in the succeeding text, PPAS was not entitled to receive any portion of its claim because its claim is disallowed.  However, the Trustee abandoned the separate claim against PPAS to recover the $800,000.

[27]    The Trustee would give Tilton credit for the full $5.7 million in proceeds derived from the liquidation of the NewCo assets.  However, the collection of the accounts receivable and the sale of the CONs accounted for $5 million of that sum and the accounts receivable and CONs were not included in the strict foreclosure or sale to Transcendence.

PPAS gave TransCare a $10 million credit against the Term Loan as compensation for the foreclosure and reduced its proof of claim by $10 million. The question is whether the credit should also reduce the damage award against Tilton. I conclude that it should not. Instead, the effect of the Tilton Plan should be reversed and PPAS's claim should be increased by $10 million. The foreclosure and sale should not have unfolded as it did. By reversing the transaction and returning the parties to the *status quo*, the effect of Tilton's breach of fiduciary duty will be undone leaving the Debtors with a damage claim based on their ownership of a substantial asset that could have been sold to a third party. In addition, as discussed below, the PPAS claim will be disallowed and PPAS is not entitled to the $10 million distribution through an offset in connection with its disallowed claim.

### d.    WARN Act Liability

The final element of damages claimed by the Trustee relates to the Debtors' potential WARN Act liability for failing to give adequate notice of mass layoffs to TransCare's employees.[28] The Trustee seeks a declaratory judgment that Tilton is responsible for indemnifying the Estate for the WARN Act liability because (i) TransCare had no such liability prior to Tilton's breach of loyalty and she must bear that liability in order to put TransCare back to where it was prior to the breach; (ii) the WARN Act liability was a natural and foreseeable consequence of Tilton's actions; and (iii) under Delaware law, a corporate officer or director who knowingly causes the

---

[28]    The WARN Act claims are proceeding separately as a class action *See Ien v. TransCare Corp.* (*In re TransCare Corp.*), 611 B.R. 160 (Bankr. S.D.N.Y. 2020) ("*Ien I*") and *Ien v. TransCare Corp.* (*In re TransCare Corp.*), 614 B.R. 187 (Bankr. S.D.N.Y. 2020) ("*Ien II*"). Tilton is named as a defendant in that adversary proceeding on state wage law claims but not on the WARN Act claims.

corporation to violate the law necessarily fails to act in good faith and thereby breaches her fiduciary duty of loyalty. *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 283 n. 20 (Del. 2016); *Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007).

The requirements of the federal and New York State WARN Acts are discussed at length in *Ien I*. Basically, and with certain exceptions, an employer must give 60-days advance written notice under the federal WARN Act and 90-days advance written notice under the New York WARN Act prior to effecting a mass layoff. *Ien I*, 611 B.R. at 165-67. The plaintiff in *Ien I* moved for partial summary judgment contending that the WARN Act notices were deficient and, essentially, of no force or effect. The Trustee conceded the point and the Court struck the Trustee's WARN Act defenses that depended on the giving of sufficient notice. *Id.* at 168. The Tilton-affiliates that were defendants on the WARN Act claims contested the plaintiff's claim of insufficiency. The Court concluded as to those defendants that the February 24 Notice was insufficient under the WARN Acts and struck certain defenses. In contrast, the February 26 Notice given to the NewCo employees was sufficient. *Id.* at 168-69.[29]

According to the Trustee, Tilton purposely chose not to issue a WARN Act notice because she did not want TransCare's employees to look for new jobs. The claim is based on an email exchange that occurred on February 19, 2016. (JX 87.) At the time, Wells Fargo and Tilton were still discussing Wells Fargo's possible funding of a 90-day

---

[29]     In *Ien II*, the Court granted partial summary judgment in favor of several Tilton-affiliates on the WARN Act claims, and the only remaining non-Debtor defendant is Patriarch Partners. *See Ien II*, 614 B.R. at 208 (denying partial summary judgment in favor of Patriarch Partners on the "single employer" issue), 211 (denying partial summary judgment in favor of Patriarch Partners on the "unforeseeable business circumstances" defense).

wind down of OldCo.  Daniel Fiorello, Esq., an attorney representing Wells Fargo, posed several questions to Lynn Harrison, III, Esq. and Cindi Giglio, Esq., the two attorneys with Curtis Mallet acting as TransCare's bankruptcy counsel.  One of the questions Fiorello asked was, "Will the TransCare Warn Act notices go out of [sic] Monday, February 22nd?"  (JX 87 at 47844.)  The email was forwarded to Tilton who responded, "Notice cannot be given prior to a foreclosure on NEWCO or there will be no NEWCO." (JX 87 at 47843.)  At trial, Tilton amplified her response: she "didn't want to tell the employees prior to the foreclosure because we didn't want to mass exodus."  (Tr. 8/13 A.M. 68:7-13.)

Even if Patriarch Partners is liable for violating the WARN Acts, the evidence relied on by the Trustee does not support imposing an obligation on Tilton to indemnify the Estate on the theory that she caused those violations in bad faith.  To establish bad faith, the Trustee had to demonstrate that Tilton's conduct in failing to provide WARN Act notice sooner was "qualitatively more culpable than gross negligence . . . ."  *Walt Disney II*, 906 A.2d at 66; *see also id.* at 63 ("We perceive no substantive difference between the Court of Chancery's 2003 definition of bad faith—a 'conscious[ ] and intentional[ ] disregard[ ][of] responsibilities, adopting a "we don't care about the risks" attitude ...'—and its 2005 post-trial definition—an 'intentional dereliction of duty, a conscious disregard for one's responsibilities.'") (alterations in original).

The Tilton Plan contemplated that the foreclosure of the NewCo assets and the commencement of the wind down of the OldCo assets would occur at the same time. OldCo was to be wound down in chapter 11 over a period of ninety days and Tilton contemplated giving that amount of WARN Act notice to the OldCo employees.  (DX 147

at 91631; Tr. 8/13 P.M. 91:25-92:14.)  The proposed timing of the notice would have met the requirements under the WARN Act, and as of February 22, Wells Fargo and Tilton were still trying to set up a meeting to discuss the 13-week wind down.  (JX 91 (email string).)  At some point, between February 22 and February 24, the plan for an orderly 90-day wind down in chapter 11 broke down and switched to a liquidation in chapter 7 but the 90-day schedule remained in place.

It is true Tilton did not want to give the notice until the foreclosure was completed but she still subjectively believed that TransCare had adequate time to send the WARN Act notices.  While Tilton has failed to justify the part of the Tilton Plan that involved the self-dealing transaction with NewCo's assets, the Trustee has failed to show that Tilton deliberately delayed the timing of the WARN Act notices because she did not care about the requirements of the WARN Act or that her actions were the product of calculated wrongdoing or intentional disregard of her responsibilities with TransCare.

To recapitulate, the Subject Collateral was worth $44 million, less the $1 million buyer capital investment, leaving $43 million as TransCare's damages for Tilton's breach of fiduciary duty at the time of the strict foreclosure.  The Trustee liquidated the Subject Collateral for a net benefit to the Estate in the sum of $1.2 million, and the Estate's damages should be reduced by that amount.  Consequently, Tilton's breach of her fiduciary duties of loyalty and good faith resulted in damages to TransCare in the sum of $41.8 million.

### C.      Count 7:  Fraudulent Transfer Against PPAS and Transcendence

### 1.      The Trustee's *Prima Facie* Case

Count 7 seeks to avoid the strict foreclosure as an actual fraudulent transfer under federal and New York state law, the latter made applicable through 11 U.S.C. § 544(b)(1), and recover the value of the transfer from PPAS and Transcendence under 11 U.S.C. § 550(a).  The Trustee also seeks his attorneys' fees pursuant to N.Y. Debtor & Creditor Law ("NYDCL") § 276-a.[30]  A conveyance or transfer is intentionally fraudulent under either NYDCL § 276 or 11 U.S.C. § 548(a)(1)(A) if the debtor made the transfer with the actual intent to hinder, delay or defraud a present or future creditor.[31]  The strict foreclosure effected a transfer of TransCare's property, *see* 11 U.S.C. § 101(54) (defining "transfer"), and the only question is whether the Trustee demonstrated TransCare's *scienter* through the imputation of Tilton's knowledge and intent.[32]

---

[30]      All references to the NYDCL refer to the version of the NYDCL in existence at the time of the transfer.  That version was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act.  *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

[31]      NYDCL § 276 provides:

>     Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

>     Bankruptcy Code § 548(a)(1)(A) states that a trustee may avoid a transfer of an interest of the debtor in property or any obligation made or incurred by the debtor, whether voluntary or involuntary, within two years of the petition date if the debtor

>>     made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[32]      Tilton effectuated the strict foreclosure on behalf of TransCare and PPAS, both of whom she controlled, and her knowledge and intent are imputed to these corporations.  *Kirschner v. Fitzsimons* (*In re Tribune Co. Fraudulent Conveyance Litig.*), No. 12-cv-2652 (RJS), 2017 WL 82391, at *5 (S.D.N.Y. Jan. 6, 2017) ("Because all corporations must act through agents, *see In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 715 (S.D.N.Y. 2006), courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation.").

The ancient phrase "'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd*, 209 F. 800 (2d Cir. 1913).  "A deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the debtor's affairs, comes within the meaning of 'hinder' and 'delay' as set forth in section 276 of the Debtor and Creditor Law." *Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374, 376-77 (N.Y. App. Div.), *appeal dismissed*, 426 N.E.2d 752 (N.Y. 1981).   If a transfer is actually fraudulent under New York law, it will likewise be actually fraudulent under Bankruptcy Code section 548(a)(1)(A).  *Kramer v. Sooklall* (*In re Singh*), 434 B.R. 298, 311 n. 5 (Bankr. E.D.N.Y. 2010).

Except in Ponzi scheme cases, fraudulent intent is not presumed, *Weisfelner v. Hofmann* (*In re Lyondell Chem. Co.*), 554 B.R. 635, 650 (S.D.N.Y. 2016), and the plaintiff must prove it.  A transferor rarely admits her own fraudulent intent.  As a result, courts rely on "badges of fraud" to fill the void.  *Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005).  These include the following:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

   (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

   (6) the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983); *accord Sharp Int'l Corp.,* 403 F.3d at 56; *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13.  Other indicia of fraud include "shifting of assets by the debtor to a corporation wholly controlled by him," *Kaiser*, 722 F.2d at 1583, and circumstances suggesting secrecy, haste or unusualness of the transaction.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

   While the presence or absence of one badge of fraud is not conclusive, the presence of multiple indicia will increase the strength of the inference of fraudulent intent.  *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13.  "In other words, while '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.'" *Id.* (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)); *accord Bear Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 10 n. 13 (S.D.N.Y. 2007) ("[T]he existence of several badges of fraud can constitute clear and convincing evidence of actual intent.") (quoting *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)).

   Virtually all of the badges of fraud identified, *supra*, are present in this case providing strong circumstantial evidence of Tilton's fraudulent intent.  Acting through

74

entities she controlled, she sold the Subject Collateral to herself at a price she picked.  In addition, the strict foreclosure was outside of TransCare's ordinary course of business, the consideration PPAS credited to the transaction was inadequate for the reasons stated in connection with the breach of fiduciary duty claim and Tilton retained control of the transferred assets through her majority interest in and control of PPAS as the foreclosing party and thereafter through Transcendence as PPAS's buyer.  In fact, she purported to own the same interest in Transcendence as in TransCare (no Transcendence stock was ever issued), but her interest in Transcendence was free and clear of the Term Loan Lenders' lien which had been eliminated through the foreclosure and sale and TransCare's unsecured debt.[33]

In addition, the entire transaction was conducted in haste and under a veil of secrecy.  The Tilton Plan was conceived and executed in just fourteen days, delayed only by the time it took to procure insurance for Transcendence.  Furthermore, the only TransCare personnel who were let in on the Tilton Plan were Glen Youngblood, who was to become president of Transcendence, and Peter Wolf, the TransCare COO who would be called upon to agree on TransCare's behalf to the terms of the strict foreclosure.  (DX 174.)  Although TransCare's counsel, Curtis Mallet, was retained to oversee OldCo's wind down, Stephen bypassed Curtis Mallet and sent the foreclosure documents, which included OldCo's assets, directly to Wolf, and Tilton did not forewarn Term Loan Lenders and shareholders Credit Suisse and First Dominion.

---

[33]     According to the January 7 Plan, TransCare owed approximately $12 million in accounts payable and additional accrued expenses of roughly $1.7 million.  (JX67 at 106577.)

Accordingly, the numerous badges of fraud establish Tilton's fraudulent intent to delay and defraud TransCare's creditors and she has not pointed to "significantly clear evidence of a legitimate supervening purpose" to effectuate a transfer of substantially all of TransCare's value for less than a quarter of its worth. The Trustee has sustained his burden of proving that TransCare transferred the Subject Collateral to PPAS[34] with the intent to hinder and delay TransCare's creditors and avoids the strict foreclosure under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A).[35]

### 2.    The Remedy

Bankruptcy Code § 550(a) provides:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

"The purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017).   Where, as here, TransCare

---

[34]    During the trial, the Court had suggested that it might collapse the strict foreclosure and the sale to Transcendence, deem PPAS a mere conduit and treat Transcendence as the initial transferee of the Subject Collateral.  PPAS did not assert this argument in opposition to the actual fraudulent transfer claim in the *DPFC* or in its response to the *PPFC* and accordingly, I do not consider it.

[35]    A clear and convincing standard of proof has been applied with respect to fraudulent intent under New York State law, but some District Courts within this Circuit have applied a preponderance of the evidence standard to a fraudulent transfer claim under the Bankruptcy Code.  *See, e.g., Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*)*,* 567 B.R. 55, 142 n. 38 (Bankr. S.D.N.Y. 2017), *aff'd,* 585 B.R. 41 (S.D.N.Y. 2018).  The Trustee has satisfied both standards.

transferred a going concern and the Trustee subsequently sold the same assets in liquidation sales, the starting point is the value of the Subject Collateral at the time of the strict foreclosure.

Although this claim involves the same transfer as Count 1, the Trustee proposes a different measure of damages.  He argues for the use of a 10.1x EBITDA multiplier and the deduction of the $10 million credit and the $5.7 million liquidation proceeds from the award.  (*See PPFC* ¶¶ 318-319.)  The Court accepts the 10.1x EBITDA multiplier because it reflects the average of Dr. Arnold's four credible "market comps" and does not involve many of the considerations that go into computing damages for breach of fiduciary duty.  The Court rejects the deduction of the $5.7 million because, for the reasons already stated, it is not supported by the evidence.  Specifically, it includes $5 million of accounts receivable and CONs that were not part of the foreclosure and it excludes the liquidation of the OldCo collateral that was part of the Subject Collateral.  Thus, the award should be reduced by $1.2 million, the net proceeds of the Subject Collateral realized through the Trustee's liquidation sales.

Finally, the Court rejects the Trustee's proposal to reduce the award by the $10 million credit because it is based on an incorrect view of the law.  A fraudulent transferee has a defense to the extent it received the transfer for value and in good faith, 11 U.S.C. § 548(c), or without knowledge of the fraud, NYDCL § 278(1),[36] *i.e.*, a good

---

[36]    Bankruptcy Code § 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that

faith purchaser for value.  *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218,

229 (2d Cir. 2010) ("DCL § 278 provides that a creditor whose claim has matured may

have a conveyance set aside 'against any person,' other than a good faith purchaser for

value, defined as 'a purchaser for fair consideration without knowledge of the fraud.'"),

*answering certified question*, 951 N.E.2d 369 (N.Y. 2011).  The defendant bears the

burden of proving this defense.  *Fed. Deposit Ins. Co. v. Malin,* 802 F.2d 12, 18 (2d Cir.

1986) ("Phyllis Malin [transferee] must also satisfy the remaining elements of section

278 to claim its benefits.  Specifically, it must be determined whether Phyllis was a

'purchaser for fair consideration without knowledge of the fraud at the time of the

purchase.'") (citation omitted).

     Even if the $10 million credit constituted value, PPAS failed to prove that it

received the Subject Collateral in good faith.  To the contrary, the Court has already

found that TransCare made the involuntary transfer through the strict foreclosure with

the intent to hinder and delay its creditors.  Its wrongful intent was imputed from

Tilton.  Tilton's same wrongful intent is imputed to PPAS which participated with

---

    such transferee or obligee gave value to the debtor in exchange for such transfer or
obligation.

(Emphasis added.)

    NYDCL § 278(1) provides:

    Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his
claim has matured, may, as against any person except a purchaser *for fair consideration
without knowledge of the fraud at the time of the purchase*, or one who has derived title
immediately or mediately from such a purchaser,

      a.  Have the conveyance set aside or obligation annulled to the extent necessary to
satisfy his claim, or

      b.  Disregard  the  conveyance  and  attach or levy execution upon the property
conveyed.

(Emphasis added.)

TransCare (and Transcendence) in the Tilton Plan and received the Subject Collateral in bad faith and with the knowledge of Tilton's intent to hinder and delay TransCare's creditors.

Accordingly, the Trustee is entitled to recover $39.2 million from PPAS pursuant to 11 U.S.C. § 550(a), and PPAS's claims are disallowed under 11 U.S.C. § 502(d).[37]  The Trustee is also entitled to recover $39.2 million from Transcendence as the immediate transferee of PPAS.  11 U.S.C. § 550(a)(2).  The damages for breach of fiduciary duty and the fraudulent conveyance remedy the same injury and the Trustee is entitled to only a single satisfaction.  (*See PPFC* ¶ 321.)

### 3.    Attorneys' Fees

A plaintiff who successfully avoids an intentional fraudulent conveyance may be entitled to recover his attorneys' fees.  NYDCL § 276-a provides in relevant part:

> In an action ... brought by a creditor [or] trustee in bankruptcy ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action ... the creditor [or] trustee in bankruptcy ... shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor [or] trustee in bankruptcy ... in such action or special proceeding, and the creditor [or] trustee in bankruptcy ... shall have judgment therefor against ... the transferee....

---

[37]    Section 502(d) states in pertinent part:

[T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550. . . of this title or that is a transferee of a transfer avoidable under section 544 [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

The Court has found that TransCare made and PPAS received the Subject Collateral with actual intent to hinder and delay TransCare's creditors. This finding led to the conclusion that PPAS was not a good faith purchaser for value entitled to a $10 million reduction in the Trustee's award based on the credit it gave TransCare. The same finding entitles the Trustee to an award of reasonable attorneys' fees to be fixed by the Court in subsequent proceedings.

### D.    Counts 4, 10 and 11:  Avoidance and Recharacterization of Ark II Lien

The Trustee seeks to avoid or subordinate Ark II's lien, granted on February 11, 2016, when TransCare executed the Ark II Security Agreement in connection with the Ark II Facility. He relies on three theories: (i) preference, (ii) constructive fraudulent transfer and (iii) recharacterization as equity. In addition, Count 3 seeks to equitably subordinate Ark II's and PPAS's liens and/or claims, and the equitable subordination claim is addressed below. To the extent the Ark II lien is avoided, the Trustee seeks to preserve the lien for the benefit of the estate, *see* 11 U.S.C. § 551.[38]

#### 1.    Count 10:  Preference

Under Bankruptcy Code § 547(b), a trustee may avoid a transfer (1) made to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) while the debtor was insolvent, (4) on or within ninety days of the petition date (one year if the transferee was an insider), (5) that enables the creditor to receive more than it would

---

[38]    Bankruptcy Code § 551 provides:

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate.

have received in a chapter 7 case if the transfer was never made and the creditor

received payment of the debt in accordance with the Bankruptcy Code.[39]  The Trustee

has the burden of proving each element under section 547(b).  11 U.S.C. § 547(g).

The Trustee contends that the granting of the lien to Ark II pursuant to the Ark II

Security Agreement to secure, *inter alia*, the January Payments in the approximate

aggregate sum of $1.9 million was a preference.[40]  Although the Ark II credit documents

were backdated to January 15, 2016, they were signed by TransCare on February 11,

2016.  TransCare granted and Ark II perfected the lien on that date, and the granting of

---

[39]     Section 547(b) states:

Except as provided in subsections (c) and (i) of this section, the trustee may . . . avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[40]     Ark II never advanced any funds directly to TransCare.  The evidence showed that the January 15 Payment in the sum of $1,172,757.53 was wired by Ark II to PPAS to allow PPAS to make insurance payments on TransCare's behalf.  Treating that advance as a loan to TransCare rather than a loan to PPAS, Ark II became a creditor of TransCare at that point.  On the other hand, the January 29 Payment in the sum of $690,168.24 was paid by PPAS on TransCare's behalf to meet obligations to the NYSIF and certain TransCare creditors.  Although the parties have sometimes lumped the two sets of payments together and treated them as having been made by Ark II, Ark II did not make the January 29 Payment.  Furthermore, while Tilton testified that it was her intention that Ark II would reimburse PPAS once Ark II was granted a lien priority under a future credit agreement, (Tr. 8/13 P.M. 6:3-6; *see* DX 121 at 99194), there was no evidence that the reimbursement occurred.  Accordingly, the only advance Ark II made was in the sum of $1,172,757.53 million in connection with the January 15 Payment and that is the extent of its claim.

a lien was a transfer, *see* 11 U.S.C. § 101(54)(A), that occurred within ninety days of the petition date.  At the time of the transfer, Ark II was a creditor of TransCare, and TransCare was presumed to be insolvent.  11 U.S.C. § 547(f).

Finally, the lien would allow Ark II to obtain a greater recovery in a hypothetical chapter 7 case than if the transfer had not been made.  To satisfy the fifth prong, a trustee must prove that the defendant received a greater amount on its claim than it would receive on the petition date in a hypothetical chapter 7 case.  *Sama v. Mullaney* (*In re Wonderwork, Inc.*), 611 B.R. 169, 213-14 (Bankr. S.D.N.Y. 2020); *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). As a result of the lien granted on February 11, 2016 and the lien priority it obtained over PPAS's lien by virtue of the 2016 Intercreditor Agreement, Ark II was fully secured by assets worth substantially more than the January 15 Payment and would have received full payment on its claim as of the petition date in a hypothetical chapter 7.

If, instead, Ark II did not receive the lien and its claim was unsecured, it would receive a lower distribution, if any distribution, in a hypothetical chapter 7 case. According to financial information and projections prepared by Greenberg on January 28, 2016, TransCare had approximately $41 million in total assets and $81 million in total liabilities, mostly secured debt.  (PX 179 at 13263.)  By February 24, most of its valuable assets had been foreclosed upon and transferred to Transcendence but TransCare's liabilities had been reduced by the $10 million credit.  The only valuable assets that escaped the foreclosure were the accounts receivable and the CONS.  Wells Fargo had a first lien and PPAS had the second lien on those assets under the 2016 Intercreditor Agreement.  Following the foreclosure and as of the petition date

TransCare owed Wells Fargo $13 million and still owed PPAS $35 million. The proceeds of the accounts receivable and CONs were substantially less than $48 million leaving unsecured creditors with nothing.

PPAS contends that the Trustee failed to establish that the grant of the lien was on account of an antecedent debt or that it enabled Ark II to recover more than it would recover in a chapter 7 case if it did not receive the transfer and instead, received a distribution on its claim. The latter contention has already been rejected. In addition, PPAS asserted in the JPTO, though not in its post-trial submissions, that the grant of the lien was a contemporaneous exchange for value under 11 U.S.C. § 547(c)(1).

### a.   Antecedent Debt

As noted, Ark II was already a creditor at the time TransCare granted the lien. Despite the obvious gap in time between the January 15 Payment and the February 11 transfer of the lien, PPAS argues that the lien relates back to the January 15 Payment under 11 U.S.C. § 547(e)(2)(A). The latter subsection provides:

> For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made--
>
> (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B). . . .

Section 547(e)(2)(A) is inapplicable. The only transfer *by* TransCare was made on February 11, 2016, and the lien it granted on that date was simultaneously perfected by virtue of the earlier, January 29 filing of the U.C.C. financing statement. The granting of the lien on February 11 to secure the earlier advance was no different analytically than the repayment of the January 15 Payment with cash. Thus, when a debtor grants a lien to secure a pre-existing debt, the transfer is preferential regardless

of whether the creditor simultaneously perfects the lien or perfects it more than thirty days later. *Cf. Corn Exch. Nat'l Bank & Tr. Co. v. Klauder*, 318 U.S. 434, 437 (1943) ("By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law. . . .") (decided under the 1898 Bankruptcy Act).

PPAS's reliance on *Telecash Indus., Inc. v. Universal Assets* (*In re Telecash Indus., Inc.*), 104 B.R. 401 (Bankr. D. Utah 1989), in support of its relation back argument, is misplaced. There, the creditor made a loan and allegedly received a security interest under the loan documentation but did not perfect the security interest within ten days, the statutory reach back period at the time under 11 U.S.C. § 547(e)(2), since increased to thirty days. *See id.* at 402. The debtor-in-possession brought an adversary proceeding to avoid the lien as a preference and moved for summary judgment. The bankruptcy court agreed that the perfection did not relate back to the granting of the lien, *id.* at 403, but ruled that the failure to perfect the lien within ten days did not foreclose the defendant's affirmative defense that the subsequent perfection constituted a contemporaneous exchange for value for the loan under 11 U.S.C. § 547(c)(1). *Id.* at 404 ("Although perfection of a security interest may not relate back under section 547(e)(2) to the underlying loan transaction, that perfection may still be considered 'substantially contemporaneous' under section 547(c)(1)."). The bankruptcy court concluded that disputed issues of fact concerning the defense prevented the grant of summary judgment. *Id.*

84

Unlike *Telecash*, and notwithstanding the backdating of the Ark II credit documents, TransCare did not purport to grant a security interest to Ark II at the time of the January 15 Payment.  There was no documentation evidencing a grant of a security interest at that time and TransCare did not sign the Ark II Security Agreement until February 11, 2016.

### b.    Contemporaneous Exchange for Value

Bankruptcy Code § 547(c)(1) provides a defense to a preference

to the extent that such transfer was--

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange

11 U.S.C. § 547(c)(1).  "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange."  *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks (USA) Inc.*), 338 B.R. 194, 208-09 (Bankr. S.D.N.Y. 2005) (quoting *Harrah's Tunica Corp. v. Meeks* (*In re Armstrong*), 291 F.3d 517, 525 (8th Cir. 2002)).  PPAS has the burden of proving this affirmative defense.  11 U.S.C. § 547(g).

Tilton testified that she authorized the January 15 Payment (as well as the January 29 Payment) to TransCare's creditors on an emergency basis "because, if not, the company would have gone out of business the next day [and] because nobody else was willing to lend cash."  (Tr. 8/13 A.M. 25:13-18.)  There was no agreement regarding the nature of the debt or the terms of the loans.  On January 28, 2016, Greenberg created financial information and *pro forma* projections for the entire company that did

not show any liability to Ark II.  (PX 179 at 13263.)  On February 3, 2016, Greenberg confirmed to Credit Suisse that there was no term sheet for the proposed lending to TransCare but only a summary of terms for a new facility between "a Patriarch Partners, LLC affiliate" and TransCare.  (PX 189.)  It did not mention Ark II or indicate that the January Payments would be part of the new $6.5 million facility.  On February 9, 2016, Stephen provided Curtis Mallet with a summary of TransCare's debt structure, including the Term Loan and the ABL but did not include Ark II.  (*See* JX 72.)  At trial, Stephen could not explain why he omitted the Ark II loan supposedly incorporated into the Ark II Credit Agreement.  (Tr. 7/23 P.M. 31:7-33:10.)

The Ark II Credit Agreement was an afterthought.  It was born from Wells Fargo's reluctance to further fund TransCare or allow a new facility to prime its liens and Tilton's failure to convince Credit Suisse to a subordination of the Term Loan liens in favor of a new facility.  Tilton circumvented these problems on February 10, 2016 by creating the Ark II Facility, rolling the January Payments into the new, secured facility and agreeing on behalf of PPAS to subordinate the Term Loan Lenders' lien to Ark II.  Hence, PPAS has failed to prove that the parties (*i.e.*, Tilton) intended for the lien granted to Ark II on February 11, 2016 to be a contemporaneous exchange for the January 15 Payment.

Accordingly, the lien granted to Ark II is avoided as a preference and the lien is preserved for the benefit of the estate.  11 U.S.C. § 551.

### 2.    Count 11:  Constructive Fraudulent Transfer

The grant of a lien to Ark II is also a constructive fraudulent transfer under the

NYDCL.[41]  NYDCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is
> or will be thereby rendered insolvent is fraudulent as to creditors without
> regard to his actual intent if the conveyance is made or the obligation is
> incurred without a fair consideration.

Under NYDCL § 272, "[f]air consideration is given for property, or obligation ... [w]hen

in exchange for such property, or obligation, as a fair equivalent therefor, and in good

faith, property is conveyed or an antecedent debt is satisfied [or] [w]hen such property,

or obligation is received in good faith to secure a present advance or antecedent debt in

amount not disproportionately small as compared with the value of the property, or the

obligation obtained."  "A transfer made by an insolvent debtor to an affiliate or insider

in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent."

*Nisselson v. Drew Indus., Inc.* (*In re White Metal Rolling & Stamp Corp.*), 222 B.R. 417,

430 (Bankr. S.D.N.Y. 1998); *accord Rubin v. Mfrs. Hanover Tr. Co.,* 661 F.2d 979, 991

(2d Cir. 1981) ("[C]ourts have long recognized that '[t]ransfers made to benefit third

parties are clearly not made for a "fair" consideration,' and, similarly, that 'a conveyance

by a corporation for the benefit of an affiliate (should not) be regarded as given for fair

consideration as to the creditors of the conveying corporations.'") (citation omitted); *see*

*Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In

general, repayment of an antecedent debt constitutes fair consideration unless the

---

[41]    The Trustee asserts the constructive fraudulent conveyance claims under NYDCL §§ 273, 274 and 275.  In light of the Court's conclusion that the granting of the lien to Ark II was a constructive fraudulent conveyance under NYDCL § 273, it is unnecessary to consider the other grounds.

transferee is an officer, director, or major shareholder of the transferor.").

At the approximate time that TransCare granted the lien to Ark II to secure the earlier advances, TransCare was woefully insolvent with negative net equity of nearly $40 million.  The granting of the lien also lacked good faith, and hence, fair consideration.  Ark II and TransCare were affiliates because Tilton directly or indirectly owned the majority of their securities and controlled both entities, *see* 11 U.S.C. § 101(2)(B), and Ark II and Tilton were insiders of TransCare.  *See* 11 U.S.C. § 101(31)(B)(iii), (E).  Accordingly, the granting of the lien to Ark II under the Ark II Security Agreement is avoided as a constructive fraudulent transfer and the lien is preserved for the benefit of the estate.  11 U.S.C. § 551.

### 3.     Count 4: Recharacterization

Count 4 seeks to recharacterize as equity all claims asserted by Ark II based on the January 15 Payment.  As courts of equity, bankruptcy courts have the equitable power to recharacterize claims asserted against a debtor so that "substance will not give way to form."  *Pepper v. Litton*, 308 U.S. 295, 305 (1939).  Recharacterization of a claim from debt to equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*."  *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001) ("*AutoStyle*") (quoting *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)) (internal quotes omitted).

Courts in this District have adopted the eleven-factor analysis set forth in *AutoStyle.  See, e.g., In re Aéropostale, Inc.*, 555 B.R. 369, 420-21 (Bankr. S.D.N.Y.

2016); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016), *appeal dismissed*, No. 16-2187 (2d Cir. Nov 22, 2016); *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 544 B.R. 75, 93-94 (Bankr. S.D.N.Y. 2016); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S & B Holdings LLC*), 420 B.R. 112, 157-58 (Bankr S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008).  Under this test, the Court considers: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.  *AutoStyle*, 269 F.3d at 749-50.  "No one factor is controlling or decisive [and] [t]he factors must be considered within the particular circumstances of each case." *Id.*; *accord Aéropostale*, 555 B.R. at 423; *BH S & B Holdings*, 420 B.R. at 157.  A bankruptcy court can recharacterize a claim as equity even if fewer than all of the factors weigh in favor of recharacterization.  *Lyondell*, 544 B.R. at 94.  The ultimate question for the court is "whether the parties called an instrument one thing when in fact they intended it as something else.... Answers lie in facts that confer

context case-by-case." *Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2005).

Here, the evidence points in both directions. The parties attempted to document the January 15 Payment, albeit belatedly, as a secured loan from Ark II to TransCare. The loan was to be repaid by TransCare pursuant to the contemplated strict foreclosure, the sale to Transcendence and the subordination of PPAS's lien in the Subject Collateral. In addition, the January 15 Payment met emergency needs rather than the purchase of capital assets and was not subordinated to the claims of outside creditors. In fact, the 2016 Intercreditor Agreement gave Ark II a priority in payment. On the other hand, TransCare was inadequately capitalized, was unable to borrow money elsewhere, there was no sinking fund to provide repayment (though that was to come through the proceeds of the foreclosure and sale) and Tilton owned Ark II and the majority of TransCare's shares and controlled both. However, bankrupt companies are generally short of cash and the shareholders are often the only source.

I conclude that the Trustee has failed to sustain his burden of proving that the January 15 Payment should be recharacterized as an equity contribution. At the time of the advance, TransCare was out of cash and needed the money to pay for insurance so that TransCare could continue to operate. There was no time to draft a loan agreement even if anyone had thought about it. The advances preceded the Tilton Plan, were not used solely to protect the assets destined for NewCo and the parties could not have intended the January 15 Payment as a contribution to  NewCo. There were many problems with the granting of a secured claim to Ark II for the reasons stated above but the January 15 Payment was still a loan.

Accordingly, the Count 4 is dismissed.

## E.  Count 14:  Return of the $800,000

After the Trustee was appointed, he and PPAS entered into the *Personal Property Stipulation*, (PX 258), to permit the Trustee to sell the assets under his control, including the Subject Collateral.[42]  The *Personal Property Stipulation*, which was approved by the Court,[43] acknowledged the parties' disputes relating to the ownership of the assets, agreed that the Trustee could sell the assets, and provided a distribution formula; the Trustee would receive 20% of the net proceeds and  PPAS would receive 80%.  (*Personal Property Stipulation* ¶ 3.)  The purpose of the *Personal Property Stipulation* was to facilitate the sale of the disputed assets, not resolve the disputes regarding the validity of the strict foreclosure or the ownership of the Subject Collateral, and each party reserved its respective rights.  As concerned the Trustee:

> Except as specifically set forth in this Stipulation, nothing herein shall be deemed to waive any and all claims, defenses, interests, rights, entitlements, or causes of action of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or, fixed, and whether anticipated or

---

[42]     Ark II and PPAS agreed in the 2016 Intercreditor Agreement that

   Notwithstanding anything to the contrary contained in any of the Agreements, only the party with the senior Lien [Ark II] in the Collateral shall have the right to restrict or permit, or approve or disapprove, the Sale, transfer or other disposition of such Collateral.

2016 Intercreditor Agreement § 2.8(a).  Ark II was not a party to the *Personal Property Stipulation* and did not expressly consent to the proposed sale.  However, given Tilton's control over Ark II, that consent can be inferred.

[43]     See *Order: (I) Approving the Stipulation Respecting the Sale of Certain Personal Property; (II) Authorizing the Public Auction Sales of Certain Personal Property; (III) Approving the Sale and Notice Terms for the Public Auction Sales of Certain Personal Property; (IV) Approving the Sale of Certain Personal Property, Free and Clear of All Liens, Claims and Encumbrances, Security Interests and Other Interests to the Successful Bidders at the Public Auction Sales; (V) Approving the Employment of Maltz Auctions, Inc. as Auctioneer to Market and Publicly Auction Certain Personal Property; (VI) Authorizing the Trustee to Donate or Otherwise Dispose of Certain De Minimus Personal Property; and (VII) Granting Related Relief*, dated Mar. 25, 2016, at ¶ 2.  (PX 258.)

> unanticipated, which the Trustee and the Debtors' estates have, had, may
> ever have or may ever claim to have against any third parties including,
> but not limited to, PPAS, Lenders, and Transcendence or any other
> "person" (within the meaning of Bankruptcy Code§ 101(41)).

(*Personal Property Stipulation* ¶ 6.)  The *Personal Property Stipulation* further

provided:

> Nothing contained herein is a waiver of any of the Trustee's rights to
> contest or otherwise object to any other party asserting a claim or interest
> in the Foreclosed Personal Property Assets and/or the CONs.

(*Personal Property Stipulation* ¶ 10.)

Following the sale, PPAS received $800,000 in accordance with the *Personal
Property Stipulation* which it turned over to Ark II pursuant to the 2016 Intercreditor
Agreement.  While it is unusual in the Court's experience to turn over disputed sale
proceeds rather than escrow the funds until the dispute is resolved, the *Personal
Property Stipulation* did not state that the payments were intended to be a final
resolution of the parties' dispute regarding the parties' rights to the proceeds of the sale
— the reservation of rights indicates that it was not — and neither PPAS nor Ark II
argued that it was.  Consequently, the *Personal Property Stipulation* does not bar the
recovery of the $800,000.

The Trustee now seeks to recover the $800,000 directly from Ark II on two
theories.[44]  First, he argues that he is entitled to reimbursement or disgorgement under

---

[44]     Count 14 also sought to recover the $800,000 from PPAS, but the Trustee did not repeat the
request or include proposed findings or conclusions in his *PPFC*.  Accordingly, the claim against PPAS is
deemed abandoned.  *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL 440775, at
*3 (S.D.N.Y. June 28, 1999) (deeming plaintiffs' negligence claims abandoned because their post-trial
submissions propose no findings of fact or conclusions of law); *McAllister Bros., Inc. v. Ocean Marine
Indem. Co.,* No. 87 Civ. 3840 (LMM), 1992 WL 34152, at *6 (S.D.N.Y. Feb. 18, 1992) (dismissing
counterclaim as abandoned where defendants did not refer to it in pre-trial or post-trial briefs);

11 U.S.C. § 502(j) based upon the overpayment of Ark II's now-avoided secured claim. (*PPFC* ¶¶ 369-70.)  Second, he contends that the $800,000 transfer was an unauthorized post-petition transfer that he can avoid and recover from Ark II as either an initial transferee (if PPAS is a conduit) or a subsequent transferee (if PPAS is the initial transferee).  (*PPFC* ¶ 371.)  Ark II responds that the Trustee cannot recover the $800,000 because he failed to prove that the Estate had a property interest in the Subject Collateral and hence, the sale proceeds, and the Estate lacked any equity in the proceeds because the proceeds secured a debt in the approximate sum of $58 million. (*DPFC* ¶¶ 468-71.)

### 1.     Section 502(j)

Bankruptcy Code § 502(j) provides, in pertinent part:

> A claim that has been allowed or disallowed may be reconsidered for cause.  A reconsidered claim may be allowed or disallowed according to the equities of the case. . . .  ***This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.***

11 U.S.C § 502(j) (emphasis added).  The last sentence appears to be derived from section 57(l) of the 1898 Bankruptcy Act which provided in relevant part that "the trustee may also recover any excess dividend paid to any creditor," ***In re Kelderman***, 75 B.R. 69, 70 (Bankr. S.D. Iowa 1987), and has been interpreted to authorize the Trustee to recover an excess payment to a creditor.  ***E.g.***, *Wells Fargo Bank NA v. Thompson*, 15-CV-941-JPS, 2016 WL 1611472, at *3 (E.D. Wis. Apr. 21, 2016) ("Courts have found support for disgorgement in the trustee's authority to recover overpayments to

---

*Sonnenblick–Goldman Corp. v. Marbella Del Caribe, Inc.*, 412 F. Supp. 439, 445 (S.D.N.Y. 1975) (defendant abandoned counterclaims that were not argued in its post-trial brief).

creditors. . . .  As discussed above, this disgorgement is contemplated by 11 U.S.C. §
502(j).") (citing cases); *United States v. Rhodey* (*In re R&W Enters.*), 181 B.R. 624, 648
(Bankr. N.D. Fla. 2006) (trustee can recover overpayment to IRS because "[s]ection
502(j) of the Bankruptcy Code specifically allows the Trustee 'to recover from a creditor
any excess payment or transfer made to such creditor.'"); *Kerney v. Capital One Fin.
Corp.* (*In re Sims*), 278 B.R. 457, (Bankr. E.D. Tenn. 2002) ("It is clear from [the last
sentence of § 502(j)] that a trustee's authority to recover overpayments from a creditor
is implied or contemplated by the Bankruptcy Code notwithstanding the absence of a
specific Bankruptcy Code provision expressly granting such authority.").

The problem with the Trustee's argument is that he paid PPAS, not Ark II, and
PPAS was not a mere conduit that lacked dominion and control over the proceeds.
While the 2016 Intercreditor Agreement gave Ark II a priority over PPAS to the sale
proceeds, the Trustee has not pointed to any provision requiring PPAS to turn the
proceeds over to Ark II or segregate the proceeds or hold the proceeds in trust for Ark II.
Instead, Ark II had a contractual right to the proceeds.  In contrast, under the Ark II
Security Agreement executed at the same time, Ark II could require TransCare in the
event of a default to "segregate" the proceeds of any accounts receivable or general
intangibles and hold them "in trust" for Ark II.  (Ark II Security Agreement § 5.2(a).)
The Trustee has not identified a basis under 11 U.S.C. § 502(j) for recovering the excess
payment from Ark II, PPAS's transferee.

### 2.    Unauthorized Post-Petition Payment

Bankruptcy Code § 549 states, in pertinent part:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--

(1) that occurs after the commencement of the case; and

(2). . . .

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).  The transfer of $800,000 to PPAS is not avoidable under section 549 because it was expressly authorized by the order approving the *Personal Property Stipulation*.  Whether it could be recovered under the *Personal Property Stipulation* is an issue that has not been raised.  In any event, the $800,000 is already reflected in the reduced credit granted to PPAS in connection with the recovery awarded to the Estate under 11 U.S.C. § 550(a) as a consequence of the avoidance of the strict foreclosure.

Accordingly, Count 14 is dismissed.

## F.     Count 3:  Equitable Subordination

In Count 3, the Trustee seeks to equitably subordinate the claims of PPAS and Ark II and transfer their liens to the estate.  Bankruptcy Code § 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).  The proponent of equitable subordination must show that (a) the claimant engaged in some type of inequitable conduct, (b) the misconduct caused injury to creditors or conferred an unfair advantage on the claimant, and (c) equitable subordination is consistent with bankruptcy law.  *Benjamin v. Diamond* (*In re Mobile*

*Steel Co.),* 563 F.2d 692, 699-700 (5th Cir. 1977).  If the creditor is an insider of the

debtor, inequitable conduct may include (a) a breach of fiduciary duty, fraud, or

illegality, (b) undercapitalization or (c) control or use of the debtor as an alter ego for

the benefit of the claimant.  *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc.* (*In re*

*Granite Partners, LP*), 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997).

      Equitable subordination has its limits.  It is remedial, not penal, *80 Nassau*

*Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*)*,* 169 B.R. 832, 840

(Bankr. S.D.N.Y. 1994), and "should be applied only to the extent necessary to offset

specific harm that creditors have suffered on account of the inequitable conduct."

*Assante v. E. Sav. Bank, FSB* (*In re Assante*), No. 12–CV–5309 (CS), 2013 WL 787968,

at *3 (S.D.N.Y. Mar. 4, 2013) (quoting *Enron Corp. v. Springfield Assocs., LLC* (*In re*

*Enron Corp.*)*,* 379 B.R. 425, 434 (S.D.N.Y. 2007)).  Once the harm has been undone

through another remedy, equitable subordination is not available.  For example,

equitable subordination is an alternative to a monetary recovery for the creditor's

wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim

based on the same wrong.  *Hirsch v. Pa. Textile Corp.* (*In re Centennial Textiles, Inc.*),

227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners,* 210 B.R. at 517.

Furthermore, equitable subordination is inferior to disallowance because equitable

subordination merely postpones payment but does not disallow the claim.  *80 Nassau*

*Assocs.*, 169 B.R. at 837.

      Equitable subordination may be preferable remedy for injuries caused by an

insolvent creditor who asserts a substantial, allowed claim.  This, however, is not such a

case.  The PPAS secured claim has been disallowed under Bankruptcy Code § 502(d)

because it is the recipient of a fraudulent conveyance and the Trustee has received a judgment for money damages based on the fraudulent conveyance.  If PPAS pays that judgment, the harm will be fully remedied, and section 502(d) will no longer bar the allowance of the claim.

The analysis relating to Ark II is slightly different but yields the same conclusion. The Court has avoided Ark II's security interest because the grant of the security interest was a preference and a fraudulent conveyance.  The avoidance of the Ark II lien provides the Estate with a complete remedy from the harm caused by the lien.  Ark II did not engage in inequitable conduct in making an emergency loan to TransCare prior to the inception of the Tilton Plan, and there is no reason in equity why it should not have a general unsecured claim for the amount of the January 15 Payment.  It is true that PPAS transferred $800,000 from the sale proceeds pursuant to the *Personal Property Stipulation* and Ark II credited that payment against its claim, but the transfer was a matter of contractual agreement between PPAS and Ark II and as just noted, the judgment awarded against PPAS on the fraudulent transfer claim reflects the $800,000. Accordingly, Count 4 is dismissed.[45]

## G.   Count 12:  Contractual Subordination

The Amended Complaint and the JPTO included a claim against PPAS for contractual subordination under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II priority lien and the preservation of the lien for the benefit of the

---

[45]      Ark II argued that the Trustee lacked prudential standing to assert an equitable subordination claim because the only parties injured by the granting of the lien were the Term Loan Lenders.  (*DPFC* ¶ 437.)  The avoidance of Ark II's lien and the disposition of the equitable subordination claim make it unnecessary to decide the issue.

Estate.  The Trustee's post-trial proposed findings of fact and conclusions of law did not

mention this claim.  For the reasons previously stated, the claim is deemed abandoned.

### H.    Count 13:  Liens on Post-Petition Proceeds

In the JPTO, which superseded the pleadings, the parties disputed whether the

"equities of the case exception," described below, precluded the extension of the Ark II

and PPAS liens to the post-petition proceeds of the sale of the Subject Collateral.  (JPTO

at pp. 53-54, 64.)  The *PPFC* drops Ark II and seeks a completely different conclusion of

law:  PPAS's lien does not extend to the proceeds of the breach of fiduciary duty claim

under the Uniform Commercial Code and the "equities of the case" exception.  (*PPFC* ¶¶

372-79.)  This claim was never raised in the pleadings or the JPTO, and I do not

consider it.

PPAS contends that the "equities of the case" exception does not apply to the sale

proceeds because it is limited to a situation where the secured creditor tries unjustly to

reap the benefit of an increase in the value of the collateral, and the Trustee failed to

prove an increase in value.  Bankruptcy Code § 552(b)(1), which governs the question

provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of
> this title, if the debtor and an entity entered into a security agreement
> before the commencement of the case and if the security interest created
> by such security agreement extends to property of the debtor acquired
> before the commencement of the case and to proceeds, products,
> offspring, or profits of such property, then such security interest extends to
> such proceeds, products, offspring, or profits acquired by the estate after
> the commencement of the case to the extent provided by such security
> agreement and by applicable nonbankruptcy law, *except to any extent that*
> *the court, after notice and a hearing and based on the equities of the case,*
> *orders otherwise.*

11 U.S.C. § 552(b)(1) (emphasis added).

The "equities of the case" exception is a means of allocating the value of post-petition collateral proceeds between the secured creditor and the estate:

> The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

*In re Barbara K. Enters.,* No. 08–11474 (MG), 2008 WL 2439649, at *11 (Bankr. S.D.N.Y. June 16, 2008) (citations omitted); *accord Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n* (*In re TerreStar Networks, Inc.*) 457 B.R. 254, 271 (Bankr. S.D.N.Y. 2011); *see Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc.* (*In re Photo Promotion Assocs., Inc.*)*, 61 B.R. 936, 939 (Bankr. S.D.N.Y. 1986) ("The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (quoting *J. Catton Farms, Inc. v. First Nat'l Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir. 1985)) (internal quotation marks omitted).

The Trustee admitted in the Amended Complaint that PPAS's lien extended to the proceeds of the collateral he sold.  (*See* Amended Complaint ¶¶ 169-72.)  His *PPFC* did not submit proposed factual findings or legal conclusions regarding the application of the "equities of the case" exception to the proceeds of the sale of the collateral. Accordingly, and for reasons previously stated, the claim is deemed abandoned and is dismissed.

## FURTHER CONSIDERATIONS

The disposition of the Trustee's claims requires further consideration regarding how to proceed.  The findings and conclusions relating to the breach of fiduciary duty claim are proposed and the parties have the right to seek *de novo* review by the District Court in accordance with Federal Bankruptcy Rule 9033(d).  The remaining, core claims, on the other hand, are ready for the entry of judgment subject, however, to the fixing of reasonable attorneys' fees in connection with the intentional fraudulent transfer claim against PPAS.  The parties are directed to contact chambers to arrange a conference to discuss the scheduling of the inquest in connection with the award of attorneys' fees, the submission of the report and recommendation to the District Court and the entry of judgment on the core claims.

Dated:  New York, New York
        July 6, 2020

                                              /s/ *Stuart M. Bernstein*
                                              STUART M. BERNSTEIN
                                              United States Bankruptcy Judge