**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x

In re:                                                    :
                                                          :
                                                          :
     TRANSCARE CORPORATION, <u>et al.</u>,     :          Chapter 7
                                                          :          Case No. 16–10407 (SMB)
                                                          :          (Jointly Administered)
                              Debtors.                    :
————————————————————————x
SALVATORE LAMONICA, as Chapter 7      :
Trustee for the Estates of TransCare       :
Corporation, <u>et al.</u>,                       :
                                                          :
                              Plaintiff,                  :
                                                          :          Adv. Proc. No. 18–1021 (SMB)
          – against –                              :
                                                          :
LYNN TILTON, PATRIARCH PARTNERS     :
AGENCY SERVICES, LLC, PATRIARCH        :
PARTNERS, LLC, PATRIARCH PARTNERS     :
MANAGEMENT GROUP, LLC, ARK II CLO    :
2001–1 LIMITED, TRANSCENDENCE          :
TRANSIT, INC., and TRANSCENDENCE       :
TRANSIT II, INC.,                                 :
                                                          :
                              Defendants.                 :
                                                          :
————————————————————————x

**DEFENDANT LYNN TILTON'S OBJECTIONS TO THE BANKRUPTCY COURT'S**
<u>**POST–TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

THE RECORD EVIDENCE................................................................................ 11

    A.    The Parties ...................................................................................11

    B.    TransCare's Debt Structure.........................................................12

    C.    TransCare's Liquidity and Financial Reporting Challenges..................................15

    D.    Third–Party Inquiries About TransCare .....................................17

    E.    Wells Fargo Decides Not To Renew Its ABL ......................................18

    F.    Tilton Explores A Sale Of TransCare ........................................19

    G.    TransCare Issues October 2015 Financial Statements.........................................26

    H.    The OldCo/NewCo Restructuring................................................27

    I.    The Article 9 Foreclosure ...........................................................35

    J.    Valuing the Subject Collateral ...................................................38

    K.    The Bankruptcy Filings And Post–Petition Events ...................44

    L.    Procedural History .....................................................................46

STANDARD OF REVIEW ............................................................................... 50

ARGUMENT ................................................................................................... 51

I.    The District Court Should Reject the Bankruptcy Court's Recommendation that Tilton Be Found Liable for Breach of Her Duty of Loyalty...............................................51

    A.    The Process Leading to the OldCo/NewCo Restructuring Was Fair....................53

        1.    Timing of the Transaction...............................................54

        2.    The OldCo/NewCo Restructuring Was Developed in Plain Sight with Participation and the Input of Third Parties......................................58

        3.    The Structure of the Transaction Was Fair .....................59

        4.    The Bankruptcy Court's Criticisms Are Unfounded and Untethered to the Facts as They Existed on the Ground. .............................................60

    B.    TransCare Received a Fair Price for the Subject Collateral. ................................68

II.    The Bankruptcy Court's Recommended Damages Award Should Be Rejected .............76

    A.    The Trustee Failed to Prove Causation..................................................79

    B.    Arnold's Calculations Are Irrelevant and Speculative ..........................................83

1.      Arnold Failed to Offer An Opinion On Value ...........................................83

2.      Arnold's Calculations Should Be Rejected As Impermissibly Speculative ................................................................................................90

CONCLUSION.......................................................................................................... 99

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ACP Master, Ltd. v. Sprint Corp.*,
    2017 WL 3421142 (Del. Ch. July 21, 2017),
    *aff'd*, 184 A.3d 1291 (Del. 2018)................................................................52, 69

*Agranoff v. Miller*,
    791 A.2d 880 (Del. Ch. 2001)..........................................................................92

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*,
    120 A. 486 (Del. Ch. 1923)..............................................................................73

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
    2018 WL 3326693 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho
    Techs. Holdco B LLC*, 2019 WL 5399453 (Del. Oct. 22, 2019) ................................56, 77, 81

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
    794 A.2d 1161 (Del. Ch. 1999), *as revised* (Nov. 16, 1999),
    *aff'd*, 766 A.2d 437 (Del. 2000)..........................................................56, 69, 82

*Boyer v. Wilmington Materials, Inc.*,
    754 A.2d 881 (Del. Ch. 1999)..........................................................................77

*Burtch v. Opus, LLC (In re Opus E., LLC)*,
    528 B.R. 30 (Bankr. D. Del. 2015),
    *aff'd*, 698 F. App'x 711 (3d Cir. 2017)............................................................73

*Cantor Fitzgerald, L.P. v. Cantor*,
    2001 WL 536911 (Del. Ch. May 11, 2001)......................................................79

*Cavalier Oil Corp. v. Harnett*,
    1988 WL 15816 (Del. Ch. Feb. 22, 1988),
    *aff'd*, 564 A.2d 1137 (Del. 1989)....................................................................92

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004)................................................................84

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1134 (Del. Ch. 1994),
    *aff'd*, 663 A.2d 1156 (Del. 1995)........................................................52, 65, 68

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995)........................................................................51, 52

*Cline v. Grelock*,
2010 WL 761142 (Del. Ch. Mar. 2, 2010)................................................................77

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*,
385 F. Supp. 2d 449 (D. Del. 2004).......................................................................79

*Cooper v. Pabst Brewing Co.*,
1993 WL 208763 (Del. Ch. June 8, 1993)...............................................................78

*Doft & Co. v. Travelocity.com Inc.*,
2004 WL 1152338 (Del. Ch. May 20, 2004).......................................................90, 94

*Emerald Partners v. Berlin*,
2003 WL 21003437 (Del. Ch. Apr. 28, 2003),
*aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003)......................................................52

*FrontFour Capital Grp. LLC v. Taube*,
2019 WL 1313408 (Del Ch. Mar. 11, 2019).......................................................53, 57

*Gen. Motors Corp. v. New Castle Cty.*,
2000 WL 33113802 (Del. Super. Ct. Dec. 16, 2000) ...............................................84

*Gentile v. Rossette*,
2010 WL 2171613 (Del. Ch. May 28, 2010)............................................................66

*Gesoff v. IIC Indus., Inc.*,
902 A.2d 1130 (Del. Ch. 2006).....................................................................10, 69, 79

*Hart v. Rick's Cabaret Int'l, Inc.*,
60 F. Supp. 3d 447 (S.D.N.Y. 2014)..................................................................89, 90

*Havee v. Belk*,
589 F. Supp. 600 (W.D.N.C. 1984),
*aff'd*, 775 F.2d 1209 (4th Cir. 1985).......................................................................73

*Huff Fund Inv. P'ship v. CKx, Inc.*,
2013 WL 5878807 (Del. Ch. Nov. 1, 2013) ...........................................................91

*In re Appraisal of Dole Food Co.*,
114 A.3d 541 (Del. Ch. 2014).................................................................................97

*In re Appraisal of Orchard Enters., Inc.*,
2012 WL 2923305 (Del. Ch. July 18, 2012)............................................................92

*In re Bos. Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010).....................................................................97

*In re Del Monte Foods Co. S'holders Litig.*,
  25 A.3d 813 (Del. Ch. 2011)...........................................................................................56

*In re Hanover Direct, Inc. S'holders Litig.*,
  2010 WL 3959399 (Del. Ch. Sept. 24, 2010) ...............................................................69, 70

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ...............................................................................77, 78

*In re Kaiser Aluminum Corp.*,
  343 B.R. 88 (D. Del. 2006)...........................................................................................51

*In re Lehman Bros. Holdings Inc.*,
  2019 WL 2023723 (S.D.N.Y. May 8, 2019) ...............................................................50

*In re LNR Prop. Corp. S'holders Litig.*,
  896 A.2d 169 (Del. Ch. 2005)...........................................................................................68

*In re Nine Sys. Corp. S'holders Litig.*,
  2014 WL 4383127 (Del. Ch. Sept. 4, 2014),
  *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015) ............52, 75, 76, 80

*In re PetSmart, Inc.*,
  2017 WL 2303599 (Del. Ch. May 26, 2017)...............................................................88

*In re Rural Metro Corp. Stockholders Litig.*,
  88 A.3d 54 (Del. Ch. 2014)...........................................................................................56

*In re Trados Inc. S'holder Litig.*,
  73 A.3d 17 (Del. Ch. 2013)...............................................................................51, 67, 68, 69

*In re Vision Hardware Grp., Inc.*,
  669 A.2d 671 (Del. Ch. 1995)...............................................................................70, 73

*Int'l Telecharge, Inc. v. Bomarko, Inc.*,
  766 A.2d 437 (Del. 2000) ...............................................................................77, 82

*Kahn v. Tremont Corp.*,
  694 A.2d 422 (Del. 1997) ...........................................................................................68

*Kohler Co. v. United States*,
  387 F. Supp. 2d 921 (E.D. Wis. 2005),
  *aff'd*, 468 F.3d 1032 (7th Cir. 2006)...............................................................85

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*,
  2014 WL 5192179 (Del. Ch. Oct. 10, 2014) ...............................................................78

*LongPath Capital, LLC v. Ramtron Int'l Corp.*,
2015 WL 4540443 (Del. Ch. June 30, 2015) ..................................................92, 94

*Neal v. Alabama By–Prods. Corp.*,
1990 WL 109243 (Del. Ch. Aug. 1, 1990),
*aff'd*, 588 A.2d 255 (Del. 1991) ..................................................................85

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) ........................................................................60

*Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Park Cap. Advisors, LLC (In re Katy Indus., Inc.)*,
590 B.R. 628 (Bankr. D. Del. 2018) .........................................................79

*Oliver v. Bos. Univ.*,
2006 WL 1064169 (Del. Ch. Apr. 14, 2006) ........................................54, 81

*OptimisCorp v. Waite*,
2015 WL 5147038 (Del. Ch. Aug. 26, 2015),
*aff'd*, 137 A.3d 970 (Del. 2016) ................................................................77

*Pereira v. Cogan*,
267 B.R. 500 (S.D.N.Y. 2001) ...................................................................53

*Ravenswood Inv. Co v. Estate of Winmill*,
2018 WL 1410860 (Del. Ch. Mar. 21, 2018),
*aff'd*, 210 A.3d 705 (Del. 2019) ................................................................78

*Reis v. Hazelett Strip-Casting Corp.*,
28 A.3d 442 (Del. Ch. 2011) ..............................................53, 69, 78, 94

*Rivera v. Mendez & Compania*,
988 F. Supp. 2d 174 (D.P.R. 2013) ...........................................................85

*Roselink Inv'rs, LLC v. Shenkman*,
386 F. Supp. 2d 209 (S.D.N.Y. 2004) ......................................................47

*Rubin v. Manufacturers Hanover Tr. Co.*,
661 F.2d 979 (2d Cir. 1981) ......................................................................72

*S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*,
2011 WL 863007 (Del. Ch. Mar. 9),
*aff'd*, 35 A.3d 419 (Del. 2011) .......................................52, 67, 68, 70, 72, 73

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ..........................................85

*Strassburger v. Earley*,
    752 A.2d 557 (Del. Ch. 2000), *as revised* (Jan. 27, 2000) .......................................53

*Thorpe by Castleman v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996) .........................................................................................60, 77

*United Rentals, Inc. v. Pruett*,
    296 F. Supp. 2d 220 (D. Conn. 2003) ................................................................................15

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .........................................................................................47, 51, 53

*William Penn P'ship v. Saliba*,
    13 A.3d 749 (Del. 2011) .........................................................................................69

**STATUTES**

Bankruptcy Code § 363 .........................................................................................19, 63

U.C.C. Art. 9 .................................................................................................................... *passim*

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9033 .........................................................................................1, 50, 51

Pursuant to Rule 9033(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), defendant Lynn Tilton respectfully submits the following objections to the bankruptcy court's Post–Trial Proposed Findings of Fact and Conclusions of Law [Dkt. No. 138] ("PFC").

## PRELIMINARY STATEMENT

The bankruptcy court's liability and damages recommendations are not supported by, and are contrary to, the trial record.  Respectfully, the bankruptcy court simply got it wrong.  In recommending the District Court: (1) find Tilton liable for breach of the fiduciary duty of loyalty under Delaware law and; (2) enter an award of damages against her in the amount of $41.8 million, the bankruptcy court wholly ignored or misstated key evidence, and turned the law of damages on its head.  As discussed below, the evidence demonstrates that (i) Tilton acted with a good faith intent to salvage a portion of a "woefully insolvent" (PFC at 88) company and the hundreds of associated jobs, (ii) Tilton, relying upon information provided to her by an outside financial advisor, believed there was no other option but the restructuring transaction at issue, (iii) TransCare lacked the liquidity or access to capital necessary to continue its operations and was swiftly heading toward a liquidation, and (iv) Tilton ultimately received no benefit from the restructuring transaction at issue. While, according to the bankruptcy court, the recommended damage award is intended to compensate the above-captioned debtors for Tilton taking, through an Article 9 foreclosure, a purportedly valuable business, the evidence shows what she "took" only had a hypothetical, potential future value wholly dependent on an infusion of new capital, the passage of time, and operational success that was far from certain.  In reality, the assets foreclosed upon were never physically transferred and the new business never operated.  Tilton herself received nothing of value.  The speculative damages award thus bears no relationship to the *actual*

*value* of the business that was foreclosed on, a business that was at that time on day-to-day life support.

This case arises from the failure of an insolvent regional ambulance business, TransCare. In February 2016, after more than a year of deep financial distress, TransCare breathed its last gasp and a number of TransCare entities filed for bankruptcy protection. Tilton was the sole director of TransCare and the indirect holder of a majority of its equity. She also controlled defendant Patriarch Partners Agency Services, LLC ("PPAS"), which was the administrative agent for a group of TransCare's term loan lenders.

The situation was dire. In the two weeks leading up to the chapter 7 bankruptcy filings on February 24, 2016, the company was a rapidly sinking ship. As the bankruptcy court found, TransCare (1) was shedding customers, (2) was in default on its term loan and an asset based revolving loan ("ABL"), (3) could have had either loan (totaling more than $55 million in secured debt) called at any time, (4) "was unable to borrow money elsewhere," and (5) was at the mercy of voluntary funding by its ABL lender, Wells Fargo N.A. ("Wells Fargo" or "Wells"), to continue operating day to day. (PFC at 10, 19, 28, 29, 90.) Indeed, as the outside financial advisory and restructuring firm, Carl Marks Advisory Group ("CMAG"), which had been hired by Tilton for TransCare, told her in late January 2016, "TransCare [was] operating at an absolute breaking point." (PX_175, at 02111.)[1]

In late 2015 and into early February 2016, Tilton, working with Wells and its outside financial advisor, CMAG, explored a potential sale of the company. But a sale was not realistic

---

[1] References to (i) "DX__" are to the defendants' exhibits that were admitted into evidence at the trial or by stipulation (Dkt. No. 131); (ii) "PX__" are to the plaintiff's exhibits that were admitted into evidence at the trial or by stipulation (*id*.); and (iii) "JX__" are to the joint exhibits that were admitted into evidence at the trial. As used herein, "Stipulation No." means the facts to which the parties stipulated in the Final Pre–Trial Order ("FPTO"). (Dkt. No. 85). In citing to the Bates–stamped page numbers, we omit the prefix and refer to the last five or six digits of the Bates–stamped page number.

due to its dire financial distress.  Indeed, in its PFC, the bankruptcy court found that, on February 5, 2016, Tilton "made a good faith determination that the company as a whole was not saleable." (PFC at 43.)  The bankruptcy court also found Tilton reached this conclusion "due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available."  (*Id.*)  The bankruptcy court noted that she made this determination, on February 5, based on the work of the outside financial advisor, CMAG.  (*Id.*)

Things got worse from there.  During the ensuing two weeks, TransCare lost key customers and Tilton was informed, at one point, by Wells Fargo that funding would immediately cease.  If that decision had not been reversed at the eleventh hour, TransCare would have had to shut its doors right then and there.  As it stood, Tilton understood Wells was free to change its mind again and stop funding at any time.   The company continued to operate at the mercy of the bank, not knowing from one day to the next whether funds would be available to operate the next day, or if Wells would rather apply any cash received to reduce its nearly $14 million loan balance.  The record makes clear that Tilton was working with, and speaking to, Wells constantly in an attempt to forestall actions by the bank that would lead to TransCare's immediate liquidation.

It was against this backdrop that Tilton developed a plan to try to salvage certain business units of TransCare and thereby save hundreds of jobs.  The basic idea was to separate TransCare's assets between a NewCo and an OldCo and then to orderly wind down OldCo's operations, while NewCo tried to build certain operations with a fresh cash infusion.  The assets to be used for NewCo would be foreclosed on by TransCare's term loan lenders under Article 9 of the Uniform Commercial Code and then contributed to a new company that would operate as "Transcendence." NewCo's funding would be provided by one of Tilton's personal investment vehicles.

Given the existential distress TransCare was facing, Tilton and her colleagues worked tirelessly with Wells, CMAG, and various TransCare personnel to execute her plan.  The only realistic alternative was to liquidate the entire business; indeed, the situation was so dire that Tilton offered to simply "hand the keys" over to Wells.  There was neither the time nor the money to pursue another path and, as the bankruptcy court acknowledged, Tilton had no obligation to continue funding the company herself.  (PFC at 43.)

Tilton, again working openly with Wells and CMAG, established the corporate entities for NewCo and had the paperwork drawn up and executed for PPAS (as administrative agent for the term loan lenders) to foreclose on certain of TransCare's assets and contribute them to the newly–formed entities that were to comprise Transcendence.  Admittedly, Tilton was on both sides of the planned transaction.  However, she engaged in a methodical calculation of the value of the assets to be foreclosed on and used that calculation as the basis for the foreclosure price (a $10 million reduction of TransCare's term loan debt, which was colloquially referred to as a "credit bid"; in fact, the $10 million represented an overpayment for the assets).  Although the plan was not perfect, it was thoughtful and fair.  Indeed, the following colloquy about the foreclosure between the bankruptcy court and counsel for the plaintiff, TransCare's chapter 7 Trustee (the "Trustee"), on the last day of the trial of this case is instructive:

> THE COURT:  "[W]hat's the evidence that [Tilton] wasn't acting with an honest intention to reorganize or save the company?"
>
> MR. AMINI:  "I don't know that we would say that she wasn't acting with an honest intention to reorganize or save the company."

(Aug. 14 PM Tr. 6:22–7:2.)[2]

---

[2] "Tr." refers to the trial transcript.  Specific transcript volumes are designated by date and either the morning ("AM") or afternoon ("PM") trial sessions.

Ultimately, the plan was unsuccessful.  After the foreclosure and the chapter 7 bankruptcy filing of the OldCo businesses on February 24, and the appointment of the Trustee the next day, Transcendence did not get up and running.[3]  Tilton did not make a penny from the plan and was denied the chance to save the jobs of hundreds of employees.  In fact, she lost funds she had loaned to TransCare on an emergency basis in an effort to keep it alive at a time when the bankruptcy court expressly found the company was "out of cash" (PFC at 90).  She made the emergency loan hoping it would help the company survive for long enough to try to salvage 700 jobs.  Moreover, because Transcendence never operated, the assets that were foreclosed on were never physically transferred from TransCare to Transcendence.  The Trustee was able to secure those assets (essentially consisting of used ambulances and some office equipment) and, after the NewCo entities subsequently filed for bankruptcy under chapter 7, the Trustee was appointed as chapter 7 trustee for those businesses too.  Through a court ordered stipulation (PX_258; *In re TransCare Corp.*, Case No. 16–10407-smb, Dkt. No. 52), PPAS (managed by Tilton) consented to the Trustee liquidating the assets that had been foreclosed on, which he did.  (PX_258, Exhibit A, at 4, ¶ 1.)  Thus, this is not a case where an insider spun off valuable assets from a debtor and then immediately made millions operating them outside the reach of the debtor's creditors.  On the contrary, *the assets were transferred only on paper, "returned" to the Trustee without incident, and auctioned off through an orderly process.*  The public auction of __***all***__ of TransCare's tangible personal property, including but not limited to the ambulances, yielded only $2.35 million.[4]

Eventually, the Trustee brought this action claiming, among other things, that Tilton breached her fiduciary duty of loyalty by undertaking the Article 9 foreclosure.  Eleven months

---

[3] In fact, the National Labor Relations Board found that Transcendence never even operated.  *Transcendence Transit II, Inc., et al. and Local 1181–10601, et al.,* Case 29–CA–182049, at 15 (N.L.R.B. 2020) (__**Exhibit A**__ hereto) ("Transcendence . . . was in fact not operating at any given time.")

[4] *See In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 257, 258; PX_282, at Exhibit 13.

after the conclusion of a bench trial, the bankruptcy court issued its PFC, which recommended the District Court find Tilton liable for breach of the fiduciary duty of loyalty.  In so doing, the bankruptcy court relied on case law involving insider transactions with large, relatively healthy businesses that did not confront the existential crises that TransCare faced in February 2016.  Based on that analytical framework and notwithstanding the bankruptcy court's repeated findings regarding TransCare's deep financial distress – including a finding that "Transcare was woefully insolvent with negative net equity of nearly $40 million" (PFC at 88) and a finding in a related TransCare case that "TransCare was on life support for nearly one year and depended on Tilton affiliates to cover shortfalls throughout 2015 and into 2016"[5] – the bankruptcy court found Tilton did not meet her burden of proving the Article 9 foreclosure was entirely fair to TransCare under Delaware law.

The bankruptcy court criticized Tilton's plan because she did not try to sell the NewCo business lines to a third party or market them in a chapter 11 bankruptcy case during the two weeks after she "made a good faith determination that the company as a whole was not saleable."  (PFC at 43.)  Such criticism is misplaced.  The supposed alternatives the bankruptcy court scolded Tilton for not considering all required TransCare to continue operations, potentially for a long period of time, so that marketing and due diligence could take place.  As a result, they were not true alternatives at all: TransCare did not have the luxury of time – it was "on life support."  It had no cash or committed working capital.  Wells, which had had called a default and stated clearly it would under no circumstances continue to lend to TransCare for any length of time, would have to be repaid.  This would have required an injection of fresh, new money into a company that was

---

[5] *Ien, et al. v. TransCare Corp., et al.* ("*Ien*"), Adv. Proc. No. 16–01033, *Memorandum Decision Granting in Part and Denying in Part Moving Defendants' Motion for Summary Judgment and Granting Partial Summary Judgment to Plaintiff*, Dkt. No. 157, at 35 (**Exhibit B** hereto).  In the *Ien* action, former employees of TransCare claim violations of federal and New York State Worker Adjustment and Retraining Notification (or "WARN") statutes.

already hemorrhaging and in default on more than $55 million in secured debt.  A chapter 11 bankruptcy would have required Debtor–In–Possession ("DIP") financing which Wells plainly had no appetite to provide, nor would Wells allow its liens to be primed for a different lender, including Tilton, to provide DIP financing.[6]  The bankruptcy court did not explain how any of the options it criticized Tilton for not exploring, during the two weeks at issue, were viable for a company that, to use the bankruptcy court's own words, "was on life support."  And, in fact, there is no explanation; none of these options were viable or realistic.  The record shows that there was neither time nor money available to keep the "woefully insolvent" TransCare afloat to pursue a sale of any of its business units, in or out of chapter 11.  Indeed, when the dust settled, and Wells collected on the receivables over which it had a lien, all of TransCare's tangible assets (mostly used ambulances and office equipment) yielded only $2.35 million at auction.[7]

In effect, the bankruptcy court punished Tilton for engaging in the OldCo/NewCo Restructuring (defined below) when the only other alternative was liquidation of the entire company.  If she had not tried to use her own money to salvage NewCo (and the associated jobs), and instead simply handed the keys over to Wells or filed the whole company for chapter 7 liquidation, this lawsuit would never have existed.  The punitive nature of the bankruptcy court's liability and damages recommendations is underscored by the fact that Tilton got nothing from the challenged transaction.

The bankruptcy court also criticized Tilton's calculation of the foreclosure price, finding it to be unfair to TransCare.  But those criticisms were either factually wrong or immaterial, or based on the untenable premise that the assets foreclosed on should have been valued as a going concern.

---

[6] JX_82, at 48227; DX_195.
[7] *See In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 257, 258; PX_282, at Exhibit 13.

That premise defies reality and the bankruptcy court's own findings about TransCare's extreme financial woes.

Most remarkably, the bankruptcy court recommended the entry of an eye-popping *$41.8 million* judgment against Tilton, an individual.  According to the bankruptcy court, this amount represented the value of the business lines that were to comprise NewCo at the time of the Article 9 foreclosure.  That valuation makes no sense: (1) the NewCo assets were held by TransCare Corporation subsidiaries that were guarantors for or borrowers of approximately $55 million in secured debt and (2) the very idea of NewCo died a day after the foreclosure and Transcendence never operated, and never made a penny.  The bankruptcy court relied entirely on the calculations of the Trustee's expert witness, who himself relied blindly on projections quickly created under extreme time pressure by Tilton and her colleagues of NewCo's ***potential future*** value, with the benefit of a fresh new capital infusion, based on ***potential*** performance and EBITDA multiples for other (supposedly comparable) companies contained in a single email from one of Tilton's colleagues.  These ***potential future*** values were calculated to determine the amount of required new money contribution at a time when NewCo was being modeled — for if there was no chance the new entities could repay the new funds provided, then there would have been no reason to engage in the NewCo transaction to save those business units and the jobs associated with them.  NewCo had ***potential***, and Tilton believed that NewCo might eventually realize that potential with an infusion of new money, but the value of NewCo at the time of the foreclosure was essentially zero.  Putting aside, for a moment, the many obvious defects in the expert testimony the bankruptcy court relied on to reach its damages conclusions (discussed further below), the bankruptcy court's damage award recommendation completely ignores the element of causation.  To say that the challenged foreclosure somehow robbed TransCare of $41.8 million dollars in actual (***as opposed***

*to hypothetical, speculative future*) value is to deny reality.  Although it is possible to speculate that, had things worked out, NewCo might have achieved the projections the expert witness used, that is a far cry from evidence to support a finding that the NewCo business lines *were actually worth $41.8 million dollars at the time of the foreclosure* or would have been worth that amount but for the foreclosure.  The reality is that at the time of the foreclosure, TransCare was a zombie company, barely surviving to make payroll to its employees.  Its value, because it did not have any hope to procure the liquidity necessary to run the business as a going concern, was merely its liquidation value.  No part of it (including what Tilton hoped would operate as a going concern as Transcendence) could possibly have held value approaching $41.8 million on February 24.  Quite the opposite.  To reach the potential future value, NewCo required millions in new money working capital funding, new management, and operational success, which was by no means assured.

In contrast, the value of the NewCo business units at the time of the foreclosure is actually known.  The recovery in liquidation by the Trustee was $2.35 million.  The *potential future value* (which assumed a fresh cash infusion plus time) – which is the measure used by the bankruptcy court in its damage calculation – bears no relationship to what was actually foreclosed on or the value of NewCo on the date of the foreclosure.  One can liken it to a foreclosure on a rundown, damaged home.  If the buyer of such a home takes the risk, and puts in time, and new money, and makes improvements, the property that was foreclosed upon may have a high *potential future value*.  But that is not the same thing as the value of the run-down, damaged house at the time of the foreclosure.  The *real value* at the time of foreclosure cannot be artificially inflated and propped–up by *potential future value*.

Reliance on an "artificial inflation" of value for NewCo is exactly what the bankruptcy court did here.  In its PFC, the bankruptcy court used the potential future value of a fully

capitalized, successful business (like the future fixed–up house) as a measure of damages – a punishing $41.8 million for what amounted to a garage full of used ambulances, which were actually liquidated by the Trustee's auctioneer for a mere $2.35 million.

Damage awards for breach of the duty of loyalty should not be punitive. *See, e.g., Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006). Where the duty of loyalty has been breached, but it cannot be established that the breach ***actually caused*** quantifiable harm, the remedy under Delaware law is to award ***nominal damages***. But here the bankruptcy court paid only lip service to causation, jumping to the conclusion that the foreclosure actually stripped TransCare of tens of millions of dollars in value when the facts (a company that, in the bankruptcy court's own words, was "woefully insolvent," "out of cash," and "on life support") did not even remotely support that conclusion. The remedy here, assuming there was a breach, should have been an award of nominal damages.

The Trustee's expert also did not do what the bankruptcy court gave him credit for doing. He did *not* "determine the projected value of the Transcendence business, and hence, TransCare's damages resulting from the stripping of that business through an unfair, tainted process." (PFC at 59.) On the contrary, the Trustee's expert freely acknowledged he did not offer ***any opinion at all about what the businesses at issue were actually worth***. Instead, he performed a mathematical calculation using other people's projections about what NewCo ***could be*** worth in the future under certain hypothetical assumptions (including the infusion of fresh capital), but the expert declined to say whether those projections, or the result of his calculations, were reasonable. That is not evidence sufficient to properly support a damage award, much less one of the magnitude the bankruptcy court recommended be awarded against Tilton, an individual. There are, as discussed below, other significant flaws with the expert's work. But, at bottom, his testimony should never

have been considered, in the absence of evidence of causation or his own opinion of value, which he expressly disclaimed having.

For these reasons and those set forth in greater detail below, Tilton's objections to the bankruptcy court's PFC should be sustained. Judgment should be entered in Tilton's favor or, in the alternative, an award of only nominal damages should be entered.

## THE RECORD EVIDENCE

### A.     The Parties

TransCare Corporation, by and through its subsidiaries (collectively, "TransCare"), provided ambulance services to hospitals and municipalities, and paratransit services to the New York Metropolitan Transit Authority ("MTA") for individuals with disabilities. (Stipulation No. 1.) TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester County, New York, (3) Hudson Valley, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) paratransit services pursuant to a contract with the MTA (the "MTA Contract"). (Id.; Stipulation Nos. 29–30.)

Tilton served as the sole director of TransCare. (Stipulation No. 2.) Ark II CLO 2001–1, Limited ("Ark II") owned a 55.7% direct interest in TransCare, and Tilton owns 99% of Ark II. (Stipulation Nos. 6, 8.) Ark Investment Partners II, L.P. ("AIP"), a Tilton affiliate, owned 5.6% of TransCare's shares. (Stipulation No. 9.) Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owned, or managed, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626), and the remaining 12.7% of TransCare was owned by various entities and individuals. (In re TransCare Corp., Case No. 16–10407-smb, Dkt. No. 132.)

PPAS, Patriarch Partners, LLC ("Patriarch Partners"), and Patriarch Partners Management Group, LLC ("PPMG") are Delaware limited liability companies, and Transcendence Transit, Inc.

11

("Transcendence Transit") and its direct subsidiary, Transcendence Transit II, Inc. (together with Transcendence Transit, "Transcendence"), were Delaware corporations.  (Stipulation Nos. 3–5, 7.)  Tilton is the sole manager and ultimate indirect owner of PPAS, Patriarch Partners and PPMG (Stipulation Nos. 3–5) and was the sole director of Transcendence.  (Stipulation No. 7.)

Patriarch Partners is a family office that supports Tilton in her ownership of, and her role as manager and director of, a number of different companies ("portfolio companies"), of which TransCare was one.  (*See, e.g.*, July 22 AM Tr. 15:4–10; July 23 PM Tr. 3:4–12.)  Affiliates of Patriarch Partners also served as the collateral manager for Zohar CDO 2003–1, Ltd., Zohar II 2005–1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds").[8]  (Aug. 13 PM Tr. 23:1–6.) PPMG is a group of operational leaders that provide operational consulting and other services to the portfolio companies.  (Aug. 13 PM Tr. 19:21–25.)[9]

### B.   TransCare's Debt Structure

- *The Term Loan*

TransCare Corporation, as borrower, the Term Loan Lenders (defined below), as lenders, and PPAS, as administrative agent, are parties to a Credit Agreement, dated August 4, 2003 (as amended, the "TLA").  (JX_1.)  From November 1, 2014, through February 24, 2016, the lenders under the TLA were:  (i) AIP, (ii) the Zohar Funds, (iii) Credit Suisse, and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").  (Stipulation No. 10.)  The Zohar Funds owned over 75% of the TLA debt.

---

[8] Tilton owned and controlled the Zohar Funds during the time period relevant to this case.  (*See* Aug. 13 PM Tr. 63:4–12.)

[9] As of 2015, through affiliated entities, Tilton held a majority or sole equity interest in over seventy portfolio companies and served as CEO of four of them.  (Aug. 13 PM Tr. 20:5–9.)  At the time they were acquired, the portfolio companies were deeply distressed.  (*Id.* at 18:22–19:5.)  Funding was provided to them, in part, by the Zohar Funds, which "invest[ed] in deeply distressed companies" and provided the necessary capital to "restructure those companies over long periods of time."  (*Id.* at 22:9–23:6.)  Funding was also provided by certain of Tilton's personal investment funds.  (JX_1.)

(PX_209.)  Credit Suisse acted as collateral manager for First Dominion (JX 1 at 00106; July 22 PM Tr. 30:20–23), and Credit Suisse and First Dominion together owned approximately 18% of the debt.  (PX_209.)  AIP owned approximately 7% of the debt.  (PX_209.)

In connection with the TLA, TransCare Corporation executed a Security Agreement, dated August 4, 2003 (the "<u>PPAS Security Agreement</u>"), and as amended, supplemented or modified, in favor of PPAS as administrative agent for the Term Loan Lenders.  (Stipulation No. 12.)  The Security Agreement gave the Term Loan Lenders a blanket lien on all of TransCare's assets.  (DX_3, at 230123, § 2.)   In addition to the Security Agreement, TransCare Corporation's subsidiaries executed a Guarantee, dated August 4, 2003, as amended, supplemented or modified, in favor of PPAS as administrative agent for the Term Loan Lenders.  (Stipulation No. 13.)

The TLA and PPAS Security Agreement gave the Required Lenders (*i.e.*, those Term Loan Lenders with credit exposure in the aggregate of more than 50%) discretion to instruct PPAS (as agent) to take certain actions on behalf of all the Term Loan Lenders.  (JX_1, at 00049, 00096; DX_3, at 230136.)  During the time period at issue, Tilton controlled the Required Lenders (*see* PX_209 (showing that the Tilton–controlled Zohar Funds and AIP owned 75% and 7% of the term loan debt, respectively)) and thus could cause PPAS to take actions that (a) could be authorized by the Required Lenders and (b) did not require the consent of all of the Term Loan Lenders.  For example, under Section 12.1 of the TLA, the Required Lenders were permitted to enter into any written amendments to the TLA or other loan documents, including the PPAS Security Agreement, subject to certain narrow exceptions.  (JX_1, at 00096, § 12.1.)  One of those exceptions was that the Required Lenders were prohibited from taking actions that "release[d] all or substantially all of the Collateral" (as defined in the PPAS Security Agreement) without the consent of each of the

Term Loan Lenders.  (*Id.*)  Thus, in order for TransCare's assets to be sold free and clear of the Terms Loan Lenders' liens, all of the Term Loan Lenders needed to consent.  (*Id.*)

Upon an Event of Default under the TLA, Section 8 of the PPAS Security Agreement permitted PPAS to foreclose on the Collateral on behalf of the Term Loan Lenders.  (DX_3, at 230136, § 8.)  An Event of Default could be called by PPAS with the consent of the Required Lenders or upon their request.  (JX_1, at 00090–91.)  Thus, the consent of all the Term Lenders was *not* required in order for PPAS to call an Event of Default or foreclose on Collateral on behalf of the Term Loan Lenders.  (*Id.*; Aug. 13 AM Tr. 9:8–11.)  Under the terms of the TLA, TransCare's failure to make timely interest payments constituted an Event of Default.  (JX_1, at 00088, § 10(a).)

- *The Wells Fargo ABL Facility*

TransCare Corporation and its subsidiaries were also parties to a syndicated, asset–backed revolving credit agreement and security agreement, as borrowers and/or guarantors, with Wells Fargo, dated October 13, 2006 (as amended, the "Wells Fargo ABL Agreement" or "ABL Agreement").  (JX_2; Stipulation No. 14.)  Under Section 5.1 of the ABL Agreement, Wells held a security interest in all of TransCare's assets.  (JX_2, at 00785–87, § 5.1.)  TransCare was prohibited from "sell[ing], issu[ing], assign[ing], leas[ing], transfer[ring], abandon[ing] or otherwise dispos[ing] of . . . any of its assets to any other Person[]" without Wells Fargo's consent.  (*Id.* at 00818–20, § 9.7(b), (d).)  In connection with the ABL Agreement, Wells and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "Wells Fargo/PPAS Intercreditor Agreement").  (JX_3.)  The Wells Fargo/PPAS Intercreditor Agreement provided for the retention by the Term Loan Lenders of first priority liens on certain

14

property, including equipment, inventory, and vehicles.  (*Id.* at 00029.)  Wells had a first–priority position in all of TransCare's other assets, including accounts receivable.  (*Id.* at 00006, § 1.26.)

### C.     TransCare's Liquidity and Financial Reporting Challenges

In November 2014, Tilton learned that TransCare was experiencing financial difficulties. (Aug. 13 PM Tr. 23:13–21.)  In response, she asked Jean–Luc Pelissier, a platform leader at PPMG, to provide operational assistance to TransCare.  (July 23 AM Tr. 8:15–9:4, 55:21–23.)  Thereafter, TransCare developed a turnaround plan.  (*Id.* at 57:1–9.)  Tilton also determined to make a leadership change at TransCare (Aug. 13 PM Tr. 25:11–14) and Glenn Leland was subsequently hired as CEO.  (July 23 AM Tr. 57:17–19.)  Shortly after arriving at TransCare, Leland reported to Tilton that the turnaround plan developed in November 2014 was not viable.  (JX_8; Aug. 13 PM Tr. 28:16–25; July 23 AM Tr. 59:16–23; *see also* JX_10.)

TransCare struggled to produce timely financial statements.  (Aug. 13 AM Tr. 52:3–6.)  It did not have audited financials for 2014 (July 22 PM Tr. 79:21–80:12) and had delayed transmitting monthly financial statements to its lenders.  (Stipulation No. 28.)  In an apparent effort to blame Tilton for TransCare's problems in this regard, the bankruptcy court made a series of erroneous findings about how TransCare was managed.  (*See generally* PFC at 8–9.)  Based on those errors, the bankruptcy court incorrectly found that "Tilton made all the decisions for TransCare and managed TransCare through her employees at Patriarch entities." (*Id.* at 9.)[10]  The evidence tells a wholly different story.

---

[10] The PFC relies on the deposition testimony of Glenn Leland, TransCare's CEO in 2015, and John Husson, a representative of Wells Fargo, TransCare's ABL lender.  Defendants objected to significant portions of the designated testimony and made cross–designations.  (Dkt. No. 85, FPTO, Exs. D–E.)  A chart of objections and cross–designations is attached as **Exhibit C**.  It is well understood that deposition testimony is a poor substitute for live testimony.  *United Rentals, Inc. v. Pruett*, 296 F. Supp. 2d 220, 229 (D. Conn. 2003).  Nevertheless, and despite defendants' request that it do so, the bankruptcy court declined to review the video of Leland's deposition (PFC at 3, n.1) and thus did not observe the remarkable changes in his demeanor based on which party was asking him questions.

To start, Tilton did not make day–to–day decisions for TransCare.  (Aug. 13 AM Tr. 41:23–24.)  As previously stated, during this time Tilton held a majority or sole equity interest in over seventy portfolio companies and served as CEO of four of them.  (Aug. 13 PM Tr. 20:5–9.)  Tilton did not, at any point, serve as CEO of TransCare.  Even where Tilton acted as CEO of a particular portfolio company, she relied on the CFO and controller of the company to produce their own financial statements.  (Aug. 13 PM Tr. 34:9–18.)

Although TransCare's management could not take certain actions without pre–approval by Tilton under TransCare's authority matrix (PFC at 7–8), the bankruptcy court erred in finding that the authority matrix limited the ability of TransCare's management to conduct *day–to–day operations* or control TransCare's daily affairs.  Instead, the authority matrix set forth the discrete actions for which TransCare's CEO had to secure Tilton's approval, primarily in respect of significant financial and operational decisions.  (PX_3, at 24172–75.)  The matrix had nothing to do with maintaining the company's financial statements.

Nor did Tilton manage TransCare through Pelissier or Michael Greenberg (PFC at 9), the Patriarch Partners credit officer assigned to TransCare.  (July 22 AM Tr. 14:10–13.)  Greenberg and Pelissier were only called upon to assist with issues at TransCare during specific moments of crisis.  (*See, e.g.*, July 23 AM Tr. 8:15–23; JX_44, at 63389 (describing assistance provided by Greenberg and Pelissier to "save TransCare" after the company missed payroll in July 2015); DX_72.)

Instead, responsibility for TransCare's day-to-day operations, including financials, belonged to TransCare's CEO and CFO.  (Leland II Tr. 377:19–378:14; July 23 AM Tr. 61:14–25.)  Mark Bonilla served as TransCare's CFO from April 2014 through September 2015 and, following his resignation, served as a consultant to TransCare until early January 2016.

16

(Stipulation No. 25.)   During his tenure, Bonilla was responsible for managing TransCare's financials.  (*See, e.g.*, JX_45, at 30459–60; JX_52, at 83108; DX_88, at 109644; *see also* JX_46, at 53413 (email from Pelissier to Bonilla and Leland: "We are not here to dictate what has to be paid and when, it remains your duty and decision as per the capabilities you have and your duties to satisfy creditors as the management team.").)   After Bonilla's departure in January 2016, Carl Landeck of CMAG, a financial advisory and restructuring firm Tilton hired for TransCare in January 2016, took on the role of CFO.  (JX_88; DX_106; July 22 AM Tr. 18:6–18, 55:1–11, 75:2–6.)[11]

### D.    Third–Party Inquiries About TransCare

On occasion during 2015, Leland and Tilton received inquiries from transportation companies about potentially purchasing some or all of TransCare's assets.  (*See, e.g.*, JX_12; JX_29, at 71449–50; JX_40.)   One company, National Express, expressed interest in TransCare's paratransit business, which provided services to the MTA (*see, e.g.*, JX_12; JX_40) pursuant to the MTA Contract.  (Stipulation No. 29.)   At the time, Leland estimated the MTA Contract produced approximately $3.5–$4 million of annual EBITDA.  (JX_12, at 04260; JX_29, at 71449.)

On July 10, 2015, National Express sent TransCare New York a non–binding Letter of Intent ("LOI") for the paratransit business (JX_40, at 30759), in which it proposed a purchase price in the range of $6 to $7 million, "less an amount [National Express] determine[d] [wa]s required to operate the acquired business for 60 days."  (*Id.* at 30760.)  The LOI provided that an unspecified

---

[11] Similarly, Pelissier had no authority over TransCare's operations; to the extent he made suggestions for operational improvements, TransCare's management team had no obligation to follow them.  (July 23 AM Tr. 54:21–55:2.)  In fact, TransCare's management team routinely ignored Pelissier's suggestions regarding operational improvements. (*See, e.g. id.* at 56:6–17, 61:4–9.)  During the relevant time period, Pelissier was also employed full–time as CEO of Universal Instruments.  (*Id.* at 5:15–17, 6:1–3, 54:1–9.)

portion of the purchase price would be "payable on closing of the transaction," with the balance to

be paid in equal installments over a five–year period.  (*Id.*)[12]

Richmond County Ambulance ("RCA") also reached out to both Leland and Tilton.  (*See, e.g.*, JX_29, at 71450.)   In a March 7, 2015 email from Leland to Tilton, Leland included a summary of one of RCA's inquiries "proposing $60 to $80MM as valuation" for TransCare.  (*Id.*) Leland explained: "My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range.  They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality).  So, I think this opportunity is not likely to succeed[.]"  (*Id.*)   RCA's inquiry was evidently premised on a significant misimpression of TransCare's current EBITDA which, on an LTM basis in March of 2015, was "zero" to "maybe slightly positive."  (*See* July 22 PM Tr. 84:5–13.)[13]

### E.    Wells Fargo Decides Not To Renew Its ABL

On October 14, 2015, Wells Fargo issued a Notice of Non–Renewal to TransCare (the "Non–Renewal Notice").  (DX_76.)  The Non–Renewal Notice stated that the ABL would expire on January 31, 2016, and that Wells "presently ha[d] no intention to extend or modify the term of such financing arrangements."  (*Id.* at 06336.)   The Non–Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016 (*see id.*), something which TransCare was in no position to do.  (July 22 PM Tr. 93:6–11.)[14]

---

[12] At the time National Express sent the LOI, the paratransit business had been generating approximately $3.5 to $4 million in EBITDA on a last twelve months ("LTM") basis.  (JX_12, at 04260; JX_29, at 71449.)  Although TransCare was able to extend the MTA Contract not long after National Express sent its LOI (JX_44), the new agreement proved to be less profitable.  (JX_67, at 106572; *see also* July 22 PM Tr. 105:9–107:19.)   By the fourth quarter of 2015, EBITDA had dropped to only $2.17 million.  (PX_191, at 04699.)

[13] Leland's belief that RCA's proposed price was based on its (albeit mistaken) impression of TransCare's then *current* earnings is consistent with Tilton's testimony at trial that prospective buyers look to actual earnings, not projections, when valuing a potential acquisition.  (Aug. 14 AM Tr. 38:17–20.)

[14] The outstanding balance as of the Initial Petition Date (defined *infra*) totaled approximately $14 million.  (PX_257.)

In the weeks that followed, TransCare management, with the assistance of Pelissier and Greenberg, tried to convince Wells to change its mind.  (DX_78, at 107560; July 22 AM Tr. 30:24–31:20.)  During this same time period, Wells lost confidence in TransCare's management team.  (*See, e.g.*, DX_88; DX_89, at 107076; DX_92, at 75263.)   Moreover, as of December 17, TransCare had failed to deliver to Wells (i) monthly unaudited financial statements for October 2015; (ii) quarterly financial statements for the first three quarters of 2015; or (iii) audited consolidated financial statements for 2014.  (PX_132, at 46849–50.)

## F.    Tilton Explores A Sale Of TransCare

In December 2015, Tilton determined to explore a potential sale of TransCare.  (JX_53, at 84007–08.)  As the bankruptcy court found, "Tilton wanted to get TransCare back to the $12–14 million of EBITDA that it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan."  (PFC at 12.)  Wells Fargo supported this decision but was disinclined to provide long–term funding.  (DX_92, at 75263 ("To be clear, our desire is to exit this credit facility and our appetite to support the business outside a process that leads to an exit is extremely limited.").)

- *Tilton Begins to Plan for a Potential Sale Process*

Tilton has a substantial depth of experience buying and selling companies.  (Aug. 13 PM Tr. 37:21–41:1.)  She has purchased and sold more than 300 companies, including sales under Section 363 of the Bankruptcy Code.  (*Id.* at 38:1–3, 38:15–22, 39:18–19.)  Armed with that experience, Tilton took steps to review and analyze TransCare to determine whether it was saleable.  (*Id*. at 53:3–7; July 22 AM Tr. 52:23–53:3.)  Tilton understood that Wells was not going to continue funding past January 31, absent a sale process.  (Aug. 13 AM Tr. 50:9–12.)

Tilton also did background work so that TransCare would be in a position to hire an investment banker if it made sense to sell the company.  (Aug. 13 PM Tr. 53:4–7.)  To that end, she asked Greenberg to get information about ambulance–company "transactions and [which investment banks] did them."  (DX_96, at 01414.)  Four hours later, Greenberg emailed Tilton a list of transactions for ambulance and air medical companies.  (JX_55, at 41410.)  As Greenberg explained, "the purpose [of the email] was to get a *general idea* of *potential* comparable transactions and comparable public companies that existed within the same or ancillary industries." (July 22 AM Tr. 42:3–18 (emphasis added).)

- *Negotiations with Wells Fargo about Funding to Bridge through a Sale*

Both Tilton and Wells Fargo understood that to engage in a sale process, TransCare would need sufficient liquidity to survive through a sale (Aug. 13 PM Tr. 38:4–22, 38:23–39:14, 39:20–24, 40:4–11; DX_98, at 18258), and both were concerned about TransCare's ability to continue operating for that period of time.  (DX_92, at 75263 ("we [Wells] are highly concerned about the company's ability to survive until a sale is completed"); Aug. 13 PM Tr. 51:22–52:6.)

Wells Fargo's expectation was that Tilton, through one of her investment vehicles, would provide TransCare with the funding necessary to keep it afloat through the completion of a sale. (DX_92, at 75263 ("It would be very helpful if we could get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity challenges.").)  Tilton likewise knew that TransCare would need continued working capital funding from Wells Fargo.  (Aug. 13 PM Tr. 54:8–9, 54:11–17.)

20

On December 23, Wells transmitted to Pelissier and Greenberg a summary of proposed terms for a longer–term forbearance of Wells Fargo's rights in order to bridge to a sale.  (JX_59.) As of December 30, the suggested timelines proposed by the parties were as follows:

| Item | PPAS Date | Wells Fargo counter |
|---|---|---|
| Budget to be prepared and reviewed by Advisor | 01/15/16 | Agreed |
| Investment banker hired (WF wants to be apprised of terms of the engagement) | 02/15/16 | 01/31/16 |
| Information Memorandum completed | 03/31/16 | 02/28/16 |
| Receipt of LOIs | 05/31/16 | 05/15/16 |
| Purchase/Sale Agreement | 07/31/16 | 06/30/16 |
| Sale closing | 09/30/16 | 07/31/16 |

(DX_100, at 106767.)  In an email sent on December 31, 2015, John Husson of Wells told Greenberg that Wells Fargo was comfortable with the dates Greenberg had last proposed so long as the sale closed by August 15, 2016.  (JX_65, at 00215.)  Thus, the parties agreed that the sale process could last up to eight months.  (*Id.*; *see also* Husson (*Ien*) Tr. 35:6–17.)

Wells Fargo's willingness to continue funding through a sale was also conditioned upon TransCare's receipt of a letter of intent and asset purchase agreement that Wells found acceptable. (JX_60, at 00145 ("[I]f we are not getting a full pay out or the payout is termed out over time we would not release our liens and the deal would just die anyway.  So the LOI needs to be in form substance satisfactory to Wells otherwise the exercise is a waste of time."); JX_64, at 12096 ("There are a number of items that Wells might find objectionable . . . [including] a requirement that Wells provides continued financing.").)

- *TransCare Hires CMAG*

In early January 2016, Tilton retained CMAG, a consulting firm that specializes in corporate restructuring, as a financial advisor.  (DX_106; Aug. 13 AM Tr. 51:22–23 ("[CMAG] came in to take control over the company").)  The scope of CMAG's assignment was set forth in

21

a consulting agreement between TransCare and CMAG.  (DX_106.)  It provided that "CMAG w[ould] report directly to TransCare's Board of Directors [Tilton]" and "assist TransCare by providing and overseeing the implementation process of recommendations intended to manage, secure [and] improve [TransCare's] financial performance and liquidity." (*Id.* at 43438.)  It further provided that CMAG's services were to include, without limitation: (i) "[p]erform[ing] normal duties of the position of TransCare CFO"; (ii) "[a]nalyz[ing] the Company's financial and capital needs in detail"; (iii) "review[ing] and updat[ing] as necessary existing financial projections and internal budget . . . [and] monthly and quarterly financials"; and (iv) "assist[ing] with further identification of actionable opportunities to improve profitability . . . intended to improve the Company's performance."  (*Id.* at 43439.)

The CMAG employees who participated in the engagement included Marc Pfefferle, Carl Landeck, and Jonathan Killion.  (*Id.* at 43438–39.)  One CMAG professional served as the Company's Chief Restructuring Officer (or "CRO") and another served as the Company's CFO. (July 22 AM Tr. 75:2–6, 55:1–11 ("Q: Wells Fargo wanted an outside chief restructuring officer, did they not?  A: Yes.  Q: Somebody who would report to not only Ms. Tilton, but to them.  A: Yes.  Q: And that's ultimately what Carl Marks' role became.  A: Yes it is.  Q And in addition to appointing at least one of their people as the outside CFO, correct?  A: Yes."); *see also* PX_165, at 00927 (describing CMAG's provision to TransCare of "restructuring guidance").)

- *The CMAG Executive Summary*

On January 13, 2016, Tilton asked CMAG to provide her an initial analysis of the cost of a potential bankruptcy filing compared to the cost of bridging to a sale of TransCare outside of bankruptcy.  (PX_165, at 00925–26; Aug. 13 PM Tr. 59:22–60:6.)  Tilton asked CMAG to perform this analysis "because . . . Wells [Fargo] was only willing to stay in the credit to bridge to some

sort of sale process." (Aug. 13 PM Tr. 60:8–10.)  On January 14, CMAG provided Tilton with a status update, in which CMAG's Pfefferle explained that TransCare "require[d] a substantial amount of [new money] funding *if the business [was] going to survive*." (PX_165, at 00927 (emphases added).)  He added, "[t]hese are not wish list amounts that might have been asked [by TransCare management] of you [Tilton] in the past, *but absolutely necessary in order to keep the business as an ongoing enterprise*." (*Id.* (emphases added).)  The CMAG team had also determined that "the EBITDA numbers [they] were originally given [were] significantly overstated." (*Id.* at 00925.)

Tilton expressed concern to CMAG about providing funding without having a plan to restructure TransCare (*id.* at 00925–26 ("I do not want to keep funding into a black hole that cannot be filled"); Aug. 13 PM Tr. 61:12–21), a concern that was shared by Pfefferle. (PX_165, at 00925 ("This is what we have been concerned about since we got here—funding into a black hole so our focus has been on the size of the hole and once filled what the business can really generate.").)  The work CMAG performed over the next several weeks further revealed that TransCare's liquidity situation was indeed dire, and there was an imminent risk that TransCare could not continue to operate. (*See, e.g.*, PX_175.)

On January 27, CMAG shared with Greenberg, Pelissier, and Patriarch Partners' Randy Jones a presentation CMAG had prepared (the "CMAG Executive Summary"). (*Id.*)  The bankruptcy court described the CMAG Executive Summary as "list[ing] a litany of significant problems with vendors, customers, landlords and equipment . . . ." PFC at 19.  That was an understatement.  In fact, the CMAG Executive Summary made clear that "TransCare is now operating at an absolute breaking point." (*Id.* at 02111.)  CMAG described "strained and broken customer relationships" at TransCare and that "*[v]irtually all key customers [were] pursuing or*

*considering replacement options.*"  (*Id.* (emphasis added).)  CMAG also described the (i) "strained and broken ambulance fleet"; (ii) "strained and broken vendor relationships"; and (iii) "strained and broken landlord relationships."  (*Id.* at 02111–12.)  CMAG also cautioned against a TransCare bankruptcy filing, fearing that, "given the business fragility," a bankruptcy would result in "customers and employees . . . abandon[ing] TC."  (*Id.* at 02116.)

CMAG reported that it had been "fighting daily fires and working to hold the business and organization together."  (*Id.* at 02118.)  CMAG also cautioned that it had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting*."  (*Id.* at 02114 (emphasis added).)

CMAG also emphasized the riskiness of any additional investment in TransCare:  "[T]ime has run out and the decision [for Tilton] to risk significant capital must be made before a turnaround can show meaningful positive results."  (PX_175, at 02114.)  CMAG specifically cautioned that "[p]lan execution risk is high and therefore ultimate payback on the incremental investment [of not less than $8.5 million] is uncertain."  (*Id.*)  CMAG did not recommend in its Executive Summary that TransCare engage in a sale process either in the short term or the medium term.  (*Id.* at 02122.)  Nor did CMAG recommend Tilton try to find new money funding from a third–party or that CMAG should contact any third parties itself.  Rather, in recognition of the fact that TransCare was in extremis, CMAG's recommendation was for Tilton to put her own capital into the company so it could survive and, hopefully, turn things around.  (*See, e.g.*, *id.* at 02114.)  As the bankruptcy court noted, however, Tilton had no legal obligation to do so.  (PFC at 43.)  At the time, TransCare was in default under the TLA, with approximately $45 million in principal and interest outstanding.  (PX_209; JX_110, at 9 ("Schedule 1").)

24

In other words, the recommendations of the financial advisor hired by Tilton to explore strategic alternatives made clear that third–party financing was not an option and Tilton needed to either provide capital to continue operations or TransCare faced an immediate liquidation.

In this same time period, TransCare needed to make payments on certain critical obligations, including payments to the New York State Insurance Fund ("NYSIF"), TransCare's workman's compensation insurance provider.  (PX_165, at 00927.)  Although, as the bankruptcy court found, she had no obligation to do so (PFC at 43), on January 15, Tilton approved a loan to TransCare from one of her personal investment vehicles, Ark II, in the amount of approximately $1.2 million to cover the insurance payments (DX_112) and prevent the company from going out of business while opportunities to save the company were being explored.  (Aug. 13 AM Tr. 57:18–58:4; *see also* PFC at 90.)  By January 27, payments were still owed to NYSIF.  (PX_175, at 02116.)  To again avoid a shutdown, on January 29, Tilton authorized PPAS to release $690,168.24 to TransCare which was used, in part, to pay NYSIF.  (Aug. 13 AM Tr. 58:21–59:8.)  Ark II thereafter reimbursed PPAS for the advance.  (Aug. 13 PM Tr. 6:3–6; JX_99, at 47616.)

- *Based on CMAG's Work, Tilton Determines That a Sale Process Would Not be Viable*

TransCare's cash situation continued to deteriorate in February 2016.  (PX_185.)  On February 2, CMAG's Landeck shared his concerns about TransCare's liquidity with Greenberg. (*Id.* at 02546 ("cash situation is dire and not improving").)  Landeck reiterated the need for a substantial cash infusion in order for TransCare to continue to operate.  (*Id.* at 02544 ("We have been telling [you] for some time . . . that TC could not continue operations without a significant infusion of cash").)  Landeck continued: "As far as the return [on investment], you MUST look at it as what is the return on the new money as the old money is essentially only worth what a

liquidation (closure or liquidation sale) would yield after [W]ells takes the AR [accounts receivable], which practically speaking is not much as it will be net of expenses." (*Id.* at 02543.)

After reviewing the CMAG Executive Summary and meeting with the CMAG team on February 5, Tilton determined that a sale process would not be viable and should no longer be pursued. (DX_130, at 28275; Aug. 13 PM Tr. 76:10–77:2, 40:18–41:1.) The bankruptcy court found that Tilton reached that conclusion in "good faith." (PFC at 43.) As the court noted, Tilton's determination that a sale was not feasible was based on CMAG's analysis and "due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available." (*Id.*)

### G.   TransCare Issues October 2015 Financial Statements

On February 5, 2016, Peter Wolf, TransCare's Chief Operating Officer, distributed to TransCare's equity–holders a copy of TransCare's October 2015 financial results. (PX_191.) The Notes to the Financial Statements showed that for the month of October 2015, revenue was 20% below the prior year and 7% below the then current business plan (the "2015 Plan"). (*Id.* at 04696.) EBITDA of about $2.2 million through October 2015 was 86% below the prior year, and 66% below the 2015 Plan on a year–to–date basis. (*Id.*) After the payment of interest and capital expenditures, the company was deep in the red. The actual results to the 2015 Plan were also provided in a chart format:

| Oct-15 | Month to Date | | | | Oct-15 | Year to Date | | | |
| | Actuals | Plan | Variance | % | | Actuals | Plan | Variance | % |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ 8,808 | $ 9,454 | $ (646) | -7% | Revenue | $ 97,651 | $ 95,352 | $ 2,299 | 2% |
| EBITDA | $ (445) | $ 1,091 | $ (1,536) | -141% | EBITDA | $ 2,190 | $ 6,367 | $ (4,177) | -66% |

(*Id.*)

26

### H.     The OldCo/NewCo Restructuring

- *Tilton and Her Team Develop OldCo/NewCo Restructuring Plan*

By early February 2016, TransCare's ability to continue operating was wholly dependent on Wells Fargo's willingness to continue funding from day to day.  (*See e.g.,* DX_150 ("I told [Wells Fargo] we should both . . . figure out if there was a constructive way to work together that did not include daily stops on funding.").)  Starting on February 5, Tilton began working with her team (comprised of Patriarch Partners and PPMG personnel) to develop a thorough understanding of each TransCare division so that they "could figure out if there was something to be saved." (Aug. 13 AM Tr. 64:8–23; *see also* Aug. 13 PM Tr. 76:10–77:6; DX_123, at 107343–44.)[15]  In the following days, TransCare management and CMAG worked with Tilton and her team.  (*See, e.g.*, DX_127, at 46297; July 23 AM Tr. 72:19–73:3.)  Although this work continued for several days (DX_127; July 23 AM Tr. 73:16–24; July 22 PM Tr. 39:9–15), as of February 7 Tilton had not yet approved a restructuring plan.  (DX_127, at 46297; July 23 AM Tr. 73:16–24; Aug. 13 PM Tr. 65:12–20.)

On February 9, Tilton reached out to Kurt Marsden (her main contact at Wells) (Aug. 13 PM Tr. 29:15–24) to discuss whether there was a path forward for TransCare.  (DX_130, at 28278.) Marsden asked that CMAG create a budget for three potential scenarios for TransCare: "(1) a forced wind down; (2) an orderly wind down; and (3) the bankruptcy scenario discussed on our earlier call."  (*Id*. at 28276; Aug. 13 PM Tr. 75:18–76:1.)  The "bankruptcy scenario" to which

---

[15] The bankruptcy court relied on a portion of this testimony to find that Tilton "instructed her own staff and TransCare's divisional chiefs to build a model for a business plan *designed to continue a version of TransCare under a new company*."  (PFC at 19 (emphasis added).)  The cited testimony does not support the court's finding.  Instead, Tilton simply described the deep dive her team was conducting as of February 5 to determine "if there was something to be saved."  (Aug. 13 AM Tr. 64:16.)  As will be discussed, Tilton did not approve a restructuring plan before February 9, a decision she made after engaging in discussions with Wells Fargo representatives and soliciting the assistance of CMAG.  The bankruptcy court's description of the genesis of what it refers to as the "Tilton Plan" ignores these developments and communications.

Marsden referred was an OldCo/NewCo Restructuring plan (the "OldCo/NewCo Restructuring"), the details of which are discussed below, which Tilton and Marsden had first discussed that day. (Aug. 13 PM Tr. 77:10–13.)  None of the three scenarios contemplated a sale of TransCare or any part of TransCare as, based upon CMAG's Executive Summary and views expressed at the February 5 meeting, it was clear that TransCare had neither the time nor money to pursue such an option; it was simply not feasible (DX_130, at 28276), which was hardly surprising given CMAG's conclusion that TransCare was out of time and money.  Nor did any of the scenarios contemplate that all of TransCare would continue to operate as a going concern.  (*Id.*)  As of February 9, Tilton believed the only alternative to the OldCo/NewCo Restructuring was the liquidation of all of TransCare.  (Aug. 13 PM Tr. 79:1–10.)  Indeed, that same day, Tilton suggested that Wells "take the keys" to TransCare.  (DX_130, at 28275; Aug 13 PM Tr. 75:8–17 ("[H]anding the keys [to Wells] means you basically give them control over the company and the liquidation.").)

- *Tilton Moves Forward with the OldCo/NewCo Restructuring*

Under the OldCo/NewCo Restructuring, TransCare was to be divided in two: (i) a new corporate entity would be formed and would take over operations of certain TransCare business lines (*i.e.*, "NewCo") through an Article 9 foreclosure sale, and (ii) the remaining business lines (*i.e.*, "OldCo") would be wound down in an orderly manner (Aug. 13 AM Tr. 65:6–16; Aug. 13 PM Tr. 76:24–77:6, 79:1–6), which would allow its customers time to replace TransCare with a new provider and the employees to find new employment  The "NewCo" would do business under the name Transcendence.  (Aug. 13 PM Tr. 9:20–25.)  OldCo would continue to operate for 90 days.  (*Id.* at 92:2–3.)  The wind-down period would enable TransCare's accounts receivable to be collected while the company was operating, which Tilton believed would maximize value.  (Aug.

13 AM Tr. 65:6–16, 43:20–44:4; Aug. 13 PM Tr. 78:1–10, 78:17–25.)[16]  The OldCo business lines would also have access during the wind–down period to certain services, equipment, and other supplies through a transition services agreement (the "TSA").  (*See, e.g.*, DX_132, at 02317; DX_138; JX_95.)

- *Transparency of Process*

The bankruptcy court erroneously found that the OldCo/NewCo Restructuring "was conducted under a veil of secrecy."  (PFC at 75.)  To the contrary, the record shows that it was in fact developed in plain sight, and with the active participation of multiple stakeholders including (i) Wells Fargo and its counsel, (ii) CMAG, (iii) TransCare executives, and (iv) TransCare's counsel.  (*See, e.g.*, PX_206; PX_234, at 47662–63; DX_137; DX_163 (Tilton authorizing Greenberg to share models with TransCare employees).)  After first discussing it with Marsden on February 9, Tilton continued to engage in daily communications with Wells Fargo personnel about the potential restructuring.  (Aug. 13 AM Tr. 67:10–16; Aug. 13 PM Tr. 87:7–8.)  Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned Article 9 foreclosure, the potential purchase by Tilton of accounts receivable, and the need for NewCo to bind insurance.  (*See, e.g.*, DX_147; JX_84; JX_86; JX_93; PX_219; Aug. 13 PM Tr. 81:7–15 ("[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); *id.* at 83:14–84:3 ("[W]e were all looking at the exact same information to try to make the best decisions."); *id.* at 91:2–7.)  TransCare and Wells were represented by separate counsel who communicated with each other throughout the two–week period preceding the Article 9 foreclosure.  (JX_77; JX_84, at 00051; July 23 PM Tr.

---

[16] To that end, Tilton intended to hire a CRO for OldCo.  (Aug. 13 PM Tr. 78:22–25 ("[W]e were hiring our own CRO to . . . run th[e] company during the wind–down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect."); JX_84, at 00048; DX_147, at 91631.)

99:8–16, 149:20–150:11.)  The bankruptcy court largely ignored all of this uncontested evidence in its PFC.  There was no secrecy; the plan was open and obvious and the negotiations were conducted in the light of day.

The CMAG team assisted with the analysis of the Article 9 foreclosure (DX_132, at 02317 (CMAG emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); July 22 PM Tr. 114:15–115:7) and prepared financial models in connection with the OldCo/NewCo Restructuring.  (PX_206, at 91292; July 23 AM Tr. 75:13–21.)  CMAG and Wells Fargo personnel also interacted directly about the OldCo/NewCo Restructuring.  (July 22 PM Tr. 116:5–8.)  TransCare management also participated in the OldCo/NewCo Restructuring.  (*See, e.g.*, PX_206; July 23 AM Tr. 23:14–23; July 23 PM Tr. 159:14–160:16.)

- *Funding Needs*

The success of the OldCo/NewCo Restructuring depended on TransCare's receipt of short–term and longer–term new money funding.  (Aug. 13 PM Tr. 95:19–22; DX_157, at 05292 ("Transcare cannot continue to operate on a daily, discretionary basis where no one knows if the company will be evicted, operate without insurance or payroll will not be made.").)  Tilton, Wells Fargo, and their respective advisors engaged in discussions about funding for OldCo through an orderly wind–down and from where and with what priority such funding might be provided, including possible DIP financing.  (DX_195; JX_82.)  On February 15, Landeck emailed Tilton a draft DIP budget which contemplated funding from one of Tilton's personal investment vehicles.  (DX_195, at 78648.)  Tilton responded that none of her investment vehicles would provide funding going into a bankruptcy unless it was rolled up into a first–out DIP loan.  (*Id.* at 78647.)  Tilton also reminded Landeck that, several days earlier, he had publicly stated he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY.  THIS IS A BLACK

HOLE." (*Id.* (emphasis in original); Aug. 13 PM Tr. 85:12–23.)  Wells Fargo would not agree to subordinate its liens and indebtedness to a DIP loan.  (JX_82, at 48227.)  In short, a bankruptcy filing under chapter 11 was not a viable option for a sale of TransCare's assets, nor could a chapter 11 provide an orderly–wind down because Wells Fargo had made clear that it was not interested in providing any further committed financing (and obviously would not have provided a DIP loan) and would not allow Tilton to provide a DIP loan that would have a priority lien.  In the absence of repayment of its ABL loan, Wells Fargo effectively controlled the future of TransCare.

TransCare also needed sufficient liquidity to keep the lights on as the OldCo/NewCo Restructuring was refined.  (Aug. 13 PM Tr. 95:19–22, 98:19–22, 46:12-15; DX_157; Aug. 13 AM Tr. 23:4–6 ("The company was in a free fall with an ABL lender who was refusing to fund on a day–to–day basis."); DX_151, at 47851 ("I told [W]ells . . . they should over advance today, so we have enough liquidity to properly make it to the weekend.").)  During the evening on February 18, Wells told Tilton that it had decided to cease further funding.  (Aug. 13 PM Tr. 94:23–24; *see also* JX_83 ("I also heard you are cutting the line as of today.  If that is the case, I will ask the lawyers to file for a Chapter 7.").)  As noted above, by February 5 a "good faith" determination had been made, based on the work of CMAG, that a sale of TransCare was not feasible.  (PFC at 43.)  With no funding sources available, Tilton understood this likely spelled doom – an immediate shutdown of operations – for TransCare, so she sent her team, which had been working around the clock to save the company, home.[17]  Later that evening, Marsden informed Tilton that Wells Fargo had "chang[ed] [its] mind and wanted to work together to try to do a more graceful wind–down,

---

[17] Aug. 13 PM Tr. 94:24–95:11 ("[I] had told everyone in the office that I wasn't sure that we would have operations the next day.  That included TransCare leaders who were in the office . . . so, it was a very somber evening.  People had been working around the clock for weeks . . . leaving at 2:00 in the morning and getting back at 7:00 in the morning.  And so, I had sent everybody home earlier[.]")  Without working capital from its ABL lender, TransCare could not make payroll or otherwise pay its bills and would have had to shut its doors.  (*See also id.* at 46:12–15; DX_88 at 109643.)

as we had been previously discussing." (Aug. 13 PM Tr. 95:3–11; *see also* DX_150.)  By this point, however, TransCare has run out of both time and options.  None of this was discussed by the bankruptcy court in its PFC.

- *Loss of Customer Contracts*

Day after day TransCare's circumstances and future grew more dire.  During this same time period (*i.e.*, after February 9), TransCare also struggled to maintain its already unstable customer base.  (July 22 PM Tr. 119:23–120:4.)  On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland.  (DX_157, at 05291 ("[T]he company just received a 90-day notice from Bronx Lebanon, a contract that we were taking with Newco.  This was an important and valuable contract to the new entity."); Aug. 13 PM Tr. 100:8–14.)  Tilton feared that TransCare might continue to lose contracts, given the "rumor mill" that had started throughout the industry and various hospitals.  (Aug. 13 PM Tr. 101:4–12, 100:18–100:23 (describing the loss of contracts "on a minute–by–minute basis").)

- *Modeling Work*

Tilton, together with substantially all of Patriarch Partners' and PPMG's personnel, also worked on developing go–forward models for NewCo.  (*Id*. at 80:6–17, 94:15–17.)  The purpose was to determine the amount of new money funding that would be required for Transcendence to operate—not to determine what Transcendence might be worth to a third–party buyer.  (Aug. 14 AM Tr. 39:25–40:9.)  As Tilton explained:

> This was purely for my purposes to see if I was willing to put up $10 million dollars of new money and if I had a chance of getting that money back.  No one would have purchased the company based on this because it's a hockey stick projection.  When you sell a company, you sell on actuals and you sell on . . .  some sort of projection that people can believe in based on business.  This [the modeling work] was done for me so that I would be willing to put in ten million of new money.

32

(*Id.*)  The modeling projected that Transcendence would require approximately $10 million in new money funding.  (PX_286; Aug. 13 PM Tr. 104:1–10.)

- *The OldCo Receivables*

In modeling different NewCo scenarios, Tilton assumed she would purchase TransCare's accounts receivable from Wells (which had a first priority lien in them), after which they would be transferred to NewCo so that cash was immediately coming into NewCo as the receivables were paid.  (PX_286; DX_166; Aug. 13 PM Tr. 9:15–25.)  Tilton and TransCare's bankruptcy counsel (the Curtis Mallet firm) engaged in discussions with Wells and its outside counsel regarding Tilton's potential purchase of the receivables.  (*See, e.g.*, JX_93; JX_94; DX_171; Aug. 13 PM Tr. 102:4–103:4, 8:24–9:25.)  These negotiations continued up until "the last second" on February 23, but ultimately the receivables remained with OldCo.  (Aug. 13 PM Tr. 108:4–9; JX_94.)

- *Allocation of Equity in Transcendence*

Tilton and her team also performed an analysis to determine how to allocate the equity in NewCo among the Term Loan Lenders, on the one hand, and Ark II and another of Tilton's investment vehicles, Ark Angels III ("Ark Angels") (which was going to provide a $10 million revolving loan facility to Transcendence), on the other hand.  (PX_209; Aug. 13 PM Tr. 115:8–117:4.)  On February 16, Carlos Mercado of Patriarch Partners prepared a spreadsheet for Tilton showing the analysis, set forth in the below table:

**TRANSCARE**

| Priority | Debt | Ark II | AIP | Zohar I | Zohar II | Zohar III | Credit Suisse | First Dom | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Term Loan - Ark II+Vehicles | 2,058,900.77 | - | - | - | - | - | - | 2,058,900.77 |
| 2 | All Other Loans | - | 2,905,731.99 | 3,500,000.00 | 4,967,123.26 | 24,545,142.39 | 3,537,243.56 | 4,043,858.69 | 43,499,099.89 |
| 3 | Sub Def Interest | 11,494.54 | | 5,405.40 | 13,942.90 | 79,400.35 | | | 110,243.19 |
| | **Total** | 2,070,395.31 | 2,905,731.99 | 3,505,405.40 | 4,981,066.16 | 24,624,542.74 | 3,537,243.56 | 4,043,858.69 | 45,668,243.85 |

**TRANSCENDENCE**

| Priority | Debt | Ark II | AIP | Zohar I | Zohar II | Zohar III | Credit Suisse | First Dom | Total |
|---|---|---|---|---|---|---|---|---|---|
| | A | 2,058,900.77 | | | | | | | 2,058,900.77 |
| | B | 10,000,000.00 | | | | | | | 10,000,000.00 |
| | C | - | 667,998.19 | 804,614.35 | 1,141,891.04 | 5,642,678.23 | 813,176.27 | 929,641.92 | 10,000,000.00 |
| | | | 8.0% | 11.4% | 56.4% | 8.1% | 9.3% | |
| | **Total** | 12,058,900.77 | 667,998.25 | 804,614.43 | 1,141,891.16 | 5,642,678.79 | 813,176.35 | 929,642.02 | 22,058,901.77 |
| | | 54.7% | 3.0% | 3.6% | 5.2% | 25.6% | 3.7% | 4.2% | |

(PX_209, at 19089 ("Sheet2" Tab); Aug. 13 PM Tr. 117:1–4.)  Row "A" shows the approximately

$1.8 million of funds that had been previously lent to TransCare by Ark II, along with

approximately $195,000 Tilton expended through another of her investment vehicles to purchase

two ambulances for TransCare.  (PX_209; Aug. 13 PM Tr. 117:5–16; Aug. 13 AM Tr. 25:4–25.)

Tilton intended that this approximately $2 million would be rolled over to Transcendence as part

of the OldCo/NewCo Restructuring.  (Aug. 13 AM Tr. 13:19–23.)

Row "B" shows the $10 million in new funding that was to be made available to NewCo

through the contemplated new Ark Angels facility.  (Aug. 13 PM Tr. 117:17–118:5.)  Row "C"

represents the amount of the contemplated credit bid for the TransCare assets that PPAS, as agent,

intended to foreclose upon.  (*Id*. at 118:6–12.)  When allocated across the lender group, the analysis

showed that Ark II and Ark Angels would hold a 54.7% equity interest in NewCo, and that the

Term Loan Lenders would hold a 45.3% equity interest.  (PX_209.)  Tilton wanted to provide this

potential equity upside to the Term Loan Lenders, including those she neither owned nor

controlled, as a possible source of future recovery on the balance of their secured loan to

TransCare.  (Aug. 13 PM Tr. 118:23–119:5.)  By this point Tilton believed that the OldCo/NewCo

Restructuring was the only viable option that could salvage certain TransCare assets from complete

liquidation, save hundreds of jobs, and provide future recoveries to the existing Term Loan

Lenders who sat behind Wells Fargo for their recoveries.  None of this was discussed by the

bankruptcy court in its PFC.

- *The Ark Angels Facility*

As noted, as part of the restructuring, Tilton committed to lending up to $10 million to

Transcendence through Ark Angels, one of Tilton's personal investment vehicles.  (Aug. 14 AM

Tr. 9:16–20; Aug. 13 PM Tr. 22:7–8.)  The loan agreement was dated February 24, 2016, but was

not executed (the "<u>Ark Angels III Credit Agreement</u>"). (JX_101.) Under Section 3.2 of the Ark Angels III Credit Agreement, the borrower was required to satisfy several conditions precedent before it could draw down on the facility. (*Id.* at 08703, § 3.2.) For example, upon an Event of Default (as defined in the Ark Angels III Credit Agreement), Ark Angels would have no obligation to provide funds to the borrower. (*Id.*, § 3.2(c).) An Event of Default included, without limitation, any failure by the borrower to meet its payment obligations when due. (*Id.* at 08723, § 8.1(a).) All of the borrower's representations and warranties also had to be true at the time of a loan draw request (*Id.* at 08703, § 3.2(b)), including that the business was solvent and had provided up–to–date financial information. (*Id.* at 08704, § 4.1(d); *id.* at 08706, § 4.1(n).)

## I.     The Article 9 Foreclosure

To understand the foreclosure, it is essential to understand the context. As set forth above, the factual record up to this point shows a steadily deteriorating company, beset by a number of complications and impediments to restructuring or a sale. In the roughly four months between October 14 (when Wells Fargo issued its Non–Renewal Notice, stating that it would not renew the ABL) and the foreclosure on February 24, the following major events occurred:[18]

- October 14: Wells issued the Non–Renewal Notice. (DX_76.)
- December 16–January 7: Tilton determined to explore a potential sale of TransCare, and retained CMAG. (DX_92; DX_106.)
- January 8: TransCare's CEO left the company. (Stip. No. 24.)
- January 14: CMAG explained that TransCare "require[d] a substantial amount of [new money] funding if the business [was] going to survive . . . "[t]hese are not wish list amounts that might have been asked of you [Tilton], but absolutely necessary in order to keep the business as an ongoing enterprise." (PX_165.)
- January 15: TransCare was "out of cash and needed the money to pay for insurance so that [it] could continue to operate[]." (PFC at

---

[18] This timeline is set out in a linear fashion as **Exhibit D** hereto (the Deterioration of TransCare).

90.)  Tilton approved a loan from Ark II to cover the insurance payments.  (DX_112.)

- January 27: CMAG Executive Summary showed need for cash infusion "from Patriarch" in excess of $7.5M.  (PFC at 19; PX_175.)  CMAG explained: "[T]ime has run out and the decision [for Tilton] to risk significant capital must be made before a turnaround can show meaningful positive results."  (PX_175, at 02114.)

- **February 5: "Tilton made a good faith determination that the company as a whole was not saleable."** (PFC at 43 (emphasis added).)

- February 9–10: Tilton began exploring the OldCo/NewCo Restructuring.  TransCare hires Curtis Mallet to assist with any out–of–court or in–court restructuring. (DX_130; JX_77.)

From February 10 through February 23, Tilton, Wells Fargo, and their respective advisors engaged in regular communications concerning the preparation and exchange of financial models, the mechanics of the Article 9 foreclosure, and the potential purchase by Tilton of accounts receivable.  (*See*, *e.g.*, JX_84; JX_86; JX_93.)  However, TransCare's situation became even more dire:

- February 15: Wells refused to agree to subordinate its liens and indebtedness for DIP financing.  (JX_82; DX_195.)

- February 17–18: Wells decided to cease further funding and Tilton sent TransCare and Patriarch Partners staff home.  Hours later, Wells reversed course and "decided they would like to find a joint solution to unwind more gracefully."  (DX_150.)

- February 19: TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland.  (DX_157.)  The Bronx Lebanon and Montefiore contracts generated about $2.5M of EBITDA.  (PFC at 28.)  NewCo was to take over these contracts and this was a "big hit" to the OldCo/NewCo Restructuring.  (*Id.*)

- February 24:  TransCare could not cover payroll. (JX_97; PFC at 32.)

With the ever–present threat that Wells could cease funding operations, time had run out.  By the 24th of February (barely 2 weeks after Tilton determined in good faith that TransCare could not be sold), many TransCare entities filed for chapter 7 liquidation and the balance of TransCare's

36

business lines ceased operating the next day.   (Stipulation No. 44; July 24 Tr. 156:9–157:8, 137:23–138:9, 138:25–139:13.)

Also, on February 24, PPAS (as administrative agent) and TransCare executed the documents for the planned Article 9 foreclosure. (JX_96.)  PPAS, as administrative agent, and the Zohar Funds, and AIP (which comprised the Required Lenders under the TLA (*see* JX_1, at 00090–91; PX_209), issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare.  (JX_96.)[19]  PPAS, as administrative agent, the Zohar Funds, and AIP also issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance").  (*Id.* at 43306; DX_174.)

The Notice of Acceptance covered certain personal property (defined as the "Subject Collateral") in which the Term Loan Lenders held a security interest.  (DX_174, at 91201.)  The Subject Collateral included all of TransCare's personal property, three contracts (including the MTA Contract), and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp.   (*Id.*)   The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral in satisfaction of $10 million of the outstanding TLA balance.  (*Id.* at 91198.)  PPAS, as administrative agent, and Transcendence also entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016 (the "Bill of Sale").[20]  (JX_102.)  TransCare was not a party to the Bill of Sale.  (*Id.*)

---

[19] The bankruptcy court in the PFC noted that "[b]oth the Notice of Default and the Notice of Acceptance were signed by Tilton, on behalf of PPAS, the Zohar Funds, and AIP, but not by Credit Suisse or First Dominion."  (PFC at 29.)  This is accurate, but irrelevant, as the consent of Credit Suisse or First Dominion was not required in order for PPAS to effectuate the foreclosure.  (*See* JX_1, at 00090–91; PX_209.)  For the same reason, the bankruptcy court's focus on certain communications between Greenberg and representatives of Credit Suisse (*see, e.g.,* PFC at 21–22) is legally irrelevant.  There is no evidence that Credit Suisse ever disputed the propriety of the foreclosure or asserted any claims against PPAS or Tilton with respect to that transaction or anything else.

[20] Section (e) of the Recitals of the Bill of Sale provides that the consideration for the Subject Collateral was to be financed through Ark Angels.  (JX_102, at 91202.)  Tilton testified at trial that the "$10 million in Section (e) [was] incorrect."  (Aug. 13 AM Tr. 20:12–13.)  She explained, the"[Ark Angels III credit facility] was part of the new company, but the [$]10 million was supposed to go to buy receivables and provide new money.  And instead, it just

Contrary to the bankruptcy court's finding that the transaction was conducted "apparently" without Wells Fargo's consent (PFC at 64-65), Wells Fargo was fully aware of and did not dispute the Article 9 foreclosure.  (PX_234, at 47662–63 (Tilton emailing Cindi Giglio of Curtis Mallet and asking "Is Wells aware of the foreclosure?" to which Ms. Giglio responded "Yes"); Aug. 13 AM Tr. 15:13–23, 76:7–22; July 24 Tr. 154:3–6.)

### J.      Valuing the Subject Collateral

Tilton valued the Subject Collateral using two methods.  First, she calculated the Subject Collateral based on its book value.  Second, she performed a "market check" by comparing: the $22 million "acquisition price" (*i.e.*, the $10 million credit bid plus the $12 million in debt funding for NewCo) against the EBITDA that Tilton and her team projected could be generated by NewCo during the balance of 2016.  (Aug. 13 AM Tr. 16:3–17; PX_286; DX_166.)

- *Step 1: Book Value Calculation*

February 13, 2016 Model

On February 13, Pelissier emailed Tilton a Transcendence Go Forward Model (the "February 13 NewCo Model").  (PX_286, at 105524 ("BS" Tab).)  The February 13 NewCo Model contained a combined balance sheet for NewCo.  (*Id.*)  Because it was then contemplated that NewCo would operate TransCare's Hudson Valley, Pennsylvania, Maryland, Bronx 911/Montefiore 911, and paratransit divisions (*id.* at 105516), the combined balance sheet consisted of a December 2015 closing balance sheet and going–forward projections for these five divisions.  (*Id.* at 105524; Aug. 13 PM Tr. 104:23–105:5.)

Tilton calculated the value of the Subject Collateral based on the book value of the assets of these five divisions as of December 2015, including the accounts receivable (which, at the time,

---

was new money going into the company.  There was never a cash amount being paid for the three OldCo book assets." (*Id.* at 20:13–17.)

she thought she would purchase from Wells and contribute to NewCo). (PX_286, at 105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 107:19–108:3.) She believed using the December 2015 closing balance sheet as the basis for the book value calculation was appropriate because TransCare had not closed its books after December 31, 2015. (Aug. 13 PM Tr. 109:16–22.)

The assets identified on the opening balance sheet included: (i) cash and cash equivalents; (ii) accounts receivable; (iii) inventory; (iv) prepaid and other current assets; (v) net property, plant and equipment ("PP&E"); (vi) goodwill; and (vii) "other assets." (PX_286, at 105524 ("BS" Tab; Col. B, Rows 6–24).) In calculating the value of the Subject Collateral, Tilton used only what she believed were the "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—which "would have been the opening balance sheet for the new business, had [NewCo] taken these five entities." (Aug. 13 PM Tr. 106:1–2, 106:19, 107:12–13.) As set forth in the table below, the sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million to arrive at the credit bid amount:

| CURRENT ASSETS | Dec–15 (millions) |
|---|---|
| Cash and cash equivalents | 56.7 |
| Patient Account Receivables (OldCo) | 8,165.5 |
| Patient Account Receivables (NewCo) | – |
| Inventory | 623.1 |
| PP&E (net) | 1,151.3 |
| **TOTAL** | **9,996.6** |

(PX_286, at 105524 ("BS" Tab; Col. B, Rows 7–11, 17); Aug. 13 PM Tr. 106:3–7.)

As noted, Tilton did not ultimately purchase the receivables from Wells. (Aug. 13 PM Tr. 108:4–9.) But she did not update the book value calculation to reflect that the receivables did not transfer to NewCo. (Aug. 13 PM Tr. 108:11–16.) Tilton also did not include the prepaid and other current assets, negative goodwill or "other assets" in the book value calculation of the Subject Collateral. (*Id.* at 106:13–15.) She excluded them because (i) she did not know what they were;

39

(ii) they were not needed for the NewCo business; or (iii) she did not think it appropriate for the Term Loan Lenders to receive the benefit of including their value in the calculation (*i.e.*, including negative goodwill would have significantly depressed the amount of the debt reduction to TransCare).  (*Id.* at 106:13–19, 107:4–18.)  The book value of all assets (*i.e.,* the assets of the five divisions, including goodwill and "other assets") as of December 2015 totaled approximately $6.855 million, more than $3 million less than the $10 million debt reduction.  (PX_286, at 105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 106:3–7.)  Nevertheless, Tilton did not reduce the $10 million purchase price.

> February 22, 2016 Model

On February 22, 2016, Vikram Agrawal of Patriarch Partners (Aug. 13 PM Tr. 121:8–10) emailed to Tilton an updated version of the NewCo model (the "February 22 NewCo Model"). (DX_166.)  The February 22 NewCo Model consisted of the three divisions that were being modeled for NewCo as of that date (*i.e.*, Hudson Valley, paratransit, and Pennsylvania) given the loss of contracts in the other divisions between February 13 and February 22, which no longer made those entities viable for the future.  (Aug. 13 PM Tr. 99:18–20, 100:8–14, 100:18–100:23, 101:4–12, 122:19–21; July 22 PM Tr. 119:23–120:4; DX_157, at 05291.)  The February 22 NewCo Model contained a combined opening balance sheet for these three divisions.  (DX_166, at 110489 ("NewCo Financial Model" Tab; Col. K, Rows 59–80).)  Had Tilton used the opening balance sheet in the February 22 NewCo Model to calculate the value for the Subject Collateral, she would have included in the calculation the same "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—that she used for the February 13 NewCo Model.  (Aug.

13 PM Tr. 123:12–15.)  As set forth in the table below, the sum of these inputs was $6.244 million

(more than $3.5 million less than the $10 million credit bid for the Subject Collateral):

| CURRENT ASSETS | Opening (as of 2/21) (millions) |
|---|---|
| Cash and cash equivalents | – |
| Patient Account Receivables (OldCo) | – |
| Patient Account Receivables (NewCo) | 5,209.6 |
| Inventory | 677.9 |
| PP&E (net) | 356.9 |
| **TOTAL** | **6,244.4** |

(DX_166, at 110489 ("NewCo Financial Model" Tab; Col. K, Rows 61–80).)

The February 22 NewCo Model also assumed that Tilton would purchase the receivables

from Wells Fargo.  (*Id*. at 110489; Aug. 13 PM Tr. 124:6–10.)  The effect of excluding the

receivables from the book value calculation would reduce the value of the Subject Collateral from

approximately $6.25 million to about $1 million.  (Aug. 13 PM Tr. 124:12–15.)  Thus, the $10

million debt reduction was "far more than book value because [TransCare] lost two divisions and

[Transcendence] didn't take the receivables."  (Aug. 13 AM Tr. 17:17–19.)

Tilton did not reduce the $10 million amount to reflect changes on the NewCo balance

sheet from February 13 to February 22, however.  (Aug. 13 PM Tr. 124:16–20.)  Because she

wanted to allocate the equity in NewCo based, in part, on the Term Loan Lenders' *pro rata* share

of the amount of the debt reduction to TransCare (*see id*. 118:6–12, 118:23–119:5; PX_209),

reducing the amount from $10 million would have given Ark II and Ark Angels (*i.e.*, the new

money) a greater percentage of equity relative to the Term Loan Lenders.  (Aug. 13 PM Tr. 125:8–

13.)  Tilton thought that sticking with the $10 million amount that gave the Term Loan Lenders a

larger equity stake in NewCo was fairer and more equitable to them.  (*Id.* at 124:23–125:15.)

41

- *Step 2: Check Based on Cash Flow*

As a check on the book–value calculation, Tilton examined the total "acquisition price" of approximately $22 million (*i.e.*, the $10 million debt reduction by the Term Loan Lenders and the $12 million in debt funding by Ark II and Ark Angels for NewCo), as a multiple of projected EBITDA.  (Aug. 13 AM Tr. 16:3–17; Aug. 14 AM Tr. 26:16–18 ("[we] use[d] that EBITDA . . . to do a check to make sure that the price was fair").)  As Tilton explained, expressing value as a multiple of EBITDA is appropriate in a "healthy situation, where people are buying cash flow." (Aug. 13 AM Tr. 17:13–16.)  Assuming NewCo was a healthy company, it might trade at a 7–8x multiple.  (Aug. 13 AM Tr. 17:5–7.)[21]

The February 13 NewCo Model showed combined projected EBITDA for the paratransit, Pennsylvania and Hudson Valley divisions of approximately $2.57 million.  (PX_286.)[22]  The projected EBITDA on the February 13 NewCo Model profit and loss statement did not include the cost of corporate overhead.  (Aug. 13 PM Tr. 113:3–7, 113:20–22, 114:12–15.)  Tilton expected that to range from about $500,000 to $750,000.  (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)  The effect of including expenses associated with corporate overhead would be to reduce the projected EBITDA from $2.57 million to approximately $1.8–$2.1 million.

The February 22 NewCo Model showed combined projected EBITDA for the paratransit, Pennsylvania, and Hudson Valley divisions of approximately $3.2 million.  (DX_166, at 110489 ("NewCo Financial Model" Tab at Col. DD, Row 44).)  The February 22 NewCo Model also did

---

[21] As noted, Leland believed an 8x multiple was "high for the industry."  (JX_29, at 71450.)  Moreover, Leland testified that in November 2014, nearly a year before Wells issued the Non–Renewal Notice, it would have been a stretch to sell TransCare at a multiple of 5x EBITDA.  (Leland II Tr. 313:3–24.)

[22] The February 13 NewCo Model showed projected EBITDA for the (i) paratransit division of $1.2 million (PX_286, at 105524 ("TS–P&L" Tab, Col. O, Row 47)); (ii) Pennsylvania division of $200,000 (*Id.* ("PA–P&L" Tab, Col. O, Row 47)); and (iii) Hudson Valley division of $1.173 million.  (*Id.* ("HV–P&L" Tab, Col. O, Row 47).)

not include "any expenses/charges related to corporate overhead at the NewCo level, any one time transaction costs, or any pre–payment/down payment for insurance." (*Id.*; *see also* Aug. 13 PM Tr. 121:23–122:3 (the model had "no corporate overhead[,] transaction costs or any insurance payments that would need to be made up front.").) The effect of including those expenses on the February 22 NewCo Model profit and loss statement would be to reduce the projected EBITDA from $3.2 million to approximately $2.5–$2.75 million. (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)

Without accounting for the costs of corporate overhead and other operating expenses, the transaction implied a multiple of approximately 7x–8.5x based on a $22 million "purchase price" and EBITDA of $2.57–$3.2 million. (PX_286; DX_166.) Taking into account the cost of corporate overhead and other operating expenses, the transaction implied a multiple of roughly 8–12x based on a $22 million "purchase price" and EBITDA of $1.8–$2.75 million. (Aug. 13 AM Tr. 14:11–14 (explaining that the purchase price ended up being "almost ten times the combined EBITDA of the three entities"); *see id.* at 16:15–17 ("So, if you take [the EBITDA] down to the two to two and a half, then it's 9 to 11 times").)

Tilton testified that in light of the "distressed, free fall situation" at TransCare, applying a multiple of about 4x–5x would have been generous. (Aug. 13 AM Tr. 17:9–12.) The fact that the transaction implied a multiple of approximately 7x–12x confirmed to Tilton that the price she calculated was beyond fair. (*Id.* at 16:3–12.)[23]

More importantly, as discussed below, without the advance of new funds (*which were assumed in Tilton's check on the book value calculation*), there could be no value from a

---

[23] The bankruptcy court concluded, incorrectly, that "there were patent errors" in Tilton's calculations. (PFC at 53.) The asserted "errors" are addressed in the Argument section below, as is the bankruptcy court's misplaced criticism of Tilton's use of book value as the basis for her calculation of the purchase price for the Subject Collateral.

continuing operation of the divisions and the value would have been only what a liquidation of the balance sheet items, excluding the receivables (which collateral belonged to Wells Fargo), could recover.  The value received for the ambulances and equipment was $2.35 million.  This is why there was no loss of value to TransCare from the Article 9 foreclosure.

### K.   The Bankruptcy Filings And Post–Petition Events

TransCare Corporation and certain of its subsidiaries (*i.e.*, OldCo) filed voluntary chapter 7 petitions on February 24 (the "Initial Petition Date").  (Stipulation No. 44.)  The Trustee was appointed on February 25.  (Stipulation No. 45.)  That same day, the Trustee and several of his colleagues met with counsel for TransCare (Curtis Mallet), counsel for PPAS (Randy Creswell), Wells Fargo and its counsel (Otterbourg), and a CMAG representative at the offices of Curtis Mallet.  (July 24 Tr. 132:11–133:4.)  At no point during the meeting did Wells Fargo claim it did not consent to the Article 9 foreclosure or assert the foreclosure violated Wells' rights.  (*Id.* at 154:2–6, 155:23–156:1.)

The Trustee testified that as of February 25–26, the TransCare estates lacked sufficient funding to operate any of the business lines as a going concern absent a voluntary cash infusion from Wells or one of Tilton's investment vehicles.  (*Id.* at 156:9–157:8.)  TransCare could not cover payroll the day before the foreclosure. (JX_97; PFC at 32.)  No agreement was reached between Wells and Tilton on February 25 to fund any part of TransCare's business so that operations could continue.  (July 24 Tr. 137:23–138:9, 138:25–139:13.)  Nor did Wells propose to the Trustee that the paratransit business continue to operate as a going concern.  (*Id.* at 156:3–8.)

In the face of these facts, the bankruptcy court nonetheless found that NewCo was worth $44 million on February 24.  Had NewCo been worth $44 million, then both buyers and new capital would likely have been available to the company.  TransCare (comprised of both OldCo

and NewCo), however, had no funds to continue its operations (*see, e.g.*, July 24 Tr. 156:9–157:8), and a liquidation was its only option.  It is simply implausible that a mere part of a company that (i) could not be sold, (ii) could not access financing, and (iii) had no cash to continue operations could be worth $44 million 24 hours before it shut its doors for good.

Ultimately, Transcendence (NewCo) was unable to operate, in part because the Trustee would not consent to the use of a computer server that was necessary to operate at least one of the divisions (Aug. 13 AM Tr. 26:3–12) and because the MTA Contract did not transfer to NewCo (July 23 PM Tr. 77:16–20.)  Although the Article 9 foreclosure had been effectuated on paper, the computer server was not moved from the TransCare building where it was located and was never physically transferred to Transcendence.  (July 24 PM Tr. 164:14–165:7.)

On March 10, 2016, the Trustee, PPAS, and Transcendence Transit entered into a stipulation (the "Personal Property Stipulation") concerning the sale of certain property at auction, including the personal property PPAS foreclosed upon on behalf of the Term Loan Lenders (the "Foreclosed Personal Property Assets").  (*In re TransCare Corporation*, Case No. 16–10407–smb, Dkt. No. 52.)  PPAS and Transcendence consented to the Trustee's sale of the Foreclosed Personal Property Assets.  (*Id.*, Personal Property Stipulation ¶ 1.)  Auction sales were thereafter conducted, with Tilton's consent.  (*In re TransCare Corporation*, Case No. 16–10407–smb, Dkt. Nos. 52, 257, 258.)  The Trustee realized approximately $19.2 million through the liquidation of ambulances, equipment, accounts receivable, and Certificates of Need (CONs).  (July 24 Tr. 13:10–14.)

As further discussed below, it is important to understand the delta between the $19.2 received by the Trustee in liquidation and what might have been realized by Tilton from the foreclosure.  First, to the extent the foreclosure was on corporate stock, any value that might have

inured to the stock through the ability of NewCo to use the CONs presupposes that NewCo had sufficient working capital to operate as a going concern.  Without that, the ability to use the CONs was of no value.  Second, the accounts receivable were liquidated by the Trustee and Wells, but they were not the subject of the foreclosure (because Wells Fargo had a lien on them), so NewCo would not have had the benefit of those receivables.  This leaves the value of the used ambulances and equipment, for which the Trustee received $2.35 million at auction.[24]

### L.    Procedural History

This adversary case was filed by the Trustee on February 22, 2018.  (Adv. Proc. No. 18–1021–smb, Dkt. No. 1.)  The Trustee filed an Amended Complaint on November 28, 2018.  (*Id.*, Dkt. No. 53.)  As the bankruptcy court noted in its PFC, various claims asserted in that pleading against Tilton and other named defendants were dismissed as a result of pretrial motion practice (PFC at 38, n.19) or at the conclusion of the six–day bench trial held between July 22, 2019 and August 14, 2019 (*id.* at 39).

These objections concern the bankruptcy court's recommendations on the first count of the Amended Complaint, asserting a claim against Tilton, as TransCare's director, for breach of her fiduciary duty of loyalty to TransCare (but *not* a breach of the duty of care).  As described by the bankruptcy court, the Trustee's fiduciary duty claim consisted "of two components:  "(1) the [alleged] failure to maximize the value of TransCare beginning in December 2015 when Tilton decided to sell the company and (2) the formulation and execution of the [plan] . . . that culminated in" the Article 9 foreclosure.  (*Id.* at 41.)

As a threshold step, the bankruptcy court was tasked with determining which standard of review applied to Tilton's fiduciary decision–making: the business judgment rule, enhanced

---

[24] Attached hereto as **Exhibit E** is a chart showing the actual and potential values of TransCare and NewCo.

scrutiny, or entire fairness.   (*Id.* at 41–43.)   Inherent in the business judgment rule is the presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company."  *Roselink Inv'rs, LLC v. Shenkman*, 386 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (citation omitted) (applying Delaware law).  However, a director who "stands on both sides of a transaction . . . has the burden of establishing its entire fairness[.]"  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

With regard to the first component of the Trustee's fiduciary duty claim, the bankruptcy court found "the entire fairness standard [of review under Delaware law] does not apply to the period before Tilton pursued" the OldCo/NewCo Restructuring (PFC at 43) and that, "[a]s a result, the Trustee failed to overcome the business judgment rule and carry his burden of proving that Tilton failed to maximize the value of the entire TransCare" (*id.* at 43–45).  Specifically, the bankruptcy court found:

> In mid–December 2015, Tilton determined that TransCare should be sold but also determined that it was not primed for a sale *given its financial condition*.  She retained [CMAG] as TransCare's financial advisor and CFO and considered [CMAG's] conclusions and recommendations.  By February 5, after having explored and evaluated a potential sale process, Tilton determined based on [CMAG's] work that a sale of the entire TransCare was not feasible, *due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available*.  Although Wells Fargo had indicated a willingness to fund a wind down of the entire company, it conditioned its willingness on Tilton's partial funding on a subordinated basis.  She was under no obligation to fund TransCare personally.  The Trustee offered no evidence that her decision was tainted by any conflict or self–interest or that her actions or decisions were dictated by the goal to acquire the entire company or any part of it for her own benefit.  *Rather, she made a good faith determination that the company as a whole was not saleable.*

(*Id.* at 43 (emphasis added).)

Thus, the company's financial condition figured prominently in the bankruptcy court's discussion of the first component of the Trustee's fiduciary duty claim.  Indeed, the bankruptcy court made a number of findings about TransCare's financial condition:

- "Throughout the Relevant Period [i.e., November 1, 2014 through February 24, 2016] TransCare experienced difficulties in funding employee payroll and paying vendors." (*Id.* at 9.)

- "[O]n July 3, 2015, TransCare missed payroll . . . .  In hindsight, the missed payroll marked the beginning of the end for TransCare." (*Id.* at 10.)

- "[O]n October 14, 2015, Wells Fargo issued a Notice of Non–Renewal to TransCare . . . . The Non–Renewal Notice stated that the ABL would expire on January 31, 2016, and Wells Fargo 'presently ha[d] no intention to extend or modify the term of such financing arrangements . . . .'  The Non–Renewal Notice also stated that the outstanding balance [of approximately $14 million] had to be paid in full by TransCare by January 31, 2016 . . ., something which TransCare was in no position to do." (*Id.*)

- On January 14, "Marc Pfefferle of [CMAG] stated that, among other things, TransCare needed a substantial amount of funding to survive, and the weekly cash flow was barely covering the payroll and payroll taxes . . . .  He also stated that all of TransCare's insurers had issued cancellation notices and urged immediate payments to numerous insurers." (*Id.* at 18.)

- By January 15, TransCare was "out of cash and needed the money to pay for insurance so that TransCare could continue to operate." (*Id.* at 90.)

- TransCare was also "woefully insolvent with negative net equity of nearly $40 million." (*Id.* at 88.)

- By January 27, CMAG "projected the need for an immediate pledge of financial support from Patriarch [Tilton] in excess of $7.5 million . . . , of which $3.5 million was needed over the next two weeks." (*Id.* at 19.)

- In February, "TransCare continued to deteriorate.  On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland . . . Tilton testified that the Bronx Lebanon and Montefiore contracts generated about $2.5 million of EBITDA . . . .  She feared that TransCare might continue to lose contracts." (*Id.* at 28.)

- And, in the related *Ien* case, the bankruptcy court found "TransCare was on life support for nearly one year and depended on Tilton affiliates to cover shortfalls throughout 2015 and into 2016." (*Ien*, Adv. Proc. No. 16–01033, Dkt. No. 157, at 35.)

With regard to the second component of the fiduciary duty claim, the bankruptcy court reasoned it was subject to review under the entire fairness standard because Tilton stood on both sides of the Article 9 foreclosure.  (PFC at 42.)   Applying this standard, the bankruptcy court concluded that Tilton should be held liable for breach of fiduciary duty with regard to the OldCo/NewCo Restructuring.  Although there was a fleeting reference to the fact that "TransCare was rapidly declining and time was running out" (PFC at 47), the bankruptcy court did not take this or any of the above findings about TransCare's ruinous financial condition in making its liability–related findings.

With regard to damages, the bankruptcy court recommended an award of $41.8 million against Tilton, which it characterized as TransCare's damages resulting from "the stripping of [NewCo] through an unfair, tainted process."  (*Id.* at 59.)   To reach that number, the bankruptcy court relied on the testimony of the Trustee's damages expert, Jonathan Arnold, and, in particular, his purported calculation of "the range of values TransCare could expect to obtain in an open– market transaction [*i.e.*, a sale] based on analyses done at various points in time in January and February 2016," including the date of the Article 9 foreclosure (*i.e.*, February 24).  (July 24 Tr. 7:5–20.)  The "analyses" Arnold used were certain hastily prepared forward-looking projections prepared by Patriarch Partners and/or CMAG personnel (collectively, the "Plans").   For his February 24 calculations, Arnold used a go–forward plan that had been prepared for NewCo (the "February 24 Projections").  (*Id.* at 11:10–15.)  Arnold "extracted" from that and the other Plans the projected "EBITDA for the rest of 2016[,] which was used as an input" in his calculations.  (*Id.* at 11:16–21.)

Arnold then applied "valuation multiples" to the forecasted EBITDA under the Plans "to identify a range of values that … could reasonably be expected to emerge from a sale and

marketing of TransCare." (*Id.* at 12:8–16.)  He employed the comparable company and precedent

transaction methods.  (PX_282, ¶ 66.)  For his EBITDA multiples, Arnold used those derived from

two publicly traded companies that Greenberg mentioned in his December email to Tilton:

Envision Health Care ("Envision") and Air Methods.  (July 24 Tr. 19:23–20:7.)  The bankruptcy

court summarized Arnold's calculations and conclusions as follows:

> For the comparably company method, "[a]pplying [Arnold's] range of [EBITDA]
> multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016
> yielded an implied value of between $22.7 million and $39.1 million for NewCo .
> . . ."

> For the precedent transaction method, "[a]pplying multiples to NewCo's projected
> EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of
> between $32.0 million and $34.3 million for NewCo . . .  The combination of these
> valuation methods yielded an average mean multiple of 10.1x EBITDA and an
> implied value of $32.3 million for NewCo as of February 24, 2016."

(PFC at 60–61.)

The bankruptcy court ultimately set the NewCo "value" number at $44 million (*id.* at 65),

an amount higher than the highest point in Arnold's calculated "value" range for NewCo as of

February 24, and then reduced the figure to $41.8 million (also above the highest point in Arnold's

range) through "certain adjustments."  (*Id.* at 65, 71.)

## STANDARD OF REVIEW

These Objections are governed by Rule 9033 of the Bankruptcy Rules.    Under

Rule 9033(d):

> The district judge shall make a de novo review upon the record or, after additional
> evidence, of any portion of the bankruptcy judge's findings of fact or conclusions
> of law to which specific written objection has been made in accordance with this
> rule.  The district judge may accept, reject, or modify the proposed findings of fact
> or conclusions of law, receive further evidence, or recommit the matter to the
> bankruptcy judge with instructions.

Fed. R. Bankr. P. 9033(d).  The law is clear that the bankruptcy judge's proposed findings of fact

and conclusions of law are not afforded any deference.  *See In re Lehman Bros. Holdings Inc.*,

2019 WL 2023723, at *13 (S.D.N.Y. May 8, 2019) (citing Fed. R. Bankr. P. 9033(d)); *see also In re Kaiser Aluminum Corp.*, 343 B.R. 88, 93 (D. Del. 2006) (emphasis added) ("In conducting a *de novo* review, the Court must consider all of the Bankruptcy Court's findings and conclusions and **_afford them no presumption of validity_**.").

## ARGUMENT[25]

**I.** **The District Court Should Reject the Bankruptcy Court's Recommendation that Tilton Be Found Liable for Breach of Her Duty of Loyalty.**

The bankruptcy court erred in recommending that Tilton be found liable for breach of her duty of loyalty. Tilton's last-gasp attempt to save as much of TransCare as possible, and as many jobs as possible, through a restructuring at a time when the only other option was liquidation, was not a breach of duty.

Tilton does not dispute that the OldCo/NewCo Restructuring is subject to review under the entire fairness standard because Tilton stood on both sides of the transaction. Under that standard, the court reviews a director's decision to ensure it is entirely fair to the corporation's stakeholders. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995). Importantly, "[a] determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 55 (Del. Ch. 2013) (internal quotation and citation omitted). In examining entire fairness, courts look at two components: (1) procedural fairness (fair dealing or process) and (2) substantive fairness (fair price). *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). However, where the price paid is fair, the entire fairness standard can be satisfied even in the absence of a fair process. *See Trados*, 73 A.3d at 76–78 (finding transaction entirely fair, notwithstanding that directors did not follow a fair

---

[25] Attached as **Exhibit F** is a chart illustrating certain of the bankruptcy court's inaccurate findings that are unsupported by the cited evidence, contradicted by the record evidence, or incomplete.

process, where evidence showed that deeply distressed company could not have obtained better result for stakeholders).

Critically, whether a transaction is entirely fair depends wholly on the specific facts of the case. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1140 (Del. Ch. 1994). *See also S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *11 (Del. Ch. Mar. 9), *aff'd*, 35 A.3d 419 (Del. 2011); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014) ("[E]ntire fairness standard of review is principally *contextual.* That is, there is no bright–line rule on what is entirely fair"), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *29 (Del. Ch. July 21, 2017) (citation omitted) ("The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger–counter invented that will make determinations of fairness objective."), *aff'd*, 184 A.3d 1291 (Del. 2018).

The court is ultimately called upon to make a *unitary* fairness conclusion *based upon the totality of the circumstances*. *Emerald Partners v. Berlin*, 2003 WL 21003437, at *22 (Del. Ch. Apr. 28, 2003), *aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003). The entire fairness inquiry demands that the court "carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness." *Cinerama*, 663 A.2d at 1179.

Here the bankruptcy court's entire fairness analysis was flawed because it failed to account for the most important fact in the case: in February 2016, TransCare was undisputedly "woefully insolvent" and "on life support." (PFC at 88; *Ien*, Adv. Proc. No. 16–01033, Dkt. No. 157, at 35.) Its financial consultant, CMAG, had provided information that led Tilton to conclude in "good faith" that a sale was not feasible, nor was new funding available. (PFC at 43; *see also id.* at 90

(TransCare "was unable to borrow money elsewhere").)  TransCare had neither the liquidity nor access to capital to continue to run its business.  The restructuring pursued by Tilton in the two weeks after her good faith conclusion that TransCare could not be sold must be examined in light of those circumstances.  Yet the cases relied on by the bankruptcy court in its analysis are inapposite because they involved an entire fairness analysis in the context of healthy, operating companies.[26]  Such cases have no application here, where the transaction at issue involved a deeply distressed company that could have ceased, and did in fact cease, as a going concern at the sole discretion of its ABL lender.  TransCare had a one-way ticket to liquidation.  When viewed against this backdrop of a rapidly failing company that could be forced to close its doors on a moment's notice, the evidence showed that Tilton's actions in forming Transcendence and foreclosing on the Subject Collateral were eminently fair and reasonable.[27]  Indeed, Tilton believed it was the only possible transaction that could save any of TransCare and hundreds of jobs for its employees. (Aug. 13 AM Tr. 40:16–18; Aug. 13 PM Tr. 79:1–10, 127:7–19.)

## A.     The Process Leading to the OldCo/NewCo Restructuring Was Fair.

Whether a process is fair "embraces questions of when the transaction was timed, how it was initiated, structured, [and] negotiated."  *Weinberger*, 457 A.2d at 711.  Here, each of those

---

[26] *See*, *e.g.*, *FrontFour Capital Grp. LLC v. Taube*, C.A. No. 2019–0100–KSJM, 2019 WL 1313408 (Del Ch. Mar. 11, 2019), as revised (Mar. 22, 2019) (public company merger involving business with hundreds of millions in asset value); *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) (reverse stock split for company valued at $3,845 per share); *Strassburger v. Earley*, 752 A.2d 557, 576–77 (Del. Ch. 2000), *as revised* (Jan. 27, 2000) (share repurchases made by public company).

[27] Citing *Pereira v. Cogan*, 267 B.R. 500 (S.D.N.Y. 2001), the bankruptcy court stated that "while the viability of the corporation may properly factor into a board's decision to sell substantially all of a corporation's assets, the directors must still follow a fair process in doing so."  (PFC at 49.)  While this is correct, it misses the point that fairness must be evaluated in context, including where a company is at death's door (as TransCare was in February 2016).  *Pereira* is wholly inapposite, as the issue there was that the defendant *contested that the company at issue was insolvent*; he did not argue that his actions should be judged in light of the company's financial distress.  267 B.R. at 511.

factors supports a finding that the process leading to the OldCo/NewCo Restructuring was entirely fair in light of TransCare's extreme distress.

1.   Timing of the Transaction

A central factual error in the PFC is bankruptcy court's finding that Tilton took active steps to time the OldCo/NewCo Restructuring to her advantage.  (*See* PFC at 48–49.)  Indeed, the bankruptcy court suggested that, on February 5, Tilton suddenly decided to pursue the Article 9 foreclosure without considering any other options.  (PFC at 21, 49.)  Not only is this wholly inconsistent with the bankruptcy court's finding that on February 5 Tilton determined in good faith, based on the work performed by CMAG, that a sale of TransCare was not feasible (PFC at 43), but it ignores the many months she, Wells Fargo, and eventually CMAG spent trying to formulate an achievable path forward for TransCare.[28]  The conception, refinement, and pursuit of the OldCo/NewCo Restructuring—all of which occurred over a period of two weeks under severe time and liquidity restraints—cannot be viewed in isolation.  *See Oliver v. Bos. Univ.*, 2006 WL 1064169, at *30 (Del. Ch. Apr. 14, 2006) (recognizing that "[t]hose negotiating the Accord Agreement . . . were under serious time constraints" and that "[u]nless they reached an agreement promptly, Seragen might well have run out of money before the merger could have been consummated").  The evidence demonstrated that Tilton's decision–making was informed, in large part, by external factors and the grim reality that TransCare—with no cash, no guarantee that Wells Fargo would continue to lend each day, and no freedom to pursue a transaction that would not pay off at least Wells Fargo's debt (if not also the term loan)—was in a free–fall and headed for liquidation.

---

[28] *See, e.g.*, JX_59; JX_65; PX_165; PX_175.

As detailed above, by late 2015 and into 2016, TransCare lacked sufficient capital to continue operations absent new, additional working capital financing. The undisputed evidence at trial demonstrated that such financing—either from existing or new lenders—was not available. To start, TransCare could no longer rely on Wells: by October 2015, Wells had issued the Non–Renewal Notice and made clear that it had no intention of continuing to fund TransCare as a going–concern.[29]   Despite continued (yet strained) negotiations with Wells, the entire outstanding loan balance (approximately $14 million) could be called at any moment.  (DX_76, at 06335–36; July 22 PM Tr. 93:6–11; July 24 Tr. 159:19–22; PX_257.)  Moreover, any notion that a 'White Knight' might provide rescue financing has no evidentiary support, as any new lender would have had to *both* refinance the Wells Fargo ABL *and* extend new, immediately available funds just to keep TransCare alive.  (July 22 PM Tr. 93:6–11; PX_165, at 00927; PX_185, at 02546, 02544.)

The precarious condition of the business was repeatedly noted by CMAG from the time the firm commenced its engagement in January.  (PX_175, at 02111 (describing TransCare as "operating at an absolute breaking point"); PX_185, at 02546 ("cash situation is dire and not improving"); *see id.* at 02544 ("We [at CMAG] have been" advising "for some time . . . that TC could not continue operations without a significant infusion of cash")).  Indeed, CMAG described its work for TransCare as "fighting daily fires and working to hold the business and organization together."  (PX_175, at 02118.)  CMAG also warned that "[v]irtually all key customers [were] pursuing or considering replacement options."  (*Id.* at 02111.)

By early February, TransCare's situation was desperate.  (PX_185, at 02546, 02544.)  Key customers were lost, and TransCare's ability to operate was entirely dependent on Wells Fargo's willingness to provide working capital funding day–to–day.  (DX_151, at 47851; DX_157, at

---

[29] DX_76, at 06335–36; July 22 PM Tr. 93:6–11; DX_92, at 75263; DX_130, at 28276.

05291 (describing continued loss of contracts on February 19).)   Even the bankruptcy court acknowledged that "TransCare was rapidly declining and time was running out."  (PFC at 47.)  Particularly in light of the fact that Wells Fargo was free to cease funding at a moment's notice, that was a significant understatement.

The bankruptcy court cited several cases for the proposition that "[f]iduciaries are liable when they tilt the playing field such that the only possible solution is a self–dealing transaction."  (PFC at 48.)  But that is not what Tilton did here.  For months she worked with Wells Fargo, and then CMAG, to implement a possible sale process.  Although she ultimately decided not to pursue a sale because it was not feasible given TransCare's dire condition, the bankruptcy court found that decision was made in good faith.  (PFC at 43.)  Indeed it was based upon the analysis and advice provided by TransCare's financial advisor, CMAG.  It was only after it became clear that TransCare could not survive a sale process that Tilton *and* Wells, on February 9, began to discuss a "forced wind down," "an orderly wind down," and the "bankruptcy scenario" that would eventually become the OldCo/NewCo Restructuring.  (DX_130, at 28276; Aug. 13 PM Tr. 77:10–13.)  Because Tilton took no affirmative steps during the two weeks in February at issue to position herself to be "the only possible solution," the cases cited by the bankruptcy court for that point are inapposite.[30]

---

[30] *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *29 (Del. Ch. July 6, 2018) (defendant "used its contractual rights to cut off the Company's access to other sources of financing" while at the same time failing "to comply with its obligations to provide financing," thereby maneuvering "the Company into a position of maximum financial distress where it had no options other than" the transaction proposed by defendant); *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54 (Del. Ch. 2014) (investment banking firm found liable for aiding and abetting breach of fiduciary duty by manipulating transactions through dishonesty for its own benefit); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del. Ch. 2011) (conflicted investment bank tainted process through self–interest); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) ("*Bomarko I*") (CEO actively steered financing opportunity away from corporation and engaged in acts of concealment).

The implication that Tilton somehow "tilted the playing field" in her favor is particularly puzzling when one considers the extraordinary bargaining power Wells Fargo wielded.  After issuing the Non–Renewal Notice, Wells repeatedly indicated that it had an "extremely limited" appetite to engage in a process that would result in anything other than its complete exit.  (DX_92, at 75263; *see also* JX_60, at 00145; JX_64.)  Its decision to continue lending on a day–to–day basis was completely discretionary.  (Aug. 13 AM Tr. 23:4–6; DX_151.)  Losing Wells Fargo's funding was hardly a hypothetical concern:  during the evening of February 18 (just six days before the challenged foreclosure), Wells actually decided to cease further funding for TransCare.  (Aug. 13 PM Tr. 94:23–24.)  The only reason TransCare did not fold the next day was because, later that night, Wells changed its mind, deciding that it "wanted to work together to try to do a more graceful wind–down" as the parties "had been previously discussing." (*Id.* at 95:3–11; *see also* DX_150.)

To be sure, there are certain indicia of a fair process mentioned in Delaware jurisprudence that were not present here—*e.g.*, the appointment of an independent director to negotiate "for TransCare."  But that should not mean the process Tilton employed was *per se* unfair.  The mechanisms fiduciaries employed in the cases cited by the bankruptcy court were only possible because they (fiduciaries of companies with sufficient capital to continue operating for a meaningful period of time) had what TransCare and Tilton lacked:  time, money, and control.  *See, e.g.*, *FrontFour Capital Grp. LLC*, 2019 WL 1313408, at *26 (examining fairness of process for affiliates of a publicly–traded asset management firm).  Here, TransCare had no money and, as a result, was at the mercy of Wells which, during the two weeks in question, refused to extend a funding commitment for any period of time.  The only other option was liquidation.

The bankruptcy court's finding that the process was unfair because there was "neither negotiation nor oversight nor approval by an unconflicted person" (PFC at 49) would, if left

standing, dis-incentivize any similarly–situated fiduciary from making an effort to salvage part of a dying business (and thus jobs) through a self–interested transaction. Where there is no time or money to locate, hire, and bring up to speed an independent director, for example, the only solution would be to hand the keys to the senior secured creditor or file the company for chapter 7 bankruptcy. That is bad policy and the District Court should reject the *per se* rule the bankruptcy court's ruling implies.

> 2. <u>The OldCo/NewCo Restructuring Was Developed in Plain Sight with Participation and the Input of Third Parties</u>

The transparent manner in which the OldCo/NewCo Restructuring was developed further underscores its fairness. The facts here do not involve the type of negotiations common in a merger or acquisition involving two healthy companies, but that does not mean interested third parties were prohibited from having a seat at the table, or that the OldCo/NewCo Restructuring was developed in secret. The evidence demonstrated the opposite: Tilton and her team engaged in an open, coordinated, and arm's–length process involving Wells Fargo and its counsel (Otterbourg), TransCare's restructuring counsel (Curtis Mallet), TransCare management, and CMAG, to create a viable restructuring plan. (*See, e.g.*, PX_206; PX_234; DX_137; DX_163; *see also* JX_84, at 00052 ("If you would like to send any of your Wells people or your own financial advisors to work with us, we would welcome them here.").)[31]

Tilton engaged in almost daily discussions with Wells Fargo—the party with the power to shut down TransCare by ceasing further funding—and shared with Wells Fargo wind–down models and budgets prepared by her team, with the input of CMAG and TransCare management.

---

[31] The fact that Credit Suisse was not involved in these discussions does not render the process unfair, given that the foreclosure only required the consent of the Required Lenders under the TLA and thus did not require Credit Suisse's consent. (JX_1, at 00049, 00096, 00090–91; DX_3, at 230136.)

TransCare's counsel was also engaged in continued dialogue with Wells Fargo's counsel.  These negotiations were intense and adversarial, with Wells Fargo holding and exercising considerable bargaining power.  (*See, e.g.*, DX_195; JX_82, at 48227; Aug. 13 PM Tr. 9:15–25, 94:23–95:11; DX_150; JX_93; JX_94; DX_171.)

### 3.    The Structure of the Transaction Was Fair

The OldCo/NewCo Restructuring was also structured fairly.  As step one, PPAS (as administrative agent) would foreclose on the Subject Collateral, as it had a right to do under the operative loan agreements because TransCare was in default, and then transfer those assets to Transcendence.  (Aug. 13 AM Tr. 65:6–16; Aug. 13 PM Tr. 76:24–77:6, 79:1–6.)  Thereafter, Tilton would, through her own voluntary personal financing, save jobs by operating certain business lines (*i.e.*, NewCo) using the Subject Collateral.  (Aug. 13 PM Tr. 76:24–77:6, 79:1–6, 104:1–10; PX_286; JX_93 ("We are trying to save 700 jobs").)  The Term Loan Lenders (including those unaffiliated with Tilton) would also receive a *pro rata* equity stake in Transcendence, which would provide them a potential upside to stem the losses on their loans to TransCare.  (PX_209; *id.* at 19089 ("Sheet2" Tab); Aug. 13 PM Tr. 118:23–119:5.)

At the same time, the OldCo business lines would have access during the wind–down period to certain services, equipment, and other supplies through the TSA.  (*See, e.g.*, DX_132, at 02317; DX_138; JX_95.)  This way, TransCare's obligations to Wells Fargo would be satisfied through its continued collection of accounts receivable, and the value of OldCo assets would be maximized for all stakeholders through an orderly wind–down to be run by its own chief restructuring officer.[32]

---

[32] Aug. 13 AM Tr. 65:6–16, 43:20–44:4; Aug. 13 PM Tr. 78:1–10, 78:17–25, 78:22–25 ("[W]e were hiring our own CRO to . . . run th[e] company during the wind–down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect."); JX_84, at 00048; DX_147, at 91631.)

4.      The Bankruptcy Court's Criticisms Are Unfounded and Untethered to the
Facts as They Existed on the Ground.

The bankruptcy court concluded that the process leading to the restructuring was unfair

because Tilton supposedly did not consider certain alternative approaches.   (PFC at 48–49.)  That

criticism—both speculative and levelled with the benefit of hindsight and far from the reality of a

rapidly collapsing business—was unwarranted.  Not only is there no requirement under Delaware

law for Tilton to consider alternative approaches that were not feasible, *Cf. Oberly v. Kirby*, 592

A.2d 445, 471-72 (Del. 1991) (finding transaction to be "intrinsically fair," and noting that "the

obvious drawbacks attached to other possible alternatives to the [challenged] transaction justified

the directors' decision not to explore alternative transactions"); *Thorpe by Castleman v. CERBCO,*

*Inc.,* 676 A.2d 436, 443 (Del. 1996) (explaining that, in corporate opportunity context, the court

need not consider "those transactions which were not economically rational alternatives"), but the

evidence shows that Tilton *did* explore alternatives.

*First*, according to the bankruptcy court, "Tilton did not retain a financial advisor to seek

out possible third–party interest in purchasing the assets or investing in TransCare."  (PFC at 49.)

But Tilton **did** hire a financial advisor:  CMAG.  (*See* PFC at 14; DX_106.)  To be sure, CMAG

was not retained for the specific purpose of finding a buyer or investor.   But, as the bankruptcy

court acknowledged, Tilton retained CMAG in connection with her discussions with Wells Fargo

to "extend the ABL so as to facilitate a sale of TransCare."  (*See* PFC at 14.)  The work that CMAG

performed in January and that was discussed on February 5 was an integral part of the process to

determine if TransCare was saleable or if it could even survive a sale process.  (*See, e.g.*, PX_165,

at 00926 (CMAG referencing analysis comparing "cost of a [bankruptcy] filing versus the cost of

bridging to a sale"); July 22 AM Tr. 77:15–19.)  There is no evidence that CMAG recommended

a sale of TransCare, in whole or in part, in January or at any point thereafter.  In fact, CMAG's

60

only recommendation was that Tilton herself provide emergency financing to keep the company afloat and then additional financing in order to implement a number of significant changes to its business.  (PX_175.)

This criticism by the bankruptcy court also ignores that TransCare could not have attracted third–party financing during the two weeks Tilton was pursuing the OldCo/NewCo Restructuring (*i.e.*, the only period during which the entire fairness standard applies).[33]  The bankruptcy court itself repeatedly found this to be the case.  (*See* PFC at 90 (as of January, TransCare had to rely on emergency funding from Tilton because it "was unable to borrow money elsewhere"); *id.* at 43 (as of February 5, company had "need for an immediate infusion of a substantial amount of cash that was not readily available").)  TransCare's assets were already pledged in full as security to multiple secured lenders; both Wells Fargo and the Term Loan Lenders had blanket liens in *all* of TransCare's assets (which, by definition, included the NewCo assets.  (JX_1, at 00069, § 6.16; JX_2, at 00785; PX_197.)  Thus, there was nothing to offer a new lender as collateral.  TransCare was also in default under the Wells Fargo ABL Agreement and the TLA.  (PX_132, at 46849–50; JX_96.)  A prospective new lender would also discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015.  (Aug. 13 AM Tr. 52:3–6; PX_132, at 46849–50.)  CMAG, in fact, highlighted the limits of TransCare's financial reporting, cautioning that it had "worked diligently to develop the most accurate financial

---

[33] The idea that TransCare could have afforded to hire another financial advisor is unsupported by the record.  Financial advisors do not work for free:  CMAG charged $135,000 per month for its services, in addition to a retainer fee in the same amount.  (DX_106.)  As discussed above, there were no funds available to pay for *anything*, let alone another advisor (in addition to CMAG).  It would also have required time and money to market TransCare or any part of it for sale.  In fact, the sale process negotiated between Tilton and Wells contemplated an *eight–month* timeframe.  (*See, e.g.*, JX_65, at 00215 (indicating, on December 31, 2015, Wells Fargo's agreement to a sale timeline that included a closing date of August 15, 2016; *see also* Husson (*Ien*) Tr. 35:6–17.)  The same timeline shows that an investment banker would only be retained *after* Wells and Tilton agreed to a budget that would allow TransCare to keep its doors open for the amount of time required to complete a sale.  (DX_100, at 106767.)

picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting*." (PX_175, at 02114 (emphasis added).)[34]  Given all this, it requires an impossible stretch of imagination to believe that a new lender would be willing to lend in a subordinated position (behind approximately $55 million in secured debt) on an emergency basis based on dated and unreliable financials.

In fact, the only new money financing CMAG (TransCare's acting CRO) or Wells Fargo proposed was from *Tilton herself*.[35]  There is no evidence CMAG recommended to Tilton that TransCare seek financing from a third party or that CMAG ever sought to do so on TransCare's behalf.  This is not surprising given that, in mid–February, CMAG's Landeck told Tilton and others that he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY.  THIS IS A BLACK HOLE." (DX_195, at 78647 (emphasis in original); *see also* Aug. 13 PM Tr. 85:17–23.)

Notwithstanding all of this evidence, the bankruptcy court chastised Tilton for making "the determination that no one other than herself would lend to NewCo . . . ." (PFC at 49.)  This is a peculiar criticism for at least two reasons.  First, as the bankruptcy court recognized elsewhere in its PFC, "bankrupt companies are generally short of cash and the shareholders are often the only source." (PFC at 90.)  And, indeed, both Wells Fargo and CMAG proposed only that *Tilton* provide funding.  Second, the bankruptcy failed to ask (much less answer) the critical question:

---

[34] Indeed, the Trustee's damages expert, Arnold, testified that he could not perform a discounted cash flow analysis because TransCare's books and records were insufficient for him to do so.  (July 24 Tr. 85:15–86:1.)  A prospective lender would have faced the same challenge.  The bankruptcy court's finding that this state of affairs was somehow Tilton's fault is counterfactual (*see supra* at Section C).  But even if it were true, it would be irrelevant.  Critically, no allegation or finding was made that Tilton breached any fiduciary duty with regard to TransCare's financial statements.
[35] DX_92, at 75263; PX_175, at 02114 ("To have a chance of a turnaround, TransCare needs an immediate incremental pledge of support *from Patriarch* totaling $7.5M+ excluding 2016 term [loan] interest" (emphasis added)); Aug. 13 PM Tr. 70:16–20, 69:21–23; *see also* JX_82, at 48227 (indicating that Wells Fargo "*expect[ed]* that any past due payroll and payroll taxes *w[ould] be funded by Patriarch*") (emphasis added).

What was the alternative?  For the reasons stated above, there was no realistic source of outside emergency funding in February 2016.

*Second*, the bankruptcy court erroneously stated that Tilton "did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor–in–possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice."  (PFC at 49.)  Such finding is contrary to the record and counterintuitive in light of the circumstances at the time.  First, as the bankruptcy court acknowledged, a section 363 sale would have required a chapter 11 filing for the NewCo entities. And a chapter 11 filing requires time and money, the two things TransCare simply did not have. Second, although the bankruptcy court suggested Tilton could have asked Wells for DIP financing for a NewCo bankruptcy (PFC at 49), this ignores that, by the time she allegedly began acting disloyally in February, Wells had already reached the conclusion it would not provide *any* long term funding.  (*See, e.g.*, DX_92, at 75263.)  And, in fact, Tilton *did* broach with Wells the subject of providing DIP financing for the OldCo businesses, but those negotiations ended when Wells refused to agree to subordinate its liens and indebtedness to a DIP loan.  (*See* JX_82, at 48227; Aug. 13 PM Tr. 86:3–8.)[36]  Wells Fargo, an obviously sophisticated lender, could have proposed providing such financing for a NewCo chapter 11 bankruptcy if it in fact saw value in doing so.  It did not.  Nor is there any evidence that CMAG, the experienced restructuring advisory firm, ever suggested a chapter 11 filing to Tilton.  In fact, CMAG warned *against* pursuing a bankruptcy,

---

[36] Even the bankruptcy court did not suggest that DIP financing could have come from a lender other than Wells Fargo (PFC at 49), implicitly recognizing that Wells Fargo would have challenged any such arrangement.  Even if a bankruptcy judge might have approved a DIP loan over Wells' objection, that process would have taken time and resources that TransCare and the NewCo business lines did not have.

noting that a bankruptcy filing would result in "customers and employees . . . abandon[ing] TC." (*See* PX_175 at 02116.)

*Third*, the bankruptcy court criticized Tilton because "she did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July."   (PFC at 49.)   But this cannot be reconciled with the bankruptcy court's finding that, on February 5, Tilton "made a good faith determination that the company as a whole was not saleable."   Why would she have called potential purchasers having just determined in good faith that TransCare was not saleable mere days before?   It is no answer that a sale of NewCo involved only part of TransCare.   The corporations owning the stock and assets that were to comprise NewCo were either borrowers or guarantors of approximately $55 million in outstanding secured debt.   (Stipulation Nos. 13–14.)   They and their assets could not be sold for a lesser amount without the consent of all lenders (and, as just discussed, a section 363 sale was not feasible).[37]   Moreover, if Wells had thought pursuing such a sale made sense, it could have tried to force the issue by using its leverage in the form of a threat to cease further funding. It did not.   The evidence leads to the inescapable conclusion that none of the key parties in interest—Tilton, Wells, or CMAG—believed in February 2016 that a sale was feasible.

Furthermore, the bankruptcy court's criticism reflects an apparent (speculative) assumption that a sale process was unnecessary because TransCare (or at least the NewCo business lines) could have been sold as a going concern for reasonable value on an emergency basis, without any marketing of the business or allowing time for buyer diligence.   *But, here again, there was no evidence whatsoever to support such speculation*.   On the contrary, any sales process would have required many months (the timeline Tilton and Wells had discussed prior to February 5

---

[37] Again, this is in contrast the foreclosure remedy under the TLA, which required only the consent of the Required Lenders.

contemplated as long as *eight months* (*see* JX_65)) and an infusion of new money.  TransCare had neither the time nor the money.  And, any sale would have required the support of all of TransCare's secured lenders, because TransCare's assets could not be sold free and clear without all of their consent.  (JX_1, at 00096, § 12.1; JX_2, at 00818–20, § 9.7(b), (d).)[38]  By February 9, none of the three scenarios under which Wells Fargo was contemplating providing any continuing financing to TransCare included a sale.  (DX_130, at 28278, 28276; Aug 13 PM Tr. 75:18–76:1, 77:10–13.)[39]

It was similarly unrealistic to believe a 'White Knight' would buy TransCare (or the NewCo business lines) in the near term, particularly "given the limitations of the Company's accounting systems and financial reporting."  (PX_175, at 02114.)  As the Trustee's damages expert, Dr. Arnold, admitted, buyers need valid numbers.  (July 24 Tr. 73:25–74:4 ("Q: Because if you're a buyer, and you're doing diligence, and you're trying to figure out whether the investment is worth it you need to know that you have reliable numbers, right?  A:  You certainly want reliable numbers.  I totally agree.").)  *See Cinerama*, 663 A.2d at 1140–41 (finding process entirely fair because, "while the company was not shopped[,] there is no indication in the record that more money was possible from [a controlling stockholder] or likely from anyone else").

The notion that any of the companies that had made inquiries about TransCare or parts of the company before would have been ready and willing to immediately purchase TransCare or NewCo (without due diligence) for an amount materially greater than liquidation value if Tilton

---

[38] In contrast, the strict foreclosure only required the consent of the Requisite Lenders under the TLA.  (JX_1, at 00049, 00096, 00090–91, 00088; DX_3, at 230136.)

[39] Obtaining such consent from Wells Fargo would have been no easy feat.  For example, when Wells and Tilton were engaged in discussions about a potential sale in December 2015, Wells insisted it would not consent to any asset purchase agreement or letter of intent unless they were both "in form and substance satisfactory to Wells Fargo." (*See* JX_64; *see also* JX_60, at 00145.)  Wells Fargo was "unwilling to have particular carve outs to this requirement because *there are so many situations or conditions that could be problematic.*"  (JX_64 (emphasis added).)

has just "picked up the phone" is not plausible.  Notably, the 2015 inquiries were "blind"; they were made by parties that had not performed any due diligence on TransCare.  (JX_29, at 71450; *see* July 22 PM Tr. 84:5–13; JX_40, at 30761 (conditioning final purchase price on due diligence period).)  As National Express's LOI made clear, it was not interested in purchasing anything without conducting due diligence.  (JX_40, at 30759 (conditioning interest on "satisfaction of its due diligence investigation of the Company and the Assets"; *id.* at 30761 (calling for "[c]ompletion of customary due diligence satisfactory to [National Express] in its discretion").)  Any due diligence process would have taken time.[40]

Critically, there was also no evidence that, by not "pick[ing] up the phone," Tilton was trying to benefit herself or putting her own interests before those of other stakeholders.  While the bankruptcy court wrongly implied this, the only evidence cited was her ownership interest in Transcendence.  (PFC at 50.)[41]

Finally, it bears emphasizing that the only party to provide a letter of intent for TransCare assets, National Express, offered only $6–7 million (paid out over time) for the paratransit business in July 2015.  (*See* JX_40.)  As of January 2016, the paratransit business was substantially less profitable than it had been in July 2015.  (JX_67, at 106572; *see also* July 22 PM Tr. 105:9–107:19.)  Even if National Express would have remained interested in buying it in early 2016, the

---

[40] On that point, the Trustee's expert, Dr. Arnold, admitted that any sale would not happen overnight; at a minimum, there would still be diligence period.  (July 24 Tr. 76:10–12.)

[41] The bankruptcy court imputed a self–interested motive to Tilton, concluding that she saw NewCo as a good business venture because she was willing to loan $10 million of her own money to finance it.  (PFC at 49.)  However, as discussed, the Ark Angels credit revolving facility Tilton contemplated was not a $10 million term loan that would be fully funded on day one.  (JX_101.)  Rather, the facility would allow NewCo to draw funds on an as–needed basis and only if its financial condition met certain requirements.  (*Id.*, at 08703, § 3.2.)  This is a far cry from *Gentile v. Rossette,* C.A., 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010), cited by the bankruptcy court (PFC at 49), where the defendant majority shareholder demonstrated a "persistent willingness … to pour his ultimately limited resources into the Company."

offer would presumably have been less and hardly enough to merit serious consideration as a solution to TransCare's crushing debt.

Most importantly, the evidence demonstrates beyond doubt that aside from the OldCo/NewCo Restructuring the only other option Tilton had in February was to liquidate TransCare in its entirety, with hundreds of employee job losses.  (PX_185, at 02543 ("the old money is essentially only worth what a liquidation (closure or liquidation sale) would yield"); Aug. 13 PM Tr. 79:1–10.)  *See Trados*, 73 A.3d at 77 (finding entire fairness where company "did not have a realistic chance of generating a sufficient return to escape the gravitational pull of the large liquidation preference and cumulative dividend," "face[d] risks," and "external threats were becoming more serious"); *S. Muoio & Co.*, 2011 WL 863007, at *11 (finding fair process because "there was no tangible way that Crown would be able to meet its debt obligations when they were due, and that Crown had no real options other than a recapitalization or bankruptcy").  Faced with that reality, Tilton conceived and chose to proceed with a fair plan to make Wells Fargo whole, give the Term Loan Lenders a chance at a recovery, and save the jobs of TransCare employees.

* * * * *

In sum, this case does not present a situation where insiders made millions by engineering a self–dealing transaction through intentional deception.  There is no evidence of secrecy or deception.  The transaction was open and obvious to Wells Fargo, TransCare, and CMAG.  Tilton, in fact, *lost* money (as both a lender and an equity holder).  Ultimately, the bankruptcy court failed to account for the highly contextual nature of the entire fairness analysis.  In particular, the court did not meaningfully engage with Delaware case law that illustrates how the financial health of a company plays a critical role in the determination of whether a transaction is fair.  For example, the bankruptcy court purported to distinguish *Trados* (PFC at 47, n.21), noting that the court in

that case did not find the defendants there engaged in a fair process.  Although that is correct, it

misses the point: the court still found *the transaction* to be entirely fair, notwithstanding a lack of

fair process, precisely because of the company's relatively weak economic position and the

"suboptimal" conditions it faced.  As the *Trados* court explained:

> In light of [Trados's] reality, the directors breached no duty to the common stock
> by agreeing to a Merger in which the common stock received nothing.  The
> common stock had no economic value before the Merger, and the common
> stockholders received in the Merger the substantial equivalent of what they had
> before [*i.e.*, nothing].

*Trados*, 73 A.3d at 78.  Moreover, the *Trados* court was clear that the defendants "failure to deploy

a procedural device such as special committee" did not make them liable, but rather only forced

them "to prove at trial that the Merger was entirely fair.  Having done so, they have demonstrated

that they did not commit a fiduciary breach."  *Id.*[42]

## B.    TransCare Received a Fair Price for the Subject Collateral.

TransCare also received a "fair price" for the Subject Collateral.  Fair price "relates to the

economic and financial considerations relied on when valuing the purchase price" of the assets.  *In

re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 n.52 (Del. Ch. 2005).  A fair price is one

that falls within the range of reasonable values, even "at the lowest level in a broad range of

fairness."  *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997).  In determining whether a price

is fair, courts consider whether the transaction was "one that a reasonable seller, under all of the

circumstances, would regard as within a range of fair value; one that such a seller could reasonably

accept."  *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663

A.2d 1156 (Del. 1995).  The fair price aspect can be "the predominant consideration in the unitary

---

[42] The bankruptcy court also ignored the decision in *S. Muoio & Co.*, where the court found the challenged recapitalization process was fair where the company, Crown, was on the brink of bankruptcy (just as TransCare was in February 2016).  *See* 2011 WL 863007, at * 17.

entire fairness inquiry." *Sprint Corp.*, 2017 WL 3421142, at *27 (citation omitted); *see also Trados*, 73 A.3d at 76–78. Indeed, "[t]he issue of fair process is secondary to the ultimate import of fair price." *In re Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *2 (Del. Ch. Sept. 24, 2010).[43]

In the PFC, the bankruptcy court erroneously found that Tilton did not carry her burden of showing the price was fair "given the tainted process and the complete absence of an independent analysis, review or approval." (PFC at 51.) The cases cited by the bankruptcy court do not support its conclusion, particularly given the facts of this case. To begin with, the issue in *Kahn*, 694 A.2d at 432, was that the trial court erred in requiring the plaintiff "to prove unfairness of price." No finding was made in *Kahn* that the unfairness of the process precluded a unitary finding of entire fairness. In *Gesoff v. IIC Industries*, 902 A.2d 1130, 1154 (Del.Ch. 2006), the court made an independent finding that the price was unfair and did not suggest it would have reached a different conclusion had the process been more fair. Finally, both *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) ("*Bomarko I*"), *aff'd*, 766 A.2d 437 (Del. 2000), and *William Penn P'ship v. Saliba*, 13 A.3d 749 (Del. 2011), involved affirmative acts of dishonesty and concealment by the fiduciary against the corporation. The bankruptcy court made no finding here, as it could not, that Tilton acted dishonestly towards TransCare or took affirmative to steps to block the company (or any part of it) from capitalizing on an opportunity during the two-week period of her alleged disloyalty.

In concluding that the price Tilton paid for the Subject Collateral was unfair, the bankruptcy court again failed to consider the financial condition of TransCare. Delaware law is

---

[43] Although *Hanover* considered fair value in the context of an appraisal action, "the 'fair price' aspect of the unitary entire fairness standard is widely regarded as requiring a valuation analysis equivalent to the 'fair value' inquiry in an appraisal." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 461 (Del. Ch. 2011).

clear that the financial condition of the company whose assets are being valued is a critical factor in determining price fairness. *S. Muoio & Co*, 2011 WL 863007, at *16. Put otherwise, an assessment of fair price must take into consideration "the economic reality" which TransCare faced—*i.e.*, a business on the brink of liquidation. *Id.* at *17 ("[T]reating Crown as if it had no liquidity crisis would require me to ignore the credible evidence adduced at trial. This I cannot do."). This is a well–understood concept under Delaware law. *See*, *e.g.*, *In re Vision Hardware Grp., Inc.*, 669 A.2d 671, 677 (Del. Ch. 1995) ("[T]he evidence shows conclusively that but for the TCW proposal and its effectuation, Better Vision was a going concern heading immediately into bankruptcy and, unless new credit was made available, liquidation. This fact has very basic importance in determining the fair value of Better Vision stock."); *In re Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *3 (Del. Ch. Sept. 24, 2010) ("[T]he company was in fact 'under water' at the time of the merger. Accordingly, a merger price above $0.00 (in this case, $0.25 per share) was entirely fair.").

The price for the Subject Collateral was based on the combined balance sheet for NewCo as of February 13, 2016.[44] At that time, Tilton assumed NewCo would operate five business divisions; thus, the combined balance sheet included all five divisions. (PX_286, at 105524; Aug. 13 PM Tr. 104:23–105:5, 107:19–108:3.) The February 13 NewCo Model showed a book value for the NewCo assets based on cash and cash equivalents, receivables (which Tilton intended to purchase from Wells Fargo and contribute to NewCo), inventory, and net PP&E of just under $10 million. (PX_286, at 105524; Aug. 13 PM Tr. 107:19–108:3, 106:3–7.)

Given the rapidly deteriorating situation on the ground, by February 24 NewCo was down to three divisions—not five—thus reducing the book value of the Subject Collateral, counting

---

[44] PX_286, at 105524; Aug. 13 PM Tr. 104:23–105:5, 106:1–7, 106:19, 107:12–13, 107:19–108:3, 109:16–22.

receivables, to approximately $6.25 million.  (Aug. 13 PM Tr. 122:19–21, 123:12–15; DX_166, at 110489.)  Ultimately, Tilton and Wells Fargo were unable to reach a deal on the purchase of receivables, which further reduced the book value calculation to just over $1 million.  (Aug. 13 PM Tr. 124:12–15.)  Although she could have done so, Tilton did not adjust the $10 million purchase price to reflect these changed circumstances.  (Aug. 13 PM Tr. 108:11–16; *id* at 124:12–15; Aug. 13 AM Tr. 17:17–19.)  As a result, $10 million represented an overpayment of the actual book value by a factor of 10.  A price that was 10 times greater than the book value was inherently fair.

The bankruptcy court acknowledged in the PFC that the book value calculation of the Subject Collateral based on the balance sheet of the February 22 NewCo Model totaled approximately $1 million.  (PFC at 53.)  But the court wrongly found "using the book value for the three Debtors destined for Transcendence undervalued the Subject Collateral" (*see id.*) because it excluded the value of OldCo's PPE and certain TransCare Certificates of Need (the "CONs").  For that finding to be correct, Tilton's book value calculation must have failed to include approximately *$9 million* in value.  But it did not.

First, the value of the OldCo PPE was not $3.6 million (as the bankruptcy court incorrectly found (*see* PFC at 53)); rather, $3.6 million represented the net value of the PPE of **all** of TransCare's assets.  (PX_191, at 04695, 04706; Aug. 13. PM Tr. 129:1–5 ("Q: Ms. [T]ilton, do you know what PX–191 [is]? A: It's a financial package from TransCare for October financials that were issued on February 5[, 2016]. Q And this is for the whole company?  A: Yes.").) [45]  Thus, at most, Tilton's calculation excluded approximately $2.45 million in value (*i.e.*, the delta of the

---

[45] The PFC refers to a "13–week wind down plan" (PFC at 53), but does not provide a citation to any exhibit or testimony.  We are unaware of the exhibit to which the bankruptcy court referred.

net PPE value for all of TransCare's assets ($3.6 million) and the net PPE value of the five NewCo business divisions as contemplated earlier in February ($1.15 million)).  Even taking this into account, the $10 million purchase price still represented a 65% premium *above* the book value.

Second, it was not an "error" for Tilton to exclude from the purchase price the value of the CONs for TC Hudson Valley and TC Ambulance Corporation.  (PFC at 53.)  As the bankruptcy court acknowledged, PPAS only foreclosed on the stock of these two entities; it did not foreclose on the CONs themselves.  (PFC at 30.)  Any value that might have inured to the stock of the two corporations through their ability to use the CONs presupposes that they had sufficient working capital to continue as a going concern.  The evidence is clearly to the contrary.  Indeed, they were guarantors or borrowers of tens of millions of dollars in secured debt (Stipulation Nos. 13–14; PFC at 6) and had no access to working capital absent voluntary funding by Wells or Tilton.  On these facts, the stock of these two entities had no value.  *See, e.g.*, *S. Muoio & Co.*, 2011 WL 863007, at *16 (emphasis added) ("[A]bsent the Recapitalization [the challenged transaction], Crown would not have survived long enough to realize any future value, much less value above the level of Hallmark's debt.  Thus, without a recapitalization, Crown was facing insolvency and *its equity was worthless*.")[46]

The bankruptcy court's finding that "the use of book value to value the assets of the three divisions that Transcendence planned to operate undervalued those assets" (PFC at 54) was not supported by the evidence.  Indeed, as the bankruptcy court acknowledged (*id.* at 55), book value may indeed reflect a fair price depending on the circumstances.  *Rubin v. Manufacturers Hanover*

---

[46] The Trustee's later sale of the two CONs for $3.2 million has no bearing on this.  Whatever value the two CONs had, they did not belong to NewCo, a fact the bankruptcy court acknowledged.  (PFC at 53.)  The bankruptcy court made no effort in its PFC to correlate the asset value of the CONs with some hypothetical enhancement to the value of the two corporations' stock.  Finally, even if Tilton should have included an asset value of $3.2 million for the CONs in the purchase price for the Subject Collateral, the $10 million debt reduction to TransCare would still represent an overpayment of more than $3 million.

*Tr. Co.*, 661 F.2d 979, 995 (2d Cir. 1981) (emphasis added) ("the market value of certain . . . assets may" be "greater *or less* than their book value.")   Courts have recognized that book value can *overstate* market value or fair value.   *See, e.g., Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 88 (Bankr. D. Del. 2015) (finding valuation of contracts and physical assets' book value was fair), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).[47]  Here, book value was the only rational way to value the assets, as, in the absence of an infusion of new capital and time, Transcendence could not operate as a going concern.

The bankruptcy court found that book value was inappropriate for the NewCo assets because Tilton "contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence."  (PFC at 54.) While that was indeed her plan, on February 24 TransCare and its business lines could not continue operating as a going concern absent a continued voluntary cash infusion and was, to use the bankruptcy court's words, "woefully insolvent."  (*Id.* at 88.)  Each of the three business lines at issue were operated by TransCare subsidiaries that owed (as borrowers or guarantors) approximately $55 million in secured debt, all of which was in default.  (Stipulation Nos. 13–14; DX_174; DX_76.) As such, the Subject Collateral necessarily could not have been worth more than liquidation value.  *See S. Muoio & Co.*, 2011 WL 863007, at *16–17 (explaining that, because company "was on the brink of bankruptcy and had no ability to refinance its debt," the "corporation's long–term, 'going concern' value becomes irrelevant and instead its value in bankruptcy becomes the relevant metric for determining fair value").[48]  The bankruptcy court itself recognized in this case that "[b]ook value

---

[47] *See also Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 495 (Del. Ch. 1923) ("book value[] may, however, be in excess of fair market value."); *Havee v. Belk*, 589 F. Supp. 600, 605 (W.D.N.C. 1984) (finding fair price for company lacking liquidity was "about 65% of book value"), *aff'd*, 775 F.2d 1209 (4th Cir. 1985).

[48] *See also Vision Hardware Grp.*, 669 A.2d at 677 ("As a company to be appraised moves closer to the lip of liquidation, the line between going concern basis and liquidation basis becomes even finer.  That is, financial

may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors [the OldCo businesses] that were liquidating." (PFC at 54.)  But the court ignored that on the day of the foreclosure, the *NewCo business lines were also on the verge of liquidation*.  In light of this, book value actually *overvalued* the Subject Collateral, as shown by what the assets fetched at auction.  The public auction of all of TransCare's tangible personal property, including but not limited to the vehicles, yielded only $2.35 million.  (*See In re TransCare Corporation*, 16–10407– smb, Dkt. Nos. 257, 258; PX_282, at Exhibit 13.)  Because Tilton's price ($10 million) was nearly five times that amount, it was fair.

The fairness of Tilton's book value calculation was bolstered by her check based on projected cash flow for Transcendence.  Specifically, Tilton compared the total acquisition price of approximately $22 million (the $10 million debt reduction by the Term Loan Lenders plus $12 million in debt financing) against the projected EBITDA for the three NewCo divisions during the balance of 2016 *if NewCo operated*.[49]  The EBITDA projections that informed Tilton's check were derived from the February 13 NewCo Model and the February 22 NewCo Model, adjusted to account for operating expenses that had been excluded from the models, resulting in a projected EBITDA range of $1.8–$2.75 million.[50]  When compared against the $22 million "purchase price," the transaction implied a multiple of 7x to 12x.  (Aug. 13 AM Tr. 14:11–14, 16:15–17.)[51]  This

---

differences between the results of these different types of analysis will grow smaller as the company moves close to forced liquidation.")

[49] Aug. 13 AM Tr. 14:11–14, 14:24–25, 16:3–17, 17:5–16, 26:16–18, 34:24–35:1; PX_286; Aug. 13 PM Tr. 113:3–7, 113:20–22, 114:12–15, 121:23–122:3; DX_166, at 110489.

[50] *Id.*

[51] Tilton explained that the $22 million did not represent the actual value of the NewCo business lines:

> THE COURT: So does that mean that the debtors got a $10 million dollar credit for a business that was ultimately worth $22 million dollars?

> THE WITNESS: Well, it was only worth $22 million dollars if you had $10 million; otherwise, it was worth zero because it had no cash coming in.

was in the range of the multiple Tilton thought generally applied to a healthy company in the

industry (7x–8x) and the multiple (8x) Leland thought was "high for the industry" (JX_29, at

71450), further validating that $10 million was a fair price, particularly given that TransCare "was

in a free fall, losing contracts every day," and operating "at the absolute breaking point."  (Aug.

13 AM Tr. 17:5–16; PX_175; *see also* DX_151; Aug. 13 AM Tr. 23:4–6.)[52]

Finally, the bankruptcy court wrongly concluded it was improper for Tilton not to include

the value of the MTA Contract in the credit bid because "*it was to be* the crown jewel of

Transcendence."  (PFC at 54 (emphasis added).)  This assumes that in conducting a fair price

inquiry, the value of an asset or property should reflect the future value that could be achieved

through a new money investment.  Case law is clear, though, that the seller is not entitled to such

an "artificial[ ] inflat[ion]" of value.  *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at

*39 (Del. Ch. Sept. 4, 2014).  The court's analysis in *Nine Systems* is instructive.  There, the court

was tasked with determining whether the recapitalization of a start–up company was entirely fair.

At step one, the court considered the proper entity to be valued: the company "plus the

acquisitions" financed through the recapitalization *or* the company as it existed prior to the

---

THE COURT: So if somebody was willing to put in $10 million dollars, they'd have a $22 million dollar company, right?

THE WITNESS: Well, only if it's worth that.  It only had $2 million of EBITDA.  The hope was that someday with time, it could be, but it wasn't worth $22 million on day one. It was the price that was paid for it. But there was only about $2.5 million of EBITDA if every contract was kept and we were losing contracts by the day.  So, you know, a value of a company is what you could sell it to someone else for at that day.  But what it took was that new money and those ambulances to be able to even begin to run it because it had no revenues because it had no receivables.  So, it could not have gotten started on day one without fresh cash to pay its expenses; otherwise, it was just liquidating assets.

(Aug. 13 PM Tr. 13:1–22.)

[52] Contrary to the bankruptcy court's finding, Tilton *did* value the MTA Contract when checking the book value against the total $22 million "purchase price".  (Aug. 14 AM Tr. 26:9–11 ("The MTA contract was not on the [NewCo] balance sheet but the revenues and the income were in the income statement which was also used to value."); *id.* at 27:6–11 ("The value of the [MTA] contract was valued in the value of New Co . . . which was $22 million dollars of capital being put up to buy a little over . . . two million of EBITDA.").)"

recapitalization. *Id.* at *39.  The court determined that the entity to be valued was the company *before* the acquisitions.  *Id.*  In so holding, the court reasoned, "the Company, on its own, did not have the capital needed to fund" the acquisitions.  *Id.* at 40.  The court continued, "neither proposed acquisition was within the Company's financial ability to capture.  The Recapitalization was what would provide the necessary cash; the 'new money', not the "old money," financed those acquisitions."  *Id.*  In other words, in conducting a fair price inquiry, the company should be valued *as it actually existed at the time of the transaction* – not based on what value *could be obtained* with an infusion of additional capital that the existing company lacked.[53]

Here, the MTA Contract had no value unless the paratransit business could operate.  But by February 24, that business lacked "the capital needed" to continue operations.  *Nine Sys.*, 2014 WL 4383127, at *40.  It was the "new money"—*i.e.*, the working capital to be provided to Transcendence through the Ark Angels credit facility—that created the possibility that future cash flows could be generated from the MTA Contract.  *Id.* ("Even if the Recapitalization was to be accretive to the Plaintiffs by improving the Company's capital structure . . . that higher value (and those capital structure changes) only occurred *after* the additional investments[.]")  Because the opportunity was not one that TransCare had the financial ability to capture at the time of Tilton's alleged disloyalty, it is not appropriate to include in the fair value analysis the contemplated value of the MTA Contract with the paratransit business continuing to operate as a going concern.

## II.     The Bankruptcy Court's Recommended Damages Award Should Be Rejected

Although, as discussed above, Tilton is not liable for breach of fiduciary duty, even if a breach had been proven the Trustee still failed to prove the debtors' estates suffered damages. Indeed, the magnitude of the recommended award – $41.8 million against an individual – is

---

[53] The *Nine Systems* court ultimately determined that although the price was fair, the recapitalization was not entirely fair "because of the grossly inadequate process employed by the Defendants."  2014 WL 4383127, at *47.

nothing short of astonishing considering that the NewCo business lines the bankruptcy court valued at $44 million as of February 24: (1) were on the brink of liquidation on that day, (2) did not continue to operate for more than a day thereafter and (3) were liquidated a few months later by the Trustee for only a little more than $2 million dollars.

Under Delaware law, courts will not award a "meaningful remedy" unless the plaintiff shows (1) "that a sufficiently convincing causal linkage exists between the breach of duty and the remedy sought," and (2) "harm to the beneficiary or, alternatively, the wrongful taking of a benefit by the fiduciary." *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018). A finding of breach does not guarantee a monetary remedy. *OptimisCorp v. Waite*, 2015 WL 5147038, at *73 (Del. Ch. Aug. 26, 2015) ("Having found that breach [of loyalty], however, I am not convinced that it warrants a monetary or equitable remedy."), *aff'd*, 137 A.3d 970 (Del. 2016); *Cline v. Grelock*, 2010 WL 761142, at *2 n.11 (Del. Ch. Mar. 2, 2010) (stating that one may "expect that a self–interested breach of fiduciary duty . . . should be remedied by damages," but "the Court has not been provided any basis for a rational award of damages.").

Moreover, a plaintiff is not entitled to damages where, as here, he offers only speculative damages calculations. *OptimisCorp*, 2015 WL 5147038, at *81. A court "cannot award damages that are based on mere speculation or conjecture . . . ." *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018).[54] While a damage award does not require "mathematical certainty,"

---

[54] The bankruptcy court cited a number of cases for the proposition that courts have discretion in awarding damages for breach of the duty of loyalty. (PFC at 55–57.) However, many of them focused on the desire to ensure profit did not flow to the defendant. *See, e.g.*, *Thorpe by Castleman v. CERBCO, Inc.,* 676 A.2d 436, 445 (Del. 1996) (noting that defendants profited from disloyalty and awarding damages of $75,000, the amount by which defendants profited); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 906 (Del. Ch. 1999) (fiduciary should "not profit personally from his conduct"); *International Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 441 (Del. 2000) ("damages should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship"). Here, in contrast, there was no evidence that Tilton profited in any way from the challenged foreclosure.

the difference between a speculative and a sufficient showing of damage is whether the court "has a basis to make a responsible estimate of damages." *Reis*, 28 A.3d at 466 (citation omitted). *See also Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *12–13 (Del. Ch. Oct. 10, 2014) (distinguishing reasonable estimate from speculation and awarding only nominal damages of $1). In the absence of such a basis, an award of damage is, "as a matter of law, improper." *Ravenswood Inv. Co v. Estate of Winmill*, 2018 WL 1410860, at *20 (Del. Ch. Mar. 21, 2018).[55]

The burden of proving damages rests squarely with the plaintiff. "It is well settled that a plaintiff alleging a breach of fiduciary duty claim must prove [his] damages by a preponderance of the evidence." *In re HH Liquidation, LLC*, 590 B.R. at 273. Nevertheless, while the bankruptcy court acknowledged that the burden of proof rested with the plaintiff (PFC at 57), it wholly ignored this well–established legal standard in its analysis, instead wrongly chastising Tilton for not offering her own measure of damages (*see* PFC at 62 ("Despite their many criticisms, *the Defendants did not offer their own analysis or suggest an alternative damage assessment*." (emphasis added).) The bankruptcy court's framing improperly turned the burden of proof on its head. As the party seeking damages, the Trustee was required to provide the bankruptcy court with "a basis to make a responsible estimate of damages." *Reis*, 28 A.3d at 466. For the reasons we will now discuss, the Trustee did not meet his burden.

---

[55] Although fiduciary duty and appraisal claims under Delaware law overlap, there is one notable difference. In an appraisal case, neither party has the burden of proof, so the court may disagree with both parties' valuations and pick an amount as it sees fit. *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993). In a fiduciary duty case, however, if the plaintiff fails to meet his burden of proof of damages, the plaintiff is not entitled to compensatory damages. *Ravenswood Inv. Co.*, 2018 WL 1410860, at *2 (although court had broad discretion to fashion a remedy "it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.").

### A.       The Trustee Failed to Prove Causation

To obtain a damages award against Tilton, the Trustee had to show that her alleged breach of fiduciary duty actually caused harm to the debtors' estates.  *See Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 n.9 (D. Del. 2004); *Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Park Cap. Advisors, LLC (In re Katy Indus., Inc.)*, 590 B.R. 628, 639 (Bankr. D. Del. 2018).   Importantly, damages for breach of the duty of loyalty should not be punitive.  *See, e.g., Gesoff v. IIC Indus., Inc*., 902 A.2d 1130, 1154 (Del. Ch. 2006) (for a breach of the duty of loyalty, "[o]bviously, the court cannot award punitive damages"); *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001).

Here, evidence of causation was lacking because, although the Trustee sought "damages equal to the lost going concern value" of NewCo (FPTO ¶ 184(b)(iv), 72 ¶ 1(a)) [Dkt. 85], and the bankruptcy court recommended an award for (allegedly) the lost going concern value of NewCo (PFC at 63–64), the Trustee failed to prove that NewCo would have had *any* going–concern value but for the challenged transaction.  At the time of the foreclosure, TransCare (and NewCo) were on the verge of liquidation and thus had no going concern value.  Without the infusion of fresh capital, neither entity had any ability to operate as a going concern.  As such, the only value for either was the liquidation value of its assets (which value is actually known because the assets were liquidated).

As already discussed at length, TransCare (and thus NewCo) was not viable in February 2016 without continued funding to operate.  As Arnold admitted, if TransCare (or the NewCo business lines) had no money to operate, they could not be sold as a going concern.  (July 24 Tr.

79

78:13–16.)[56]   Simply put, calculating what a business **could have been worth** under a set of

projections (which is, at most, all that Arnold did) is not evidence that it **would have been (or even**

**likely would have been) worth** that amount but for the alleged disloyalty.   More important, the

calculation could not be made on a continuing operation without adding fresh capital (and other

variables that did not exist) to that equation.   Any valuation on the basis of what the enterprise

**could have been worth** makes hypothetical assumptions about value that adds new cash, new

executive management and time—additional assets contributed by others that the assets foreclosed

upon clearly did not have.   If a major oil company acquires a well that has not been drilled from a

seller that has no capital to invest in exploration of the well, the value that major oil company

exploits years later, after infusion of tens of millions of working capital and effort, is not the value

of the undrilled well on the date of purchase.   The same is true for TransCare – TransCare was not

viable in February without funding to operate.   And, unlike an oil well – which has some inherent

value based on untapped reserves whether it is operating or not – NewCo only had more than

liquidation value if it operated.

In light of this, the Trustee failed to prove that any lost going–concern value was caused

by the foreclosure.   *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 (finding

disloyal conduct caused no harm and refusing to conclude that such conduct, "when the

Company's equity was worth nothing[,] should now be remedied by an award of damages in the

---

[56] Arnold admitted that any sale would not happen overnight; at a minimum, there is still going to be a diligence
period.  (July 24 Tr. 75:8–76:12.)  Yet he nowhere accounted for how TransCare would be able to keep the lights on
for long enough to negotiate a sale of all or part of its business, even though he knew TransCare (and thus the NewCo
business lines within TransCare) could not be sold as a going concern if there was no money to operate the business.
(*Id.* at 76:13–16, 78:13–16.)  At another point in his testimony Arnold claimed he assumed a sale process that started
"in December or November" and ended with a sale on his valuation dates (*Id.* at 77:17–78:12), which, for NewCo,
was February 24.  (*Id.* at 11:10–12.)  Tilton, though, *did* start exploring a sale process with Wells Fargo in December
and came to what the bankruptcy court found to be a good faith conclusion that it would not be viable.  (PFC at 43.)
From that point forward, TransCare (and the NewCo business lines) were reliant upon voluntary funding by Wells or
Tilton to survive day–to–day.

tens (or hundreds) of millions of dollars"; "In other words, but for the [challenged transaction], there is little evidence to suggest the Company would have been worth any amount approaching what the Plaintiffs seek in damages"); *see also Oliver v. Bos. Univ.*, 2006 WL 1064169, at *25 (Del. Ch. Apr. 14, 2006) (finding that "the nil value effectively assigned to the . . . claims" was fair, and "thus, the only harm suffered by the Plaintiffs was a procedural one. Therefore, although the BU Defendants did breach their duty of loyalty and were unable to demonstrate the entire fairness of the [challenged] transactions, for purposes of assessing the fiduciaries' treatment of these claims in the context of negotiating the Accord Agreement, the Court does not find it appropriate to assign anything but nominal damages to these breaches.").[57]

The bankruptcy court simply ignored this glaring failure of proof. Nowhere in its discussion of damages did the bankruptcy court even mention the Trustee's burden of demonstrating causation, much less explain what evidence there was to support the conclusion that the damages the bankruptcy court recommended be awarded against Tilton were actually caused by the Article 9 foreclosure. In fact, the notion that the foreclosure caused the loss of tens of millions of dollars in value cannot be squared with the bankruptcy court's findings that TransCare: was unable to borrow money (PFC at 90); was "woefully insolvent" (*id.* at 88), with TransCare Corporation's subsidiaries being liable (as borrowers and guarantors) on approximately $55 million in defaulted secured debt (Stipulation Nos. 13–14); and had been "on life support" for a year. (*Ien*, Adv. Proc. No. 16–01033, Dkt. No. 157, at 35.)

---

[57] Quoting from the decision in *Basho*, the bankruptcy court stated that "[w]here fiduciaries acquire property through self–dealing, and 'through a combination of the taking and their subsequent use of the property, destroy[] its value entirely[,]' they are liable for the value the property would have had absent the breach of loyalty, not just its value immediately before the breach." (PFC at 56.) To the extent this was intended as a justification for the bankruptcy court's failure to consider causation, the bankruptcy court was wrong. *Basho* merely stands for the proposition that "the disloyal fiduciary who wrongfully takes property … is liable for changes in value *while wrongfully taken property is under the disloyal fiduciary's control.*" 2018 WL 3326693 (emphasis added). This does not excuse a plaintiff from having to prove what the value of the property at issue would have been but for the alleged disloyalty. There was no such proof here.

The bankruptcy court erroneously found that Arnold utilized valuation methods "to determine the value of the entire TransCare company (WholeCo) and NewCo." (PFC at 60.)  In fact, he did no such thing.  At best, he "determined" what NewCo *could have been worth* as a going concern after an infusion of fresh capital and the passage of time.  That did not meet the Trustee's burden of proving causation because calculating *what could have happened* is not evidence of what NewCo *was actually worth* but for the foreclosure.  For the same reason, the bankruptcy court's finding that Arnold calculated "the projected value of the Transcendence business, ***and hence***, TransCare's damages resulting from the stripping of that business through an unfair, tainted process" (PFC at 59 (emphasis added)) is a non–sequitur.  Although Arnold did purport to calculate NewCo's projected (*i.e.*, future) value, that does not prove the NewCo business lines ***had that value on February 24*** or lost it due to the foreclosure.

In his post–trial submissions, the Trustee tried to fill the causation gap by arguing the bankruptcy court should assume (contrary to the reality at hand) TransCare would have been successfully restructured but for the foreclosure, citing to *Int'l Telecharge Inc. v. Bomarko, Inc.*, 766 A.2d 437 (Del. 2000), as support.  However, the trial court's opinion in that case, *Bomarko I*, 794 A.2d 1161, shows that it differs factually from this one in crucial respects.

In *Bomarko I*, International Telecharge, Inc. ("ITI") restructured some of its debt prior to implementing the challenged merger.  The defendants argued that, in valuing the company, the court should not include the benefit of the debt restructuring because, without the merger transaction, ITI would not have been able to obtain needed financing and restructure its debt, rendering ITI valueless.  In rejecting that contention, the court stressed that the defendant CEO, Haan, had interfered with a specific existing financing opportunity with Bell Atlantic in order "to divert the opportunity to secure financing from Bell Atlantic away from ITI at the moment ITI

most needed it." *Bomarko I*, 794 A.2d at 1173.   The court further found that Haan "fully understood the impropriety of his conduct and affirmatively tried to conceal it . . . ." *Id.*   In other words, in *Bomarko I*, the defendant's misconduct precluded the company from realizing a concrete opportunity to restructure its debts.   Accordingly, the court rejected defendants' argument that the value of ITI should not include the debt restructuring.   *Id.* at 1184.   Indeed, the trial court recognized that although this was a "potentially harsh" result, it was nonetheless appropriate "given the nature of Haan's misconduct."   *Id.* at 1185.

Here, by contrast, there was no opportunity to restructure or sell TransCare (or any part of it) that Tilton wrongfully interfered with, much less one she sabotaged for her personal benefit or concealed from stakeholders.   Certainly the bankruptcy court made no such finding.   Thus, the reasoning of *Bomarko* does not apply here and there can be no assumption that TransCare would have somehow been successfully restructured, or sold for tens of millions of dollars (as the bankruptcy court's recommended damage award assumes), but for the challenged foreclosure.

## B.   Arnold's Calculations Are Irrelevant and Speculative

In any case, Arnold's calculations should not have been given any weight.   Because his testimony was the Trustee's only evidence of damages, the bankruptcy court's recommended damages award should be rejected on this basis too.[58]

### 1.   Arnold Failed to Offer An Opinion On Value

As an initial matter, Arnold failed to actually offer an opinion of the value of NewCo.   At trial, Arnold initially claimed he was retained to "determine[ ] the range of values that TransCare

---

[58] In fact, the bankruptcy court should have granted the defendants' motion to exclude his testimony under *Daubert*. (*See Memorandum in Support of Defendants' Motion in Limine to Exclude the Testimony of Plaintiff's Purported Expert Jonathan I. Arnold*, Adv. Proc. No. 18-1021-smb, Dkt. No. 106; *Declaration of Michael T. Mervis in Support of Defendants' Motion in Limine to Exclude the Testimony of Plaintiff's Purported Expert Jonathan I. Arnold*, Adv. Proc. No. 18-1021-smb, Dkt. No. 107.)

could reasonably expect to obtain in an open market transaction based on the analyses that were done at various points in time in January and February 2016." (July 24 Tr. 7:9–12.) On cross–examination, however, he admitted that he did *not* actually give ***his own opinion of value***, but rather only calculated "value" based on work that was done by "the people within Patriarch" in January and February 2016. (*Id.* at 106:15–107:1) (emphasis added):

> [I]n this matter I was asked to address what is a reasonable range for value of TransCare ***given what the people within Patriarch were doing in January and February***. That does not require me to do a deep dive into the comparables or the precedent transactions because I'm not giving, ***I'm not putting my own value on TransCare***. I instead am trying to get insight into the, to answer the question of what is reasonable for TransCare and Patriarch to expect to get in a range based on ***their*** analyses both of TransCare itself on a going forward basis and the companies that ***they believe*** were comparable or represented precedent transactions.

In other words, Arnold's calculations were based solely on what "*the Patriarch people believed* the EBITDA for 2016 would be and what the value for TransCare is that [was] *implied by those beliefs*." (*Id.* at 57:10–13 (emphasis added).) Arnold never opined on what ***he*** thought TransCare or NewCo were worth, much less what they would have been worth but for Tilton's alleged disloyalty. That renders his calculations legally meaningless. *See Gen. Motors Corp. v. New Castle Cty.*, 2000 WL 33113802, at *6 (Del. Super. Ct. Dec. 16, 2000) (finding "[expert] obviously did not consider how the property would have [fared] in an arms–length sale between a willing buyer and willing seller, which is the proper standard for fair market value" and instead considered only GM's "subjective" view of the property). *See also Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l., Inc.*, 350 F. Supp. 2d 582, 589–591 (D. Del. 2004) (excluding expert testimony on lost profits where expert's opinion of lost sales was based on advertising firm's

projections for which expert "did not conduct any independent analysis"; "the desire to achieve

10% of the market was a 'marketing objective,' which . . . may or may not have been achieved").[59]

Nor, as he admitted, did Arnold form an opinion about whether the projections he relied

on were themselves were reasonable.[60]  It almost goes without saying that "methods of valuation"

are "only as good as the inputs to the model. . . .  So the relevant question is . . . how correct was

the input or datum that produced the answer."  *Neal v. Alabama By–Prods. Corp.*, 1990 WL

109243, at *9 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991).  Arnold testified that he

did not have to evaluate the Plans or their projections because the people preparing them must

have believed they were accurate and they were closest to the facts.  (July 24 Tr. 57:10–13, 35:18–

21.)  However, Tilton was clear that even the February 24 Projections involved substantial risk.

She testified:

> It was a dynamic model, and everything was changing by the minute.  So,
> ultimately, to get the foreclosure done, I had to make decisions in the minute, and
> *certainly things were not settled because contracts were being lost and people
> were being lost every minute.*  But I got as comfortable *as I could* to make a
> decision that would try to save as much of this company and as many jobs as I
> could.

(Aug. 13 AM Tr. 40:11–18 (emphasis added).)

Indeed, the February 24 Projections depended on the realization of a series of assumptions

(DX_166, at 110489), but Arnold did not investigate the feasibility of the assumptions in any of

the Plans.  (July 24 Tr. 39:10–49:24, 59:3–60:12, 61:11–13; 64:4–17, 69:15–23.)  The authors of

the Plans understood the risk that those assumptions might not be valid.  (*See, e.g.*, Aug. 13 PM

---

[59] *See also Kohler Co. v. United States,* 387 F. Supp. 2d 921, 926 (E.D. Wis. 2005) ("Implicit in 'fair market' value is objectivity, not the subjective value attributed by individual parties."), *aff'd*, 468 F.3d 1032 (7th Cir. 2006); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (making same point); *Rivera v. Mendez & Compania*, 988 F. Supp. 2d 174, 178 (D.P.R. 2013) (explaining difference between "subjective willingness or valuations of the parties" and "the objective fair market value . . . .").

[60] July 24 Tr. 39:10–49:24, 60:13–61:13, 57:9–10, 35:2– 14, 86:2–8, 88:3–6, 39:10–49:24, 59:3–60:12, 64:15–17, 72:17–73:24.

Tr. 126:23–25 ("[G]iven the condition the company was in and the continued loss of people and contracts, it was a very high–risk transaction."); Aug. 13 AM Tr. 40:11–18; PX_175, at 02114.) The bankruptcy court's observation that Tilton must have thought the projections reliable because she gave them to an insurance broker and talked them up in an effort to bind insurance for NewCo (PFC at 62–63) hardly excused Arnold from doing anything to vet them or relieved the Trustee from fulfilling his burden of proof.[61]

As Tilton's expert, Dunn, explained, valuation professionals must offer their own opinion of value by assessing the risk that projections will not be realized; that is, whether the projections are reasonable.  (Aug. 8 Tr. 25:5–15.)  As explained by IRS Revenue Ruling 59–60, a generally accepted standard among valuation professionals, "[t]he value of shares of stock of a company with very uncertain future prospects is highly speculative.  The business appraiser ***must exercise his judgment as to the degree of risk attaching to the business*** of the corporation [that] issued the stock, but that judgment must be related to all of the other factors effecting value."  (*Id.* at 26:1–27:2 (emphasis added).)

An independent assessment of risk is critical because projections are *not* valuations.  (*Id.* at 69:9–16.)  A plan contains projections, the realization of which assume certain risks are overcome.  (*Id.* at 68:13–69:16.)  A valuation, on the other hand, "*assess[es]* the risk"—*i.e.*, how possible is it that the company will overcome those risks.  (*Id.* at 69:9–16 (emphasis added).)  The range of what is possible (and the value of that range) is what distinguishes a valuation from a projection.  (*Id.*)  Arnold acknowledged that all of the Plans had risk (July 24 Tr. 45:8–11), but that he did not perform ***any*** risk assessment.  (*See, e.g.*, *id*. 64:4–17.)

---

[61] Equally unpersuasive is the bankruptcy court's observation that Tilton had "committed up to $10 million of her own funds through [Ark Angels]" to NewCo.  (PFC at 63.)  As noted, that commitment was conditional and effectively tied to whether (or not) NewCo was financially successful.  (JX_101, at 08703, § 3.2.)

Moreover, in performing a risk assessment, a valuation professional must take into account the historical performance of the business that is being valued.  (Aug. 8 Tr. 27:21–30:15.)  Dunn discussed IRS Revenue Ruling 59–60, which "require[s]" valuation experts to focus on historical context: "[t]he history of a corporate enterprise will show it's [sic] past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business . . . The detail to be considered should increase with approach to the required date of appraisal since recent events are of greatest help in predicting the future." (*Id.* at 29:9–20.)  Even though he admitted that prospective buyers would consider the company's past financial performance (July 24 Tr. 30:12–25), Arnold ignored TransCare's recent historic performance—including at least two years of downward trending revenue (from $131 million in 2014 to $8 million in December 2015) and EBITDA (from $488,000 in 2014 to –$552,000 in December 2015).  (July 24 Tr. 80:1–84:11; PX_158, at 03376 ("Summary Table" Tab).)  Arnold also ignored TransCare's unsuccessful attempt to implement at least one turnaround plan.  (July 24 Tr. 67:21–68:22.)

Not only did Arnold assume the projections in the Plans would be realized without performing a risk assessment, his opinions of value assumed that a buyer would similarly accept the projections in the Plans without performing its own independent analysis or testing the assumptions on which the success of the Plans relied.  (Aug. 8 Tr. 24:8–12.)  Arnold, in fact, acknowledged the likelihood that a buyer would actually ignore the Plans altogether.  (July 24 Tr. 63:18–23 ("They [a prospective buyer] may have their own thought that they can make twelve cents of EBITDA on the dollar and ***who cares what the people at Patriarch and TransCare are doing because they're going to do it their way.  That's pretty common in M&A transactions that the buyer imposes their model on the acquirer.   That is common.***") (emphases added).)

Moreover, although Arnold did not account for TransCare's recent struggles, he expected that a third–party buyer would "use it as a point of negotiation and leverage [it]" to drive the price down. (*Id.* at 68:9–22 (emphasis added).)

Notably, the February 24 Projections Arnold relied upon were ***not*** regular management projections created in the ordinary course of business. On the contrary, they assumed a substantial restructuring (*i.e.*, the foreclosure) and were not prepared for the purpose of facilitating normal business planning.[62]   Delaware courts have repeatedly rejected expert testimony based on management projections where, as here, they were prepared outside the ordinary course of business. *See*, *e.g.*, *In re PetSmart, Inc.*, 2017 WL 2303599, at *33–34 (Del. Ch. May 26, 2017) (rejecting management projections as unreliable because they were "not created in the ordinary course of business" but rather "specifically to aid PetSmart in its pursuit of strategic alternatives").

The bankruptcy court's attempt to distinguish *PetSmart* (PFC at 58, n.24) is unavailing. To begin with, the evidence is overwhelming that the projections were created (a) for the purpose of evaluating a significant restructuring (*i.e.*, the OldCo/NewCo Restructuring) (Aug. 13 AM Tr. 64:8–16; DX_123, at 107343–44) and (b) under extraordinarily stressful conditions (with people working round the clock (Aug. 13 PM Tr. 95:3–5) and the company dependent on voluntary financing to survive day–to–day (Aug. 13 PM Tr. 94:24–95:11)) that were the opposite of ordinary course. The bankruptcy court itself found that the Article 9 "foreclosure was outside of TransCare's ordinary course of business." (PFC at 75.) Furthermore, the fact that the projections weren't prepared for use in an auction, as they were in *PetSmart*, hardly means they were prepared in the ordinary course. Likewise, the fact that they were provided to third parties in an attempt to procure insurance coverage does not make them ordinary course projections for at least two

---

[62] Aug. 13 PM Tr. 80:6–17, 94:4–17; Aug. 14 AM Tr. 39:25–40:9.

reasons.   First, regardless of how they were used, they were undeniably *prepared* under extraordinary circumstances.[63]   Second, the binding of insurance here was no ordinary matter. Tilton was trying to get insurance to operate a new company for the first time.   There is nothing routine about that.   Further, contrary to the bankruptcy court's finding, there *was* evidence the company had missed its recent projections (PX_191, at 04696) and the bankruptcy court ignored the uncontested fact that TransCare had failed to achieve its prior business plan and had generated earnings numbers that, according to CMAG, were significantly overstated.   (JX_8; Aug. 13 PM Tr. 28:16–25; July 23 AM Tr. 59:16–23; JX_10; PX_165, at 00925.)

The bankruptcy court downplayed Dunn's testimony and sought to justify Arnold's failure to do any investigation of the reasonableness of the inputs he used for his calculations by citing to the District Court's decision in *Hart v. Rick's Cabaret Int'l, Inc*., 60 F. Supp. 3d 447 (S.D.N.Y. 2014).   (PFC at 63.)   *Hart*, however, is inapposite.   There, the court denied a motion to exclude the opinions of plaintiffs' expert, who attempted to calculate the hours worked by class members in a wage–and–hour law class action.   As the *Hart* court discussed at some length, the defendants had kept imperfect records of the class members' working hours, but case law was clear that "in wage–and–hour cases, employees are permitted to prove their hours worked as a matter of 'just and reasonable inference' in the absence of employer–mandated time records."   60 F. Supp. 3d at 466 (quoting Second Circuit authority, which cited a controlling United States Supreme Court case on the subject, *Mt. Clemens*).

---

[63] One set of projections shared with an insurance broker (PX_196) was derived from a spreadsheet prepared by Jonathan Killion of CMAG.   (PX_193, at 08557 ("P&L" Tab).)   In his transmittal email, Killion wrote: "I just generally need to review the balance sheets *to make sure they make sense*.  *All this has been done on the fly without time to really review with a clear mind*."   (*Id.* at 08556 (emphasis added).)   Killion continued:  "Also, to be clear, these models are directional.  With the cluttered balance sheets in New York it is hard to tell what is and what isn't an asset / liability that would be part of the go forward entity." (*Id.*)   A set of projections developed through a seat–of–the–pants process cannot credibly be characterized as regular management projections.

It was against this very particular legal framework that the *Hart* court found the expert's "methodology is sufficiently sound to satisfy *Mt. Clemens'* 'just and reasonable inference standard' . . . ." *Id.*  The *Hart* court further noted that the defendants failure "to offer an alternative, let alone a superior methodology" was "a relevant consideration under *Mt. Clemens*" because the Supreme Court found a "defendant whose record keeping is deficient bears the burden of 'coming forward with evidence' to contradict" a plaintiff's estimate under the just and reasonable inference standard.  *Id.* at 467 (citation omitted).  Here, in contrast to *Hart*, the burden of proving damages was squarely on the Trustee; there is no equivalent in Delaware fiduciary duty damages law to the just and reasonable inference standard in wage–and–hour jurisprudence.  Nor did Arnold contend there was anything about TransCare's books and records that prevented him from doing an analysis of the reasonableness of the February 24 Projections or, as discussed further below, a risk–based adjustment to the EBITDA multiples he used.  The notion that the bankruptcy court was free to ignore the deficiencies in Arnold's analysis as a result of *defendants*' purported failure to proffer an "alternative" calculation simply has no support in Delaware case law.  The Trustee had the burden of proving damages.  Arnold's faulty analysis failed to meet that burden.

2.  <u>Arnold's Calculations Should Be Rejected As Impermissibly Speculative</u>

For related reasons, Arnold's opinions should be rejected and are entitled to no weight as they are unsupported by the record and impermissibly speculative.  *See Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *7 (Del. Ch. May 20, 2004) (giving expert's valuation no weight because "the record clearly shows that, in the absence of reasonably reliable contemporaneous projections, the degree of speculation and uncertainty characterizing the future

prospects" of the subject company give the analysis "marginal utility").[64]

- *Projected EBITDA*

First, Arnold improperly relied on the speculative February 24 Projections.  As described by Tilton, they were a "hockey stick projection" (Aug. 14 AM Tr. 39:25–40:9; *see also* PX_283, at 8 (containing chart of projections)), meaning that, graphically, the sudden and dramatic uptick in profits resembled the shape of a hockey stick blade.  The February 24 Projections showed EBITDA of $3.2 million for NewCo in the first ten months (a 128% increase over 2015 EBITDA for all of TransCare).  (DX_166, at 110489.)  This dramatic near–term spike in profitability ignored TransCare's failure to achieve its prior turnaround plans.  (JX_8; Aug. 13 PM Tr. 28:2–22; July 23 AM Tr. 59:16–23; JX_10.)  Tilton was appropriately cautious about the ability to achieve the projections (Aug. 13 PM Tr. 126:23–25), and the Trustee presented no evidence that the projected near–term explosion of profit in the February 24 Projections was likely to occur, particularly when viewed against TransCare's dismal performance over the immediately preceding years.  *See Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *10 (Del. Ch. Nov. 1, 2013) (finding expert's use of "projections based on a $20 million increase in [television show's] revenue leads to a speculative DCF valuation" where projected increase depended on outcome of future negotiation).

- *EBITDA Multiples*

Even if the Trustee had proven that the February 24 Projections were not speculative, his Arnold's calculations should still be rejected as impermissibly speculative because Arnold applied EBITDA multiples identified by Greenberg in a single email (one he composed *less than four hours* after Tilton asked him for information about prior industry transactions) (DX_96, at 01414;

---

[64] While this language from *Doft* is in the context of a discounted cash flow (or DCF) analysis, which Arnold did not perform, the principle that a projection or model is only as good as its inputs is not novel, nor is there any reason to restrict its application to the DCF context.

91

JX_55, at 41410; July 22 AM Tr. 42:3–18)) *without* "adjusting [them] to account for the differences from the company being valued and the comparables . . . ." *Agranoff v. Miller,* 791 A.2d 880, 892 (Del. Ch. 2001).  As Delaware case law makes clear, a credible multiples analysis must evaluate the comparable risk and reflect it in a multiple that "would be accepted by a disinterested mind." *In re Appraisal of Orchard Enters., Inc.*, 2012 WL 2923305, at *10 (Del. Ch. July 18, 2012); *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *31 (Del. Ch. Feb. 22, 1988) (finding "sufficient uncertainty" in comparable company approach because the comparable company's "business risks and earnings results . . . were unrelated to the risks of the [subject company]"), *aff'd*, 564 A.2d 1137 (Del. 1989).[65]

Arnold made no adjustments.  Rather, he simply applied market multiples for Envision and Air Methods – two thriving, multi–billion dollar companies that either did not engage in ground–based medical transportation at all or only in part – to TransCare, a ground–based ambulance company that was in deep financial distress.  (Aug. 8 Tr. 33:19–35:6, 36:1–37:18; PX_283 at Ex. 1; July 24 Tr. 94:13–95:21.)  Arnold's failure to consider the differences in actual circumstances and business segments between TransCare, Envision and Air Methods renders the multiples he used unreliable as applied to TransCare.

As Dunn explained, a valuation professional must test the differences between the purported comparable companies and the company being valued and, if warranted, adjust the EBITDA multiples derived from the supposedly comparable companies accordingly.  (July 24 Tr. 102:10–24 (referencing *Valuation: Measuring and Managing the Value of Companies*, which Arnold described as "one of the most popular textbooks and has been for over ten years in this

---

[65] The same analysis applies to the precedent transaction method.  *Orchard Enters.*, 2012 WL 2923305, at *9–10; *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *18–19 (Del Ch. June 30, 2015).  And here, Arnold used transactions involving Envision and Air Methods for both his comparable company multiples and his transaction multiples.

area" (*id.* 96:2–97:1).)   Arnold, however, did not analyze the comparability of the so–called comparable companies he used to TransCare.  (*Id.* at 102:8–103:3; Aug. 8 Tr. 32:15–25.)  He thus committed what a valuation treatise Arnold himself cited identifies as a "common flaw": comparing a subject company to comparison companies without accounting for "difference in their performance."  (July 24 Tr. 101:10–23 (quoting from *Valuation: Measuring and Managing the Value of Companies*).)  Such differences in performance manifest when comparing the companies' respective operations and financial performance and metrics.  (Aug. 8 Tr. 31:23–32:6.)

Because Arnold committed the "common flaw," he did not assess the following differences between TransCare and the two purported comparable companies he used, Envision and Air Methods.  Unlike TransCare, which engaged only in ground transportation, Envision operated two business segments, one of which involved staffing of acute care and surgical centers and which accounted for 66% of its total revenue.  (*Id.* at 33:19–34:13.)  Similarly, Air Methods principally operated helicopter transportation services and had no ground–based transportation services.  (*Id.* at 34:14–35:6.)  Arnold also failed to account for the following sizable differences in financial metrics between TransCare and those companies:

- In the last twelve months prior to the valuation dates, TransCare generated revenue of $114 million compared to Envision's $5 billion and Air Method's $1 billion of revenue (*id.* at 36:1–10);

- TransCare's LTM EBITDA was $1.4 million compared to Envision's $582 million and Air Method's $284 million (*id.* at 36:11–20);

- TransCare's LTM EBITDA margin (that is, the ratio of EBITDA to revenue that indicates profitability) was 1.2% compared to Envision's 11.4% and Air Method's 26.8% (*id.* at 36:21–37:1; PX_283 at Ex. 1); and

- TransCare's EBITDA growth (i.e., a calculation of established, historic trends in improving or declining profitability and thus relative riskiness) from 2012 to 2015 was –46.4% compared to Envision's +13.8% and Air Method's +3.4%.  (Aug. 8 Tr. 37:2–37:18; PX_283, at Ex. 1.)

Moreover, while TransCare was operating "at the absolute breaking point," Arnold admitted that Envision and Air Methods were healthy, stable companies with no sign of distress. (July 24 Tr. 94:13–95:7.)  Any market participant interested in purchasing TransCare "would need to take these differences into account" by "lowering the applied multiple or the observed multiple" of Envision and Air Methods.  (Aug. 8 Tr. 38:9–22.)  Simply put, the greater the risk in an investment, the lower a potential buyer will pay for the investment.  (*Id.* at 82:5–15.)  As applied here, an investment in TransCare was indisputably riskier than one in Envision and Air Methods, so a potential third–party buyer would lower the multiple it applied to the projected EBITDA and, by extension, the price it would reasonably pay.  (*Id.* at 38:24–39:11.)  Indeed, a market participant might well decide not to apply any EBITDA multiple to TransCare if the buyer concluded it was unlikely that the Company could continue as a going concern.  (*Id*. at 60:17–61:10.)

Courts routinely give no weight to expert valuations that failed to account for such large differences between the company to be valued and the comparable companies or transactions used. *See Doft & Co.*, 2004 WL 1152338, at *9 (rejecting comparable company analysis as "unduly optimistic" because the expert's analysis "is too speculative when compared to the clear evidence in the record that [the subject company] still faced significant challenges" compared to its comparator company); *Reis*, 28 A.3d at 477 (rejecting expert's comparable companies analysis because "[t]he selected companies have stable earnings and have achieved consistent growth over the past five years.  During the same period, [the subject company's] earnings have been erratic, and the company has suffered losses.  I lack sufficient confidence in the comparability of the selected companies to use the comparable company method, even with adjustments to reflect their differences from [the subject company]."); *LongPath Capital*, 2015 WL 4540443, at *18 (citation omitted) ("Reliance on a comparable companies or comparable transactions approach is improper

where the purported 'comparables' involve significantly different products or services than the company whose appraisal is at issue, or vastly different multiples.").

Contrary to the bankruptcy court's conclusion (PFC at 62), Arnold's failure to adjust the multiples was not cured by his rebuttal testimony. The bankruptcy court provided the following description of Arnold's rebuttal work:

> During rebuttal testimony, Dr. Arnold explained that he had investigated certain of the criticisms involving his use of Envision and Air Methods as comparable companies. He looked for new guideline companies and created a larger database of a group of sixty–nine companies that he filtered down to a group of thirty–four . . ., which met his definition of being either smaller, distressed, low operating, or undercapitalized . . . . He concluded that they confirmed Greenberg's analysis . . . .

(PFC at 62.) [66]

However, as Arnold freely admitted he actually had "***no opinion, one way or the other***, as to whether ***any*** of these 69 [companies, including any of his subset of 34] ***actually are*** comparable guideline companies for TransCare." (Aug. 14 AM Tr. 64:21–65:22 (emphasis added).) Indeed, only *one* of the 69 was an ambulance company. (*Id.* at 62:18–63:3.) To state the obvious, using the EBITDA multiples of companies that may or may not be comparable to TransCare or NewCo (Arnold said he had no opinion on that) is hardly probative of what an appropriate multiple for TransCare or NewCo should be.

---

[66] This description of the email Greenberg wrote is not apt. As Greenberg testified, he prepared this email to get "a *general idea* of *potential* comparable transactions." (July 22 AM Tr. 42:3–18 (emphasis added).) Put otherwise, Greenberg's email was a jumping off point, rather than the end product of substantial research (indeed, it was compiled in only four hours (*see* DX_96, at 01414; JX_55, at 41410)). The preliminary nature of his work is further underscored by a follow–up email Greenberg sent Tilton six days later. (JX_61; July 22 AM Tr. 52:12–15 (describing email as an update on the matters reported to Tilton on December 18).) In that email, Greenberg identified for Tilton several "middle market ambulance transactions"—*i.e.*, transactions involving companies closer in size to TransCare than those identified in Greenberg's December 18 email—and the investment bankers who worked on them. Greenberg again inserted the chart from his December 18 email, but explained that the "chart focused on ***certain larger transactions before these smaller deals were found.***" (*Id.* (emphasis added).) As part of his rebuttal work, Arnold made no effort to investigate any of the middle–market transactions Greenberg identified.

In another effort to excuse Arnold's lack of diligence, the bankruptcy court opined that "there was little need for any risk adjustment" because Tilton was allegedly bullish on NewCo's prospects. (PFC at 62.) That finding is not supported by the record. As discussed elsewhere, Tilton understood that the transaction involved substantial risk. (*See, e.g.*, Aug. 13 PM Tr. 126:23– 25 ("[G]iven the condition the company was in and the continued loss of people and contracts, it was a very high–risk transaction.").) An 11x multiple was in a different stratosphere from what Tilton thought NewCo would trade at if it were operated as a going concern. (Aug. 13 AM Tr. 17:5–12 ("Q: And at that time, you believed that seven to eight was a normal multiple, that was what the industry traded at. A: For a healthy company, not a company that was in free fall, losing contracts every day. Q: So anything above eight, eight to nine, you believed was generous. A: I think anything about four to five, in this distressed, free fall situation, would have been generous.").) Ignoring this evidence, the bankruptcy court instead relied heavily on a communication from Tilton to her insurance broker describing Transcendence "as a less risky transit business." (JX_80.) But the fact that a business might have been "less risky" than one that was in undeniable free fall does not mean it was without considerable risk.

Even if Tilton's claimed enthusiasm for NewCo's future prospects was justified, it is irrelevant to the damages analysis; it would not change the vast differences between the two comparable companies Arnold used in calculating the value of the NewCo business lines. Similarly irrelevant was the bankruptcy court's attempt (yet again) to blame Tilton for the fact that "TransCare did not generate better financial information." (PFC at 58, n.24.) The unjustifiable use by Arnold of EBITDA multiples of companies with vastly different business and economic circumstances than TransCare had absolutely nothing to do with the quality of TransCare's

financial information.   Regardless, Arnold did not say he could not perform a risk adjustment because he lacked sufficient information.

Critically, the EBITDA multiples used by Arnold are wholly inconsistent with how an actual prospective investor in one of the NewCo business lines evaluated it.   To that end, as previously discussed, the National Express July 2015 LOI offered $6 to $7 million (to be paid out over time) for the paratransit division (JX_40), which produced $3.5 to $4 million EBITDA at the time—in other words, the consideration proposed in the LOI implied a multiple of 1.7x to 1.75x (at most), a fraction of the multiple adopted by the bankruptcy court.   Indeed, the multiple implied by the LOI is arguably the most probative evidence of the appropriate EBITDA multiple to apply to TransCare (or at least NewCo) since it reflected actual market multiples for TransCare itself. *See In re Appraisal of Dole Food Co.*, 114 A.3d 541, 558 (Del. Ch. 2014) (citation omitted) (noting that "a court may consider third party offers to purchase corporate assets 'as a reality check [on] any independently determined valuation,'" and that such offers are "market evidence of what knowledgeable lay people believed about the value of the asset"); *see also In re Bos. Generating, LLC*, 440 B.R. 302, 325 (Bankr. S.D.N.Y. 2010) (explaining judicial preference for market evidence, where available).   Arnold also ignored that Leland, who had decades of experience working in the ambulance industry, described an 8x multiple was "high for the industry."   (JX_29, at 71450.)[67]

Finally, illustrating just how far the bankruptcy court deviated from requiring the Trustee to meet his burden of proof is its extended discussion of what it thought could have happened if the NewCo business lines were acquired by a strategic buyer.   (PFC at 63–64.)   There the bankruptcy court made a variety of its own observations about efficiencies and cost savings that

---

[67] Leland also testified that in November 2014, nearly a year before Wells issued the Non–Renewal Notice, it would have been a stretch to sell TransCare at a multiple of 5x EBITDA.  (Leland II Tr. 313:3–24.)

might be realized by a strategic buyer.  But there are at least two fundamental problems with the bankruptcy court's ruminations.  First, National Express *was a strategic buyer* and its offer in July 2015 implied only a 1.5x–1.75x multiple.  Second, there was no record evidence supporting the bankruptcy court's ideas about possible efficiencies and cost savings.  The Trustee had the burden of proving damages.  It was not for the bankruptcy court to come up with its own ideas about what might or could have happened in the absence of evidence from the Trustee supporting those ideas.

* * * * *

In sum, the factual record reflects that by February 9th, when Tilton and her team began the exploration of the OldCo/NewCo Restructuring, TransCare was on borrowed time with no options other than a liquidation of its assets.  Had Tilton taken no action to save any of the TransCare business lines, and hundreds of associated jobs, the company would simply have entered liquidation earlier, with all of its business lines shuttering together.

TransCare did not have the liquidity or access to funds to (i) continue its operations in the ordinary course or (ii) sell itself (or any part of itself) as a going concern.  In fact, TransCare had only one destination without new capital from one or more of its existing lenders: a fire sale of its assets in a liquidation – which is what ultimately occurred.  Tilton's attempt to save part of TransCare (had it been successful) would have required more than just an Article 9 foreclosure; it would have required an infusion of new money, time, new management personnel (*see* Aug. 13 PM Tr. 125:23–126:7) and operational success.  The only true value that was "taken" from TransCare in the foreclosure was the value of the balance sheet assets intended to be transferred from TransCare to Transcendence.  That transfer happened on paper only; Transcendence never operated.  When those assets were ultimately sold by the Trustee, after payment to Wells Fargo on

its secured claims, they yielded a nominal amount to the estates that wholly belies the outsized damages award erroneously recommended by the bankruptcy court.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the District Court should reject the bankruptcy court's recommendation that it find Tilton liable for breach of the duty of loyalty.  Alternatively, the District Court should reject the District Court's recommendation to award $41.8 million in damages against Tilton and instead enter an award of $1 as nominal damages.

Dated: August 7, 2020

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036–8299
Tel.: (212) 969–3000
Fax: (212) 969–2900
Email: mmervis@proskauer.com
tkarcher@proskauer.com

*Attorneys for Lynn Tilton*

99