# EXHIBIT A

JD(NY)-15-19
Brooklyn, NY

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

TRANSCENDENCE TRANSIT II, INC.;
TRANSCENDENCE TRANSIT, INC.;
PATRIARCH PARTNERS, LLC AND
PATRIARCH PARTNERS AGENCY SERVICES;
Single Employer or Joint Employers

         and                                  Case 29-CA-182049

LOCAL 1181-1061, AMALGAMATED TRANSIT
UNION, AFL-CIO

*Lynda Tooker, Esq.,*
     for the General Counsel.
*Kathleen M. McKenna, Esq.;*
*Corinne M. Osborn, Esq.;* and *Carolyn Schiff, Esq.,*
     for the Respondents.
*Richard A. Brook, Esq.,*
     for the Charging Party.

DECISION

STATEMENT OF THE CASE

     KENNETH W. CHU, Administrative Law Judge. This case was tried in Brooklyn, New York, on April 9, 17, 18, and May 9, 30, 2019.  The charging party, Local 1181–1061, Amalgamated Transit Union, AFL–CIO (Union) filed the charge on September 15, 2016,[1] with the National Labor Relations Board (NLRB) and the General Counsel issued the complaint on September 28, 2018, and an amended complaint on December 19, 2018, alleging that the Respondents violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act). Respondents Transcendence Transit II, Inc.; Transcendence Transit, Inc.; Patriarch Partners, LLC; Patriarch Partners Agency Services, LLC filed a timely answer denying the material allegations in the amended complaint (GC Exh. 1).[2]

---

    [1]  All dates are in 2016 unless otherwise indicated.
    [2]  The exhibits for the General Counsel are identified as "GC Exh." and Charging Party's exhibits are identified as "CP Exh."  Respondents' exhibits are identified as "R. Exh."  Joint exhibits are identified at "Jt. Exh." The closing briefs are identified as "GC Br." and "R. Br." for the General Counsel and the Respondents, respectively.  The Charging Party Brief is identified as "CP. Br."  The hearing transcript is referenced as "Tr."

On the entire record, including my observation of the demeanor of the witnesses[3] and corroborating the same with the objective findings in the record, and after considering the briefs filed by the General Counsel and the Union,[4] I make the following

5                                    FINDINGS OF FACT

I.   JURISDICTION AND UNION STATUS

Respondent Patriarch, with an office and place of business at One Broadway, New York,
10  New York, has been engaged in providing managerial, investment, and financial services for other corporate entities.  During the past 12 months ending in November 30, 2018, Respondent Patriarch purchased and received goods valued in excess of $50,000 directly from enterprises located outside of the State of New York at its New York facility.[5]  Respondent Patriarch admits that it has purchased and received goods valued in excess of $50,000 from enterprises located
15  outside of the State of New York, but denies that it has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.  Despite its denial, I find that Respondent Patriarch is an employer engaged in commerce within the aforementioned section of the Act.  The charging party, Local 1181–1061, Amalgamated Transit Union, AFL–CIO, is a labor organization within the meaning of Section 2(5) of the Act.
20

II.   ALLEGED UNFAIR LABOR PRACTICES

The complaint alleges that Respondents Patriarch Partners, LLC (Patriarch); Patriarch Partners Agency Services, LLC (PPAS); Transcendence Transit, Inc. (Transcendence); and
25  Transcendence Transit, II, Inc (Transcendence II) constitute a single employer and/or have been joint employers of the employees of Respondent Transcendence II (collectively, "Respondents").  The complaint states that at all material time prior to February 24, 2016, TransCare New York (TransCare NY) was engaged in the business of providing para-transit services in New York City pursuant to a contract with the Metropolitan Transit Authority (MTA).  The full-time and part-
30  time drivers employed at TransCare NY constituted a unit within the meaning of Section 9(b) of the Act and were represented by the Union.  The Union had been the exclusive collective-bargaining representative of the unit, which TransCare NY recognized in successive bargaining agreements, the most recent from April 1, 2015, to March 21, 2018.
      The complaint further alleges that on or about February 24, the Respondents acquired the
35  MTA contract of TransCare NY and began operations of the para-transit business in basically

---

[3]  Witnesses testifying at the hearing included Shunda Watson, Alejandrina Cleary, Karen Dockery, Mariane Insogno, Salvatore LaMonica, Glen Youngblood, Anthony Cordiello, Brian D. Stephen, William Randall Jones, and Lynn Tilton.
[4]  On August 19, 2019, the counsel for the General Counsel moved to strike the Respondents' post-hearing because it was untimely filed by COB on August 15.  In my order of August 6 granting the extension of time, I specifically instructed that the parties file posthearing briefs by COB on August 15, which was 5:30 p.m. and the time for close of business in Region 29.  As such, I have not considered the Respondents' posthearing brief in my deliberations in issuing this decision.
[5]  The complaint did not allege that Respondents Transcendence, LLC and Transcendence II, LLC engaged or conducted operations and had purchased and received goods in excessive of $50,000.  The complaint did not allege that Patriarch Partners Agency Services had purchased and received goods at its State of New York office in excessive of $50,000.

unchanged form and employed a majority of the TransCare NY unit employees.  The complaint
alleges that Transcendence II is a successor to TransCare NY and that on or about February 26,
Respondents closed down the para-transit operations in New York City and laid off all of its unit
employees without notice and affording the Union an opportunity to bargain with the
5    Respondents with respect to the layoff and the effects of its conduct in violation of Section
8(a)(1) and (5) of the Act (GC Exh. 1).

a.   Corporate Structure and Management of Companies

10    Lynn Tilton (Tilton) is an entrepreneur and business woman.  She is the sole owner of
Patriarch, which she created and incorporated the entity in 2000.  Tilton testified that Patriarch is
an investment firm that makes loans to distressed companies and through business strategies and
restructuring, to turn the companies' losses to profitability.  The intended business purpose of
Patriarch is to provide investment advisory services, legal and related analytical services with
15    respect to nonperforming loans, securities and other assets and to enter into investment advisory
agreements with other entities to which Patriarch may manage and provide investment advice (Jt.
Exh. 3 at D-002068).  Tilton best sums up her business concept stating (Tr. 325)

I created a financial model that I actually have patented, one of the few business method
20        patents, that allowed me to take the loans of deeply distressed companies, and in a
portfolio model of how the cash flows perform, turn those into investment-grade assets,
which basically allowed me to borrow, at very low rates, to give the companies that I loan
money to the time and the strategy to restructure and become profitable.  So it was the
first time that the loans of deeply distressed companies could, together, be turned into
25        investment-grade notes, and it was a first of a kind. But what it did allow me to do is to
buy companies that otherwise would have been left for dead and lend money to those
companies to try to restructure and build those operations and take them from loss to
profitability through strategic support and financing and hiring the right people.

30    At the time of the hearing, Tilton, through Patriarch, managed 74 companies in her
portfolio.  A portfolio company is a company that is owned by Tilton through her investment
funds and personal money.  Tilton owns all the portfolio companies, directly and personally,
through the funds that are loaned to the companies.  Tilton serves as the CEO for three of her
companies (Tr. 265).[6]  None of the companies are owned by Patriarch.   Patriarch has no
35    subsidiaries and no common financial books with any of the portfolio companies.  Patriarch has
approximately 50 employees and none work for the portfolio companies.  None of Patriarch's
employees are engaged in the day-to-day operations of any portfolio companies.  Patriarch has
not engaged in any labor negotiations on behalf of any portfolio companies (Tr. 326, 327).

40    Patriarch Partner Agency Services (PPAS) serves as a bank for the lending groups that
provides loans to the portfolio companies.  PPAS is owned by Tilton.  One function of PPAS is
to collect payments/interest on behalf of the lending groups. Tilton testified

When I buy these companies, they are financially strapped and they have very little cash.
45        So we're the agent. We set up the agent bank so that the companies, if they were unable

---

[6]  None of those companies are relevant in this proceeding.

3

to pay, wouldn't have fees to pay to an agent bank. You need an agent bank when you
have many lenders because they bill for the interest they collect, and they allocate. So
rather than going to a Bank of New York or another agent that would charge, you know,
250,000 dollars a year and legal fees, by setting it up internally, we were charging, at the
beginning, like, 25,000, and then, eventually, over 20 years, went up to 75,000. But
today, PPAS has about a seven million-dollar receivable from the companies who have
not been able to pay, they were able to use their cash.

PPAS has no employees.  Patriarch employees are delegated to act on behalf of PPAS.
Tilton is the owner and manager of PPAS, but the authority is delegated by her to Patriarch to
perform the financial services on behalf of PPAS (Tr. 266).  Patriarch and PPAS do not share
financial books and records.  PPAS does not direct day-to-day operations or engage in labor
negotiations with any portfolio companies (Tr. 329, 330).

TransCare Corporation was acquired by Tilton in 2001 from an individual who
previously owned the company.  The company was under financial duress at the time and Tilton
took over most of the outstanding loans held by the lender group and gained a controlling interest
in the company by investing millions of her personal money and from other funds that she
owned.[7]  Tilton steered TransCare away from bankruptcy, which continued to operate until 2016
(Tr. 330, 331).  Tilton is the sole director/owner of TransCare.  She made broad policy decisions
but was not involved in the day-to-day operations of TransCare (Tr. 267).

Under the TransCare umbrella, there were 13 separate subsidiaries, each individually
incorporated, including TransCare New York, Inc. (TransCare NY).  TransCare NY was in the
business of providing transportation to the elderly and the disabled in New York City.
TransCare also operated an ambulance service in various geographic areas in the greater New
York, Maryland, and Pennsylvania.

In about February 2009, TransCare NY was awarded a contract by the New York City
Metropolitan Transit Authority (MTA) to provide para-transit transportation to the elderly,
disabled and infirmed.  The original contract amount was over $435 million dollars for
TransCare NY to operate the para-transit services (Jt. Exh . 7).  Relevant to this proceeding,
TransCare NY was to provide the drivers, schedulers, managers and other employees for the
para-transit services.  The vehicles, schedules, the multipoint pickups of passengers, routes and
locations were provided by MTA.

On March 22, 2011, the NLRB certified the Union as the exclusive collective-bargaining
representative of "all full-time and regular part-time para-transit drivers (including field training
officers) employed by TransCare NY at its Foster Avenue/Bank Street, Brooklyn, New York
facility" (GC Exh. 20).  The employer and the Union entered into a collective-bargaining
agreement on April 1, 2012, through March 31, 2015,  and by a memorandum of agreement, the
contract was extended through March 31, 2018 (GC Exhs. 21, 22).

---

[7] For example, Tilton is the manager/owner of Ark Investment Partners, II, LLP and Zohar CDO, two
investment fund companies that provided loans to TransCare through a credit agreement in 2003 and
continuing until TransCare petitioned for bankruptcy.  The lenders had collateral interests in TransCare
assets that were held by PPAS (Jt. Exh. 5).

Tilton testified that Wells Fargo Bank (Wells Fargo) held an outstanding asset-based loan on TransCare.  The asset-based loan was essentially a revolving credit line from Wells Fargo in which the bank would lend money to TransCare based upon the revenues generated by TransCare that had been deposited in a Wells Fargo account.  The revenues are "re-lent" to TransCare to pay expenses.  PPAS acted on behalf of Wells Fargo and other lenders in the transaction of loans between the lending group and TransCare.

Brain Stephen is the senior legal director at Patriarch and is involved in the financial and legal aspects of Tilton's portfolio of companies, including TransCare (Tr. 377).  Stephen testified that TransCare NY was able to draw on Wells Fargo's revolving credit line for its operational expenses and payroll.  Aside from Wells Fargo, other lenders also held outstanding loans on TransCare NY with a specific amount and repayment dates.  PPAS acted as the conduit in accepting payment obligations from TransCare to the appropriate lenders.  The security interests on TransCare NY were also held by PPAS on behalf of the lenders (Tr. 383, 383, 391).

Tilton said that Wells Fargo began to reduce the amount of funds to TransCare NY in July 2015 and by early 2016, Wells Fargo wanted to exit the revolving credit account and close the asset-based loan by February (Tr. 269).  Tilton developed a plan to save certain business operations of TransCare.  She decided certain TransCare divisions could be restructured and made profitable.  Other divisions would be liquidated through bankruptcy.  Patriarch assisted Tilton in the restructuring plan.  Tilton, with the financial advice and assistance of Patriarch, created two new entities that would continue operating some of the TransCare divisions.

Stephen testified that he was familiar with the para-transit division of TransCare NY and was knowledgeable of the MTA contract.  Stephen, through Patriarch, assisted in the incorporation of Transcendence Transit, Inc. (Transcendence) and Transcendence Transit II, Inc. (Transcendence II) on February 10 (Jt. Exhs. 3, 4).  Stephen stated that Wells Fargo had a first-priority interest in TransCare NY.  Stephen said that some of TransCare NY's assets would be sold to satisfy the obligations of the bank and other assets would be sold to the two new entities in a foreclosure sale.

On February 24, TransCare was deemed in default of the 2003 credit agreement[8] and PPAS, as agent for the lenders, accepted certain TransCare assets as partial satisfaction of the credit agreement obligations.  Included in the TransCare NY assets was the MTA contract (Jt. Exh. 6).  In a "Bill of Sale, Agreement to Pay and Transfer Statement," PPAS, as the administrative agent of Wells Fargo, would sell some of TransCare's assets to the new entities.  Essentially, Transcendence would purchase TransCare's operations in the Hudson Valley area and Pittsburgh, PA in the foreclosure sale.  Transcendence would also purchase the computer server that contained the software information on routes, schedules, pick-up points, payroll, and other data used by TransCare NY in its para-transit operations.  Transcendence II was designated to run the para-transit operations formerly operated by TransCare NY.  The remaining TransCare

_____

[8]  The notice of default stated, in part, "Your failure to pay interest when due under the Credit Agreement caused an Event of Default to occur under Sec. 10(a) of the Credit Agreement. Because of this and other Events of Default under the Credit Agreement, the Lenders hereby declare all of the Obligations to be due and payable forthwith, and all of the Commitments to be terminated" (Jt. Exh. 6 at D-000654).

assets would be wound down (Tr. 386).  The consideration for the transfer or sale of TransCare's assets was funded at $10 million dollars through an investment fund entity named Ark Angels. At the time, Ark Angels was owned and managed by Tilton (GC Exh. 12).

5        Glen Youngblood (Youngblood) had worked with TransCare since 2007 in several different capacities, such as vice-president of performance improvement, director of strategy and director of performance improvement.  He also oversaw and train the operations staff and did data analysis of the company (Tr. 161–163).

10       Youngblood was aware of TransCare's financial difficulties and was present at a meeting in January to restructure TransCare and to determine the viable and profitable divisions under TransCare that could be save.  Consistent with the testimony of Tilton and Stephen, Youngblood testified that the profitable divisions were the para-transit operations under the MTA contract, Pittsburgh and Hudson Valley (Tr. 168).  Youngblood said that Tilton offered him the position of
15   president in one of the two Transcendence entities.  Youngblood was directed by Stephen to set up separate bank accounts for Transcendence and Transcendence II because it was Youngblood's understanding that the MTA wanted a separate financial account for the entity operating under the contract.  Youngblood signed the bank documents on February 24 (GC Exh. 16). Youngblood stated that he was authorized to sign both bank accounts (Tr. 171–176).  He also
20   testified in assisting to secure the workers' compensation and auto insurance policies for Transcendence and Transcendence II (Tr. 177; GC Exh. 11).

       Consistent with Youngblood's testimony, Tilton sought to preserve TransCare NY's para-transit operations under the MTA contract.  Tilton testified she could preserve at least the
25   700 of 1200 jobs at TransCare NY if the MTA contract was assigned to Transcendence II. However, under article 204 of the contract, the contractor (TransCare NY) could not subcontract, assign, transfer or convey the contract without prior consent from the MTA (Jt. Exh.7 at D-001528).

30       Tilton was unable to secure the assignment of the MTA contract for Transcendence II and the foreclosure sale and transfer of assets never went through.  Further, Wells Fargo and Tilton could not agree on how to fund the last payroll obligation for the TransCare NY employees. According to Stephen, TransCare NY assets were never transferred to Transcendence II and the assignment of the MTA contract to Transcendence II never occurred (Tr. 386, 287; Jt. Exh 8).
35   Instead, TransCare filed for bankruptcy on February 24.

### b.  The Closing of TransCare NY Operations

       Shunda Watson (Watson) worked at TransCare NY as a para-transit driver since
40   September 2008 and was responsible for picking up and dropping off riders.  Her work schedule was from 6 a.m. to 5 p.m. Mondays through Fridays.  She departs from the TransCare NY Foster Avenue facility and her driving routes were usually throughout the borough of Brooklyn, New York.  Watson is a member of Union Local 1181–1061 (Tr. 17, 18).  As a union board official, Watson was aware at least a month prior to February of TransCare's financial difficulties and
45   knew that the company was being restructured.

Watson testified that she picked up a notice that was placed in the front area of the "push-out and push-in" (dispatch) room where the drivers receive their route schedules, radio, and bus keys at the beginning of the day and where they would return at the end of the day.  Watson picked up the notice at the end of her work day on February 23 (Tuesday).  The notice was dated February 23 (Tr. 20–36).  The notice (GC Exh. 2) stated

### TransCare Employee Announcement- 2.23.2016

### URGENT:

Dear Colleagues,

As you are likely aware, TransCare has been in the process of restructuring the company to return it to sustainable profitability. While we have addressed many of the underlying issues, some challenges still remain.

As part of the restructuring process, we have analyzed each division of the company - Maryland, Pittsburgh, Hudson Valley, Westchester, MTA Para-transit and the NYC 911 and Core businesses.

During this restructuring evaluation, the MTA required that we set up a separate entity to segregate the paratransit business from TransCare's ambulance businesses, including separate bank accounts and financial records. We are pleased to say we have accomplished setting up and capitalizing the separated paratransit entity which will now be called Transcendence Transit II, Inc. This changes nothing for our transit employees except that their employment is being transferred to this new entity -  same jobs, same compensation, same benefits. You will receive a new employment letter from your manager within the next 24 hours reflecting this change. It is our hope that this change and new capitalization will encourage the MTA to rapidly return routes to us that were recently curtailed.

Simultaneously, we have formed a new company, Transcendence Transit, Inc., that will acquire our stronger performing ambulance business divisions in Pittsburgh and the Hudson Valley.
Aside from the name of the new legal entity, nothing changes operationally for the businesses in Pittsburgh and the Hudson Valley or their respective employees. As an employee of one of  these businesses, everything will be business as usual for you. We believe that through these restructuring efforts we have been able to save 700 jobs.

The notice also stated that the remaining operations (NYC 911, Core, Westchester and Maryland) were being forced to liquidate under Chapter 7 of the Bankruptcy Code.  The notice came from the TransCare management team and was not signed.

Youngblood testified that the notice was attached to an email sent to him by Randall Jones to distribute to the Pittsburgh and Hudson Valley employees of TransCare.  Youngblood

7

stated that he was not responsible for distributing the notice to the para-transit employees because that was the responsibility of Thomas Fuchs, who was the vice-president of transit services for TransCare NY at the time (Tr. 186, 187; GC Exh. 13).

5        Randall Jones (Jones) was and is a managing director at Patriarch for the past 9 years.  He is responsible, among other things, to recruit talent to operate the portfolio companies.  Jones works on assignment at the direction of Tilton (Tr. 444, 445).  Jones does not supervise or deal with labor relations at TransCare and has no decision-making authority at that company.  Jones testified that he had sent the email to Youngblood as a draft communication to the TransCare NY
10       employees in preparation of TransCare's restructuring and pending bankruptcy.

         The email was sent by Jones on Wednesday, February 24, but the notice was dated on February 23.  Jones said that the notice was nearing a final version.  The notice was intended to go only to the para-transit and ambulance operations of TransCare NY.  Jones stated that the employees were not yet offered employment at Transcendence (or Transcendence II) and was
15       not aware that Youngblood had sent the email because it was still in draft form.  Jones said that the notice, dated February 23 (GC Exh. 2) should never have been distributed because his email was not sent to Youngblood until February 24 and the notice clearly stated that it was a draft (Tr. 448–457).
20

         Watson understood the notice to mean that there would only be a name change in the company and that the para-transit operations with the MTA would stay "just the way it was except the name change."  Watson went to work on February 24 (Wednesday) and 25 (Thursday).  She said there was no mention of bankruptcy of the para-transit operations during these 2 days
25       (Tr. 24–27).  Watson arrived to work on February 26, which was also payday.  Watson would routinely receive her paycheck by direct deposit around 7 a.m. on February 26.  There was no paycheck in her bank account.  Watson spoke to Tisha Leshane (Leshane), the manager in the dispatch room that assigns the routes and schedule.  According to Watson, Leshane said that checks will be deposited later in the day or physically delivered to the drivers.
30

         Watson went on her bus routes on February 26.  Towards the end of her work shift, she received call to return to the office because the company was no longer in business.  The call came from Alejandrina Cleary, who was formerly the assistant operations manager.  Watson observed other drivers milling around, several MTA vehicles in the vicinity, and MTA officials
35       when she arrived at the Foster Avenue facility.  Watson repined that she never received her paycheck for her last pay period (Tr. 32, 33, 40).

         Alejandrina Cleary (Cleary) was formerly the cashier, dispatcher, and scheduler for the TransCare NY drivers.  She was on vacation and returned to work on February 26.  Cleary
40       received a letter around 3 or 4 p.m. on February 26 (Tr. 46; GC Exh. 3).  The letter was dated February 24 and had a heading stating, "Transcendence Transit II, Inc." The letter was signed by Glen Youngblood, the president.  The letter stated the following

## Transcendence Transit II, Inc.

February 24, 2016

Alejandrina Cleary

Re:      *Transfer of Employment Relationship*

Dear Alejandrina:

This is to advise that effective February 24, 2016, your employment relationship has been transferred from TransCare Corporation (**"TransCare"**), to Transcendence Transit II, Inc. (the **"New Company"**) as part of a corporate reorganization to strengthen the operations of the New Company.

You will continue to have the same duties and responsibilities as an employee of the New Company with the same compensation and benefits you received from TransCare. Your accrued and unused PTO will also be transferred.

Your continuing employment with the New Company will serve as acknowledgement of the transfer of your employment to the New Company on these terms. You will continue as an employee-at-will with the New Company.

We are excited about the future and hope you are too.

Please feel free to contact Felicia Sparkman if you have any questions.

Sincerely,

Glen Youngblood
President

Cc: Employee file

Employee Acknowledgement (signed)          Date          2/26/16

Cleary acknowledged her employment offer.  Unfortunately for Cleary, she also received an email on February 26 at 5:58 p.m. from Thomas Fuchs (Fuchs) (GC Exh. 4).  The email from Fuchs stated that Wells Fargo had refused to fund the payroll and to honor its previous commitment for an orderly wind down of TransCare assets through the foreclosure sale.  The

5   email further stated that the bankruptcy trustee disputed Transcendence's claim to the assets and refused to allow the sale of assets to proceed.  Cleary was told by someone to call the drivers back and to return their vehicles.  Cleary showed a copy of her email to Karen Dockery, who was the union representative for the drivers at the time (Tr. 52, 53).

10   Karen Dockery (Dockery) has been a driver for TransCare NY since July 2009.  She was also the shop steward for the drivers.  Her last day of work was on February 26.  She finished her day and was on her way home when she received a call that the company was shutting down.  She received the call from Benjamin Blakely, a coworker.  She immediately returned to the Foster Avenue facility and met up with Cleary (Tr. 62–68).  Dockery was shown a copy of the

15   email by Cleary.  Dockery testified that she was unsure as to whether she was shown the email by Cleary on February 24 or 26 (Tr. 71, 72, 77).

Mariane Insogno (Insogno) has been a driver for TransCare NY since 2007 until the company closed.  She testified to receiving the February 23 letter (GC Exh. 2) regarding the

20   establishment of Transcendence II to operate the para-transit business and the transfer of her employment to the new company.  Insogno worked on February 24, 25, and 26 (Tr. 79–82).  Insogno was still working on February 26 when she received call around 4:30-5 p.m. to return to the office (Tr. 86).  She returned to the dispatch office and observed on the computer screen the email that was received by Cleary from Fuchs.  She asked Supervisor Kyan Charles to forward

25   the email to her, which he did (Tr. 92–95; GC Exh. 6).

Anthony Cordiello (Cordiello) was a delegate and a field representative for the Union in February 2016 and assisted in the negotiation of the TransCare NY collective-bargaining contract (Tr. 213; GC Exh. 21).  He had previously dealt with Fuchs at the Foster Avenue facility

30   and he contacted Fuchs when he heard that there were some payroll issues in February.  Fuchs informed him there were some financial difficulties with TransCare and the intent was to carve out the para-transit operations into a new company called Transcendence.  Cordiello also spoke also to Tom Charles, also a vice-president of TransCare NY.  Charles confirmed to Cordiello that there were financial problems.  Cordiello asked to keep him abreast.

35

Cordiello received a call from Fuchs on February 24 that some employees would be transferred to the new company.  Fuchs also informed him that all employees' benefits and wages would remain unchanged under the new company (Tr. 215–219).  Cordiello testified that Charles confirmed that the transfer was happening.  He asked Charles to keep him updated (Tr.

40   219–221).  Cordiello was at the Foster Avenue facility on February 25 and assured the union members that Fuchs verbally told him that the transition will go smoothly.  Cordiello did not recall if he spoke to anyone in management on that date (Tr. 222, 223).

Cordiello said he received a phone call from Charles on February 26 at approximately 3

45   or 4 p.m. that "it is over" and TransCare was closing and vehicles would be locked down.  Cordiello was informed by Charles that MTA was not comfortable with the financing and the deal fell through (Tr. 223, 224).

10

C.  TransCare's Petition for Bankruptcy

TransCare filed a voluntary petition for bankruptcy on February 24.  The list of affiliated
5    debtors included TransCare NY (GC Exh. 8).  Salvatore LaMonica was and is the trustee for the
Chapter 7 bankruptcy proceeding.  He was appointed trustee late in the evening of February 24
and it was his responsibility as trustee to act as a fiduciary for the benefit of the creditors and to
ensure a fund of money is available for distribution to the creditors.  LaMonica stated that the
Chapter 7 filing was to liquidate all the assets of TransCare as opposed to a reorganization of the
10   company (Tr. 110–112).

LaMonica held a meeting at the offices of Curtis Mallet, the law firm that had filed the
bankruptcy petition.  Present at this meeting on February 25 were L.P. Harrison from Curtis
Mallet and Randy Creswell (Creswell), who represented the secured creditor.  LaMonica
15   believed at the time that Creswell was representing PPAS as the secured creditor (141, 142).[9]

LaMonica became aware of the MTA contract at the February 25 meeting and was told
by Creswell that the para-transit business (as well as the Hudson Valley and Pittsburgh
operations) were foreclosed by the secured creditors and would not be part of the assets that
20   belonged to TransCare on the day that the bankruptcy petition was filed.  LaMonica was told that
a new entity was operating the para-transit business.  LaMonica testified that he was relieved
upon hearing that a new entity had taken over some of TransCare's assets because it reduced his
burden as trustee in creating a fund for the creditors.  It was LaMonica's understanding that the
secured creditor was running the para-transit business after the foreclosure sale.  The parties
25   could not agree on funding the operation of the TransCare's 911 ambulance service and the
decision was made that evening to bring the ambulances back and close that operation (Tr. 115–
119, 123, 124, 130–132, 139–141).[10]

On February 26, LaMonica arrived at the Foster Avenue facility, along with his law
30   partner, Gary Herbst, to collect the debtor's accounting books and records.  During that day,
LaMonica received a phone call from Creswell and was asked if LaMonica would allow the
entity that was operating the para-transit service to run the payroll through the debtor' bank
account by using the debtor's system to issue payroll checks.  It was explained to LaMonica that
the new entity did not have time after the foreclosure sale to set up a new payroll system and
35   wanted to use the debtor's system.  LaMonica did not recall the name of the entity making that
request.  LaMonica responded in the negative (Tr. 120).

At some point in time, Creswell asked LaMonica several times whether he would
approve the termination of the debtor's (TransCare NY) contract with the MTA.  In an email on
40   February 26 at 2 p.m., Creswell explained to LaMonica that Transcendence II was providing the
para-transit services since the bankruptcy filing date and that the MTA would like

---

[9]  Initially, LaMonica believed that Creswell also represented Patriarch, which he did not (Tr. 116).
[10]  LaMonica was able to obtain permission from the bankruptcy judge to continue operating the 911
ambulance because of the valuable licenses owned by TransCare in the operations of its ambulance
service.  LaMonica testified that the licenses were only valid if the ambulance continued to operate.  The
ambulance service was operated by a subcontractor until ultimately, the licenses were sold at an auction.
LaMonica did not request permission to continue TransCare's para-transit operations (Tr. 125, 126).

Transcendence II to continue that service with the ultimate goal of entering into a new MTA contract with Transcendence II.  Creswell was requesting LaMonica' consent for the voluntary termination of the MTA contract by debtor TransCare NY.  Creswell sent two more emails to LaMonica at 3:15 and 4:24 p.m. if he had decided on consenting to the termination of the MTA contract by TransCare NY.  LaMonica ultimately agreed and he sent Creswell an email at 5:07 p.m. on February 26 informing Creswell he had no problem terminating the contract so long as TransCare is paid the amount due under the contract.  Creswell replied at 5:44 p.m. as follows: "Unfortunately it does not appear that it will come together."  LaMonica understood this to mean that there were other problems with this arrangement (Tr. 120–122, 148–150; GC Exh. 9).

LaMonica testified that he also received a call from Fuchs shortly afterwards that Fuchs was leaving the premises at Foster Avenue because he was concerned with his own safety after the employees realized that they were not getting paid that Friday.  LaMonica then called the MTA attorney and instructed that the busses be returned to the Foster Avenue facility and that the MTA should secure the vehicles (Tr. 122, 123).

Stephen testified that the forced foreclosure sale of TransCare's assets never went through because LaMonica refused to release the assets for the sale.  Stephen stated that one of the assets listed for sale included the computer server, that contained the routes, schedules, points of pick up, passengers, etc., that Transcendence II needed to operate the para-transit business.  Youngblood told Stephen that he would not remove the server because of the trustee's opposition.  Youngblood then decided not to accept the job offer at Transcendence on February 26 at 3:26 a.m. (Tr. 403; R. Exh. 1).  According to Stephen, Youngblood believed it was prudent on his part not to remove the server and not to accept Tilton's offer of employment (Tr. 403).

Stephen testified that, aside from the assets that PPAS was holding for the lenders that was needed for Transcendence II to operate, he also was unsuccessful in assigning the MTA contract to Transcendence II.  Although LaMonica gave his consent to Creswell in terminating the MTA contract and releasing this asset under TransCare NY, Stephen testified that MTA held the final approval for any assignment and would not agree to the assignment.  Stephen said that he attempted to obtain the MTA's consent for the assignment of the contract (or in the alternative, to terminate the contract with TransCare NY and negotiate a new contract on behalf of Transcendence II) but was unsuccessful.  Stephen stated that the assignment agreement dated February 24 from TransCare NY to Transcendence II was never executed because the MTA never agreed to the assignment (Tr. 414; Jt. Exh. 8; GC Exh. 32).

Stephen denied that Transcendence II was providing para-transit service after the date that the bankruptcy petition was filed by TransCare.  Stephen admitted that he represented to the MTA that Transcendence II ". . . would be amendable to moving forward and providing (para-transit) services while we work through the MTA's process with a few accommodations" (GC Exh. 27).  Stephen testified that his email on February 26 at 2:09 p.m. was "poor drafting on my part" (Tr. 424).  Stephen stated that he wanted to assure the MTA that the lenders would not have a right to foreclose on the contract.  He wanted to sell to the MTA the appearance that Transcendence II was operating the para-transit business and that the employees had been transferred to the new company.  He believed it would easier to have the contract assigned to Transcendence II if it was seen by the MTA that the company was a going concern (Tr. 401, 434).  In any event, the MTA attorneys informed Stephen at 3:33 p.m. on the same date that the

MTA was concerned that the para-transit contract might not be excluded from the bankruptcy proceeding and therefore the MTA could not work through the contract process with Transcendence II (GC Exh. 27).

5      Stephen was also concerned that the employees at TransCare NY who were designated to go to Transcendence II would not be paid for their last pay period.  He said that was the reason for telling Fuchs, Youngblood and others, to get a message out to the employees that Transcendence II would cover the employee payroll for TransCare NY (Tr. 406, GC Exh. 15).  Unfortunately, as noted above, LaMonica refused to allow Transcendence II to use the
10   TransCare NY payroll records and system to pay the employees and that arrangement fell through.

III. Discussion and Analysis

15                          Credibility Assessment

The credibility resolutions herein have been derived from a review of the entire testimonial record and exhibits, with due regard for the logic of probability, the demeanor of the witnesses, and the teachings of *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962).  A
20   credibility determination may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the records as a whole. *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001) (citing *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996)), enfd.
25   sub nom. 56 Fed. Appx. 516 (D.C. Cir. 2003). Credibility findings need not be all of all-or-nothing propositions—indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness' testimony. *Daikichi Sushi*, supra.

The counsel for the General Counsel argues Patriarch, PPAS, Transcendence, and
30   Transcendence II constitute a single employer and/or have been joint employers of the employees of Transcendence II.

1.   Transcendence II is not Successor to TransCare NY

35      Before addressing the joint/single-employer status, the counsel for the General Counsel must first prevail on the issue as to whether Transcendence II is a successor to TransCare NY. The complaint alleges that Respondents began operating the business of TransCare NY as Transcendence II after the filing of the bankruptcy petition by TransCare in basically unchanged form, and employed a majority of individuals who were previously employees of TransCare NY
40   (GC Exh. 1 at p.4; GC Br.).

In *NLRB v. Burns International Security Services*, 406 U.S. 272 (1972), a successor employer must bargain with the employee representative when it becomes clear that the successor has hired its full complement of employees and that the union represents a majority of
45   those employees.  In *Burns*, the Court stated:

Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.

The Board has held that when a business changes hands, the successor employer must take over and honor the collective-bargaining agreement negotiated by the predecessor. In *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987), the Supreme Court clarified the *Burns* doctrine and held that an employer that purchases the assets of another is required to recognize and bargain with a union representing the predecessor's employees when (1) there is a substantial continuity of operations after the takeover and (2) if a majority of the new employer's workforce in an appropriate unit, consists of the predecessor's employees at a time when the successor has reached a substantial and representative complement.

The rule of successorship imposes an obligation on the Respondent to bargain with the union of its predecessor. *Fall River Dyeing*, 482 U.S. at 36. "If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of 8(a) (5) is activated. This makes sense when one considers that the employer intends to take advantage of the training work force of its predecessor." Id. at 41–42. Thus, a finding of successorship imposes an obligation on the Respondent to bargain with the union of its predecessor.

Contrary to the General Counsel's contentions, I find that Respondent Transcendence II is not a successor to TransCare NY. Under *Burns*, determining whether a new company is a successor "is primarily factual in nature and is based upon the totality of the circumstances of a given situation." *Fall River Dyeing,* 482 U.S. at 43. Here, the successorship argument fails because there was no substantial continuity of operations after the takeover and Transcendence II never hired a majority of the predecessor's (TransCare NY) employees.

In my opinion, it is clear that Transcendence II never began operating. The factual record is consistent with the credited testimony of Stephen and Tilton that Transcendence and Transcendence II were incorporated for the express purpose of taking over some of the operations of TransCare, with Transcendence II to operate the para-transit services previously under TransCare NY. However, due to extenuating circumstances, the takeover was unsuccessful. It is not disputed that steps were taken to set up Transcendence and Transcendence II. Bank and financial documents were filed and insurance policies for workers' compensation and vehicles were taken out. However, in order for Transcendence II to operate, it needed the computer server that contained the valuable data on routes, passengers, schedules, and other information to pick up and drop off passengers. Without the server, Transcendence II would be in the dark. LaMonica credibly testified that he would not release the server to Youngblood or any other official of TransCare because the server was deemed as a valuable asset for bankruptcy purposes. This is not disputed. So, while Youngblood and, perhaps others, were obtaining the auto and workers' compensation insurance policies in preparation for the eventual transfer of operations during the critical period between February 23–26, there was no way Transcendence II could have operated without the information in the server. Further, the bill of sale, agreement to pay and transfer statement dated February 24 was never executed by the parties because,

again, the trustee objected to the sale and transfer of TransCare assets, which included the computer server and the MTA contract, to Transcendence II (GC Exh. 12).  While the bill of sale and agreement seems to indicate that the agreement and transfer was executed on February 24, the factual reality was such that the two most significant assets for Transcendence II could not be

5  transfer absent the consent of the bankruptcy trustee and the MTA.  Stephen admittedly testified that he represented to the MTA that Transcendence II was already operating in order to show the MTA that the new company was capable of handling the contract.  However, Transcendence II was in fact not operating at any given time.  I credit Stephen's testimony that his statement to the MTA on February 26 that Transcendence II was operating the para-transit business was "poorly

10  drafted." A close reading of his email to the MTA corroborated his testimony because he never stated that Transcendence II was operating but had in fact stated to the MTA attorney, Diana Morgenroth, that his principle would be "*. . . amendable to moving forward and providing services* (emphasis added) while we work through the MTA's process with a few accommodations" (GC Exh. 27).  In my opinion, this showed that Transcendence II could be up

15  and running the para-transit operations but only if certain accommodations (conditions) could be reached, namely, the contract approval by the MTA.

Similarly, Creswell's alleged statements to LaMonica at the February 25 trustee meeting that Transcendence II was already operating the para-transit business for TransCare NY and in

20  his email of February 26 (at 2 p.m.) to LaMonica that Transcendence II has been providing para-transit services under the MTA contract since the filing date (of TransCare's bankruptcy petition) was also an overstatement on his part (GC Exh. 9).  I would note as significant that Creswell did not speak on behalf of the Respondents; rather Creswell represented the interest of the secured creditors.  Again, like Stephen, it was a clumsy attempt to get LaMonica's approval to allow for

25  the voluntarily termination of the contract, which was still held by the trustee as a TransCare NY asset.

I credit the testimony of Tilton when she credibly summarized the current situation.  She stated that TransCare assets were never transferred, sold and/or assigned to Transcendence II (Tr.

30  313; CP Exh. 1):

> It was PPAS's assertion that it had signed the documents. The assets were never
> delivered. So yes, it -- we -- there was an assertion that we should have had those assets
> delivered to us, and they were not. The documents were signed, but as in any agreement,
35  > if someone violates or breeches that agreement, that agreement is null and void.
> TransCare, nor its subsidiaries, ever delivered those assets because the trustee got
> involved and stopped the delivery.

With respect to the MTA contract, it is also clear that Transcendence II could not operate

40  a para-transit business unless it was under contract with the MTA.  Without revenue generated from the contract, it would make little business sense for Transcendence II to operate when it cannot pay employees and expenses.  In my opinion, I find that Tilton was sincere in trying preserve the para-transit operation and, in turn, to save approximately 700 jobs under her restructuring plan.  A necessary and critical aspect of that plan required the assignment of the

45  MTA contract from TransCare NY to Transcendence II.  There was an "all-hands-on-deck" at Patriarch to work out the details of this restructuring between the filing of the bankruptcy petition on February 24 and by 5 p.m. on February 26.  The employees of Patriarch working on

the restructuring plan needed the consent from the bankruptcy trustee to terminate the contract and consent from the MTA for either an assignment of the contract or to negotiate a new contract.  LaMonica did not give his consent until 5:07 p.m. on February 26.  By then, Creswell informed LaMonica that there were other intervening factors that caused the assignment to fail (GC Exh. 9).  Of course, that failure was the result of the MTA's refusal to go forward with the transfer of the contract earlier that same day (GC Exh. 27).

The "keystone is whether there is substantial continuity of the employing industry. Continuity of the employing industry requires consideration of the *work done*." *Saks Fifth Avenue*, 247 NLRB 1047, 1050–1051 (1980).  In this situation, no work was done by Transcendence II.  Transcendence II was still in flux with opening bank accounts, obtaining insurance policies, attempting to get the trustee's permission to retrieve the computer server, and in trying to get consent from the MTA to assign the contract.  In the meanwhile, all the work done on February 24, 25, and 26 was done by TransCare NY.

Further, I find that the counsel for the General Counsel failed to show that Transcendence II had hired a majority of the predecessor's employees.  Jones and Stephen credibly testified that the announcement that the employees' jobs were being transferred to a new company was only a draft.  Their testimony was corroborated by the objective evidence in the record.  The email from Jones to Fuchs dated February 24 that contained the announcement clearly stated that it was a draft.  The announcement was dated February 23, while the email from Jones was dated February 24.  As such, any leakage of the announcement to the unit drivers was in anticipation of the job transfers that never occurred.  Obviously, the notice would not have gone out to the employees in such a format (GC Exh. 29).  Similarly, the two notices transferring the employment relationship from TransCare to Transcendence and Transcendence II that were attached to an email from John Pothin[11] on February 24 to Youngblood, Fuchs, Jones, and Stephen, was also a draft (GC Exh. 17).  This is so because the anticipated employment offers to the TransCare NY employees were never given and never acknowledged by any employees. Indeed, the notice that Watson happened to pick up in the dispatch office clearly stated that, "You will receive a new employment letter from your manager within the next 24 hours. . . " (GC Exh. 2).

With the understanding that new employment would be offered within the next 24 hours, none of the employees should have been under the impression that they were working for Transcendence II on February 24, 25, and 26.  Additionally, in Jones' email to Fuchs (GC Exh. 29), Fuchs would have been the one responsible for distributing the notice to the para-transit employees and providing them with offers of employment.  This was not done and none of the drivers testified that they received an offer of employment.  This finding is buttressed by the fact that none of the drivers testified at the hearing that they under the impression they were working for Transcendence II at any point in time.  Watson, who had testified that she took one of the notices from the dispatch office, did not sign an offer of employment and continued to work her routine schedule until February 26 (Friday).  Dockery, another bus driver, finished her tour on Friday and believed she was still employed by TransCare NY when she was going home until she was called back to the facility by Cleary.  Insogno also saw a copy of the announcement but

---

[11]  Pothin was the managing director of Patriarch HR at the time.

testified that no one from management said anything to her about the notice or that an offer of employment would be made to her.[12]  Cordiello testified that Fuchs told him on February 24 that the job offers had not yet transferred to Transcendence II and was informed at approximately 3 p.m. on February 26 that TransCare NY was closing its operations.  As such, even Fuchs, who was a vice-president of TransCare NY at the time, believed that TransCare NY was still operating until the afternoon of February 26.[13]

Accordingly, I find that Transcendence II is not a successor to TransCare New York.

2.   Patriarch, PPAS, Transcendence, and
Transcendence II are not Joint Employers

In *TLI, Inc.*, 271 NLRB 798 (1984), the Board adopted the Third Circuit's test in *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117 (3d Cir. 1982), for determining whether two separate corporations should be considered to be joint employers with respect to a specific group of employees.  The test is. . . Where two (or more) separate entities share or codetermine those matters governing the essential terms and conditions of employment, they are to be considered joint employers for the purposes of the Act.  The Board stated, "the joint employer concept does not require the existence of a single integrated business enterprise."  The concept recognizes that "the business entities involved are, in fact, separate but that they share or co-determine those matters governing the essential terms and conditions of employment." Id. (quoting *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1123 (3d Cir. 1982)).

The Board disagreed with the administrative law judge's finding in *TLI, Inc.* that a joint-employer relationship existed between Crown Zellerbach Corporation (Crown), a paper products company that manufactures and distributes boxes, and TLI, Incorporated (TLI), a corporation that provides truckdrivers to Crown—as well as to other firms in the United States. Id. The Board held that Crown did not affect the terms and conditions of employment to such a degree that it may be deemed a joint employer because the drivers themselves select their own assignments based on seniority basis; Crown neither hires nor fires the drivers; and when a driver engages in conduct adverse to Crown's operation, Crown supplies TLI, not the employee with an "incident report" whereupon a TLI representative investigates—thus Crown has no disciplinary authority.  Id. at 799.

In *Laerco Transportation*, 269 NLRB 324 (1984), the Board, referring to the *Browning-Ferris* test, defined the essential terms and conditions of employment as those involving such matters as hiring, firing, disciplining, supervision, and direction of employees. The Board stated that a joint-employer relationship exists where two or more business entities are in fact separate but they share or codetermine those matters governing the essential terms and conditions of employment.  Moreover, "whether an employer possesses sufficient indicia of control over petitioned-for employees employed by another employer is essentially a factual issue." Id.  "To

---

[12]  Alejandrina Cleary testified that she signed an offer of employment.  However, Cleary is not a member of the bargaining unit and her employment status as a dispatcher and scheduler was not similar to the drivers.

[13]  If nothing else, TransCare's operations of the para-transit business after the filing of the bankruptcy petition may have violated bankruptcy laws since it should have ceased all operations on the eve of February 24 (as testified by LaMonica).

establish joint employer status there must be a showing that the employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction." Id.

5        The Board did not agree with the administrative law judge and held that Laerco was not a joint employer because although Laerco provided some minimal day-to-day supervision of the petitioned-for employees such supervision is of an extremely routine nature and all major problems relating to the employment relationship are referred back to CTL, the company which provided the employees. Id. at 326.

10

In *Teamsters Local 776 (Pennsy Supply)*, 313 NLRB 1148, 1162 (1994), the administrative law judge, in an opinion adopted by the Board, held that two companies were not joint employers despite a degree of authority exercised by one over the other. The judge stated:

15        Evidence of minimal and routine supervision of employees, limited dispute resolution authority, and the routine nature of work assignments has been held insufficient to establish a "joint employer" relationship . . . .

In *Airborne Express*, 338 NLRB 597, 597–599 (2002), the Board affirmed the
20   administrative law judge, where he found that Airborne was not a joint employer and thus had no obligation to bargain with the union. The judge found there was no evidence to indicate that Airborne had "any say or influence in. . . decisions and no evidence to suggest that the hiring, disciplining, or firing of a contractor's employees was in any way under the control or even suggestion of Airborne." Id. at 604–606.

25

On the other hand, evidence of substantial control over hiring, promotion, and the base wage rates, hours, and working conditions of employees, coupled with evidence of close and substantial supervision of employees, and constant presence of supervisors with a detailed awareness and control of employees' daily activities, has been held by the Board to be sufficient
30   to establish a joint employer relationship. The Board found a joint employer relationship in *Continental Winding Co*., 305 NLRB 122, 123 (1991), where even though one employer alone hired employees supplied to another and set and paid their wages, the record supported the judge's finding that the other employer to which the employees were supplied exercised sole authority to assign, schedule, and supervise the workplace conditions, and the performance of
35   work by the employees. There, the Board said, the supervision was more than "routine" and was not "insignificant."

The Board in *Branch International Services,* 327 NLRB 209, 219 (1998), affirmed the administrative law judge's finding that J&L and BISO were a joint employer where J&L was
40   shown to have hired and directed the work of BISO's employees, and J&L established its own disciplinary system, which included an explicit provision for employee discharge. Moreover, the administrative law judge opined that a " joint employer finding is required in an employee leasing context where the employer to which the employees are leased meaningfully affects such matters relating to the employment relationship as hiring, firing, discipline, supervision, and
45   direction." Id.; See also, *Continental Winding Co.,* 305 NLRB 122, 142 fn. 4 (1991) (the Board affirmed the judge's reasoning that where Continental exercised sole authority to assign, schedule, and supervise the Kelly employees, the day-to-day supervision by Continental over

Kelly employees was more than "routine" and is not "insignificant."); also, *Teamsters Local 776 (Pennsy Supply)*, supra.

5
In *D&F Industries, Inc.*, 339 NLRB 618, 640 (2003), the Board affirmed the administrative law judge's findings that D&F and Olsten were joint employers of temporary employees based upon the finding that

10
> Olsten hires its own employees, maintains all employment records, is responsible for workplace injuries to its employees, and is responsible for disciplining its own employees; the work of the Olsten's temporary employees is of routine and repetitive nature and employees must report absences to Olsten's site manager, and D&F's supervision of Olsten employees is minimal, consisting of assigning them to their daily jobs, pointing out violations of D&F's workplace rules, and ensuring that they are performing their assigned tasks. However, D&F determined the number of available temporary employee job vacancies to be filled by Olsten hires; established the rates of pay for Olsten's employees and provided the funds from which they were paid; decided when overtime was required and the number of temporary employees necessary for such work; and was authorized to suspend Olsten's temporary employees from work. There was no evidence that Olsten was authorized to question, or ever questioned D&F as to its decision to layoff or terminate employees or its selection of employees for layoff.

15

20

25
Thus, the Board affirmed that D&F participated meaningfully in the exercise of control over matters governing the terms and conditions of employment of Olsten's temporary employers and at all times material, D&F and Olsten constituted joint employers. Id.

30
In *BFI Newby Island Recyclery*, 362 NLRB 1599 (2015), the Board restated the joint-employer standard as reflected in the *TLI* and *Laerco* decisions and reaffirmed that standard articulated in the Third Circuit *Browning-Ferris* decision,[14] that is ". . . we will adhere to the Board's inclusive approach in defining the "essential terms and conditions of employment."' The Board described the following joint employer test:

35
> The Board may find that two entities . . . are joint employers of a single work force if they are both employers within the meaning of the common law, and if they share or codetermine those matters governing the essential terms and conditions of employment. [citations and footnotes omitted].

40
Applying this  test as to whether the entities are in fact separate but share or co-determinate matters governing the essential terms and conditions of employment, the Board stated that it would focus on whether an alleged joint employer "meaning fully affects matters relating to the employment relationship, such as hiring, firing, discipline, supervision, and direction." *Laerco*, above at 325.

---

[14]  *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982), enfd. 259 NLRB 148 (1981).

The Board's current joint-employer standard, articulated in *TLI*, supra, refers to "matters relating to the employment relationship *such as* hiring, firing, discipline, supervision, and direction," a nonexhaustive list of bargaining subjects.  *TLI*, supra, 271 NLRB at 798.  See, *Browning-Ferris*, at fn. 2.  The Board went on to state,

5

> Under this standard, the Board may find that two or more statutory employers are joint employers of the same statutory employees if they "share or codetermine those matters governing the essential terms and conditions of employment." In determining whether a putative joint employer meets this standard, the initial inquiry is whether there is a
> 10  common-law employment relationship with the employees in question. If this common-law employment relationship exists, the inquiry then turns to whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining. Central to both of these inquiries is the existence, extent, and object of the putative joint employer's control.

15

The Board stated that since the *TLI* and *Laerco* decisions, additional requirements for finding joint-employer status were imposed, which it has never articulated how these additional requirements are compelled by the Act and appear inconsistent with prior case law that has not been expressly overruled.[15]  The Board specifically rejected those limiting requirements,

20

> We will no longer require that a joint employer not only *possess* the authority to control employees' terms and conditions of employment, but also *exercise* that authority. Reserved authority to control terms and conditions of employment, even if not exercised, is clearly relevant to the joint-employment inquiry. Nor will we require that, to be
> 25  relevant to the joint-employer inquiry, a statutory employer's control must be exercised directly and immediately. If otherwise sufficient, control exercised indirectly—such as through an intermediary—may establish joint-employer status.

Prior to *Browning-Fer*ris, the Board, in applying common law principles, held that the
30  "essential element" when evaluating joint employer status is "whether the putative joint employer's control over employment matters is direct and immediate." *Airborne Express*, above. However, in *Hy-Brand*, 365 NLRB No. 156 (2017) (*Hy-Brand I*), the Board held that the *Browning-Ferris* joint-employer test "…fundamentally altered the law applicable to user-supplier, lessor-lessee, parent-subsidiary, contractor-subcontractor, franchisor-franchisee,
35  predecessor-successor, creditor-debtor, and contractor-consumer business relationships under the Act and expressly rejected this test." *Hy-Brand I*, above at 5.  The Board issued an order vacating the *Hy-Brand I* decision on February 28, 2018 (on other grounds), in *Hy-Brand*, 366 NLRB No.

---

[15]  The Board stated that ". . . these additional requirements—which serve to significantly and unjustifiably narrow the circumstances where a joint-employment relationship can be found—leave the Board's joint-employment jurisprudence increasingly out of step with changing economic circumstances, particularly the recent dramatic growth in contingent employment relationships. This disconnect potentially undermines the core protections of the Act for the employees impacted by these economic changes. . . Our aim today is to put the Board's joint-employer standard on a clearer and stronger analytical foundation, and, within the limits set out by the Act, to best serve the Federal policy of "encouraging the practice and procedure of collective bargaining."

26 (2018) (*Hy-Brand II*) and issued an order denying a motion for reconsideration on June 6, 2018.  *Hy-Brand,* 366 NLRB No. 93 (2018).

5        Assuming that Transcendence II is a successor and upon my review applying either the *BFI/Newby Island Recyclery* test or the common law principles prior to *Browning-Ferris*, I find that the Respondents are not joint employers.

       I credit the testimony of Tilton, Stephen, and Jones in their descriptions on the limited corporate responsibilities of Patriarch towards Transcendence and Transcendence II in governing 10 the essential terms and conditions of employment.  Patriarch searches, interviews and recommends leadership-level executives for companies owned by Tilton.  Jones testified that one of his responsibilities is to recruit and recommend talent to Tilton.  That is the extent of Patriarch's responsibility in recruiting, retaining, and removing employees. This made absolute sense for a private investment fund to ensure that the best possible talent is recruited and hired 15 for one of its portfolio company.  Below the executive level, there has been no testimony or evidence that Patriarch was involved in the hiring, retention, or removal of rank-and-file employees.  Unlike *D&F Industries, Inc*., above, Patriarch did not establish the rates of pay for Transcendence II's employees; nor provided the funds from which they were paid; did not decide when overtime was required; did not determine the number of employees necessary for para-20 transit work; was not authorized to discipline or suspend Transcendence II's employees; and, did not assign any Patriarch employees to work at Transcendence II.  At most, Patriarch was acting on behalf of Tilton, the owner of TransCare, who was trying to save 700 TransCare NY jobs by offering new employment at Transcendence II, and not because Patriarch, PPAS, and/or Transcendence were joint employers with Transcendence II.

25

       In contrast and without rebuttal by the counsel for the General Counsel or the Union, there is no evidence that Patriarch would have codetermined or imposed any specific conditions on the employees of Transcendence II or retained the right to reject and remove the unit bus drivers that would have been hired by Transcendence II.  Patriarch did not handle the labor 30 negotiations for Transcendence and Transcendence II.  Indeed, there is no evidence that Patriarch (or PPAS) had previously imposed any terms and conditions on TransCare NY employees.  I find this as significant because Patriarch treated TransCare NY in similar fashion to the Transcendence companies and every other company in Tilton's portfolio.  As such, if Patriarch (and PPAS) was a joint employer with TransCare NY, it would be reasonable to find a joint-35 employer status with Transcendence II.  However, this is not the case.  Patriarch was not a party to the collective-bargaining agreement with TransCare NY and the Union and Patriarch never sat at the bargaining table.  There is no evidence that Patriarch governed the essential terms and conditions of TransCare NY employees.

40        Further, Patriarch did not directly or indirectly hold employees of Transcendence II to the same or similar terms and conditions as directly-employed employees of Patriarch during the alleged 3 days of operations in February.  Patriarch (or PPAS) never exercised unilateral control over specific production standards for employees, directed assignment of tasks or provided instructions regarding the execution of such tasks, hired or fired employees, or had day-to-day 45 responsibility for the overall operations of Transcendence II that would show evidence of joint employer direct (or indirect) control.  See, *Sprain Brook Manor Rehab., LLC*, 311 NLRB No. 45 (2016). (Please check this citation.  I could not find this in Board Volume 311)

Additionally, it would make perfect business sense that Patriarch was intimately involved in setting up the bank accounts, insurance policies, workers' compensation, payroll, taxes, and other items needed to start-up Transcendence and Transcendence II.  As a private investment fund, Patriarch had the responsibility to establish the corporate structure of the Transcendence entities, whether it was incorporating the companies, setting up the leadership team, transferring employees, opening bank and other financial accounts, or obtaining insurance policies and other matters that were needed in a start-up company.  However, that is not indicative of a joint-employer status.  I am hard pressed to fathom how Transcendence II, as start-up company, would have had the means to begin operating if not for the financial and legal services provided by Patriarch.  Patriarch (and PPAS) could have easily share its financial and bank accounts with the Transcendence companies or have Patriarch executives takeover the operations of Transcendence and Transcendence II, which would have been indicative of joint-employer status.  Instead, Patriarch hired an independent executive team for Transcendence and Transcendence II and did not its share financial and bank accounts or employees with any portfolio companies, including Transcendence and Transcendence II.

Accordingly,  I find that the Respondents never imposed, share or codetermine directly or indirectly any matter over the essential terms and conditions of employment of the statutory employees and are therefore, not joint employers with Transcendence II.

### 3.  Patriarch, PPAS, Transcendence, and Transcendence II is not a Single Employer

The counsel for the General Counsel alleges that Transcendence, Transcendence II, Patriarch, and PPAS is a single employer.[16]  The Respondents deny this allegation.  The Board considers several nominally separate business entities to be a single employer where they comprise an integrated enterprise. *Radio Union v. Broadcast Service of Mobile*, 380 U.S. 255 (1965). The Board focuses on four factors in determining whether entities constitute a single employer: (1) interrelations of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control.  *Bolivar-Tees, Inc.*, 349 NLRB 720 (2007); see also *Rogan Brothers Sanitation*, 362 NLRB 547 (2015), and cases cited therein. All four factors need not be present.  *Bolivar-Tees*, above; *Rogan Brothers*, above.

Significantly, in the single employer analysis, there is no requirement that one entity was formed in order to avoid responsibilities under the Act.  The Board has held that the first three factors are more critical than the last, and further that centralized control of labor relations is of particular importance because it tends to demonstrate "operational integration." See *Denart Coal Co.*, 315 NLRB 850, 851 (1994), enfd. 71 F.3d 486 (4th Cir. 1995).  It ultimately depends on all the circumstances.  *Carr Finishing Specialties*, 358 NLRB 1766, 1776 (2012*); Newark Electric*, 362 NLRB 345, 354 (2015).

---

[16]  The complaint did not allege that the named Respondents is a single employer with TransCare.

Single-employer status is also characterized by a lack of an arms-length relationship. *Hydrolines, Inc.*, 305 NLRB 416, 417–419 (1991); *RBE Electronics of S.D., Inc.*, 320 NLRB 80 (1995), and cases there cited; see also, *Mercy Hospital of Buffalo*, 336 NLRB 1282, 1283–1284 (2001). The Board has found that two nominally separate entities constitute a "single employer" 5    when there is an absence of an arms-length relationship between them. *Hydrolines, Inc.*, above. The significance of finding two companies to be a "single employer" is that both are jointly and severally liable for the unfair practices committed and are responsible for remedying them.

    Assuming Transcendence II is a successor, upon my review, I find that the Respondents 10   is not a single employer with Transcendence II.  In assessing the single-employer relationship among the entities, I initially note that there is common ownership and financial control by Lynn Tilton.  Tilton testified that she is the owner or majority owner of all the companies in her portfolio.  Tilton was and is the CEO of three of her portfolio companies.  Tilton created Patriarch to provide financial and legal advice in the management her portfolio companies. 15   Tilton also created PPAS to handle the financial and banking transactions on behalf of her companies and the secured lenders.  Tilton's business model was unique to her, but this is not to say that Tilton's business model is so different from the management of other companies in corporate America.  Tilton's model is essentially a private investment fund that owns and manages companies under her portfolio.  To say that the common ownership or financial control 20   factor is critical in establishing single-employer status would place most, if not all, investment and management funds in the inevitable position of being single employers with every company that they own or have financial control.  This essentially disregards how businesses operate when ownership and financial control are by other corporate entities.

25   Rather, an appropriate determination of single-employer status is to focus on the remaining factors of (1) interrelations of operations, (2) common management, and (3) centralized control of labor relations.  I find that none of these factors exist with Patriarch, PPAS, Transcendence, and Transcendence II.

30                                   1.   Interrelations of operations

    Patriarch has no interrelations of operations with Transcendence and Transcendence II. The operations of each company are distinct and separate.  Patriarch was and is in the business of providing financial, legal, and other services as requested by Tilton for her portfolio 35   companies.  Transcendence and Transcendence II were incorporated to operate para-transit and ambulatory services.  The Transcendence entities are not involved with providing financial and legal services.  None of the Patriarch employees were loaned to Transcendence or Transcendence II to operate para-transit services.  None of the three Respondents share equipment and machinery with Transcendence II.  With regard to PPAS, it is not disputed that PPAS is a 40   banking entity that implements the financial transactions of the various portfolio companies. PPAS collects payments on loans and secured interest, reimburses the lenders on the payments received from the debtor companies, holds outstanding secured interests, and manages other financial matters.  However, PPAS has no employees and is not in the business of providing para-transit services or in providing legal and financial advice to Tilton.

45

### 2.   Common management

There is no common management among the four companies.  Patriarch management does not sit on any boards of directors of companies owned by Tilton.[17]  Patriarch management never held any positions with Transcendence and Transcendence II.  As noted, PPAS has no employees and therefore, it has no management common with the other three companies. Patriarch employees are delegated the responsibility to act on PPAS transactions but are not employed by PPAS.  William Jones testified that among his many responsibilities, he was also involved in recruiting talent and recommending individuals for Tilton to hire.  In that role, Jones recommended Youngblood to Tilton to work as president at Transcendence.  However, Youngblood never worked at Patriarch and it cannot be said that this demonstrated common management.  Patriarch employees would not have managed Transcendence and Transcendence II employees.  Transcendence and Transcendence II employees would not have managed Patriarch employees.  The Transcendence entities would have had its own management team, separate and distinct from Patriarch directors and managers, with Youngblood as the president as Transcendence and Fuchs serving in a managerial role in Transcendence II.

### 3.   Centralized control of labor relations

There was no centralized control of labor relations among the Respondents.  There is no evidence in the record that the labor relations functions of Transcendence and Transcendence II would have been the responsibilities of Patriarch.  Patriarch had its own labor relations office and there is no evidence that the EEO, harassment, FMLA, drug, safety, and other policies in effect at Patriarch would have applied to Transcendence and Transcendence II.  The Patriarch HR office was initially involved in providing offers of employment to TransCare NY employees to Transcendence and Transcendence II, but that was the extent of any apparent centralized control of labor relations by Patriarch.  Transcendence and Transcendence II would have their own bank accounts, financial books, payroll, tax, and direct deposit matters through ADP.  Indeed, Transcendence II was required to have a separate bank account from Transcendence because the MTA contract prohibited the comingle of revenues and expenses between the two Transcendence companies.  Any health, workers' compensation insurance policies and other benefits at the Transcendence entities would have been separate and apart from the employee benefits provided at Patriarch.

### 4.   Arms-length relationship

The lack of arms-length relationship between the entities is significant in the analysis in determining single-employer status.  Indeed, the Board has repeatedly held that "the hallmark of a single employer is the absence of an arm's length relationship among seemingly independent companies." *Bolivar-Tees, Inc.,* above (single-employer relationship found where one company was located in Mexico and the other in America, where financial exigencies of one entity were met by the other); *RBE Electronics of S.D.,* 320 NLRB 80 (1995); *Hydrolines, Inc.*, supra;

---

[17]  Tilton sat on the corporate boards or owns all of her portfolio companies, including Patriarch.  Her role is no different with any other entrepreneur that owns or manages several companies.  It is unreasonable to conclude that, this, by itself, would show single-employer status of companies that are managed or owned by an individual, hedge fund, or private investment fund.

*Rogan Brothers*, supra slip op. at 3.  Such lack of an arms-length relationship is demonstrated by bookkeeper's performance of payroll functions for both companies and by comingling of funds of the two entities by one entity paying bills of the other, and by no interest loans and free rent, and nondocumented transactions.  *Rogan Brothers* supra at 4–5 (controller same for both
5   entities, checks issued to repay loans from payroll of one company for debts owed by other); *Spurlino Materials, Inc.,* 357 NLRB 1510, 1516 (2011) (controller runs accounting department for both companies); *Carr Finishing,* supra, 358 NLRB at 1766 (funds deposited from one company into account of another, and one company paid obligations of another). *Grane Healthcare Co.,* 357 NLRB 1412, 1441 (2011) (funds for purchase of a new facility jointly
10  borrowed and guaranteed by number of entities by owners of entities.).  *Emcor Corp.,* 330 NLRB 849 fn. 1 (2000) (performed payroll functions for both companies, and president of old company was involved in construction of new facility); *Naperville Jeep/Dodge,* 357 NLRB 2252, 2269 (2012) (sales vehicles of balance between the two entities.); *Emsing's Supermarket, Inc.* 284 NLRB 302, 304 (1987); enfd. 872 F.2d 1279 (7th Cir. 1989) (1984) (finding of single
15  employer status is supported by propensity to operate both companies "in such a manner that the exigencies of one would be met by the other," showing the relationship was not at arms length).

       None of these situations exist in this complaint.  Patriarch did not perform payroll functions for Transcendence and Transcendence II.  PPAS did not comingle funds to the benefit
20  of Patriarch or any other companies in Tilton's portfolio.  Patriarch and PPAS were not directed to write checks to cover the payrolls of Transcendence and Transcendence II employees. Transcendence and Transcendence II had their own bank accounts and would have had its own payroll accounts with ADP.

25     The bill of sale of TransCare's assets was an arms-length transaction.  Other lenders were involved, including Wells Fargo, to ensure that there was proper accounting and fair value for TransCare's assets.  Tilton was prepared to put up her own personal funds of $10 million to buy some of TransCare's assets.  All loans and financial transactions were well documented and there was nothing suspicious, such as an interest-free loan or nonpayment of a secured interest
30  when an installment was due, to negate anything less than an arm's-length arrangement.

       Accordingly, I find that the Respondents is not a single employer.

                                CONCLUSIONS OF LAW
35
       1.  I find and conclude that Transcendence II is not a successor to predecessor TransCare
           New York.

       2.  I find and conclude that the Respondents are not joint employers
40
       3.  I further find and conclude that the Respondents is not a single employer.

       4.  As such, I find and conclude that the Respondents have not failed and refused to
           bargain collectively and in good faith with the Union in violation of Section 8(a)(5)
45         and (1) of the Act.

       5.  Accordingly, I recommend that the complaint be dismissed in its entirely.

                                       25

JD(NY)-15-19

Dated: Washington, D.C.  September 4, 2019

5

Kenneth W. Chu
Administrative Law Judge