# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

In re:                                                      :

                                                            :          Chapter 7

        TRANSCARE CORP., *et al.*,                    :          Case No. 16-10407 (SMB)

                                                            :

             Debtors.                    :          (Jointly Administered)

---------------------------------------------------------X

SHAMEEKA IEN on behalf of herself and all           :
Others similarly situated,                          :

             Plaintiff,        :          Adv. Proc. No. 16-01033 (SMB)

                                                            :

       --against--                                  :

                                                            :

TRANSCARE CORP., TRANSCARE                           :
NEW YORK, INC., TRANSCARE ML, INC., TC              :
AMBULANCE GROUP, INC., TRANSCARE                    :
MANAGEMENT SERVICES, INC., TCBA                     :
AMBULANCE, INC., TC BILLING AND                     :
SERVICES CORP., TRANSCARE                           :
WESTCHESTER, INC., TRANSCARE                        :
MARYLAND, INC., TC AMBULANCE NORTH,                 :
INC., TRANSCARE HARFORD COUNTY, INC.,               :
LYNN TILTON, ARK II CLO 2001-1 LIMITED,             :
ARK INVESTMENT PARTNERS II, L.P.,                   :
PATRIARCH PARTNERS, LLC, and                        :
PATRIARCH PARTNERS III, LLC,                        :

                                                            :

            Defendants.      :

---------------------------------------------------------X

**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART
MOVING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFF**

**A P P E A R A N C E S :**

RAISNER ROUPINIAN LLP
*Attorneys for Plaintiff*
500 Fifth Avenue, Suite 1600
New York, NY 10110

        Jack A. Raisner, Esq.
        René S. Roupinian, Esq.
          Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Movants*
Eleven Times Square
New York, NY 10036

>Nicole A. Eichberger, Esq.
>Gillian G. Egan, Esq.
>Kathleen M. McKenna, Esq.
>>Of Counsel

LAMONICA HERBST & MANISCALCO, LLP
*Attorneys for Chapter 7 Trustee*
3305 Jerusalem Avenue
Wantagh, NY 11793

>Joseph S. Maniscalco, Esq.
>Holly R. Holecek, Esq.
>>Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Plaintiff, Shameeka Ien, brought this class action on behalf of herself and similarly situated former employees of Defendants TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc. and TransCare Harford County, Inc. (collectively, "TransCare" or "Debtors") to recover damages under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* ("US WARN Act"), the New York State Worker Adjustment and Retraining Notification Act, N.Y. LAB. LAW ("NYLL") § 860 *et seq.* ("NY WARN Act," and together with the US WARN Act, the "WARN Acts"), and the unpaid wage laws of New York, Pennsylvania and Maryland.

The non-TransCare Defendants (collectively, the "Movants") have moved for summary judgment ("Motion"). (*See Non-Debtor Defendants' Memorandum of Law in*

2

*Support of Their Motion for Summary Judgment*, dated May 21, 2019 ("*Moving Brief*") (ECF[1] Doc. # 109).)[2]  The Movants include Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners III, LLC ("Patriarch III"), Ark Investment Partners II, L.P. ("AIP II"), Ark II CLO 2001-1 Limited ("Ark II," and collectively with Patriarch Partners, Patriarch III, and AIP II, the "Entity Defendants"), and Lynn Tilton.  The Plaintiff opposes the Motion.[3]  (*See Plaintiff's Opposition to Non-Debtor Defendants' Motion for Summary Judgment*, dated June 28, 2019 ("*Opposition Brief*") (ECF Doc. # 131).)[4]  For the reasons set forth below, the Motion is granted in part and denied in part.  In addition, the Court grants partial summary judgment on behalf of the Plaintiff and against Tilton on the state wage claims.

## BACKGROUND[5]

---

[1]  "ECF" refers to the electronic docket of this adversary proceeding.

[2]  *See also Non-Debtor Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment*, dated July 31, 2019 ("*Reply Brief*") (ECF Doc. # 125); *Non-Debtor Defendants' Memorandum in Opposition to the Court's Notice of Fed. R. Civ. P. 7056(f) Motion*, dated Sept. 6, 2019 ("*Defendants Rule 56(f) Brief*") (ECF Doc. # 138); *Non-Debtor Defendants' Supplemental Memorandum in Support of Their Motion for Summary Judgment, Seeking Summary Judgment in Favor of Non-Debtor Defendant Ark II CLO 2001-1 Limited*, dated Dec. 13, 2019 ("*Defendants Supp. Brief*") (ECF Doc. # 149).

[3]  The chapter 7 trustee of the Debtors (the "Trustee") filed a limited objection to the Motion.  (*See Chapter 7 Trustee's Limited Objection to Non-Debtor Defendants' Motion for Summary Judgment*, dated June 28, 2019 ("*Trustee Opposition*") (ECF Doc. # 118).)

[4]  *See also Plaintiff's Response to Non-Debtor Defendants' Opposition to a Sua Sponte Summary Judgment Determination*, dated Sept. 13, 2019 ("*Plaintiff Rule 56(f) Brief*") (ECF Doc. # 140); *Plaintiff's Opposition to Non-Debtor Defendants' Motion for Summary Judgment With Respect to Non-Debtor Defendant Ark II CLO 2001-1 Limited*, dated Jan. 24, 2020 ("*Plaintiff Supp. Brief*") (ECF Doc. # 155).

[5]  The background is derived from the statements of undisputed facts submitted by the parties pursuant to Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York.  Each party's proposed facts, and whether the other side disputes them, are set forth in the *Non-Debtor Defendants' Reply Statement of Undisputed Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Their Motion for Summary Judgment*, dated July 31, 2019 (ECF Doc. # 126) (this reply document also fixed a typo in the Plaintiff's fact statement which resulted in many facts being mis-numbered by one).  The Movants' facts listed in numbered paragraphs 1 through 99, and the Plaintiff's facts listed in

## A.    TransCare and the Movants

At all relevant times prior to February 24, 2016, the Debtors provided ambulance and paratransit transportation services in New York, Pennsylvania, and Maryland. (DF ¶ 1.) Glenn Leland served as TransCare's CEO until his employment was terminated on January 8, 2016. Mark Bonilla served as TransCare's CFO until his resignation on or about September 29, 2015, and continued as a consultant until about January 8, 2016. The remaining TransCare officers were Peter Wolf (COO), Tom Fuchs (VP of Transit Services), and Glen Youngblood (VP of Performance Excellence). (DF ¶ 3.) Lynn Tilton served as TransCare's sole director, (DF ¶ 12), and indirectly holds a majority equity stake in TransCare through her personal investment funds Ark II and AIP II (together, the "Funds"). (DF ¶ 23; PF ¶ 104; *Amended Answer to Amended Adversary Class Action Complaint*, dated Dec. 13, 2019 at ¶ 27 (ECF Doc. # 148).)

Tilton also controls and directly or indirectly owns the other Entity Defendants. They include Defendant Patriarch Partners, a private equity firm, (DF ¶ 14; PF ¶ 101), whose employees, including Brian Stephens (senior director, legal), Michael Greenberg (director of portfolio management), and W. Randall Jones (managing director), worked on TransCare matters. (DF ¶ 17.) Jean Luc Pelissier, an employee of non-party affiliate

---

numbered paragraphs 100 through 260, will be denoted as "DF ¶ _" and "PF ¶ _," respectively. The Court will refer to the facts set forth in the parties' Rule 7056-1 statements if those facts are undisputed and essentially stipulated.

The Court will also refer to exhibits attached to the *Declaration of Nicole A. Eichberger, Esq. in Support of Non-Debtor Defendants' Motion for Summary Judgment*, dated May 21, 2019 ("*Eichberger Declaration*") (ECF Doc. # 113) and the *Declaration of Jack A. Raisner*, dated June 28, 2019 ("*Raisner Declaration*") (ECF Doc. # 131-2). Finally, the Court recently addressed some of these issues in connection with the Plaintiff's motion for summary judgment in *Ien v. TransCare Corp.* (*In re TransCare Corp.*), 611 B.R. 160 (Bankr. S.D.N.Y. 2020) ("*Prior Decision*"), familiarity with which is assumed.

4

Patriarch Partners Management Group, LLC ("Patriarch Management"), also worked on TransCare matters. (DF ¶ 18.) Patriarch III is a limited partner of AIP II and was previously the collateral manager for AIP II. (DF ¶¶ 28, 29.) In addition to using the Funds to hold equity, Tilton also used the Funds to make secured loans to TransCare. (DF ¶¶ 24, 50.)[6] Tilton controls and manages the Funds and Patriarch III, and those entities have no other employees. (DF ¶¶ 23, 25, 28, 31, *Declaration of Lynn Tilton in Support of Non-Debtor Defendants' Supplemental Memorandum in Support of Their Motion for Summary Judgment, Seeking Judgment in Favor of Non-Debtor Defendant Ark II CLO 2001-1 Limited*, signed Dec. 11, 2019 at ¶¶ 1, 4 (ECF Doc. # 149-1).)

### B.  Prepetition Credit Facilities

By credit agreement dated as of August 4, 2003 ("2003 Credit Agreement"), TransCare Corporation borrowed funds from a group of term loan lenders comprised of (i) AIP II, (ii) Zohar CDO 2003-1, Ltd., ("Zohar CDO") (iii) Zohar II 2005-1, Ltd. ("Zohar II"), (iv) Zohar III, Ltd. ("Zohar III," and collectively with Zohar CDO and Zohar II, the "Zohar Lenders"), (v) Credit Suisse Alternative Capital, Inc., and (vi) First Dominion Funding I. (PF ¶ 106.) Non-party Patriarch Partners Agency Services, LLC ("PPAS") – an entity ultimately owned and controlled by Tilton (PF ¶ 102) – served as the administrative agent under the 2003 Credit Agreement. (PF ¶ 106.) Patriarch Partners performed collateral management duties for the Zohar Lenders until it resigned as collateral manager on March 3, 2016. (DF ¶ 15.)

---

[6]    Tilton also made secured loans to TransCare through non-party Ark Angels II, LLC ("Ark Angels") – another personal investment fund owned by Tilton. (DF ¶ 50.)

On or about October 13, 2006, Wells Fargo Bank, N.A. ("Wells Fargo") and TransCare entered into an asset-based lending agreement ("ABL Agreement") which allowed TransCare to borrow funds from Wells Fargo secured by TransCare's inventory and receivables.  (DF ¶¶ 36-37.)

## C.  TransCare's Financial Distress

TransCare was in severe financial distress from at least 2015.  It was significantly behind in satisfying its outstanding accounts payable to the point that various critical suppliers refused to continue doing business with TransCare until their debts were satisfied.  (*See* Deposition[7] of Glenn Leland, dated Nov. 27, 2018 ("Leland Dep. I")[8] at 53:19-55:5, 57:3-58:19; Deposition of Glenn Leland, dated Jan. 3, 2019 ("Leland Dep. II")[9] at 619:15-620:2.)[10]  TransCare often struggled to make weekly payroll, (Leland Dep. I at 76:7-10, 124:12-17), and missed payroll in July and December 2015.  (Leland Dep. II at 520:25-521:9, 621:3-14, 629:8-17.)  TransCare's fleet of ambulances was old and in dire need of repair and/or replacement.  (Leland Dep. I at 55:6-57:3, 67:6-69:10;

---

[7]    The deposition transcripts provided by the parties include those taken in this action as well as an action commenced by the Trustee asserting, *inter alia*, breach of fiduciary duty claims against Tilton, Patriarch Partners, and certain affiliated entities.  *See LaMonica v. Tilton*, Adv. Pro. No. 18-01021 (Bankr. S.D.N.Y.) ("*LaMonica v. Tilton*").  Many of the material facts overlap, and the Court will not identify the action in which the deposition was taken unless it is necessary to avoid confusion.

[8]    Excerpts of Leland Dep. I are attached as Exhibit M to the *Eichberger Declaration* and Exhibit 2 to the *Raisner Declaration*.

[9]    Excerpts of Leland Dep. II are attached as Exhibit 7 to the *Raisner Declaration*.

[10]   TransCare even lost cashless access through tollways and toll-bridges because it failed to pay the balance owed to EZ-Pass – the system which facilitates automatic debit of tolls.  This had a negative effect on TransCare's ability to quickly get patients to the hospital because its ambulances had to use the cash-only lanes in a queue with other cars at toll plazas.  (Leland Dep. I at 103:15-104:15.)

Deposition of John Husson, dated Nov. 12, 2018[11] at 19:12-16.)  Moreover, TransCare

lacked the funds to pay premiums for vital insurance policies and lost workers'

compensation coverage at one point.  (Leland Dep. I at 60:20-61:14.)  TransCare also

had to make substantial interest payments under the 2003 Credit Agreement including

to Tilton-owned entities affiliated with Patriarch Partners.  (Husson Dep. II at 17:12-24.)

As a result of these financial pressures, Tilton-owned entities had to inject capital into

TransCare on several occasions to fund payroll and prevent interruption of critical

supplies.  (Husson Dep. I at 16:25-17:13, 32:6-12; Leland Dep. I at 58:24-59:4; Leland

Dep. II at 520:25-521:9.)  These cash infusions, however, were never enough to remedy

the underlying liquidity issues TransCare faced.  (Leland Dep. II at 614:15-21.)

On October 2, 2015, Wells Fargo issued a notice of intent to waive renewal of the

ABL Agreement, which would otherwise renew automatically at the end of January

2016, in favor of negotiating a new agreement with TransCare.  (DF ¶¶ 41-42.)  In

November 2015, representatives of TransCare (Leland, Bonilla, Wolf, Youngblood),

Patriarch Partners (Greenberg), Patriarch Management (Pelissier), and Well Fargo met

to discuss renewal of the ABL Agreement.  Wells Fargo conveyed that a prerequisite to a

renewal of the ABL Agreement was an investment by Patriarch into TransCare.  (*See*

Email from Leland to Tilton, *et al.*, dated Nov. 21, 2015.)[12]  Moreover, the deterioration

of the business negatively affected TransCare's ability to borrow funds under the ABL

---

[11]     Mr. Husson, a Wells Fargo lending officer, was deposed twice on November 12, 2018 – once in
this action and then in *LaMonica v. Tilton*.  The deposition transcript from this action will be referenced
as "Husson Dep. I," excerpts of which are annexed as Exhibit C to the *Eichberger Declaration* and Exhibit
8 to the *Raisner Declaration*.  The deposition transcript from *LaMonica v. Tilton* will be referenced as
"Husson Dep. II," excerpts of which are annexed as Exhibit K to the *Eichberger Declaration* and Exhibit
15 to the *Raisner Declaration*.

[12]     Attached as Exhibit 49 to the *Raisner Declaration*.

Agreement. Wells Fargo's collateral base was shrinking, (Husson Dep. I at 38:8-25), and Wells Fargo eventually downgraded TransCare's credit rating citing, *inter alia*, (i) "significant deterioration" in financial performance, (ii) the age of the ambulance fleet, (iii) the existence of a financial covenant default, (iv) weak IT systems, (v) significant turnover in senior management, and (vi) substantial interest payment obligations under subordinated debt, of which approximately 90% was "owed to Patriarch," totaling over $7,500,000 in the past two years. (*See* Email chain among Wells Fargo personnel, dated Feb. 21-23, 2015;[13] Husson Dep. II at 20:5-13, 108:3-24.)

On December 3, 2015, Leland told a colleague that TransCare was "close to the end" unless it received a capital investment of $6.4 million from Patriarch – an amount based on a financial model that Bonilla had built. (*See* Email chain between Leland and colleague, dated Dec. 2-3, 2015.)[14] No investment came in December, Bonilla updated his model in early January 2016, and the passage of one month increased the required capital investment to $7.8 million. (*See* Email chain between Leland and Youngblood, dated Jan. 3, 2016;[15] *accord* email chain among Bonilla, Leland, Wolf, Greenberg, and Pelissier, dated Jan. 2, 2016.)[16] Similarly, on or around December 10, Wells Fargo's Husson told Greenberg of Patriarch Partners that an investment between $5.5 million and $6 million was necessary to address outstanding issues including improving

---

[13]    Attached as Exhibit 64 to the *Raisner Declaration*.

[14]    Attached as Exhibit 50 to the *Raisner Declaration*.

[15]    Attached as Exhibit 59 to the *Raisner Declaration*.

[16]    Attached as Exhibit 78 to the *Raisner Declaration*.

TransCare's infrastructure.  (*See* Email from Greenberg to Tilton and Pelissier, dated Dec. 10, 2015.)[17]

On December 16, 2015, Wells Fargo learned that TransCare was three weeks in arrears on payroll tax payments and froze TransCare's ability to borrow under the ABL Agreement.  Leland observed that absent a capital investment, TransCare would not be able to make payroll or pay workers compensation insurance premiums, and therefore, TransCare was approaching "a natural point of cessation of operations without an investment."  (*See* Email chain among Leland, Bonilla, Greenberg, Pelissier, and Gerald Campbell, dated Dec. 16, 2015.)[18]

## D.    Retention of CMAG

Over the weekend of December 12-13, 2015, Tilton determined that "we could not continue with the current management team, and we would either need to sell, file for bankruptcy, unwind, or do some sort of transaction" with respect to TransCare. (Deposition of Lynn Tilton, dated Oct. 29, 2018 ("Tilton Dep. I")[19] at 164:15-19.)  Around January 8, 2016, Leland's employment as CEO of TransCare was terminated, and Bonilla ceased his role as a consultant.  (DF ¶ 3.)  TransCare did not hire a replacement CEO, and thereafter, Wells Fargo primarily dealt with Greenberg, Pelissier and Tilton on TransCare matters.  (*See* Husson Dep. II at 53:14-21; Husson Dep. I at 122:24-123:8;

---

[17]     Attached as Exhibit 65 to the *Raisner Declaration*.

[18]     Attached as Exhibit 66 to the *Raisner Declaration*.

[19]     Excerpts of the Tilton Dep. I are attached as Exhibit J to the *Eichberger Declaration* and Exhibit 43 to the *Raisner Declaration*.

*accord* Deposition of Carl J. Landeck, dated Nov. 16, 2018 ("Landeck Dep.")[20] at 40:4-12.)

By Consulting Agreement, dated as of January 7, 2016 ("Consulting Agreement"), TransCare retained Carl Marks Advisory Group ("CMAG") to provide financial consulting services.[21] CMAG's Carl Landeck assumed the role of TransCare's interim CFO under the Consulting Agreement. (Consulting Agreement at ¶ 2.) CMAG employees Jonathan Killion, Mark Claster, and Marc Pfefferle also worked on the engagement. (*Id.*)

CMAG produced an initial report to Patriarch Partners on January 15, 2016 ("CMAG Report").[22] It stated, *inter alia*, that TransCare was "at a critical junction where it can no longer operate without a significant infusion of capital . . . ." (CMAG Report at 2.) Among other things, CMAG discussed the need to pay outstanding insurance obligations, replace a certain number of vehicles, and repair eroded relationships with vendors and customers. (*Id.*) In order to have a successful turnaround, TransCare required a capital investment of between $4.5 million and $6.5 million, of which between $1.5 million and $2 million was needed immediately. (*Id.* at 3.) Around the same time, Tilton authorized secured loans to TransCare from Ark II and non-party Ark Angels in an aggregate amount of over $2 million. (DF ¶ 50.)

---

[20] Excerpts of the Landeck Dep. are attached as Exhibit G to the *Eichberger Declaration* and Exhibit 16 to the *Raisner Declaration*.

[21] A copy of the Consulting Agreement is attached as Exhibit BB to the *Eichberger Declaration*.

[22] A copy of the CMAG Report is attached as Exhibit 80 to the *Raisner Declaration*.

On January 27, 2016, CMAG sent various documents to Greenberg, Pelissier and Jones in advance of a meeting including TransCare's 2016 Plan Executive Summary ("CMAG Summary").[23] The CMAG Summary explained that TransCare was "now operating at an absolute breaking point" and had "strained and broken relationships" with customers, employees, vendors, and landlords. (CMAG Summary at 2-3.) The CMAG Summary increased the capital investment required for a turnaround to at least $7.5 million. (CMAG Summary at 5 ("To have a chance of a turnaround, TransCare needs an immediate incremental pledge of support from Patriarch totaling $7.5M+ excluding 2016 term interest . . . .").) In early February, CMAG explained to Patriarch representatives that "we are all at the 24th hour. Without funding of critical requirements, company cannot last through next week." (Email chain among Landeck, Pfefferle, Pelissier, Greenberg, *et al.*, dated Feb. 2-3, 2016;[24] Landeck Dep. at 74:4-7.)

In a series of emails on February 9, 2016 between Tilton and Wells Fargo's Kurt Marsden, Tilton commented, *inter alia*, that (i) TransCare had endured a "constant deterioration of customers, vendors and loss of employees" since July 2015, (ii) she was meeting with bankruptcy counsel that afternoon, and (iii) it may be time for Wells Fargo to foreclose on TransCare's assets under the terms of the ABL Agreement. (Email chain between Tilton and Marsden, dated Feb. 9, 2016.)[25]

## E.    The Tilton Plan

---

[23]    A copy of the CMAG Summary is included in Exhibit 83 to the *Raisner Declaration* at Bates Nos. PPTC00021567-80.

[24]    Attached as Exhibit 85 to the *Raisner Declaration*.

[25]    Attached as Exhibit 18 to the *Raisner Declaration*.

Out of options, Tilton devised a plan ("Tilton Plan"). (DF ¶ 55.) She divided TransCare into two groups. The first group, which ultimately corresponded to the Subsequent Debtors identified in the *Prior Decision*, would continue to operate under new ownership through a two-step reorganization. In step one, the secured lenders represented by PPAS, as agent, would foreclose pursuant to Article 9 of the Uniform Commercial Code on the assets of the TransCare entities that provided ambulance services in Pittsburgh, Pennsylvania and New York's Hudson Valley and paratransit transportation services under a contract with the Metropolitan Transit Authority ("MTA"). In step two, the secured lenders would transfer the foreclosed assets to two new entities, Transcendence Transit, Inc. and Transcendence Transit II, Inc. (together, "Transcendence")[26] created by Tilton (the "Transcendence Transfer"). The remaining TransCare entities, which corresponded to the Initial Debtors identified in the *Prior Decision*, would be wound down (the "Wind-Down") in chapter 11. (Husson Dep. I at 115:5-25; Deposition of Lynn Tilton, dated Oct. 30, 2018 ("Tilton Dep. II")[27] at 48:24-49:10; DF ¶ 60.)

By early February 2016, Tilton and her employees at Patriarch Partners (Greenberg, Stephen, Jones, John Pothin and Kevin Dell) and Patriarch Management (Pelissier) were taking steps to implement the Tilton Plan including:

---

[26]    The two Transcendence entities were formed on February 10, 2016. (DF ¶ 59.) Tilton held a majority equity interest in the Transcendence entities through her ownership of the Funds and other entities. (Tilton Dep. I at 111:6-11.) She also acted as manager of the Transcendence entities. (PF ¶ 203.)

[27]    Excerpts of Tilton Dep. II are attached as Exhibit A to the *Eichberger Declaration* and Exhibit 89 to the *Raisner Declaration*.

- retaining Curtis, Mallet-Prevost, Colt & Mosle LLP ("Custis Mallet") as bankruptcy counsel for TransCare,

- inquiring with the MTA about re-issuing the paratransit transportation contract to a different legal entity (*i.e.*, Transcendence) (*see* Email, dated Feb. 9, 2016 from Pelissier to MTA representative),[28]

- circulating a checklist of matters to address in advance of "Business Shutdown" (*see* Email, dated Feb. 8, 2016 from Pothin to Pelissier, Greenberg, Stephen and Jones;[29] *see also* Email, dated Feb. 14, 2016 from Pelissier to Jones, Pothin, Greenberg, Stephen, Dell, Wolf and Youngblood),[30]

- circulating draft communications to be sent to TransCare employees including draft WARN Act notices[31] (*see* Emails among Patriarch personnel, dated Feb. 12, 14, 16, & 17, 2016),[32] and

- drafting a Transition Services Agreement between TransCare and Transcendence under which, *inter alia*, TransCare would continue to provide certain services to Transcendence (*see* Email, dated Feb. 17, 2016 from Dell to Youngblood).[33]

Additionally, Tilton and Patriarch were negotiating with Wells Fargo on the terms of continued financing, (*see, e.g.*, Email chain between Tilton and Marsden, dated Feb. 9, 2016),[34] and on February 19, Wells Fargo sent Patriarch Partners a term sheet[35] outlining the terms of a proposed $16.5 million credit line. However, a dispute arose

---

[28] Attached as Exhibit 86 to the *Raisner Declaration*.

[29] Attached as Exhibit 32 to the *Raisner Declaration*.

[30] Attached as Exhibit PP to the *Eichberger Declaration*.

[31] On February 17, 2016, Stephen rebuffed the advice of a Curtis Mallet attorney to "provide WARN Notices to the employees ASAP," (*see* Email, dated Feb. 17, 2016 attached as Exhibit 37 to the *Raisner Declaration*), and two days later, Tilton stated that WARN Act notices would not be issued until the Transcendence Transfer was completed. (*See* Email, dated Feb. 19, 2016 attached as Exhibit 38 to the *Raisner Declaration*.)

[32] Attached as Exhibits 33-36 to the *Raisner Declaration*.

[33] Attached as Exhibit 94 to the *Raisner Declaration*.

[34] Attached as Exhibit 18 to the *Raisner Declaration*.

[35] A copy of the term sheet is attached as Exhibit 102 to the *Raisner Declaration*.

between Tilton and Wells Fargo about which party would fund a certain "$10 million hole" which included TransCare payroll obligations. (*See* Husson Dep. I at 77:10-79:6.) In the days leading up to the chapter 7 filing of the Initial Debtors, negotiations broke down and Tilton resolved to end the financing relationship with Wells Fargo. (*See* Emails, dated Feb. 19, 21, 22, & 23, 2016.)[36]

Documents were also prepared to effectuate the Transcendence Transfer.[37] Patriarch Partners' Stephen sent TransCare's Wolf a "Notice of Default and Acceleration" with respect to the 2003 Credit Agreement executed by PPAS as administrative agent and the Zohar Lenders and Ark II[38] as lenders (collectively, the "Foreclosing Parties"). (*See* Notice of Default and Acceleration, dated Feb. 24, 2016.)[39] In addition, Stephen sent Wolf a "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" in which the Foreclosing Parties proposed to accept the Subsequent Debtors' assets under an Article 9 foreclosure in satisfaction of $10 million owed under the 2003 Credit Agreement. (*See* Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated Feb. 24, 2016.)[40] Last, the Foreclosing Parties and Transcendence Transit Inc. entered into a Bill of Sale on February 24 to transfer the foreclosed-upon assets to Transcendence Transit Inc. (*See* Bill of Sale,

---

[36]     Attached as Exhibits 26-30 to the *Raisner Declaration*.

[37]     The Tilton Plan was executed without Wells Fargo's input and violated the terms of the ABL Agreement. (Husson Dep. II at 75:24-76:18, 82:3-83:8.)

[38]     The record does not indicate when Ark II became a lender under the 2003 Credit Agreement.

[39]     Attached as Exhibit 113 to the *Raisner Declaration* at Bates Nos. PP-TRBK0043311-14.

[40]     Attached as Exhibit 113 to the *Raisner Declaration* at Bates Nos. PP-TRBK0043306-10.

Agreement to Pay and Transfer Statement, dated Feb. 24, 2016;[41] DF ¶ 81.) Tilton signed for each Foreclosing Party on both notices and the bill of sale. According to the Movants, the Transcendence Transfer, if successful, could have saved the jobs of 700 out of the roughly 1,800 total TransCare employees. (DF ¶ 56; Email from Landeck to the Trustee, dated Feb. 27, 2016[42] (noting that TransCare has approximately 1,800 employees).)

## F.    Bankruptcy Filings and the Failure of the Transcendence Transfer

On February 24, 2016, the Initial Debtors filed petitions for relief under chapter 7 of the Bankruptcy Code. On February 25, 2016, Salvatore LaMonica was appointed interim Trustee of the Initial Debtors. (DF ¶ 95.) He met with representatives of Patriarch Partners and Wells Fargo late into the evening to find out if either party was willing to fund payroll to keep the Initial Debtors operational for a short period. (Deposition of Salvatore LaMonica, dated Oct. 23, 2018 ("LaMonica Dep. I")[43] at 51:9-24; PF ¶ 244.) Wells Fargo was prepared to fund some of the payroll but not enough, and Tilton's representative ultimately refused to fund anything. (LaMonica Dep. II at 24:3-25:10.) The Trustee made it clear that he was not going to continue the business unless he was assured that the employees would be paid. (LaMonica Dep. I at 52:12-16.)

---

[41]    Attached as Exhibit KKK to the *Eichberger Declaration*.

[42]    Attached as Exhibit 119 to the *Raisner Declaration*.

[43]    Excerpts of the LaMonica Dep. I are attached as Exhibit F to the *Eichberger Declaration* and Exhibit 120 of the *Raisner Declaration*. The Trustee was also deposed in *LaMonica v. Tilton* on October 23, 2018 ("LaMonica Dep. II") excerpts of which are attached as Exhibit 31 to the *Raisner Declaration*.

After the meeting, it became clear to the Trustee that he wasn't going to continue the operations. (LaMonica Dep. I at 54:2-4.) The ambulances, including those that had been foreclosed upon, were out on the street driven by people who were not going to be paid. The Trustee was concerned that the drivers might abandon the vehicles and the vehicles might have narcotics on board. Accordingly, he directed the dispatcher to tell the drivers to return their vehicles to the Hamilton Avenue location and arranged with the New York City Fire Commissioner to accept ambulances at firehouses throughout the city. (LaMonica Dep. I at 54:2-21.)

The Tilton Plan was in jeopardy. Without the Trustee's cooperation, the Patriarch/Transcendence team turned to self-help. Stephen sent an email at 10:53 p.m. to the team advising them that "we need to secure as many assets (ambulances, equipment, etc.) as possible as quickly as we can." (*Raisner Declaration*, Ex. 121.) Stephen was not sure where the most valuable assets were located "but it makes sense to target those first — if those assets can be moved." (*Id.*) Pelissier responded with plans to seize the AS 400 computer. At 11:23 p.m., he sent an email to Stephen and others that the server would be picked up, moved in a non-ambulance vehicle to the MTA facility "and reconnected on time for the MTA para transit division to do their early morning routing." (*Raisner Declaration*, Ex. 122.) However, TransCare's computers were located at premises in the Trustee's possession, (*see* LaMonica Dep. I at 36:7-8), and any attempt to seize the server might violate the automatic stay.

The continuation of the paratransit division presented a separate problem. Patriarch was willing to fund the payroll for those drivers, but Transcendence had not set up a payroll account and wanted to use TransCare's account and checks to pay them;

16

a proposal the Trustee found "problematic." (Lamonica Dep. II at 35:13-36:10.) In addition, the MTA contract was with an Initial Debtor, TransCare New York, Inc. The attorney acting on behalf of Transcendence asked the Trustee to consent to the termination of the MTA contract so that Transcendence could enter into a new contract with the MTA. (*See* Email chain, dated Feb. 26, 2016;[44] LaMonica Dep. II at 36:11-20.) The Trustee ultimately agreed but any deal between Transcendence and the MTA was nevertheless unraveling.

On February 26, Stephen wrote to an MTA representative that the "main issue" was that "when we heard that the MTA was scheduling to retrieve the vehicles, we took that as an expression that we were not going to be able to reach agreement and we immediately notified the employees that operations would be discontinuing." (Email from Stephen to MTA representative, dated Feb. 26, 2016.)[45] Stephen was also "concerned" with what actions the Trustee "might take on multiple fronts." (*Id.*) Thus, by February 26, 2016, it became clear that the Transcendence Transfer would also fail, and the February 26 Notice was sent laying off the remaining TransCare employees. *See Prior Decision*, 611 B.R. at 164.

The February 26 Notice attributed the second set of layoffs to the refusal by Wells Fargo, CMAG and the Trustee to fund the previous week's payroll. *Prior Decision*, 611 B.R. at 164 (quoting February 26 Notice). It is not clear whether Patriarch Partners is still contending that Wells Fargo's refusal to fund Transcendence led to the failure of the

---

[44]     Attached as Exhibit 123 of the *Raisner Declaration*.

[45]     Attached as Exhibit 125 to the *Raisner Declaration*.

Transcendence Transfer and, in fact, "ARK Angels III," a Tilton affiliate, was going to invest $10 million in Transcendence. (Tilton Dep. I at 167:3-22.) Nor is there evidence that CMAG ever intended to fund anything; CMAG served as TransCare's interim CFO, not its banker. Finally, the estates lacked unencumbered cash and could not use Wells Fargo's cash collateral without its permission.

The Subsequent Debtors filed petitions for relief under chapter 7 of the Bankruptcy Code on April 25, 2016, and Mr. LaMonica became the Trustee of those entities as well.

## G.    This Adversary Proceeding

The Plaintiff commenced this action on March 1, 2016, and the Court approved the filing of the *Amended Adversary Class Action Complaint* ("*Am. Complaint*") (ECF Doc. # 134-1) on November 26, 2019. (*See Order Granting Plaintiff's Motion for Leave to File the Amended Complaint*, dated Nov. 26, 2019 (ECF Doc. # 147).) Among other things, the Plaintiff alleged that Tilton was the sole director of TransCare and a director, officer or manager of each of the Entity Defendants (*Am. Complaint* at ¶¶ 31-32), Tilton and Patriarch Partners concocted the Transcendence Transfer and made the decision to place TransCare into bankruptcy (*id.* at ¶¶ 47-49), and TransCare was dependent on Patriarch Partners and its affiliates for funding and operational management. (*Id.* at ¶¶ 51-55.) The *Am. Complaint* asserted claims under the US WARN Act (Count I), NY WARN Act (Count II), and the unpaid wage laws of New York (Count III), Pennsylvania (Count IV), and Maryland (Count V).

Both sides moved for summary judgment.  In the *Prior Decision*, the Court concluded that the WARN Act notices sent on February 24 failed to comply with the requirements of the WARN Acts but the February 26 Notice did.  Accordingly, the Court granted partial summary judgment to the Plaintiff striking the Defendants' two statutory defenses ("faltering company" and "unforeseeable business circumstances") with respect to the February 24 layoffs.  *Prior Decision*, 611 B.R. at 169.

In the Motion before me, the Entity Defendants seek summary judgment dismissing the WARN Act claims primarily on two bases.  First, they are not subject to "single employer liability."  (*Moving Brief* at 11-25.)  Second, even if they were, the layoffs occurred as a result of "unforeseeable business circumstances."  (*Id*. at 25-33.)  Finally, all the Movants seek to dismiss the state wage claims because they did not contract to pay wages to the TransCare employees, (*id*. at 34-35), and the Plaintiff cannot demonstrate liability under New York, Maryland or Pennsylvania law.  (*Id*. at 35-40.)

## DISCUSSION

### A.    Standards Governing the Motion

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable hereto pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact.  *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  "A fact is material if it might affect the outcome of the suit

under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quotation omitted).

The Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When deciding whether a genuine dispute exists as to a material fact, all ambiguities must be resolved, and all reasonable inferences must be drawn, in favor of the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the records as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

Federal Civil Rule 56(f)(1) allows a court to grant summary judgment to the nonmovant so long as the party against whom judgment is entered is provided with notice and a reasonable time to respond. FED. R. CIV. P. 56(f)(1). The notice requirement is designed to prevent a party from suffering procedural prejudice, which occurs when it "is surprised by the [court's] action and that surprise results in the party's failure to present evidence in support of its position." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000); *accord Responsible Person of Musicland Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), Adv. Pro. No. 08-01023 (SMB), 2012 WL 769473, at *1 (Bankr. S.D.N.Y. Mar. 7, 2012). The threat of procedural prejudice is "greatly diminished if the court's *sua sponte* determination is

based on issues identical to those raised by the moving party." *Bridgeway Corp.*, 201

F.3d at 140; *accord Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167

(2d Cir. 1991).

At oral argument, the Court advised the Movants' counsel that it might consider

granting summary judgment to the Plaintiff on the state law wage claims against Tilton

and gave both sides ten days to address whether it was appropriate to do so "as a

procedural matter" since the Plaintiff had not moved for summary judgment.[46] (*See*

Transcript of Aug. 27, 2019 Hr'g at 63:20-64:8 (ECF Doc. # 133).) The Movants

responded with several arguments as to why the Court should not grant summary

judgment to the Plaintiff under Rule 56(f)(1). First, the Plaintiff did not move for

summary judgment on those claims. (*Defendants Rule 56(f) Brief* at 3-4.) However,

Rule 56(f)(1) specifically allows the Court to grant summary judgment to the

nonmovant. Second, the Court did not give them a "reasonable time to respond" as

required by Rule 56(f). (*Id.* at 4-5.) But defense counsel did not object to the Court's

proposed supplemental briefing schedule at the conclusion of oral argument or suggest

that she needed more time to respond to the narrow procedural question. Third, the

Movants assert that the Court erred by failing to identify each material undisputed fact

and suggest that the Court should provide a Local Bankruptcy Rule 7056-1 fact

statement for the Movants. (*Id.* at 6.) However, the Court identified the claims and the

---

[46]     Rule 56(f)(1) provides:

> **Judgment Independent of the Motion.** After giving notice and a reasonable time to respond, the court may:
>
>> (1) grant summary judgment for a nonmovant. . . .

Defendant against whom it was considering summary judgment, and the Movants had moved for summary judgment on the same claims.  Hence, there was no prejudice. *Bridgeway Corp.*, 201 F.3d at 140.  Fourth, the Movants contend that the Court limited the supplemental briefing to "the procedural rather than substantive issue presented." (*Defendants Rule 56(f) Brief* at 6-7.)  However, the Defendants had already identified the pertinent facts and relevant case law in arguing that Tilton was entitled to summary judgment dismissing the state law wage claims.  In fact, it is the Movants' own admissions that provide the basis for summary judgment against Tilton.

## B.     WARN Acts

The Plaintiff seeks damages from the Entity Defendants for violations of the WARN Acts.[47]  The US WARN Act requires an employer to give employees sixty-days' written notice of a plant closing or mass layoff, 29 U.S.C. § 2102(a), and the NY WARN Act requires ninety-days' notice.  NYLL § 860-b(1).

### 1.     "Single Employer"

The threshold issue is whether the Entity Defendants are considered a "single employer" along with TransCare for purposes of the WARN Acts.  To determine whether related entities constitute a single employer, the Second Circuit has adopted the five non-exclusive factors promulgated by the Department of Labor: (i) common ownership, (ii) common directors and/or officers, (iii) *de facto* exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of

---

[47]     The Plaintiff did not assert WARN Act claims against Tilton individually apparently because individual liability is an open question.

operations.[48]  *Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013)

("*Guippone*") (citing 20 C.F.R. § 639.3(a)(2)).  No one factor is controlling, and all

factors need not be present for liability to attach.  *Vogt v. Greenmarine Holdings, LLC*,

318 F. Supp. 2d 136, 142 (S.D.N.Y. 2004).  At bottom, the single employer liability test is

"an inquiry into whether the two nominally separate entities operated at arm's length."

*Pearson v. Component Tech. Corp.*, 247 F.3d 471, 495 (3d Cir.), *cert. denied*, 534 U.S.

950 (2001).

### a.    *De Facto* Control

While no one factor controls, the factors are accorded different weights and *de

facto* control is the "key" factor.  *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d

369, 379 (S.D.N.Y. 2017).  "The core of this factor is whether one company was the

decision-maker responsible for the employment practice giving rise to the litigation."

*Guippone*, 737 F.3d at 227 (citation and internal quotation marks omitted); *see also id.*

("Thus, the 'de facto exercise of control' prong allows the factfinder to consider whether

the parent has specifically directed the allegedly illegal employment practice that forms

the basis for the litigation.") (citation and internal quotation marks omitted).  Where the

*de facto* exercise of control is "particularly striking – for instance, were it effectuated by

disregarding the separate legal personality of its subsidiary then liability might be

warranted even in the absence of the other factors."  *Id.* at 228 (citation, internal

quotation marks and alteration omitted).  Nevertheless, the factor "is not intended to

support liability based on a parent's exercise of control pursuant to the ordinary

---

[48]     Neither party has suggested that a different "single employer" test should apply under the NY
WARN Act and applied the same test for claims under both WARN Acts.

incidents of stock ownership." *Id.* at 227 (citation and internal quotation marks omitted).

It is undisputed that Tilton formulated and directed the execution of the Tilton Plan, (*see* DF ¶¶ 55, 60), which included the foreclosure on the Subsequent Defendants' assets, the transfer of those assets to Transcendence, the filing of the chapter 7 by the Initial Debtors, the termination of their employees on February 24, 2016 and the termination of the Subsequent Debtors' employees on February 26, 2016.[49]  But Tilton wore many hats.  In particular, she was the CEO and owner of Patriarch Partners and although TransCare had its own email address ("transcare.com"), all of Tilton's emails were sent from and received at a "PatriarchPartners.com" address, and her e-signatures reflected that she was the CEO of Patriarch Partners, LLC.  (*See, e.g.*, Email chain, dated Jan. 14, 2016 attached as Exhibit 79 to the *Raisner Declaration*.)

In addition, Patriarch Partners employees played a critical role in the execution of the Tilton Plan.  Pothin circulated a "downsizing checklist" email on February 8, 2016 to Pelissier, Greenberg, Stephen and Jones.  (*Raisner Declaration*, Ex. 32.)  The checklist outlined "Questions in Advance of Business Shutdown," including notice under the WARN Act, and asked "[i]f and when is [f]oreclosure."  Pothin also drafted the initial WARN Act notice on February 12, (*id.*, Ex. 33), and served as the point man on the WARN Act issues.  (*See id.*, Exs. 34, 35, 90.)  Kevin Dell, the Senior Director-Legal at

---

[49]     According to the Movants, (i) Tilton "had the authority to make decisions for TransCare," (ii) Tilton "authorized TransCare to file for Chapter 7 bankruptcy," (iii) TransCare's "Authority Matrix . . . made clear that Tilton . . . had the authority to make important operational decisions for TransCare," and (iv) there was "no doubt that Tilton . . . was the ultimate decision maker, [sic] with respect to TransCare's decision to file for Chapter 7 bankruptcy on February 24, 2016."  (*Moving Brief* at 16-18.)

Patriarch Partners, oversaw the drafting of the letters to those employees who would be transferred to Transcendence, the WARN Act notices for those employed by what was then assumed (on February 17) would be chapter 11 debtors and related letters to New York State and City departments informing of the events. (*Id.*, Ex. 36.) Stephen oversaw the legal aspects of the Transcendence Transfer. He sent TransCare's Wolf a "Notice of Default and Acceleration" with respect to the 2003 Credit Agreement and a "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" in which the Foreclosing Parties proposed to accept the Subsequent Debtors' assets under an Article 9 foreclosure in satisfaction of $10 million owed under the 2003 Credit Agreement.

I cannot say from the record whether Tilton was exercising control over the key decisions in her capacity as sole director of TransCare or was directing the execution of the Tilton Plan through Patriarch Partners, given that Stephen, Pothin and Dell were not TransCare employees. Moreover, after Leland was fired in early January 2016, he was not replaced and Wells Fargo and CMAG dealt with Patriarch Partners personnel on TransCare financial matters. Accordingly, Patriarch Partners' *de facto* control presents a disputed issue of material fact. Conversely, there is no evidence suggesting that Patriarch III exercised any control over the Tilton Plan or TransCare generally, and the fact that Tilton controlled Patriarch III and TransCare does not establish, without more, that Patriarch III exercised *de facto* control over TransCare.

With respect to the Funds, the Second Circuit has outlined a different test for *de facto* control when the defendant is a lender or other creditor. Analogizing to principles of lender liability, the Court has explained that "the dispositive question is whether a

creditor is exercising control over the debtor beyond that necessary to recoup some or all of what is owed, and is operating the debtor as the *de facto* owner of an ongoing business." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 150 (2d Cir. 2007). The other factors – commonality of ownership and directors/officers, unity of personnel policies and dependency of operations – "are standard 'piercing the veil' factors to be used in the case of related firms, *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 63 (2d Cir. 2001), and have little direct bearing on paradigmatic relationships between lenders and borrowers." *Coppola*, 499 F.3d at 150.

The Funds were lenders and TransCare was in default under the 2003 Credit Agreement. The most that can be said is that their agent, PPAS, exercised the right to foreclose on their collateral for their benefit to collect part of what was owed to all the lenders under the 2003 Credit Agreement. The foreclosure was consistent with their rights to collect an unpaid debt and does not evidence *de facto* control.

### b.    The Other Factors

#### i.    Common Ownership

The common ownership factor asks "whether a parent or related entity directly owns a separate corporate entity." *Garner*, 260 F. Supp. 3d at 376-77 (citation omitted). This factor is of "limited significance . . . since it is well established that stock ownership alone is not grounds for holding a parent liable for its subsidiary's actions." *Vogt*, 318 F. Supp. 2d at 142. This factor is met for the Funds because they hold direct equity interests in TransCare. *See id.* (common ownership factor satisfied as to three investment companies holding various levels of equity in the employer). However, the factor is not met for Patriarch III because its interest in TransCare, as a limited partner

26

of AIP II (an entity itself holding only a 5.6% equity stake), is indirect and remote.  *See*

*Guippone v. BH S&B Holdings LLC*, No. 09 Civ. 1029(CM), 2010 WL 2077189, at *4

(S.D.N.Y. May 18, 2010) (common ownership factor not satisfied for entities holding

indirect interest in the employer), *aff'd*, 737 F.3d 221 (2d Cir. 2013); *Vogt*, 318 F. Supp.

2d at 142 (complaint did not allege "common ownership" as to investment

vehicles/grandparents that owned interests in three direct owners of bankruptcy

employer).  Finally, Patriarch Partners did not hold an equity stake in TransCare and

does not meet the common ownership factor.[50]

## ii.      Common Directors and/or Officers

The common directors and/or officers factor looks to whether two entities "(1)

actually have the same people occupying officer or director positions with both

companies; (2) repeatedly transfer management-level personnel between the

companies; or (3) have officers and directors of one company occupying some sort of

formal management position with respect to the second company."  *Garner*, 260 F.

Supp. 3d at 377 (quotation omitted).  Like the preceding factor, the common

director/officer factor is of "limited importance" because it is "entirely appropriate for

directors of a parent corporation to serve as directors of its subsidiary."  *Vogt*, 318 F.

Supp. 2d at 142 (quoting *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998)).  This

factor is clearly satisfied for each Entity Defendant because Tilton was a director, chief

---

[50]      The Plaintiff argues that the common ownership factor is met because (i) the Movants and TransCare are all indirectly owned by Tilton and (ii) the Movants exercised financial control over TransCare. (*See Opposition Brief* at 14-15; *Plaintiff Supp. Brief* at 17.)  Courts within the Second Circuit, however, have limited common ownership to entities holding a direct equity interest, *see Guippone v. BH S&B Holdings*, 2010 WL 2077189, at *4; *Vogt*, 318 F. Supp. 2d at 142, and the Plaintiff relies on precedent from outside the circuit.  *E.g.*, *D'Amico v. Tweeter Opco, LLC* (*In re Tweeter Opco, LLC*), 453 B.R. 534, 542 (Bankr. D. Del. 2011) (disagreeing with *Guippone v. BH S&B Holdings* and expanding common ownership to indirect equity holders).

executive officer and/or manager of those entities and was the sole director of
TransCare.

### iii.    Unity of Personnel Policies

The "unity of personnel policies" factor is "analogous to the aspect in the federal
labor law test concerning 'centralized control of labor operations,' which the Second
Circuit has considered to include factors such as centralized hiring and firing, payment
of wages, maintenance of personnel records, benefits and participation in collective
bargaining." *Vogt*, 318 F. Supp. 2d at 142-43 (citing *Clinton's Ditch Coop. Co., Inc. v.
NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985), *cert. denied*, 479 U.S. 814 (1986)); *accord
Garner*, 260 F. Supp. 3d at 377; *see also Pearson*, 247 F.3d at 499 (this factor focuses
"on whether the companies actually functioned as a single entity with regard to its
relationships with employees"). "In the context of the WARN Act, the decision to effect
a mass layoff is the single most important personnel policy." *Vogt*, 318 F. Supp.2d at
143; *accord Garner*, 260 F.3d at 377. The Plaintiff points to evidence in the record
showing that, after the head of TransCare's human resources ("HR") resigned in March
or April 2015, TransCare did not replace him, and TransCare's local HR personnel took
direction from John Pothin of Patriarch Partners. (Leland Dep. II at 666:8-23, 729:2-
18.) Among other things, Pothin oversaw TransCare's headcount, approved job
descriptions, created TransCare's HR policies, and posted TransCare jobs on the
Patriarch Partners website. (Leland Dep. II at 667:4-668:5.) In addition, as discussed,
he oversaw the labor and WARN Act issues relating to the Tilton Plan.

As noted, there is a question of fact as to whether Patriarch Partners participated
in the execution of the Tilton Plan which included the layoffs of the Initial Debtors'

employees, and once the Tilton Plan failed, the layoffs of the remaining employees. Furthermore, an employee of Patriarch Partners essentially took over the human resources functions at TransCare after April 2015. Conversely, there is no evidence that the Funds or Patriarch III – entities without employees – participated in the execution of the Tilton Plan or shared any personnel policies with TransCare.

### iv.    Dependency of Operations

The "dependency of operations" factor addresses three areas of overlap between two entities: "(1) sharing of administrative or purchasing services, (2) interchanges of employees or equipment, or (3) commingled finances." *Garner*, 260 F. Supp. 3d at 379 (quotation omitted). "Control over day-to-day operations has been held to be indicative of interrelation of operations. . . . However, the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." *Pearson*, 247 F.3d at 501; *see also id*. ("dependency of operations cannot be established by the parent corporation's exercise of its ordinary powers of ownership, i.e., to vote in directors and set general policies"). Further, loans that are "bona fide arm's length transactions" do not establish that the borrower was operationally dependent on the lender. *Id*. at 502-03; *accord id*. at 503 ("We surely do not want to discourage companies from attempting to keep their subsidiary operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes a 'dependency of operations' giving rise to liability.").

The Plaintiff has submitted evidence showing that employees of Patriarch Partners exerted control over TransCare's day-to-day operations.[51]  Indeed, by early January 2016, TransCare no longer had a CEO and was entirely dependent on Patriarch Partners for its day-to-day operations and decision making.  Greenberg, in particular, frequently worked out of TransCare's offices (Leland Dep. II at 724:16-725:8), routinely directed TransCare officers to pay certain vendor-creditors to the exclusion of others and described this practice of selective non-payment as the "Patriarch way" (Leland Dep. I at 59:12-60:16, 144:17-145:17), and directed Leland not to pay 2015 payroll taxes. (Leland Dep. II at 662:22-24.)  Leland understood that directives from Patriarch Partners officers including Greenberg, Jones and Stephen must be followed.  (Leland Dep. I at 47:13-49:22, 51:17-51:21; Leland Dep. II at 668:14-25; *see also* Husson Dep. I at 42:24-43:4 (stating that TransCare's management was not empowered to make decisions).)[52]  As a result, whether TransCare was operationally dependent on Patriarch Partners is a question of fact.

Moreover, the evidence indicates that TransCare was financially dependent at least on Ark II for financing.  Ark II made secured loans to TransCare when funding under the ABL Agreement became unavailable, (Husson Dep. I at 16:25-17:13, 32:6-12;

---

[51]      The Plaintiff also argues that Pelissier of Patriarch Management exerted control over day-to-day operations, but Patriarch Management is not a defendant in this action.

[52]      The Movants cite distinguishable precedent on this point.  (*See Moving Brief* at 21-22.)  In two of the cases, the plaintiffs did not argue that there was a dependency of operations, *Azzata v. Am. Bedding Indus., Inc.* (*In re Consol. Bedding, Inc.*), 432 B.R. 115, 122 (Bankr. D. Del. 2010) ("Plaintiffs have not made any such allegations."); *Manning v. DHP Holdings II Corp.* (*In re DHP Holdings II Corp.*), 447 B.R. 418, 425 (Bankr. D. Del. 2010) (Plaintiffs did not dispute "that the evidence fails to show a dependency of operations."), and in *Czyzewski v. Jevic Transp., Inc.* (*In re Jevic Holding Corp.*), 492 B.R. 416 (Bankr. D. Del. 2013), *aff'd*, 526 B.R. 547 (D. Del. 2014), *aff'd*, 656 F. App'x 617 (2016), there was "no evidence that [the defendant's employees] were involved in the day-to-day business operations of Jevic sufficient to show an existence of dependency."  *Jevic*, 492 B.R. at 432.

Leland Dep. I at 58:24-59:4; Leland Dep. II at 520:25-521:9), and TransCare was prohibited from independently seeking an alternative source of financing. (Leland Dep. I at 77:24-78:20; 148:24-149:3; Leland Dep. II at 603:20-604:15, 629:18-22.) In addition, Patriarch Partners officers directed TransCare to repay the loans to these entities, never permitted TransCare to seek payment deferment, and demanded early payment of interest at times ahead of other pressing obligations. (Husson Dep. II at 17:12-24; Leland Dep. I at 139:24-140:25; Leland Dep. II at 641:18-25.)

Finally, there is no evidence that TransCare was dependent on Patriarch III or *vice versa*.

### c.    Summary of "Single Employer" Analysis

All of the Entity Defendants and TransCare shared common directors and/or officers through their connection to Tilton. Turning to the other factors, there is a triable issue of fact whether Patriarch Partners exercised *de facto* control, whether TransCare was dependent on Patriarch Partners for its operations and whether Patriarch Partners and TransCare shared personnel policies. Accordingly, Patriarch Partners' motion for summary judgment on the "single employer" issue is denied.

Conversely, there is no evidence that any of the factors weigh in favor of a finding that Patriarch III was a "single employer," and its motion for summary judgment dismissing the WARN Act claims is granted.

Finally, the Funds will also be granted summary judgment on the "single employer" issue. The only factors that arguably weigh against them are their direct ownership interests in TransCare and Ark II's role as TransCare's funder of last resort.

However, while the Funds were separate corporations, there is no evidence to suggest that they were anything more than Tilton's personal bank accounts. Furthermore, they had no employees and the decision whether to advance funds was Tilton's alone.

### 2. Unforeseeable Business Circumstances

To the extent that any of the Entity Defendants are determined to be a "single employer" with TransCare, the Movants assert that they are protected by the "unforeseeable business circumstances" ("UBC") exception. This defense shields an employer from WARN Act liability when a mass layoff occurs before the conclusion of the notice periods under the US WARN Act and the NY WARN Act if the layoff was caused by business circumstances that were "not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A); NYLL § 860-c(1)(b).[53] The UBC defense requires that the employer establish "(1) that the business circumstances that caused the layoff were not reasonably foreseeable and (2) that those circumstances were the cause of the layoff." *Varela v. AE Liquidation, Inc.* (*In re AE Liquidation, Inc.*), 866 F.3d 515, 523 (3d Cir. 2017); *accord Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015). The employer must also give employees "as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *accord* NYLL § 860-c(2). "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in

---

[53] The parties generally relied on precedent interpreting the UBC exception under the US WARN Act, and, other than the different notice periods which mark the starting point of the analysis, neither party has asserted that a different standard should apply under the NY WARN Act.

predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2); *accord* 12

N.Y.C.R.R. 921-6.3(b); *see AE Liquidation*, 866 F.3d at 530 ("WARN Act is triggered

when . . . the objective facts reflect that the layoff was more likely than not").

In reviewing the employer's business judgment, the court "must be careful to

avoid analysis by hindsight." *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765

(6th Cir. 2002). Business circumstances brought on by a "sudden, dramatic, and

unexpected action or condition outside the employer's control" such as a principal

client's termination of a contract, a strike at a major supplier, or an unanticipated

economic downturn are indicative of circumstances that are not reasonably foreseeable.

20 C.F.R. § 639.9(b)(1); *accord* 12 N.Y.C.R.R. 921-6.3(a). The UBC defense is fact

intensive and thus not conducive to resolution through dispositive motion practice. *See*

*Conn v. Dewey & LeBoeuf LLP* (*In re Dewey & LeBoeuf LLP*), 487 B.R. 169, 175 (Bankr.

S.D.N.Y. 2013) (UBC defense not conducive to resolution under Federal Civil Rule

12(b)(6) dismissal motion); *accord Thielmann v. MF Global Holdings Ltd.* (*In re MF*

*Global Holdings Ltd.*), 481 B.R. 268, 278 (Bankr. S.D.N.Y. 2012) (same); *see also*

*Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1060 (8th Cir. 1996) (noting the

Department of Labor's guidance that the UBC defense "involves a highly factual inquiry

to be assessed on a case by case basis").

Although the Second Circuit has not yet ruled on the test for reasonable

foreseeability under the UBC defense, every other circuit court of appeals to consider the

matter has adopted the "probability" standard first set forth in *Halkias v. Gen.*

*Dynamics Corp.*, 137 F.3d 333 (5th Cir.), *cert. denied*, 525 U.S. 872 (1998). The Fifth

Circuit explained:

> [T]he question of reasonable foreseeability begs another question: by
> adopting 'reasonable foreseeability' as a standard, does the WARN Act
> envision the probability of an unforeseen business circumstance . . . or
> instead the mere possibility of such a circumstance? We can only conclude
> that it is the probability of occurrence that makes a business circumstance
> 'reasonably foreseeable' and thereby forecloses use of the § 2102(b)(2)(A)
> exception to the notice requirement. A lesser standard would be
> impracticable [because employers would be] put to the needless task of
> notifying employees [every time the possibility of a mass layoff exists].

*Halkias*, 137 F.3d at 336. The Third Circuit in *AE Liquidation* subsequently noted that

the Sixth, Seventh, Eighth and Tenth Circuits had adopted the *Halkias* ruling, 886 F.3d

at 528, and observed that requiring a WARN notice when layoffs are not the most likely

outcome "has the potential to accelerate a company's demise and necessitate layoffs that

otherwise may have been avoided." *AE Liquidation*, 866 F.3d at 530; *accord Watson*,

311 F.3d at 765 ("WARN was not intended to force financially fragile, yet economically

viable, employers to provide WARN notice and close its doors when there is a *possibility*

that the business may fail at some undetermined time in the future. Such a reading of

the Act would force many employers to lay off their employees prematurely, harming

precisely those individuals WARN attempts to protect.") (emphasis in original).

Therefore, this Court also adopts the *Halkias* "probability" test.

The Court has already granted summary judgment to Patriarch III and the Funds

on the "single employer" issue and in the *Prior Decision*, struck the UBC defenses with

respect to the February 24 Notices and resulting layoffs of the Initial Debtors'

employees. Hence, the sole question is whether the Court can grant summary judgment

to Patriarch Partners in connection with the layoffs of the remaining employees on

February 26, 2016 when the Tilton Plan failed.

Patriarch Partners has adduced evidence of the reasonable probability that these employees would keep their jobs and operations would continue through Transcendence, at least as of February 24, 2016. It points to the communications which were sent to TransCare employees on February 24, 2016 stating that the Subsequent Debtors would continue operations through Transcendence. *See Prior Decision*, 611 B.R. at 162-64 (describing the February 24 Notices). The Transcendence Transfer failed two days later and the remaining 700 TransCare employees lost their jobs. The Movants contend that the Trustee's refusal to turn over certain assets that had been foreclosed upon by the Foreclosing Parties was not reasonably foreseeable and caused the loss of jobs. (*Moving Brief* at 32-33.)

However, this conclusion is open to question. TransCare was on life support for nearly one year and depended on Tilton affiliates to cover shortfalls throughout 2015 and into 2016. The chapter 11 Wind-Down fell through and the record shows that at some point Tilton and Patriarch Partners realized that the Initial Debtors would have to be liquidated through chapter 7.

Patriarch Partners anticipated that a chapter 7 bankruptcy trustee could present a problem. Stephen specifically asked Curtis Mallet whether a chapter 7 trustee would allow the Initial Debtors to perform under the Transition Services Agreement and whether "anyone [would] have access to [the Initial Debtors'] assets (particularly the billing system)" in the period between the chapter 7 filing and the appointment of the chapter 7 trustee. (*See Raisner Declaration,* Ex. 107.) The Curtis Mallet attorney responded that it was up to the chapter 7 trustee, but the firm would meet with the

trustee *before the filing* to address these issues.[54] (*Id.*) Nor should it have surprised Patriarch Partners that the Trustee would not permit Transcendence to pay former TransCare employees using TransCare's payroll account and checks and expose the estate and the Trustee to possible liability as an employer.

In fact, Patriarch Partners has not provided a consistent explanation for the failure of the Tilton Plan. The February 26 Notice blamed Wells Fargo, CMAG and the Trustee for their refusal to fund and the Trustee's interference with the possession and control of the foreclosed assets. The same day, Stephen blamed it on the breakdown in negotiations with the MTA. At a minimum, once it appeared that a chapter 11 would not work and the Initial Debtors would have to go through chapter 7, the success of the Tilton Plan would depend on factors outside Patriarch Partners' control and was extremely doubtful. In short, the UBC became reasonably foreseeable at some point and when that occurred raises questions of fact that cannot be resolved on a motion for summary judgment.

## C.     Unpaid Wage Claims

The Movants assert that they are entitled to summary judgment on the Plaintiff's state law wage claims because none of them were "employers" within the meaning of New York, Maryland or Pennsylvania law. As stated, the Court notified the Movants at oral argument that it might consider granting summary judgment in favor of the Plaintiff against Tilton.

---

[54]     A chapter 7 trustee is appointed only after the case is filed. Counsel may have been referring to the United States Trustee.

### 1.    New York Wage Claims

Under New York law, an "employer" includes any "person, corporation, limited liability company, or association employing any individual."  NYLL § 190(3); *see also* NYLL § 651(6).  Although neither the New York Court of Appeal nor the United States Court of Appeals for the Second Circuit has ruled that "the tests for 'employer' status are the same under the [Fair Labor Standards Act ("FLSA")] and the NYLL," *Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013), *cert. denied*, 572 U.S. 1002 (2014), district courts in the Second Circuit "have consistently interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA."  *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015); *accord Salinas v. Starjem Rest. Grp. Corp.*, 123 F. Supp. 3d 442, 464 n. 17 (S.D.N.Y. 2015); *Ho v. Sim Enters., Inc.*, No. 11 Civ. 2855(PKC), 2014 WL 1998237, at *10 (S.D.N.Y. May 14, 2014).

The Supreme Court has "consistently construed the [FLSA] liberally to apply to the furthest reaches consistent with congressional direction . . . recognizing that broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (citations and quotation marks omitted); *accord Irizarry*, 772 F.3d at 103.  Moreover, the FLSA's broad definition of "employ"[55] expands the meaning of "employee" to cover parties who "might not qualify as such under a strict application of traditional agency law principles in order to effectuate the remedial purposes of the act."  *Irizarry*, 772 F.3d at 104;

---

[55]    "'Employ' includes to suffer or permit to work."  29 U.S.C. § 203(g).

*accord Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).

Therefore, the determination of whether an employer-employee relationship exists

should be grounded in "economic reality rather than technical concepts." *Barfield*, 537

F.3d at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

Under the "economic reality" test, the relevant factors include whether the alleged

employer "(1) had the power to hire and fire the employees, (2) supervised and

controlled employee work schedules or conditions of employment, (3) determined the

rate and method of payment, and (4) maintained employment records." *Herman v.

RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("*RSR*"); *accord Carter v.

Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). However, "the determination of the

employment relationship does not depend on such isolated factors as where work is

done or how compensation is divided but rather upon the circumstances of the whole

activity." *Irizarry*, 722 F.3d at 104 (citation, alterations and quotation marks omitted);

*accord Barfield*, 537 F.3d at 141-42 (employment for FLSA purposes is "a flexible

concept to be determined on a case-by-case basis by review of the totality of the

circumstances"); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003)

("The court is also free to consider any other factors it deems relevant to its assessment

of the economic realities.").

    Further, when confronted with the question of whether an *individual* is an

employer, the economic reality test must address two related questions: (1) "an

individual's authority or 'operational control' over a company – at what level of a

corporate hierarchy, and in what relationship with plaintiff employees, must an

individual possess power in order to be covered by the FLSA?" and (2) "hypothetical

versus actual power: to what extent and with what frequency must an individual actually

use the power he or she possesses over employees to be considered an employer?"

*Irizarry*, 722 F.3d at 106. On the "operational control" question, the Second Circuit in

*Irizarry* observed that, "[e]ven in the individual-liability context," the FLSA warrants an

"expansive interpretation," and nothing in the FLSA requires an individual to have been

"personally complicit in the FLSA violations." *Id.* at 110; *accord RSR*, 172 F.3d at 139.

Therefore, in addition to evidence of "direct control" over the employees, courts should

consider the evidence of the individual's "authority over management, supervision, and

oversight of a company's affairs in general" when determining whether the individual

has "operational control" over the employment of the plaintiffs. *Irizarry*, 722 F.3d at

110 (citation, internal quotation marks and alternations omitted); *see also id.* ("A person

exercises operational control over employees if his or her role within the company, and

the decisions it entails, directly affect the nature or conditions of the employees'

employment."). On the "hypothetical versus actual power" inquiry, the Court explained

that "the manifestation of, or, at the least, a clear delineation of an individual's power

over employees is an important and telling factor in the 'economic reality' test." *Id.* at

111. Conversely, an ownership stake "without some involvement in the company's

employment of the employees" is insufficient to establish that the defendant is an

"employer." *Id.*

Here, Tilton had "operational control" over TransCare, affirmatively exercised

her power over the TransCare employees, and satisfied the first and third prongs of the

"economic reality" test. Indeed, many of pertinent facts were conceded by the Movants

through their briefs and statement of facts. Tilton alone had the power to make

"important operational decisions for TransCare." (*Moving Brief* at 18; *accord id.* at 16 (Tilton "had the authority to make decisions for TransCare;" DF ¶ 13 ("major decisions" required approval by Tilton); *see also* Husson Dep. I at 43:5-8 (Tilton made "[e]very single meaningful" decision).) Tilton also had the "authority to direct TransCare or its employees to take any actions." (*Moving Brief* at 17-18.) Importantly, Tilton ultimately directed all of the layoffs that are the subject of the state law wage claims. "There is no doubt that Tilton . . . was the ultimate decision maker, [sic] with respect to TransCare's decision to file for Chapter 7 bankruptcy on February 24, 2016," (*id.* at 18; *accord id.* at 17), and she devised the Tilton Plan. (DF ¶¶ 55, 60.) She "made the ultimate hiring/firing decisions," (*Moving Brief* at 20), hired the "high level TransCare executives," (*id.*) and "was the only individual with authority to make the decisions related to the layoffs of TransCare's employees[.]" (*Reply Brief* at 13.)

In addition, Tilton exercised financial control over TransCare thereby satisfying the third prong of the "economic reality" test. *See Irizarry*, 722 F.3d at 115 (financial control satisfies the third prong). She orchestrated the strict foreclosure of the Subsequent Debtor's assets, hired bankruptcy counsel for TransCare, directed the filing of the chapter 7 petitions and funded TransCare's operations when Wells Fargo refused.

Although the second factor (supervision/control over employee work schedules or conditions of employment) and the fourth factor (maintenance of employment records) are not satisfied by the undisputed facts and the Movants' concessions, Tilton is nevertheless liable as an "employer" under the "economic reality" test. In *Irizarry*, the Second Circuit ruled that an individual who was the owner and CEO of Gristede's grocery stores ("Catsimatidis") was an "employer" under the FLSA when he was

40

responsible for hiring managerial employees and had overall financial control over the company – *i.e.* the first and third prongs of the "economic reality" test. 722 F.3d at 116. The Court explained that "[t]his involvement meant that Catsimatidis possessed, and exercised, 'operational control' over the plaintiffs' employment in much more than a 'but-for' sense. His decisions affected not only Gristede's bottom line but individual stores, and the personnel and products therein." *Id.*

Here, Tilton exercised greater and more direct "operational control" over TransCare than Catsimatidis did over Gristede's. Not only did she hire and oversee TransCare management, she made all major operational decisions including the decisions giving rise to the wage claims. Consequently, the Court grants summary judgment against Tilton to the Plaintiff pursuant to Rule 56(f)(1) of the Federal Rules of Civil Procedure on the unpaid wage claims under the NYLL.

The Movants rely on *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442 (S.D.N.Y. 2015) but that case is distinguishable. There, employees of a restaurant brought FLSA and NYLL claims against *inter alia* the individual that was the CEO and majority shareholder of the restaurant ("Scotto"). The plaintiffs argued that Scotto was an "employer" because she was present in the restaurant every day and sometimes gave directions to the bussers, signed paychecks, is considered to be the "boss" by the plaintiffs, and provided input for the restaurant's policies. *Id.* at 464. The Court ruled that Scotto was not an employer because, among other things, (i) Scotto's daily presence and guidance on customer service was immaterial to the "employer" analysis, (ii) Scotto's mere ownership stake was insufficient, (iii) Scotto only signed paychecks because they required signatures of two owners, (iv) the plaintiffs' perception that

41

Scotto was the "boss" was not dispositive, and (v) her input on the policy document was limited to information about the artwork at the restaurant. *Id.* at 464-65. Most importantly, "there was no evidence" that Scotto met any of the four factors of the "economic reality" test. *Id.* at 463-64. In contrast, as stated, Tilton clearly meets two prongs of the test by her own admission, exercising pervasive operational and financial control over TransCare.

Next, the Court denies the Movants' Motion as to Defendant Patriarch Partners on the NYLL claim. The Court has already held in connection with the WARN Act claims that the capacity under which Tilton was acting raises a question of fact. Therefore, to the extent Tilton was exerting "operational control," exercising direct influence and power, and financially controlling TransCare in her capacity as the CEO and owner of Patriarch Partners, summary judgment would be improper. Moreover, Tilton was aided in her operational control of TransCare by her employees at Patriarch Partners and Patriarch Management. (*Moving Brief* at 17, 18, 20; *Reply Brief* at 12.) As set forth in the preceding discussion of the WARN Act claims, these employees routinely worked out of TransCare's offices, were involved in directly managing TransCare's operations and gave directions to TransCare's management on Tilton's behalf. Accordingly, whether Patriarch Partners was an "employer" raises an issue of fact.

Finally, the Motion is granted with respect to Patriarch III and the Funds for the same reasons that the Court granted summary judgment in their favor on the WARN Act claims. Although the Funds loaned money to TransCare, they (as well as Patriarch III) had no employees and lacked the ability to influence TransCare in any other

meaningful manner. Hence, they cannot be viewed as "employers" of TransCare's employees under the "economic reality" test.

### 2. Maryland Wage Claim

Under Maryland Wage Payment and Collection Law ("MWPCL"), an "employer" includes "any person who employs an individual in the State or a successor of the person." MD. CODE ANN., LAB. & EMPL. § 3-501(b). Like New York, Maryland follows the FLSA's four-factor "economic reality" test to determine the degree of formal control over workers. *Campusano v. Lusitano Constr. LLC*, 56 A.3d 303, 307-10 (Md. Ct. Spec. App. 2012); *Rivera v. Mo's Fisherman Exch.*, Civil Action No. ELH-15-1427, 2018 WL 2020423, at *11-12 (D. Md. May 1, 2018) (citing precedent and observing that "Maryland continues to adhere to the decision in *Campusano*"). Maryland also examines an individual defendant's "operational control" over employees and such control "may be restricted, or exercised only occasionally." *Jones v. Hoffberger Moving Servs. LLC*, 92 F. Supp. 3d 405, 415-16 (D. Md. 2015) (citation and internal quotation marks omitted); *Mould v. NJG Food Serv. Inc.*, 37 F. Supp. 3d 762, 775 (D. Md. 2014) (same).

Because Maryland follows the same test as New York, the Court's rulings with respect to the NYLL claims apply to the MWPCL claims.

### 3. Pennsylvania Wage Claim

Under Pennsylvania's Wage Payment and Collection Law ("PWPCL") an "employer" includes "every person, firm, partnership, association, corporation, receiver or other officer of a court of [Pennsylvania] and any agent or officer of any of the above-

mentioned classes employing any person in [Pennsylvania]." 43 PA. STAT. § 260.2a.

An "agent" under the statute can include a director of the employer. *Bowers v. NETI Techs., Inc.*, 690 F. Supp. 349, 354 (E.D. Pa. 1988) ("A director may, and frequently will, be appointed an agent of the corporation. For example, the board may exercise its express or implied power to confer authority upon him to act for the corporation. . . . In this case, he is necessarily an agent, and normally a general agent, of the corporation . . . .") (quoting RESTATEMENT (SECOND) OF AGENCY § 14C cmt. b (1958); alterations omitted). To find an "agent or officer" personally liable for unpaid wages, "evidence of an active role in decision making is required." *Hirsch v. EPL Techs., Inc.*, 910 A.2d 84, 88 (Pa. Super. Ct. 2006), *cert. denied*, 920 A.2d 833 (Table) (Pa. 2007); *accord Int'l Ass'n of Theatrical Stage Emps., Local Union No. 3 v. Mid-Atl. Promotions, Inc.*, 856 A.2d 102, 105 (Pa. Super. Ct.), *cert. denied*, 878 A.2d 864 (Table) (Pa. 2004); *Mohney v. McClure*, 568 A.2d 682, 686 (Pa. Super. Ct. 1990), *aff'd*, 604 A.2d 1021 (Pa. 1992).

The PWPCL "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (citation and quotation marks omitted). If the employee did not have a written contract or collective bargaining agreement with the employer, "the employee will have to establish the formation of an implied oral contract to recover under the [PWPCL]." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015); *accord Tyson Foods*, 342 F.3d at 309-10.

For the reasons stated in the section detailing the NYLL claims, Tilton clearly had "an active role in decision making" at TransCare and is liable for the unpaid wages as an

"agent" of TransCare under the PWPCL.  Therefore, the Court grants summary judgment against Tilton to the Plaintiff on the PWPCL claims pursuant to Federal Civil Rule 56(f)(1).

With respect to the Entity Defendants, however, the Plaintiff has not pleaded the existence of a contract, express or implied.  Lacking a contractual relationship, the Entity Defendants are entitled to summary judgment dismissing the PWPCL claim.

The Court has considered the Movants' remaining arguments and concludes that they lack merit.  Settle order on notice.

Dated:  New York, New York
        May 7, 2020

/s/ *Stuart M. Bernstein*
      STUART M. BERNSTEIN
United States Bankruptcy Judge