# EXHIBIT F

## BANKRUPTCY COURT FINDING'S V. RECORD EVIDENCE[1]

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| P. 8 | "Mark Bonilla served as TransCare's Chief Financial Officer ('CFO') from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016, (Stipulation No. 25), but per Tilton's instructions, Michael Greenberg, a Patriarch Partners credit officer, took on the responsibility for TransCare's finances. (DX 73 at 58180; Tr. 7/22 A.M. 18:19–24.)" | This finding implies that, after Bonilla's resignation and/or while he served as a consultant, Greenberg was primarily responsible for TransCare's finances. That is not so. Greenberg did not serve in any operational role for TransCare. He did not prepare the general ledger or financial statements; rather, responsibility for TransCare's financials belonged to TransCare's CEO and CFO. (Leland II Tr. 377:19–378:14; July 23 AM Tr. 61:14-25.) Moreover, Greenberg did not decide what suppliers were paid and when. (*See, e.g.*, JX_46 (email from Pelissier indicating that he and Greenberg had no authority to "dictate what has to be paid and when" and that TransCare management was responsible.)<br><br>DX_73 shows Greenberg provided temporary assistance to TransCare, while simultaneously trying to find a replacement CFO for the company, in the wake of Bonilla's departure in September 2019. The exhibit also demonstrates that TransCare's controller had significant involvement in the areas of accounting and finance at TransCare upon Bonilla's resignation.<br><br>The bankruptcy court selectively cites to a portion of Greenberg's testimony and ignores other portions of the testimony showing Greenberg was one of several people assisting with TransCare's finances after Bonilla's resignation. (*See* July 22 AM Tr. 17:18–18:24.) |

---

[1] Capitalized terms used but not defined herein have the meaning given to them in Tilton's contemporaneously filed *Objections to the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law* ("Objection"). Citation conventions are the same as those used in the Objection. This chart is illustrative but is not intended to be exhaustive. There are additional findings that Tilton contests that are discussed in more detail in the Objection, and Tilton reserves all rights to bring additional contested findings to the District Court's attention.

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | The bankruptcy court finding also ignores that the day *before* Bonilla's consultancy ended, CMAG was hired to "[p]erform normal duties of the position of TransCare CFO," among other things. (DX_106.) |
| PP. 8-9 | "Under an Authority Matrix issued by Tilton as the sole director of the Board, the officers of TransCare did not have authority to [take certain actions] . . . [a]ccordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities." | These findings are inaccurate with respect to the scope and function of the Authority Matrix and/or are contradicted by the evidence adduced at trial.<br><br>The Authority Matrix set forth discrete actions for which TransCare's CEO had to secure Tilton's approval, primarily in respect of significant financial and operational decisions with long-term consequences for the company. (PX_3, at 24172–75.) This includes, for example, major decisions such as new financings and/or long-term leases. (*See id.*) The Authority Matrix nowhere required Tilton's consent for day-to-day decision-making at TransCare or running the business in the normal course, including maintaining the company's financial statements. (*Id.*)<br><br>Tilton did not make day-to-day decisions for TransCare. (Aug. 13 AM Tr. 41:23–24.) Nor did Tilton manage TransCare through Greenberg or Pelissier. Rather, Greenberg and Pelissier were only called upon to assist with issues at TransCare during specific moments of crisis. (*See, e.g.*, July 23 AM Tr. 8:15–23; JX_44; DX_72.) Greenberg and Pelissier had no authority over TransCare management with respect to paying bills. (*See* JX_46 (email from Pelissier to Bonilla and Leland: "We are not here to dictate what has to be paid and when, it remains your duty and decision as per the capabilities you have and your duties to satisfy creditors as the management team.").)<br><br>To the extent Pelissier made suggestions to TransCare management on operational issues, TransCare management was not obligated to follow his advice. (July 23 AM Tr. 54:21–55:2.) And in fact, TransCare management often ignored his suggestions. (*See, e.g.* July 23 AM Tr. 56:6–17, 61:4–9.) |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| P. 11 | "Working primarily with Pelissier, Greenberg submitted a presentation for Tilton's review and approval on November 14, 2015 to share with Wells Fargo at a meeting scheduled for two days later. (JX 51; Tr. 7/22 A.M. 32:6–25.)" | The cited evidence does not support finding that referenced presentation was created by Pelissier and Greenberg.<br><br>The presentation Greenberg transmitted to Tilton was created by TransCare management (JX_51; DX_89 (Greenberg, describing revised 2016 plan, states, "Jean-Luc and I first saw the revised plan this past Monday. We will work to write something up on it as management believes this plan is one they can manage.").)<br><br>As Pelissier testified:<br><br>TRUSTEE'S COUNSEL: "Is this—I mean I don't know if you know because I don't know, if this was the plan that was given to [Wells Fargo] in November at the November meeting or some other plan?"<br><br>PELISSIER: "I believe it's that plan, yeah."<br><br>TRUSTEE'S COUNSEL: "And you prepared that plan, did you not, with the company? The November plan."<br><br>PELISSIER: "*I don't prepare anything*."<br><br>TRUSTEE'S COUNSEL: "You didn't work with –"<br><br>PELISSIER: "I review them, I opinion them, I give my feedback, I check, you know, to see if they are correct and so on. ***But those are not my plans***."<br><br>TRUSTEE'S COUNSEL: "Okay. And you do -- when you go through that process the purpose is that process is so when the plan is presented by management to Lynn Tilton –"<br><br>PELISSIER: "Yes." |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | TRUSTEE'S COUNSEL: "—it's in the proper form?" <br><br> PELISSIER: "*That it is in the proper form, yes*." <br><br> (July 23 AM Tr. 80:24–82:21; *see id.* at 82:5–21 (emphases added).) |
| P. 11 | "Tilton agreed the plan could be shared with Wells Fargo, but never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6–9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13–19.)." | The testimony cited by the bankruptcy court does not support finding or inference that the plan was actually shared with Wells Fargo. <br><br> Neither Greenberg nor Pelissier thought the management presentation referenced by the bankruptcy court was actually a workable plan. (DX_89; July 23 AM Tr. 66:1–68:17; July 22 PM Tr. 94:14–96:12.) <br><br> 7/22 AM Tr. 102:6–9 refers to a January 27 meeting based on a presentation prepared by CMAG; it has nothing to do with Wells Fargo. <br><br> Glenn Leland only testified that *a* presentation was shared with Wells Fargo, he did not recall what version was shared. (*See* Leland Tr. 547:13–549:9, 583:9–584:25; July 22 PM Tr. 123:13–19.) |
| P. 11 | "On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division. (JX 12 at 04260; Leland Tr. 85:9–86:14.)." | This finding is incomplete and is not corroborated by contemporaneous written evidence. <br><br> The only written proposal received by TransCare from National Express, the July 2015 LOI, was for nearly half this amount – i.e., $6-7 million paid out over time. (*See* JX_40.) <br><br> National Express's "offer" in February 2015 was made before any due diligence had been conducted. (July 23 AM Tr. 63:2–64:7; Aug. 13 AM Tr. 48:8–16.) <br><br> National Express's outreach in February 2015 predated the renewal of the MTA contract in mid-2015. (JX_67, at 106572.) The renewed contract was less profitable (*id.*) and, in fact, EBITDA generated by the paratransit business fell in |

4

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | July and the months that followed. (*Id.* at 106586 ("Region Rev-EBITDA by Month" Tab).) |
| P. 11 | "Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement. (PX 44 at 90486; Tr. 8/13 A.M. 45:7–15.)." | This finding is incomplete.<br><br>This "offer" was made without any due diligence and was premised on a misimpression of TransCare's current EBITDA. (*See* JX_29, at 0071450; Leland I Tr. 174:8-12.)<br><br>At the time, TransCare's EBITDA was "zero" to "maybe slightly positive level":<br><br>"Q Do you see the part where he says that RCA must assume TransCare has EBITDA in the ten-million-dollar range?<br> A Yes.<br> Q To your recollection, what was TransCare's EBITDA and on a 9 last 12-months-basis in March of 2015?<br> A In the—somewhere in the neutral to maybe slightly positive level.<br> Q What do you mean by neutral?<br> A Neutral being zero."<br><br>(*See* July 22 PM Tr. 83:22-84:13; *see also id.* 81:8-9.)<br><br>Leland expressed that the 8x EBITDA multiple used by RCA was "high for the industry." (JX_29, at 0071450.)<br><br>Leland also testified that in November 2014, nearly a year before Wells issued the Non-Renewal Notice, it would have been a stretch to sell TransCare at a multiple of 5x EBITDA. (Leland II Tr. 313:3–24; *see id.* at 313:15–22 ("[TransCare's] profitability is declining, they're accumulating negative equity, and if they're to turn that around, there's -- even if they were to sell the company at a multiple of five |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | times, the company is worth a third of its negative equity. So it's got a negative equity.") |
| P. 12 | "Even after the payroll default, TransCare continued to receive expressions of interest." | This finding is incomplete, and the inference drawn is not supported by the record evidence.<br><br>Third parties were not interested in TransCare *in spite of* the missed payroll, but rather *because of it* (because they assumed the company was vulnerable and could be bought 'on the cheap'. (*See, e.g.*, Leland I Tr. 171:23–25; *id.* 172:22–24 ("The point is, **a lot of industry contacts started to express interest in TransCare's plight and ways to capitalize on that**." (emphases added); *see also* July 22 PM Tr. 89:1–90:2 (describing TransCare as being in a "vulnerable position" after the missed payroll).)<br><br>The July 2015 LOI from National Express, sent shortly after the payroll miss, offered half of the alleged $15-18 million allegedly proposed by National Express in February. (*See* JX_40.) |
| PP. 12-13 | "On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express called him that morning about purchasing the paratransit business and asked whether he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M. 26:19–27:1.) On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him 'a few times' that day to reiterate that its offer to buy TransCare's paratransit contract was 'still out there.' (PX 124; Tr. 7/23 A.M. 50:22–51:3.)." | The cited testimony does not support the finding, and the finding is incomplete.<br><br>The July 2015 LOI from National Express had lapsed by December 2015. (*See* JX_40, at 30764 (noting that, if TransCare did not return a signed copy of the [LOI] within seven days, "the offer set forth herein shall cease to be valid").<br><br>Moreover, Leland's statements are not corroborated by contemporaneous written evidence. There is no evidence in the record, beyond Leland's unsupported statements in an email, to demonstrate National Express's continued interest.<br><br>The testimony (Aug. 14 AM Tr. 26:19–27:1) cited by the bankruptcy court relates to National Express's *July* LOI of $6-7 million, not an alleged indication of interest from December. |

6

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| P. 14 | "[Tilton] also instructed Greenberg to find investment bankers to market TransCare. (Tr. 7/22 A.M. 41:6–13, 42:21–23; *see* DX 96.)." | The finding misstates Tilton's request. Tilton's request was part of a process to determine whether TransCare was saleable; not reflective of a decision to sell some or all of TransCare. (Aug. 13 PM Tr. 52:17–53:7 ("Q Why did you send Mr. Greenberg DX-96?  A Because I wanted to see who were the investment bankers working in this industry, to see if there would be some way to piece together a sale process and who I should go to if we were able to do that.").) |
| P. 16 | "Tilton, however, never hired an investment banker to pursue a possible sale." | Tilton did not hire an investment banker because, based on CMAG's work, it was apparent that the company could not engage in a sale process without a substantial infusion of new money, an investment that CMAG itself described as very risky. (*See* PX_175, at 02114 (noting that "time has run out and the decision to risk significant capital must be made before a turnaround can show meaningful positive results" and that "[p]lan execution risk is high").)  As a result, she determined that a sale process would not be viable. (DX_130, at 28275; Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18–24.)<br><br>The bankruptcy court intimates that the decision was made in bad faith despite expressly finding later in the PFC that Tilton "*made a good faith determination that the company as a whole was not saleable.*" (PFC at 43 (emphasis added).) |
| P. 21 | "Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company . . . . (Tr. 8/13 A.M. 64:1–16.)." | The cited testimony does not support the finding.  In the cited testimony, Tilton simply described the deep dive her team was conducting as of February 5 to determine "if there was something to be saved." (Aug. 13 AM Tr. 64:16.)  Tilton did not approve a restructuring plan, or the potential for such a plan, before February 9, after engaging in discussions with Wells Fargo representatives and soliciting the assistance of CMAG. (*See, e.g.* DX_127, at 46297; July 23 AM Tr. 73:16–24; Aug. 13 PM Tr. 65:12–20; DX_130.) |
| P. 27 | "Tilton maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare. (Tr. 7/23 A.M. 17:17–24)." | The cited testimony does not support the finding; the finding is incomplete; and the inference drawn is not supported by the record evidence.<br><br>The cited testimony relates to an operational listing of action items among Tilton, Patriarch Partners and PPMG personnel, and TransCare management. (PX_206.) |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | Many people (Wells Fargo, CMAG, and TransCare executives) were involved in the efforts to avoid a free-fall liquidation.  (*See infra* at 17–18.)  The cited document only indicates that Tilton was the point person for the timing of the foreclosure and bankruptcy filings.<br><br>Pelissier never testified that Tilton "maintained exclusive control" over either decision (July 23 AM Tr. 17:17-24); it would have been impossible for her to do so. Wells Fargo had the power to cease funding at any point during the two-week period at issue and thereby cause the company to shut down.  (*See, e.g.,* Aug. 13 PM Tr. 94:23–24; *id.* at 95:3–11; DX_150; JX_83.) |
| P. 28 | "Tilton testified that EBITDA would increase to $4 million if annualized over a full twelve months.  (Tr. 8/14 AM Tr. 38:4–12.)" | The cited testimony does not support the finding; the testimony attributed to Tilton actually comes from the Trustee's counsel:<br><br>"TRUSTEE'S COUNSEL: But based on this model that your people or you created if you add those a month and a half your EBITDA is four million, perhaps even more.<br>TILTON: No, because it actually lost money in the first two months."<br><br>(Aug. 14 AM Tr. 38:4–11; *see also id.* at 38:4–40:25.) |
| PP. 28-29 | "The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million EBITDA shown on the earlier forecast, (PX 286), resulted from the decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions, (PX 286 at 105516) . . . ." | The difference in EBITDA was not the result of a "decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions," but rather the fact that those divisions had lost key customers as the company continued to fall apart on a minute-to-minute basis.<br><br>Between February 13 and February 24, TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland.  (DX_157, at 05291 ("[T]he company just received a 90 day notice from Bronx Lebanon, a contract that we were taking with Newco.  This was an important and valuable contract to the new entity."); *id.* at 05291 ("This company is unraveling by the minute.  I do not think it is a coincidence that we received 2 unexpected cancellations today."); Aug. |

8

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | 13 PM Tr. 99:8–101:12; *see also* July 22 PM Tr. 119:23–120:4.)  It was apparent that customers and others in the industry were aware of TransCare's dire situation. |
| P.31 | "As consideration for the purchase of the Subject Collateral, Transcendence agreed to pay PPAS $10 million. Ark Angels III, a Tilton affiliate, would finance the purchase under a Purchase Credit Agreement and was deemed to have loaned Transcendence $10 million." (JX_101.) | The finding is inaccurate and/or incomplete.  Ark Angels was not "deemed to have loaned Transcendence $10 million."  Ark Angels III also did not pay PPAS $10 million, or any other amounts.  The Subject Collateral was paid for by a credit bid by the Term Loan lenders, using a portion of its loans as payment for the Subject Collateral.  (PX_209; Aug. 13 PM Tr. 118:6–12; JX_110, at 9 ("Schedule 1").)<br><br>JX_101 (the Ark Angels credit agreement with Transcendence) is unexecuted.  The contemplated Ark Angels facility was a working capital revolver whereby Ark Angels would loan *up to* $10 million to Transcendence through intermittent loan draws.  (*Id.*)  Ark Angels was only required to provide funding to Transcendence upon the satisfaction of certain conditions precedent, including conditions related to Transcendence's financial performance and solvency.  (*Id.*, § 3.2.) |
| P. 34 | "Historically, the paratransit business was TransCare's second biggest revenue producer accounting for 26% of TransCare's operating revenue, (JX 67 at 106572), and $4 million of EBITDA. (JX 12 at 04260.)" | The finding is incomplete and misstated.  The discussion is around EBITDA and not revenues, and the EBITDA is overstated.<br><br>"The Transit contract was renewed in mid-2015 through October 2019 but the MTA moved away from a commercial contract to a municipal contract where it limited profitability."  (JX_67, at 106572.)<br><br>"The MTA also demanded a rebate of $225k per month beginning in October (for at least 9 months) due to an interim extension where they believed they were overcharged."  (*Id.*)<br><br>"During the 3rd and 4th quarters of 2015, Transit lost routes due to challenged performance and concerns about . . . TransCare's stability due to the delayed payment of insurance bills and other obligations."  (*Id.*)<br><br>*See also* July 22 PM Tr. 105:9–107:19 (Greenberg discussing decrease in profitability of MTA contract after mid-2015 contract renewal). |

9

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | By the fourth quarter of 2015, EBITDA for the paratransit business had dropped from approximately $4 million to $2.17 million. (PX_191, at 04699.) (JX_12, cited by the bankruptcy court, is an email dated February 6, 2015 detailing historical profitability of the MTA Contract.) |
| P. 35 | "At the same time, Randy Creswell (counsel to PPAS) asked the Trustee to consent to termination of the MTA Contract. (JX 105.) At trial, Tilton blamed Transcendence's loss of the MTA Contract on the Trustee's refusal to consent per the MTA's insistence, (*see* Tr. 8/13 A.M. 26:21–25), but the Trustee was willing to consent to the termination of the MTA Contract as long as it was without prejudice to amounts due to TransCare, (JX 105), and informed the MTA's lawyer of his consent. (Tr. 7/24 148:2–5.)." | The finding is incomplete and ignores the importance of the timeline of events. The Trustee's consent to the termination of the MTA contract was untimely. (JX_105; Creswell writes "Salvatore [LaMonica], With apologies for this final message, but if you do have a position or thoughts on the termination of the contract, please let me know. We need to respond to the city if this will work. If you cannot respond ***before 5***, then we won't be able to proceed with the city." Creswell received a responsive email from the Trustee giving conditional consent after 5pm. (*Id.* (emphasis added).) By the time the Trustee responded, employees had been sent home and the vehicles, belonging to the MTA but used by TransCare had been picked up by the MTA. (PX_245; July 23 PM Tr. 123:8–12.) |
| P. 49 | "Tilton did not retain a financial advisor to seek out possible third-party interest in purchasing the assets or investing in TransCare." | The finding ignores the purpose of hiring CMAG, a financial advisor hired by Tilton, and CMAG's duties under its consulting agreement. Tilton retained CMAG in connection with her discussions with Wells Fargo to "extend the ABL so as to facilitate a sale of TransCare." (*See* PFC at 14.) The work that CMAG performed in January 2016 and that was discussed on February 5. 2016 was an integral part of the process to determine if TransCare was saleable or if it could even survive a sale process. (*See, e.g.*, PX_165, at 00926 (CMAG providing analysis comparing "cost of a [bankruptcy] filing versus the cost of bridging to a sale"); July 22 AM Tr. 77:15–19.)<br><br>The scope of CMAG's assignment was set forth in a consulting agreement between TransCare and CMAG. (DX_106.) It provided that CMAG would "assist TransCare by providing and overseeing the implementation process of recommendations intended to manage, secure [and] improve [TransCare's] financial performance and |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | liquidity." (*Id.* at 43438.) It further provided that CMAG's services were to include, without limitation: (i) "[p]erform[ing] normal duties of the position of TransCare CFO"; (ii) "[a]nalyz[ing] the Company's financial and capital needs in detail"; (iii) "review[ing] and updat[ing] as necessary existing financial projections and internal budget"; and (iv) "assist[ing] with further identification of actionable opportunities to improve profitability . . . intended to improve the Company's performance." (*Id.* at 43439.) |
| P. 49 | Tilton "did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice." | The findings ignore the record evidence showing that such alternatives were explored and were not feasible, based on Wells Fargo objections, the absence of sufficient time and the lack of funds to support them.<br><br>There was no money available for a Chapter 11. By February, Wells had already reached the conclusion it would not provide *any* long-term funding to TransCare. (*See, e.g.*, DX_92, at 75263.) Tilton did broach with Wells the subject of providing DIP financing for the OldCo businesses, through her personal investment funds, but those negotiations ended when Wells refused to agree to subordinate its liens and indebtedness to a DIP loan. (*See* JX_82, at 48227; Aug. 13 PM Tr. 86:3–8.) Moreover, CMAG warned *against* pursuing a bankruptcy, noting that a bankruptcy filing would result in "customers and employees . . . abandon[ing] TC." (*See* PX_175, at 002116.) |
| P. 49 | "Moreover, [Tilton] did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July." | The findings ignore the record evidence showing that such alternatives had already been considered and determined to be infeasible.<br><br>Tilton commenced exploration of and conceived the design for the OldCo/NewCo Restructuring on February 9, **four days** after making a good faith determination that TransCare could not survive a sale process, based largely on CMAG's work. (PFC at 43; DX_130.)<br><br>That is because there was neither the time nor the money to sell to a third party. Wells would have to keep funding to keep the doors open long enough for diligence |

11

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | and the negotiation of an asset purchase agreement that Wells would have to consent to. (*See, e.g.*, JX_64; *see also* JX_60, at 00145.) <br><br> There was no evidence showing Tilton could have sold the NewCo business lines on an expedited basis without any due diligence process by potential buyers. (*See, e.g.*, JX_40 (National Express LOI, expressly conditioning its interest on completion of a due diligence period).) |
| P. 49 | "Instead, she made the determination that no one other than herself would lend to NewCo . . ." | This finding is inaccurate and is contradicted by the bankruptcy court's own findings that TransCare "was unable to borrow money elsewhere" (PFC at 90) and "bankrupt companies are generally short of cash and the shareholders are often the only source." (*Id.*) <br><br> The only new funding Wells Fargo or CMAG proposed was from Tilton herself. (DX_92, at 75263; PX_175, at 02123; *id.* at 02114; Aug. 13 PM Tr. 70:16–20; *id.* at 69:21–23; PX_175, at 02114; *see also* JX_82, at 48227.) <br><br> TransCare could not realistically obtain third-party financing. TransCare's assets were already pledged in full as security to multiple secured lenders; both Wells Fargo and the Term Loan Lenders had blanket liens in *all* of TransCare's assets (which, by definition, included the NewCo assets. (JX_1, at 00069, § 6.16; JX_2, at 00785; PX_197.) TransCare was also in default under the Wells Fargo ABL Agreement and the TLA. (PX_132, at 46849–50; JX_96.) <br><br> A prospective new lender would also discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015. (Aug. 13 AM Tr. 52:3–6; PX_132, at 46849–50.) CMAG highlighted the limits of TransCare's financial reporting, cautioning that it had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting.*" (PX_175, at 02118 (emphasis added).) |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| P. 49 | "Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value." | The finding is inaccurate.<br><br>Ark Angels III's commitment of $10 million was conditional and effectively tied to whether (or not) NewCo was financially successful. (JX_101, at 08703, § 3.2 (detailing conditions precedent the borrower was required to satisfy before it could draw down on the facility).) Tilton testified that the transaction was very risky and the success of Transcendence uncertain. (*See, e.g.*, Aug. 13 PM Tr. 126:23–25 ("[G]iven the condition the company was in and the continued loss of people and contracts, it was a very high-risk transaction").) Tilton was the only person or entity willing to take that level of financial risk in the hope of saving parts of this company and hundreds of jobs. (*See, e.g.*, Aug. 13 AM Tr. 40:11–18; Aug. 13 PM Tr. 126:11–25.) That willingness is not evidence of "substantial value"; at best it is evidence of potential future value with a new working capital investment. |
| P. 53 | "The 13-week wind down plan valued OldCo's plant, property and equipment ('PPE') at approximately $3.6 million, and this did not account for the wind down value of the PPE owned by Maryland, Westchester and Bronx 911/Montefiore 911." | The finding is inaccurate. The value of the OldCo PPE was not $3.6 million; rather, $3.6 million represented the net book value of the PPE of ***all*** of TransCare's assets. (PX_191, at 04695, 04706; Aug. 13 PM Tr. 129:1–5 ("Q: Ms. [T]ilton, do you know what PX–191 [is]? A: It's a financial package from TransCare for October financials that were issued on February 5[, 2016]. Q And this is for the whole company? A: Yes.").) |
| P. 53 | "Although PPAS did not foreclose on the CONs, it foreclosed on the stock of these two entities and transferred the stock to Transcendence. The CONs they owned allowed them to operate their ambulances and increased the value of their stock. The Trustee sold the two CONs for the aggregate sum of $3.2 million at a *liquidation* sale after they filed for bankruptcy." | The finding is inaccurate and relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment.<br><br>The ability to use the CONs could only increase the value of the stock of TC Hudson Valley and TC Ambulance Corporation if the CONs could be used in a going concern business. None of TransCare's business lines—including those that were contemplated to become NewCo—could operate as a going concern on the day of the foreclosure, absent a significant infusion of new working capital. (*See, e.g.* July 24 Tr. 156:9–157:8).) Any potential increase in stock value would be |

13

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | attributable to a substantial working capital investment in *NewCo*. (JX_101.) It is improper to include in fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *39–40 (Del. Ch. Sept. 4, 2014). |
| P. 54 | "Book value may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors that were liquidating, but the strict foreclosure contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence." | The finding relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment.<br><br>TransCare's assets could not be valued as a going concern as it did not have the capital to continue operations on its own. On February 24, the three TransCare divisions that were slated to comprise NewCo could not operate as a going concern (and were worth only what they could be liquidated for) because there was no working capital to fund their operations. (July 24 Tr. 156:9–157:8.) Any potential future value of the assets in operation would be attributable to a substantial working capital investment in *NewCo*. (JX_101.) It is improper to include in fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *Nine Systems*, 2014 WL 4383127, at *39–40.<br><br>Moreover, buyers in an open-market transaction look at a company's *current* EBITDA and *current* financial status—not potential future values. (*See, e.g.*, Aug. 14 AM Tr. 38:17–20.) Leland's belief that RCA's proposed price was based on RCA's (albeit mistaken) impression of TransCare's then *current* earnings is consistent with Tilton's testimony that prospective buyers look to actual earnings, not projections, when valuing a potential acquisition. (*See* JX_29, at 71450; Aug. 14 AM Tr. 38:17–20.) |
| P. 54 | "Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence." | The finding is inaccurate and relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment. |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | The MTA Contract only had value if it could be used in a going concern business. None of TransCare's business lines—including those that were to become "NewCo"—could operate as a going concern on the day of the foreclosure, absent a significant infusion of working capital. Any potential increase in value of corporate stock could only occur if there was a substantial working capital investment in *NewCo*. (JX_101.) It is improper to include in a fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *Nine Systems*, 2014 WL 4383127, at *39–40. |
| P. 58 | "Greenberg's projections provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo. At the time he issued them [February 2016], he, along with Pelissier, were essentially functioning as TransCare's senior management reporting directly to Tilton." (citing PX_196 and PX_228.) | These findings are inaccurate. Greenberg and Pelissier never "essentially function[ed]" as TransCare's senior management; rather, they helped Tilton analyze information from the company's management team. (*See, e.g.*, July 23 AM Tr. 8:15–23, 54:21–55:2, 56:6–17, 61:4–9; JX_44; DX_72; JX_46.) As of February 2016, CMAG was "[p]erforming normal duties of the position of TransCare CFO." (DX_106.)<br><br>The pro forma financial information shared with an insurance broker (PX_196) does not "provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo" and was not created by Greenberg or Pelissier. Instead, the summary pro forma information is derived from a spreadsheet prepared by Jonathan Killion of CMAG. (PX_193, at 08557 ("P&L" Tab).) In his transmittal email, Killion wrote: "I just generally need to review the balance sheets to make sure they make sense. All this has been done on the fly without time to really review with a clear mind." (*Id.* at 08556.) Killion continued: "Also, to be clear, these models are directional. With the cluttered balance sheets in New York it is hard to tell what is and what isn't an asset / liability that would be part of the go forward entity." (*Id.*) <br>The February 24 Projections sent to another insurance broker (PX_228), similarly do not "provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo" on February 24. Tilton was clear that these projections involved substantial risk and uncertainty. She testified: |

15

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | "It was a dynamic model, and everything was changing by the minute. So, ultimately, to get the foreclosure done, I had to make decisions in the minute, and *certainly things were not settled because contracts were being lost and people were being lost every minute.* But I got as comfortable *as I could* to make a decision that would try to save as much of this company and as many jobs as I could." <br><br> (Aug. 13 AM Tr. 40:11–18 (emphasis added).) |
| P. 59 | "The Trustee's damages expert, Jonathan Arnold, developed an appropriate multiple of EBITDA to apply to Transcendence's projections to determine the projected value of the Transcendence business." | This finding is inaccurate. Arnold freely acknowledged he did not offer any opinion at all about what the businesses at issue were actually worth. (July 24 Tr. 106:15–20.) Instead, he performed a mathematical calculation using other people's projections about what NewCo **could be** worth under certain **hypothetical** assumptions. (*Id.* at 106:21–107:1.) Arnold declined to say whether those projections, or the result of his calculations, were reasonable. (*Id.* at 57:9–13.) |
| P. 62 | "[I]f better financial information was unavailable, it is only because TransCare did not generate better financial information under Tilton's watch." | These findings are inaccurate with respect to Tilton's alleged "control" over TransCare's daily operations and financial reporting. <br><br> Responsibility for TransCare's financials belonged to TransCare's CEO and CFO. (Leland II Tr. 377:19–378:14; July 23 AM Tr. 61:14–25.) <br><br> Tilton did not serve as the CEO of TransCare, nor did she make day-to-day decisions for TransCare. (Aug. 13 AM Tr. 41:23-24.) Moreover, she did not supervise the Company's financial reporting or operations. (*See* Aug. 13 PM Tr. 34:9–18 (Tilton testifying that she relies on the CFO and controller at each portfolio company to produce their own financial statements).). <br><br> Bonilla served as TransCare's CFO from April 2014 through September 2015 and, following his resignation, served as a consultant to TransCare until early January 2016. (Stipulation No. 25.) During his tenure, Bonilla was responsible for managing TransCare's financials. (*See, e.g.*, JX_45, at 30459-60; JX_52, at 83108; DX_88, at 109644; *see also* JX_46 (email from Pelissier to Bonilla and Leland: "We are not here to dictate what has to be paid and when, it remains your duty and decision as per the |

16

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | capabilities you have and your duties to satisfy creditors as the management team.").) After Bonilla's departure in January 2016, Carl Landeck of CMAG took on the role of CFO. (JX_88; DX_106; July 22 AM Tr. 18:6-18, 55:1–11, 75:2–6.) |
| PP. 66-67 | Dr. Arnold's testimony regarding "whether it was appropriate to deduct required funding from the purchase price a third party would be willing to pay" was "unrefuted." | This finding is inaccurate. Defendants' expert Jeffrey Dunn testified that any third-party buyer looking to purchase a company would factor into the sale price the cash the buyer would need to contribute to keep the company operating. (July 8 Tr. 22:12–23:14; *id.* at 23:12–14 ("[A]ny market participant looking to acquire TransCare . . . needs to account for what else they would need to contribute to TransCare in order to reach a total value of the company.").) |
| P. 67 | On adjustments to proposed damages award: "Only $2 million (net) was attributable to the sale of the physical assets, (*see* PX 282, Ex. 13), and the Trustee paid $800,000 of those proceeds to PPAS. Accordingly, the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million." | This finding is factually incomplete and incorrect as a matter of law.<br><br>PPAS turned the $800,000 in proceeds over to Ark II, and Ark II then applied the $800,000 to its claim against the bankruptcy estates, thus reducing its indebtedness. (Aug. 13 AM Tr. 36:19–24; JX_109 at ECF p. 5 of 9.) These facts are acknowledged in the PFC. (PFC at 37.)<br><br>A debtor is entitled to only a single satisfaction of claims. *See, e.g., McCord v. Agard, et al. (In re Bean)*, 252 F.3d 113, 115 (2nd Cir. 2001). Any damages award must be reduced by $800,000 to avoid a double recovery. *Dollar Time Group, Inc. v. Sasson (In re Dollar Time Group, Inc.)*, 223 B.R. 237, 249 (Bankr. S.D. Fla. 1998) ("To award the Trustee an amount Dollar Time has already received would equate to a double recovery and a windfall to the debtor.") |
| P. 75 | "In addition, the entire transaction was conducted in haste and under a veil of secrecy." | This finding is inaccurate. The record shows that the OldCo/NewCo Restructuring was transparent, developed in plain sight and in the light of day, and with the active participation of multiple stakeholders including (i) Wells Fargo and its counsel, (ii) CMAG, (iii) TransCare executives and (iv) TransCare's counsel. (*See, e.g.,* PX_206; PX_234 at 47552–63; DX_137; DX_163 (Tilton authorizing Greenberg to share models with TransCare employees).) |

| PFC Cite | Finding | What the Evidence Showed and/or Applicable Law Demonstrates |
|---|---|---|
| | | After first discussing it with Kurt Marsden, of Wells Fargo, on February 9, Tilton continued to engage in daily communications with Wells Fargo personnel about the potential restructuring. (Aug. 13 AM Tr. 67:10–16; Aug. 13 PM Tr. 87:7–8.) Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned Article 9 foreclosure, the potential purchase by Tilton of accounts receivable, and the need for NewCo to bind insurance. (*See, e.g.*, DX_147; JX_84; JX_86; JX_93; PX_219; Aug. 13 PM Tr. 81:7–15 ("[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); *id.* at 83:14–84:4 ("[W]e were all looking at the exact same information to try to make the best decisions."); *id.* at 91:2–7.) TransCare and Wells were represented by separate counsel who communicated with each other throughout the two-week period preceding the Article 9 foreclosure. (JX_77; JX_84, at 00051; July 23 PM Tr. 99:8–16, 149:20–150:11.)<br><br>The CMAG team also assisted with the analysis of the Article 9 foreclosure (DX_132, at 02317 (CMAG emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); July 22 PM Tr. 114:14–115:7) and prepared financial models in connection with the OldCo/NewCo Restructuring. (PX_206, at 91292; July 23 AM Tr. 75:13–21.) CMAG and Wells Fargo personnel interacted directly about the OldCo/NewCo Restructuring. (July 22 PM Tr. 116:5–8.)<br><br>TransCare management also participated in the OldCo/NewCo Restructuring. (*See, e.g.*, PX_206; July 23 AM Tr. 23:14–23, July 23 PM Tr. 159:14–160:16.) |