**AMINI LLC**
131 West 35th Street, 12th Floor
New York, New York 10001
Tel: (212) 490-4700
bamini@aminillc.com
Bijan Amini, Esq.
Avery Samet, Esq.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                          :
                                                :
                                                :
        TRANSCARE CORPORATION, <u>et al.</u>,   :
                                                :
                                                :
                          Debtors.              :
------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7               :
Trustee for the Estates of TransCare           :
Corporation, <u>et al.</u>,                     :
                                                :        20-cv-06523 (LAK)
                          Plaintiff,            :
                                                :
                                                :        (Case No. 16-10407 (SMB)
        - against -                             :        (Adv. Proc. No. 18-1021 (SMB))
                                                :
LYNN TILTON, PATRIARCH PARTNERS                :
AGENCY SERVICES, LLC, PATRIARCH                :
PARTNERS, LLC, PATRIARCH PARTNERS              :
MANAGEMENT GROUP, LLC, ARK II CLO              :
2001-1 LIMITED, TRANSCENDENCE                   :
TRANSIT, INC., and TRANSCENDENCE               :
TRANSIT II, INC.,                               :
                                                :
                          Defendants.           :
------------------------------------------------------------x

## PLAINTIFF'S RESPONSE TO DEFENDANT LYNN TILTON'S OBJECTIONS TO THE BANKRUPTCY COURT'S POST-TRIAL <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... III

GLOSSARY OF CITATIONS TO THE TRIAL RECORD ................................. IX

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE CASE ............................................................................... 4

THE BANKRUPTCY COURT'S DECISION .................................................... 10

STANDARDS OF REVIEW OF TILTON'S OBJECTION ............................ 16

RESPONSE TO SPECIFIC OBJECTIONS TO FACTUAL FINDNGS ............ 20

    A.  Relevant Background ............................................................................. 20

        1.  TransCare's Business ..................................................................... 20

        2.  TransCare's Debt Structure ............................................................ 21

        3.  TransCare's Management Structure ............................................... 22

    B.  Tilton Maintained Exclusive Control over the Foreclosure (Obj. No. 12) ................. 23

    C.  Tilton Engaged No Independent Advisors to Appraise or Market the
        Foreclosed Assets (Obj. Nos. 10 and 18) ..................................... 26

    D.  The Transcendence Projections Were Well Supported (Obj. No. 27) ...................... 27

    E.  After the Sale, Tilton Controlled and Operated Transcendence ................................ 32

        1.  Tilton Conceded That the Foreclosure and Sale to Transcendence
        Took Effect ...................................................................................... 32

        2.  Transcendence Operated Its Business Lines Until Tilton Decided to Stop .......... 33

    F.  Dr. Arnold Provided a Responsible Estimate of Damages .......................................... 35

ARGUMENT ........................................................................................................ 39

I.    THE COURT SHOULD OVERRULE THE OBJECTION TO THE
    BANKRUPTCY COURT'S DETERMINATION THAT TILTON BREACHED
    HER FIDUCIARY DUTY OF LOYALTY ..................................................... 39

    A.  Tilton Owed a Duty of Loyalty and Good Faith to TransCare .................................. 39

    B.  The Entire Fairness Test Governs Whether Tilton Breached Her Fiduciary Duty ..... 40

      1.  Tilton Concedes That the Bankruptcy Court Correctly Determined that Entire Fairness Is Delaware's Most Onerous Standard of Review ...................... 41

      2.  Tilton Concedes That the Bankruptcy Court Correctly Determined that Entire Fairness Is an Objective, Not a Subjective, Test ........................................ 41

      3.  Tilton Concedes That She Bore the Burden of Proof ............................................ 43

   C.  Tilton Failed to Prove Fair Dealing ............................................................................ 43

      1.  Tilton Controlled Every Aspect of the Transcendence Transaction .................... 43

      2.  TransCare's Financial Situation Did Not Relieve Tilton From Fair Dealing ....... 44

      3.  Tilton Failed to Explore Disinterested Options ................................................... 47

      4.  Tilton Did Not Rely on Carl Marks for the Tilton Plan ........................................ 50

      5.  The Timing of the Foreclosure Was Driven by Tilton's Self-Dealing ................. 52

   D.  Tilton Failed to Prove Fair Price .................................................................................. 52

II.  THE COURT SHOULD OVERRULE THE OBJECTION TO THE BANKRUPTCY COURT'S DETERMINATION OF DAMAGES ............................................................. 55

   A.  The Bankruptcy Court Correctly Determined Delaware Law for Damages for Breach of the Duty of Loyalty .................................................................................. 55

   B.  Loyalty Breaches Entitle the Plaintiff to Rescissory Damages ................................. 57

   C.  The Trustee Made a Responsible Estimation of Damages ......................................... 58

      1.  The Transcendence Projections Provided a Responsible Basis Upon Which to Value the Foreclosed Assets ................................................................. 58

      2.  Dr. Arnold Selected a Responsible Range of EBITDA Multiples ........................ 65

   D.  Tilton Offered No Competing Methodology to Value the Transcendence Assets ..... 67

   E.  The Bankruptcy Court's Other Damages Rulings Were Correct ................................ 69

**CONCLUSION** ....................................................................................................................... **71**

## <u>TABLE OF AUTHORITIES</u>

**Cases**            **Page(s)**

*Advisors, LLC (In re Katy Indus., Inc.)*,
   590 B.R. 628 (Bankr. D. Del. 2018) ....................................................................57

*Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*,
   2019 WL 2714331 (Del. Ch. June 28, 2019) ......................................42, 43, 44, 45

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
   2018 WL 3326693 ..........................................................................................*Passim*

*Bomarko, Inc. v. Int'l Telecharge, Inc. ("Bomarko I")*,
   794 A.2d 1161 (Del. Ch. 1999) ....................................................................*Passim*

*Brundle ex rel. Constellis Employee Stock Ownership Plan v. Wilmington Trust N.A.*,
   241 F. Supp. 3d 610 (E.D. Va. 2017) ................................................................70

*Burtch v. Opus, LLC (In re Opus E., LLC)*,
   528 B.R. 30 (Bankr. D. Del. 2015) ....................................................................42

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ....................................................................40, 53, 56

*Cede & Co. v. Technicolor, Inc.*,
   2003 WL 23700218 (Del. Ch. Dec. 31, 2003) ....................................................60

*Chemipal Ltd. v. Slim-Fast*,
   350 F. Supp. 2d 582 (D. Del. 2004) ..................................................................66

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1134 (Del. Ch. 1994) ..........................................................................49

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1156 (Del. 1995) ................................................................................53

*Citron v. E.I. Du Pont de Nemours & Co.*,
   584 A.2d 490 (Del. Ch. 1990) ..........................................................................45

*Continuing Creditors Comm. of Star Telecomms., Inc. v. Edgecomb*,
   385 F. Supp. 2d 449 (D. Del. 2004) ..................................................................57

*Doft & Co. v. Travelocity.com Inc.*,
   2004 WL 1152338 (Del. Ch. May 20, 2014) ................................................61, 62

*Donovan v. Bierwirth*,
    754 F.2d 1049 (2d Cir. 1985) ................................................................69

*FrontFour Capital Grp. LLC v. Taube*,
    2019 WL 1313408 (Del. Ch. Mar. 11, 2019) ........................................42

*Gen. Motors Corp. v. City of New Castle*,
    2000 WL 33113802 (Del. Super. Ct. Dec. 16, 2000) ....................66, 68

*Gentile v. Rossette*,
    2010 WL 2171613 (Del. Ch. May 28, 2010) ........................................64

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006) .......................................................42, 55

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ............................................................70

*Hart v. Rick's Cabaret Int'l, Inc.*,
    60 F. Supp. 3d 447 (S.D.N.Y. 2014) ....................................................69

*Hausman v. Buckley*,
    299 F.2d 696 (2d Cir. 1962) ................................................................40

*Henkel of America, Inc. v. Bell*,
    2020 WL 4919998 (6th Cir. Aug. 21, 2020) ........................................57

*HMG/Courtland Props., Inc. v. Gray*,
    749 A.2d 94 (Del. Ch. 1999) ................................................................53

*In re Appraisal of Dole Food Co., Inc.*,
    114 A.3d 541 (Del. Ch. 2014) ..............................................................64

*In re Cornerstone Therapeutics Inc. Stockholder Litig.*,
    115 A.3d 1173 (Del. 2015) ...................................................................43

*In re Del Monte Foods Co. S'holders Litig.*,
    25 A.3d 813 (Del. Ch. 2011) .........................................................50, 58

*In re DSI Renal Holdings, LLC*,
    574 B.R. 446 (Bankr. D. Del. 2017) ....................................................54

*In re El Paso Corp. Shareholder Litig.*,
    41 A.3d 432 (Del. Ch. 2012) ................................................................58

*In re Loral Space & Comms. Inc.*,
   2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ........................................................49

*In re MAXXAM, Inc.*,
   1997 WL 187317 (Del. Ch. Apr. 4, 1997) .............................................................41

*In re Opus East LLC*,
   698 Fed. App'x 711 (3d Cir. 2017) ..........................................................41, 42, 43

*In re PetSmart, Inc.*,
   2017 WL 2303599 (Del. Ch. May 26, 2017) ....................................................61, 66

*In re Rural Metro Corp. S'Holders Litig.*,
   88 A.3d 54 (Del. Ch. 2014) ........................................................................50, 58, 59

*In re The Brown*,
   386 B.R. 37 (Bankr. D. Del. 2008) .......................................................................41

*In re Vision Hardware Grp., Inc.*,
   669 A.2d 671 (Del. Ch. 1995) ..........................................................................48, 49

*Int'l Telecharge, Inc. v. Bomarko, Inc. ("Bomarko II")*,
   766 A.2d 437 (Del. 2000) .....................................................................................13

*Kahn v. Household Acquisition Corp.*,
   591 A.2d 166 (Del. 1991) .....................................................................................54

*Kahn v. Lynch Commc'ns Sys., Inc.*,
   638 A.2d 1110 (Del. 1994) ...................................................................................41

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997) .....................................................................................55

*LaMonica v. Tilton, (In re TransCare Corp.)*,
   592 B.R. 272 (Bankr. S.D.N.Y. 2018) ....................................................................8

*LaMonica v. Tilton, (In re TransCare Corp.)*,
   602 B.R. 234 (Bankr. S.D.N.Y. 2019) ....................................................................8

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
   78 F.3d 30 (2d Cir. 1996) .................................................................................54, 55

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) .................................................................................19

*Merritt v. Colonial Food, Inc.*,
   505 A.2d 757 (Del. Ch. 1986) ................................................................43

*Messer v. Peykar Int'l Co.*,
   510 B.R. 31 (S.D.N.Y. 2018) ...............................................17, 20, 21

*Meyer v. Berkshire Life Ins. Co.*,
   250 F. Supp. 2d 544 (D. Md. 2003) ......................................................69

*Milbank, Tweed, Hadley & McCloy v. Boon*,
   13 F.3d 537 (2d Cir. 1994) ....................................................................57

*Montana v. United States*,
   440 U.S. 147, 99 S. Ct. 970 (1979) ...............................................*Passim*

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
   137 F. Supp. 2d 502 (S.D.N.Y. 2001) ..................................................41

*Oliver v. Bos. Univ.*,
   2006 WL 1064169 (Del. Ch. Apr. 14, 2006) ...............................46, 47, 71

*Paradee v. Paradee*,
   2010 WL 3959604 (Del. Ch. Oct. 5, 2010) ..........................................69

*Pereira v. Cogan*,
   52 Fed. App'x 536 (2d Cir. 2002) .................................................41, 43

*Pereira v. Cogan*,
   267 B.R. 500 (S.D.N.Y. 2001) ...............................................42, 43, 45

*Pinkney v. Progressive Home Health Servs.*
   2008 WL 2811816 (S.D.N.Y. July 21, 2008) ......................................18

*Prescott Group Small Cap, L.P. v. Coleman Co. Inc.*,
   2004 WL 2059515 (Del. Ch. Sept. 8, 2004) ........................................62

*Reis v. Hazelett Strip-Casting Corp.*,
   28 A.3d 442 (Del. Ch. 2011) .......................................................*Passim*

*Related Cos., L.P. v. Ruthling*,
   2018 WL 3315728 (S.D.N.Y. July 5, 2018) ........................................43

*S. Muoio & Co. LLC v. Hallmark Entm't Invests. Co.*,
   2011 WL 863007 (Del. Ch. Mar. 9, 2011) ..........................................48

*Solomon v. Armstrong*,
  747 A.2d 1098 (Del. Ch.1999) ...........................................................42

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ..................................................................40

*Strassburger v. Earley*,
  752 A.2d 557 (Del. Ch. 2000) .................................................41, 43, 44

*Summa Corp. v. Trans World Airlines, Inc.*,
  540 A.2d 403 (Del. 1988) ..................................................................53

*Sure-Snap Corp. v. State Street Bank & Trust Co.*,
  948 F.2d 869 (2d Cir. 1991) ...............................................................19

*Thorpe by Castleman v. CERBCO, Inc.*,
  676 A.2d 436 (Del. 1996) .........................................................12, 56, 66

*U.S. v. Radatz*,
  447 U.S. 667, 100 S. Ct. 2406 (1980) ..................................................17

*Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*,
  847 A.2d 340 (Del. Ch. 2004) ............................................................63

*United States v. Nysco Labs. Inc.*,
  318 F.2d 817 (2d Cir. 1963)...............................................................19

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ...........................................41, 44, 45, 57

*William Penn P'ship v. Saliba*,
  13 A.3d 749 (Del. 2011) ............................................41, 44, 55

## Statutes

11 U.S.C. § 547..................................................................................17

11 U.S.C. § 550 .................................................................................17

28 U.S.C. § 157(c)(1) .........................................................................17

28 U.S.C. § 157(b)(1) .........................................................................19

Bankruptcy Code § 363 ...............................................................47, 48

N.Y. Debt. & Cred. Law § 276-a ........................................................16

**<u>Rules</u>**

Bankr. R. 9033(d) ...................................................................................................17

Fed. R. Civ. P. 72(b) ...............................................................................................17

## GLOSSARY OF CITATIONS TO THE TRIAL RECORD

| | |
|---|---|
| **DX** | Defendants' trial exhibits |
| **Husson Tr. (*LaMonica*)** | Designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in the Adversary Proceeding in the Bankruptcy Court, Adv. Pro. No. 18-1021 |
| **JX** | Joint trial exhibits |
| **Leland Tr.** | Deposition testimony of Glenn Leland, TransCare's former CEO |
| **PX** | Plaintiff's trial exhibits |
| **Stipulation No.** | Numbered paragraphs in the Stipulated Facts section of the May 14, 2019 Joint Pretrial Order (Doc. No. 85) at pages 6-15 |
| **Tr. Month/Day (*e.g.*, "Tr. 7/22")** | Official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019. "A.M." and "P.M." refer to the morning and afternoon sessions, respectively, of the July 22 and 23, and August 13 and 14 trial days. |

# INTRODUCTION

This action concerns the sale by a corporate fiduciary of corporate assets to herself.  After a six-day trial, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") found that defendant Lynn Tilton, the sole director of TransCare Corp. and its subsidiary companies, ("TransCare"), breached her fiduciary duty to the company.  (Doc. 1, Case No. 20-6523, Post-Trial Findings of Fact and Conclusions of Law ("PFC")).  The Bankruptcy Court found that Tilton failed to meet her burden under Delaware law to establish that she engaged in fair dealing and paid a fair price when she transferred TransCare's valuable business lines to herself on the eve of TransCare's bankruptcy filing.  The Bankruptcy Court assessed $41.8 million of damages against Tilton based upon the value that TransCare could have realized through the arms-length sale of the same assets under the same plan but in a disinterested manner.

By this Objection brought pursuant to Bankruptcy Rule 9033 (Doc. 3, Case No. 20-6523) (the "Objection"), Tilton has identified thirty-two findings made by the Bankruptcy Court to which she seeks de novo review by this Court.  (*Id*. at Ex. F).  Twenty-eight objections seek de novo review of the Bankruptcy Court's factual findings.  The Court should overrule these objections because each finding is well-supported by the record.

Of the remaining objections, three claim that the Bankruptcy Court improperly considered the earnings potential of the assets which Tilton transferred to herself when considering whether Tilton paid a fair price for the assets.  The Court should overrule these objections because the assets were business lines which held profitable long-term contracts with hospitals and municipalities. One objection claims that the Bankruptcy Court improperly deducted $800,000 from a deduction from the damage award.  Here too, the Bankruptcy Court was correct.

1

Otherwise, Tilton's 99-page objection is notable for how little of the Bankruptcy Court's decision she actually challenges.  Tilton does not object to the Bankruptcy Court's determination that she owed a fiduciary duty of loyalty to TransCare under Delaware law.  Tilton does not object to the Bankruptcy Court's determination that she consummated a self-interested transaction on February 24, 2016 when she sold three of TransCare's operating business lines, plus all of its ambulances, to entities owned by herself.  Tilton does not object to the Bankruptcy Court's determination that Delaware law placed the burden of proof on her to prove that the transaction met the 'entire fairness test,' Delaware's most exacting standard of corporate review.  Tilton does not object to the Bankruptcy Court's determination that this test required her to prove that she engaged in objectively fair dealing with TransCare, such as engaging an independent subcommittee of the board of directors or engaging independent attorneys and investment bankers to appraise the assets and negotiate a sale with her.  Tilton does not object to the Bankruptcy Court's determination the entire fairness test also required her to prove fair price but that she put on no valuation, and indeed her rebuttal expert admitted that he had no knowledge of the transaction.  Instead, Tilton argues that her subjective beliefs and good faith should satisfy her burden of proof on these factors.  Under Delaware law, they do not.

Tilton certainly objects to the Bankruptcy Court's determination of damages, but here too, Tilton objects to little of the damage analysis undertaken by the Bankruptcy Court.  Tilton does not object to the Bankruptcy Court's determination that the Trustee bore the burden to present only a responsible estimate of damages in light of the uncertainty created by Tilton's self-dealing. Instead, Tilton objects to a straw-man argument of her own creation that the Trustee failed to present a valuation of TransCare for the assets which Tilton sold to herself.  But, as the Bankruptcy

Court correctly found, the Trustee's expert offered an opinion of the value of the assets Tilton took from TransCare *based upon Tilton's own projected value of the business.*

That is precisely the analysis required under Delaware law for breaches of the duty of loyalty.  As discussed above, Delaware law places the burden of proof on Tilton to demonstrate that she valued fairly and paid a fair price for the assets that she sold to herself.  Once Tilton fails to establish this fair valuation, the Trustee has the burden to present a damage analysis in light of *Tilton's* failure to conduct a valuation or to explore sale options.  Here, the Trustee's damages expert, Dr. Jonathan Arnold valued the foreclosed assets based upon Tilton's *own* projections and assumptions for those assets.   Dr. Arnold used Tilton's business plan, prepared by Tilton's financial analysts, endorsed and checked by Tilton, and provided by Tilton to counterparties.  Dr. Arnold used Tilton's identification of comparable companies and precedential transactions, which he validated as well, to arrive at a range of EBITDA multiples for such assets during February 2016.

As a result, there is nothing "eye-popping" about the recommended $41.8 million in damages.  Tilton internally claimed to value the same assets at $22 million and was further willing to put $10 million of her own money behind the new venture (for comparison only, the Trustee was able to obtain nearly $20 million in *liquidation* for TransCare's assets).  Tilton's witnesses testified that the assets were extremely valuable in so far as they constituted businesses with long-term contracts to provide ambulance services to hospitals and municipalities, plus the exclusive contract to provide paratransit services for the City of New York.  While TransCare was certainly in financial distress during the period under consideration, Tilton sought to preserve these valuable business lines for her own benefit, free and clear of TransCare's other secured and unsecured obligations.  In her own words, "It is because this new business makes sense that I would

3

personally be providing all the new working capital for this business myself, personally." (PFC at 59).

The Court should overrule the Objection.

## STATEMENT OF THE CASE

On the evening of February 24, 2016, TransCare Corp. and ten of its subsidiary companies (the "Initial Debtors") filed petitions for bankruptcy protection under chapter 7 of the Bankruptcy Code. (PFC at 31). On February 25, 2016, Salvatore LaMonica was appointed as interim chapter 7 trustee of the Initial Debtors. (*Id.* at 32). On April 25, 2016, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corp. (the "Subsequent Debtors") filed chapter 7 petitions. (*Id.* at 36). Mr. LaMonica serves as Trustee of the estates the Subsequent Debtors and the Initial Debtors, and their bankruptcy cases have been and continue to be jointly administered in the Bankruptcy Court. (*Id.*).

On February 22, 2018, the Trustee commenced this action as an Adversary Proceeding in the Bankruptcy Court against Tilton, Patriarch Partners Administrative Services, LLC ("PPAS"), Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-Limited ("Ark II"), Transcendence Transit, Inc. and Transcendence Transit II Inc. (collectively, "Transcendence"). (Doc. 1).[1] Each of the corporate defendants are solely owned, managed and controlled by Lynn Tilton and are headquartered at her office at 1 Liberty Plaza in downtown Manhattan. (PFC at 4-5). Throughout this action, they have been represented by the same counsel. For the Court's ease, the Trustee summarizes the various parties as follows:

- **Tilton** – Tilton formed, owns and manages all of the "Patriarch" and "Ark" entities. At all relevant times she served as the sole director of TransCare. (PFC at 4).

---

[1]     Unless otherwise indicated, all docket references ("Doc.") are to the Adversary Proceeding in the Bankruptcy Court, Adv. Pro. No. 18-1021. The initial complaint also asserted claims against other "Patriarch" entities controlled by Tilton, which were subsequently dismissed.

- **PPAS** – served as Administrative Agent under a 2003 Credit Agreement between TransCare, as borrower, the Term Loan Lenders (defined below) as lenders and PPAS (as administrative agent) (the "Term Loan").  During the relevant period, there were six lenders under the Term Loan:  (i) Ark Investment Partners LP (a Tilton owned entity), (ii) Zohar CDO 2003-1 Ltd., Zohar II 2005-1 Ltd., and Zohar III, Ltd. (the "Zohar Funds"), which were then controlled by Tilton, (iii) Credit Suisse Alternative Capital, Inc. ("Credit Suisse") and (iv) First Dominion Funding I ("First Dominion") (Credit Suisse acted as collateral manager for First Dominion) (collectively, the "Term Loan Lenders").  (PFC at 5).

- **Ark II** – is a Cayman Islands company, which owns 55.7% of TransCare's equity. (PFC at 4).  On February 10-11, 2016, Ark II entered into a Credit Agreement with TransCare under circumstances discussed below.  (PFC at 23-24).

- **Patriarch Partners LLC** and **Patriarch Management Group LLC** – entities through which Tilton employed the financial, operational and legal personnel through which Tilton managed TransCare, including Michael Greenberg, a financial analyst, Jean-Luc Pelissier, an operational platform leader and Brian Stephen, an attorney who supported Tilton in all legal matters regarding Patriarch entities.  (PFC at 9).  "These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare."  (PFC at 9).

- **Transcendence** – Tilton formed and served as the sole director of both Transcendence entities.

The Trustee's surviving claims arise from a transaction executed by Tilton between February 5 and February 24, 2016.  Throughout 2015 and early 2016, TransCare had experienced financial distress, which had grown increasingly severe.  (PFC at 9-10).  By December 2016, Tilton decided to sell TransCare and sought a deal with TransCare's other secured lender, Wells Fargo (defined below) whereby Tilton would fund TransCare through a sale process.  (*Id.* at 13-14). Wells Fargo, Tilton's banker over a wide number of companies she controlled, indicated that it would extend its revolving loan to TransCare through a sale, subject to Tilton engaging a financial advisor and submitting a 2016 budget.  (*Id.* at 14).  Nevertheless, by early February 2016, Tilton determined that she would not be willing to fund such a sale process herself as TransCare required more funding at more risk than she was willing to contemplate.  (*Id.* at 19-20, 43).  Instead, she

determined to sell the least risky, most profitable assets to herself and continue operating them, while winding down the rest of TransCare. (*Id.* at 21, defining this as the "Tilton Plan").

Tilton set the plan in motion on February 10, 2016 (see below for a list of the actions Tilton took or directed on this day and the next). She executed the plan two weeks later, on February 24, 2016, once she had arranged for insurance to operate TransCare's business lines under the name of her new company: "Transcendence." Tilton executed the plan in two steps. First, at 12:07 a.m., Tilton caused TransCare to consent to a voluntary foreclosure by which PPAS – as agent for the Term Loan Lenders – took ownership of (a) all of TransCare's personal property, (b) TransCare's contract to provide paratransit services for the New York Metropolitan Transit Authority (the "MTA Contract") and (c) the stock of three TransCare subsidiaries, which operated (i) the business underlying the MTA Contract, (ii) TransCare's Pittsburgh division and (iii) TransCare's Hudson Valley division. (PFC at 29). Second, later that morning, Tilton caused PPAS to sell the same assets to Transcendence pursuant to a Bill of Sale. (*Id.* at 31). Under the Bill of Sale, another Tilton entity, Ark Angels III, agreed to loan Transcendence $10 million and pay PPAS $10 million for the purchase price of the assets. (*Id.*).

In addition, on February 11, 2016, Tilton had TransCare enter into a new security agreement with Ark II, which gave Ark II a blanket senior secured lien over all of TransCare's assets, superior even to the Term Loan Lenders (as discussed below, the new Ark II Credit Facility securitized previously unsecured advances made by Tilton to TransCare). (*Id.* at 23-24). As a result, on February 25, 2016, the day after the foreclosure and sale to Transcendence, Tilton was the sole director for a company with three of TransCare's business lines, but without TransCare's secured or unsecured debt. (*Id.* at 75). As found by the Bankruptcy Court, *without objection from Tilton*:

> she purported to own the same interest in Transcendence as in
> TransCare (no Transcendence stock ever issued), but her interest in
> Transcendence was free and clear of the Term Loan Lenders' lien
> which had been eliminated through the foreclosure and sale and
> TransCare's unsecured debt.

(*Id.*; *see also id.* at 50, also without objection). Contrary to her assertions on this Objection, Tilton operated Transcendence until 7 p.m. on February 26, 2016, when she decided to shut down Transcendence's operations and terminate Transcendence's employees. (*Id.* at 35-36). On April 25, 2016, Tilton filed bankruptcy petitions for the three TransCare entities which she had transferred to Transcendence. (*Id.* at 36).

The Trustee's complaint asserted that (i) Tilton breached her fiduciary duty of loyalty owed to TransCare, (ii) the February 24, 2016 transfers to PPAS and Transcendence constituted fraudulent transfers, (iii) the February 11, 2016 transfer of a security interest to Ark II constituted a fraudulent transfer and an avoidable preference, (iv) objections to the claims filed by PPAS, Ark II, Patriarch Partners, LLC and Patriarch Partners Management Group, LLC, in addition to (v) other claims dismissed prior to trial. (Doc. 1).

On May 4, 2018, Tilton and the corporate defendants filed a combined partial motion to dismiss: all defendants moved to dismiss the Trustee's claims for indemnification damages resulting from the claims asserted against TransCare by TransCare's former employees; some of the corporate defendants moved to dismiss for group pleading deficiencies; and the Transcendence entities moved to dismiss for failure to state a fraudulent transfer claim. (Doc. 11). By Memorandum and Order dated October 18, 2018, the Bankruptcy Court denied the motion, but granted it with respect to the group pleading issue, and directed the Trustee to replead against each defendant with more specificity. *LaMonica v. Tilton*, (*In re TransCare Corp.*), 592 B.R. 272 (Bankr. S.D.N.Y. 2018).

On November 28, 2018, the Trustee filed an amended complaint with the same causes of action against Tilton (the Trustee dropped several corporate defendants and added certain causes of action against others).  (Doc. 53).  On January 14, 2019, the corporate defendants moved to dismiss certain claims asserted against them.  (Doc. 60).  By Order dated April 3, 2019, the Bankruptcy Court granted the motion as to Count XI asserted against PPAS (constructive fraudulent transfer for certain loan repayments), reserved judgment on the other claims and directed all defendants to answer the amended complaint.  (Doc. 73).  On April 23, 2019, the defendants, including Tilton, collectively filed a single Answer to the amended complaint.  (Doc. 76).  By Memorandum Decision dated April 30, 2019, the Bankruptcy Court granted the motion to dismiss Count VI (the lender liability claims asserted against the Corporate Defendants) but denied Ark II's motion to dismiss a claim asserted against it seeking to recharacterize its debt claim as equity.  *LaMonica v. Tilton*, (*In re TransCare Corp.*), 602 B.R. 234 (Bankr. S.D.N.Y. 2019).

On May 3, 2019, the parties filed the Joint Pre-Trial Order (Proposed) (Doc. 83), which the Court so-ordered on May 14, 2019 (Doc. 85).  All defendants submitted a single set of trial contentions, exhibits and witnesses.  Both sides consented to the Bankruptcy Court's authority to enter final judgment on core claims, but the defendants did not consent to entry of final orders by the Bankruptcy Court as to non-core claims.  (PFC at 40).[2]  On July 8, 2019, the defendants (collectively) filed two motions in limine (Docs. 102 and 105), and on July 19, 2019, a single pre-trial brief (Doc. 116).

Trial began on July 22, 2019.  All Defendants were represented by the same law firm, who made objections and examined witnesses collectively on behalf of all the Defendants.  On Day 1,

---

[2]     On May 6, 2019, Defendants filed an Amended Answer in which they declined to consent to final entry of judgment on any non-core claim (Doc. 84 at p.23).  The Trustee contested that belated assertion, but the Bankruptcy Court ruled that Tilton's lack of consent was not asserted too late.  (PFC at 40, n.20).

the Bankruptcy Court ruled on the in limine motions and took the live testimony of former Patriarch employee, Michael Greenberg, a financial analyst and credit officer.

On Day 2, the Bankruptcy Court heard the testimony of Jean Luc Pelissier, a Patriarch operations manager, and Brian Stephen, a Patriarch lawyer.

On Day 3, the Bankruptcy Court heard the testimony of the Trustee and the Trustee's expert Dr. Jonathan Arnold.

On Day 4, the Bankruptcy Court heard the testimony of the Defendants' (again collective) rebuttal expert Mr. Jeffrey Dunn.

On Day 5 and Day 6, the Bankruptcy Court heard the testimony of Lynn Tilton and rebuttal testimony from the Trustee's expert, Dr. Arnold.  The Court also took oral argument and made certain rulings.

In addition to the seven live witnesses, the Court also took the deposition testimony of Glenn Leland, TransCare's former CEO and John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A.  (PFC at 3, n.1).

On September 18, 2019, the parties submitted their proposed findings of fact and conclusions of law.  (Docs. 133, 134).  On October 11, 2019, the parties submitted reply briefs. (Docs. 136, 137).

On July 6, 2020, the Bankruptcy Court issued the PFC.  With respect to Tilton, the Bankruptcy Court determined that the PFC represented proposed findings and conclusions.  (PFC at 40).  With respect to PPAS, Ark II, Patriarch Partners, LLC, PPMG, Transcendence and Transcendence II, the Bankruptcy Court determined that the PFC represented final findings and conclusions.  (*Id.* at 40).  On July 15, 2020, the Bankruptcy Court entered Judgment with respect

to the Corporate Defendants.  (Doc. 141).  On July 27, 2020, PPAS, Ark II, Transcendence and

Transcendence II appealed to this Court from the PFC and the Judgment.  (Doc. 146).

### **THE BANKRUPTCY COURT'S DECISION**

The Bankruptcy Court determined that Tilton owed a fiduciary duty of loyalty to TransCare

as the sole director of TransCare. (PFC at 41).  TransCare was a Delaware corporation,

headquartered in Brooklyn, New York.  (*Id.* at 3).  Tilton owns 61.3% of TransCare's equity,

through two personal investment funds, defendant Ark II, which owned 55.7%, and non-party Ark

Investment Partners II L.P., which owned 5.6% of TransCare's shares.  (*Id.* at 4).  Credit Suisse

owns or manages 26% of TransCare's equity on behalf of five separate entities, and the remaining

12.7% of TransCare is owned by a variety of entities and individuals.  (*Id.*).  Under the internal

affairs doctrine, Delaware law governs the substance of Tilton's fiduciary duties owed to

TransCare.  (*Id.* at 41).

Tilton consummated an interested transaction with TransCare on February 24, 2016, when

she caused TransCare to transfer (i) all of its personal property, including all of its vehicles and

computer servers, (ii) three specific contracts, including the MTA Contract, and (iii) the stock of

three TransCare subsidiaries, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc.

and TC Ambulance Corp., to PPAS in exchange for a $10 million credit off of a secured loan

administered by PPAS.  (*Id.* at 29).  Because Tilton was on both sides of this transaction, the

Bankruptcy Court determined, and Tilton conceded, that the entire fairness review was

appropriate.  (*Id.* at 42).  However, the Bankruptcy Court determined that the entire fairness review

did not apply to the period before Tilton pursued this transaction in February 2016 because those

prior decisions were not tainted by any conflict or self-interest.  (*Id.* at 43).

As the Bankruptcy Court determined, the entire fairness standard is Delaware's most onerous standard of review, and Tilton bore the burden of proving by a preponderance of the evidence that the transaction met the entire fairness test.  (*Id.* at 45).  To establish entire fairness, Tilton was required to prove that she engaged in fair dealing and paid a fair price for the TransCare assets which she purchased.  (*Id.* at 45-46).  This is an objective test and Tilton must prove both prongs based on objective evidence, independent of her beliefs.  (*Id.* at 45).

With respect to fair dealing, the Bankruptcy Court determined that Delaware law examines how the transaction was initiated, structured, negotiated, disclosed to the other shareholders.  (*Id.* at 46).  The Bankruptcy Court also determined that Delaware law requires the interested director to prove how the transaction reflected arms-length bargaining and provided protection for the interests of all shareholders.  (*Id.*).  The Bankruptcy Court found that the Tilton Plan did not reflect arms-length negotiation:  Tilton "controlled every aspect of the transaction with neither negotiation nor oversight nor approval by any unconflicted person." (*Id.* at 49).  With respect to the NewCo assets, she failed to retain a financial advisor, seek out third-party interest, consider restructuring NewCo through a bankruptcy process, or even pick up the phone to call any of the numerous ambulance and other companies who had expressed interest in acquiring TransCare over the previous seven months.  (*Id.* at 49).  Instead of doing any of those things, Tilton unilaterally chose a $10 million credit, based on a *book value* that Tilton disclaimed at trial.  (*Id.* at 52).

With respect to fair price, the Bankruptcy Court determined that Delaware law requires a director to prove that the transaction price falls within a range that a reasonable seller, under all the circumstances, would regard as within a range of fair value.  (*Id.* at 50).  The Bankruptcy Court also determined that, under Delaware law, where a director stands on both sides of a transaction and manipulates the sale process, merely showing that the sale price fell within the range of

fairness is insufficient.  (PFC at 51, quoting numerous authorities).  Applying these principles, the Bankruptcy Court determined that Tilton failed to prove that the $10 million credit represented a fair price.  The Bankruptcy Court relied on, (a) "the complete absence of an independent analysis, review or approval," (*Id.*), (b) her unilateral determination to use the book value of five divisions from a December 2015 balance sheet (*Id*. at 52), (c) her "patent errors" in consistently calculating the $10 million credit (*Id*. at 53), (d) her failure to include any value for the CONs owned by TC Hudson Valley or TC Ambulance Corp. (*Id.*), and (e) her failure to attribute any value to the MTA Contract, "although it was to be the crown jewel of Transcendence." (*Id.* at 54).  The Bankruptcy Court rejected Tilton's argument that her $22 million *internal* valuation of Transcendence included the MTA Contract because it was simply an arbitrary number backed into by Tilton.  (*Id.*).

With respect to damages, the Bankruptcy Court determined that Delaware law dictates that the scope of damages for the breach of the fiduciary duty of loyalty is not to be determined narrowly.  (PFC at 55, quoting *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).  The Bankruptcy Court determined that breach of the duty of loyalty damages are distinct from the damage remedy in appraisal cases, and that Delaware awards rescissory based damages to discourage disloyalty. (PFC at 55-56, relying on numerous authorities, including *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("*Bomarko II*")).  In particular, the Bankruptcy Court determined that where fiduciaries acquire property through self-dealing, "they are liable for the value the property would have had absent the breach of loyalty, not just its value immediately before the breach."  (PFC at 56).  Finally, the Bankruptcy Court found that the plaintiff alleging a breach bears the burden of proving its damages, but that in determining the amount of damages for breach of fiduciary duty, "responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of

damages."   Further, under Delaware law, in the context of breach of fiduciary duty, any uncertainties in awarding damages are resolved against the wrongdoer.  (PFC at 57, quoting *Basho*, 2018 WL 3326693, at *50).

Applying these principles, the Bankruptcy Court determined that "Delaware law affords great weight to contemporaneous management projections in determining value, when available." (PFC at 57, citing numerous authorities).  The Bankruptcy Court found that Greenberg's financial projections for Transcendence provided the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo.  (PFC at 58).  The Bankruptcy Court also determined that Greenberg's projections for Transcendence (which he prepared for Tilton's decision making and for third-parties to rely upon) were consistent with Tilton's projections (which she also reported to third-parties), as well as with Greenberg's additional financial projections, and that Greenberg has the requisite experience to prepare them.  (*Id.* at 58-59 and 58. n.24).  The Bankruptcy Court also found that these were "the only reliable data from which to determine the value of TransCare or its separate business lines." (*Id.* at 60).

Next, the Bankruptcy Court determined that the Trustee's expert, Dr. Arnold, "developed an appropriate multiple of EBITDA to apply to Transcendence's projections to determine the projected value of the Transcendence business, and hence, TransCare's damages resulting from the stripping of that business through an unfair, tainted process." (*Id.* at 59).  The Bankruptcy Court determined that Dr. Arnold's application of two separate methodologies to the Transcendence projections was accurate and grounded in Greenberg's own projections which he had reported to Tilton.  (*Id.* at 60).

After a lengthy discussion (*Id.* at 61-63), the Bankruptcy Court determined that 11x EBITDA was the appropriate multiple to use "in determining an amount of damages that will

compensate the Estate for the lost opportunity caused by Tilton's breach of fiduciary duty." (*Id.* at 63) (Dr. Arnold had proposed a range of multiples between 7.1x EBITDA and 12.2x EBITDA). The Bankruptcy Court selected an 11x EBITDA multiple because:  (a) the unfair process engaged in by Tilton prevented the possibility of selling NewCo to a strategic buyer and (b) a strategic buyer would not incur some of the projected operating expenses, or would otherwise incur them in lower amounts, or in non-linear ways.  (*Id.* at 63-64).

Next, the Bankruptcy Court determined that the EBITDA multiple should be applied to Greenberg's February 24, 2016 financial projection.  Relying on Tilton's trial testimony and her contemporaneous email, the Bankruptcy Court extrapolated the 10-month projection to a full year, resulting in an increase to projected EBITDA from $3.2 million to $4 million.  (*Id.* at 64). Applying the EBITDA multiple to this figure resulted in a damage amount of $44 million.  (*Id.* at 65).

The Bankruptcy Court applied three adjustments to this figure based upon the trial testimony and the subsequent arguments of the parties.  First, the Bankruptcy Court determined to deduct $1 million from the value of the NewCo assets based upon the need for a buyer to advance certain required funding to NewCo.  (*Id.* at 65-67).  The Bankruptcy Court relied upon the "unrefuted testimony" of Dr. Arnold that temporary *operating* capital should not be subtracted dollar for dollar from purchase price, because it will be repaid in the short term while the shareholders will go on to capture all of the additional EBITDA going forward.  (*Id.* at 66-67). The Bankruptcy Court also relied on the trial evidence which indicated that the funding under the Tilton plan called for a revolving line of credit, rather than any investment of new capital, and was earmarked for funding of *TransCare's* debts, which a third-party buyer would not pay.  (*Id.* at 65).

14

Second, the Bankruptcy Court made a deduction for the Trustee's mitigation efforts in liquidating the assets of the NewCo entities after they became the Subsequent Debtors. The Bankruptcy Court determined $2 million of the Trustee's liquidation sales related to the NewCo assets, but that the Trustee had paid $800,000 of those funds to PPAS pursuant to a stipulation. (*Id.* at 67). Therefore, the Bankruptcy Court subtracted $1.2 million from the damage amount. (*Id.*).

Third, the Bankruptcy Court determined that the $10 million credit against the Term Loan should not reduce the damage award against Tilton because the entire transaction should be reversed: "By reversing the transaction and returning the parties to the *status quo*, the effect of Tilton's breach of fiduciary duty will be undone leaving the Debtors with a damage claim based on their ownership of a substantial asset that could have been sold to a third party." (*Id.* at 68).

Finally, the Bankruptcy Court rejected the Trustee's theory that Tilton should be liable for any damages incurred by the Estate for any WARN Act liability. (*Id.* at 68-71). Thus, the Bankruptcy Court concluded that Tilton's breach of the fiduciary duty of loyalty resulted in damages of $41.8 million. (*Id.* at 71).

With respect to the fraudulent transfer claims against PPAS and Transcendence, the Bankruptcy Court found that Tilton acted with fraudulent intent. The Bankruptcy Court found that Tilton picked the sale price for the Transcendence transaction herself, which as discussed above was inadequate, and Tilton retained control of the transferred assets post-sale, with the same ownership interests, but now owning the assets free and clear of liens and unsecured debt. (*Id.* at 74-75). The Bankruptcy Court found that Tilton even bypassed the counsel that she had hired for TransCare and did not provide them with the foreclosure documents, and furthermore did not forewarn the Term Loan Lenders and shareholders, Credit Suisse and First Dominion. (*Id.* at 75).

Because of the different burdens applicable to the fraudulent transfer claim and the breach of fiduciary duty claim, the Trustee proposed, and the Bankruptcy Court adopted a 10.1x EBITDA multiplier to the projections for the Transcendence assets based upon the average of Dr. Arnold's four credible market comps.  (*Id.* at 77).  The Bankruptcy Court determined that because PPAS failed to prove that it received the transferred assets in good faith it was not entitled to a $10 million credit off of the damage award.  (*Id.* at 77-79).  As a result, the Bankruptcy Court found that PPAS, and Transcendence, as the immediate transferee of PPAS, were jointly liable for $39.2 million to TransCare.  (*Id.* at 79).  The Bankruptcy Court also found that they were liable for the Trustee's attorneys' fees pursuant to NYDCL § 276-a because Tilton (acting for TransCare and PPAS) authorized the transfers with actual intent to hinder, delay and defraud TransCare's creditors.  (*Id.* at 79-80).

Finally, the Bankruptcy Court determined that Tilton's granting of a senior secured lien to Ark II on February 11, 2016 in connection with the Tilton Plan constituted a constructive fraudulent transfer under New York Debt and Creditor Law § 273 and an avoidable preference under 11 U.S.C. §§ 547 and 550.  (*Id.* at 80-88).  The Bankruptcy Court determined that the lien transfer improved Ark II's position from an unsecured creditor to a secured creditor on the eve of TransCare's bankruptcy and the Transcendence transaction.  (*Id.*).

## STANDARDS OF REVIEW OF TILTON'S OBJECTION

28 U.S.C. § 157(c)(1) provides that the bankruptcy court may hear a non-core proceeding and submit proposed findings of fact and conclusions of law to the district court, which shall enter any final order or judgment "after reviewing de novo those matters to which any party has timely and specifically objected."  Pursuant to Bankruptcy Rule 9033(b), a party who seeks such review must make written objections which "identify the specific proposed findings or conclusions

objected to and state the grounds for such objection." Under Bankruptcy Rule 9033(d), the district court reviews such specified objections de novo.

Bankruptcy Rule 9033(d) is modelled on Rule 72(b) of the Federal Rules of Civil Procedure. F. Bankr. R. 9033(d), advisory committee's note (1987). When conducting its review of a report and recommendation, the district court does not hear the case a second time. *U.S. v. Radatz*, 447 U.S. 667, 673-74, 100 S. Ct. 2406, 2411 (1980) (the statute providing for review of magistrate judge report and recommendations requires a de novo determination of specified objections, not a de novo hearing). Moreover, the objector waives any right to object to those matters which it does not submit sufficiently specified objections. *See Messer v. Peykar Int'l Co*., 510 B.R. 31, 38 (S.D.N.Y. 2018). Similarly, general or conclusory objections, or objections that merely rehash arguments previously made are not necessarily entitled to de novo review. *See*, *e.g*., *Pinkney v. Progressive Home Health Servs*., No. 06 Civ. 5023 (LTS), 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008) (objections "must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a 'second bite at the apple' by simply relitigating a prior argument.")

The closest Tilton comes to identifying the specific proposed findings or conclusions of the Bankruptcy Court that she objects to on a stated ground is Exhibit F to her Objection, described as "a chart illustrating certain of the bankruptcy court's inaccurate findings." (Obj. Br. at 51, n. 25). ("Obj. Ex. F")[3]. Twenty-eight of those objections seek review of factual findings made by the Bankruptcy Court. (Obj. Nos. 1-23, 27-30 and 32). Four objections seek review of the Bankruptcy Court's application of law to the facts. (Obj. Nos. 24-26, 31). However, different standards of proof and review apply to these objections.

---

[3]      To assist the Court's review, the Trustee submits Exhibit 1, which numbers each of Tilton's 32 objections and briefly responds to each of them. This brief cites those objections by "Obj. No. __" as numbered on Ex. 1.

First, Tilton bore the burden of proof at trial with respect to proving that she engaged in fair dealing when structuring the Transcendence transaction and with respect to proving that she paid a fair price for the assets transferred to Transcendence.  (*See* PFC at 45; Obj. Br. at 51 ("Tilton does not dispute that the [Transcendence transaction] is subject to review under the entire fairness standard because Tilton stood on both sides of the transaction.")).  Therefore, Tilton bears the burden of proof on this Objection with respect to Obj. Nos. 1-26 (*see, e.g.*, Obj. Nos. 1-4, 11-12 (taking issue with certain, but not all, of the Bankruptcy's findings concerning her role as sole decisionmaker and her core team's role in leading TransCare and creating the plans and projections for what eventually became the Transcendence transaction); Obj. Nos. 5-8 (criticizing as "incomplete" the Bankruptcy Court's findings that TransCare had numerous offers and expressions of interest from strategic purchasers in the months leading up to Tilton's purchase of its assets);  Obj. Nos. 13-14, 16, 23 (criticizing again as "incomplete" several of the Bankruptcy Court's findings concerning what the company's documents described as the value of TransCare's assets); Obj. Nos. 24-26 (objecting that the Bankruptcy Court erred in considering the earning potential of an asset in assessing whether Tilton met her burden to show fair price)).

Second, the facts necessary for final judgment against Tilton's fully owned and controlled corporate entities, PPAS, Ark II and Transcendence, are subject to clear error review on appeal. 28 U.S.C. § 157(b)(1).  In connection with those claims, the Bankruptcy Court determined that Tilton's entities would be held accountable for the same Transcendence related transactions, that Tilton acted with actual intent to hinder, delay and defraud creditors and that Tilton's intention

could be imputed to the entities on whose behalf she acted.  (PFC at 74-76).  Tilton is collaterally estopped from challenging such facts, except through the appellate process.[4]

Those findings overlap with the findings against Tilton but, at a minimum, they relate to Objection Nos. 12 (Tilton controlled the decision and timing of the foreclosure), 13 (the annualized EBITDA of the foreclosed upon assets), 15 (the consideration paid for the assets), 24 (the assets foreclosed upon) and 32 (Tilton conducted strict foreclosure in secrecy and haste).

Third, the Trustee bore the burden of proving a responsible estimate of damages in light of the uncertainty caused by Tilton's breach.  (PFC at 57).  This burden applies to Obj. No. 27 (the Transcendence projections constituted the best evidence of the value TransCare could have realized in an arms-length sale of those assets); No. 28 (Dr. Arnold developed an appropriate EBITDA multiple to apply to the Transcendence projections); No. 29 (Tilton did not generate any better financial information with which to value the Transcendence assets); No. 30 (that Dr. Arnold's testimony concerning the effect of a short-term loan on purchase price was unrefuted); and No. 31 (the Court's decision to deduct $800,000 from a deduction to the damage award).  As discussed below, although the Trustee had the burden to prove a responsible estimate, uncertainties must be resolved against Tilton.  (*Id.* at 57).

---

[4]    "Collateral estoppel, or issue preclusion, prevents parties *or their privies* from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002) (emphasis added).  A final bankruptcy court judgment is entitled to the same preclusive effect in subsequent district court litigation as any other federal judgment.  *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991).  The Bankruptcy Court's judgment against these entities is final and preclusive even though an appeal is pending from it to this Court.  *See United States v. Nysco Labs. Inc.*, 318 F.2d 817 (2d Cir. 1963) (Southern District of New York properly gave preclusive effect to factual findings of prior judgment of District of New Jersey that was subject to pending appeal; issue could be revisited if necessary when the Third Circuit resolved that appeal).

Tilton was in privity with PPAS, Ark II and Transcendence.  *See Sure-Snap*, 948 F.2d at 877 (controlling stockholder of the corporation bound by the prior bankruptcy court judgment was in privity with that corporation and thus equally bound even though she had not, as an individual, been a party to the bankruptcy court proceedings).  Moreover, a non-party to the prior litigation that actively directs and controls the litigation strategy of a party to that litigation is in privity with that party and thus bound by the issue-preclusive effect of a judgment against that party.  *Montana v. United States*, 440 U.S. 147, 99 S. Ct. 970 (1979).

**RESPONSE TO SPECIFIC OBJECTIONS TO FACTUAL FINDNGS**[5]

**A. Relevant Background**

1. TransCare's Business

TransCare provided ambulance services to hospitals and municipalities, plus paratransit services to the New York Metropolitan Transit Authority (the "MTA").  (PFC at 3).  TransCare's principal business lines were (a) ambulance services in New York City, Westchester County, New York, New York's Hudson Valley, Pittsburgh, Pennsylvania and Maryland, and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout New York City (the "MTA Contract)."  (*Id.*).

In July 2015, TransCare and the MTA extended the MTA Contract through October 31, 2019.  (*Id.* at 3-4).  Under the MTA Contract, TransCare did not need to provide its own vehicles, but instead leased the vehicles from the MTA.  (*Id.* at 3).  Tilton does not object to the Bankruptcy Court's finding that the MTA Contract "was to be the "crown jewel of Transcendence.""  (*Id.* at 54).  Instead, she quibbles with the percentage revenue and EBITDA the MTA Contract provided to TransCare.  (Obj. No. 16 (Tilton does not provide her own value)).  Greenberg reported to Tilton that conservative estimates of revenue indicated that the MTA Contract would generate EBITDA of $1.87 million, $2.73 million, $2.77 million and $2.81 million over the four years, respectively, between November 2015 and October 2019.  (JX 51 at 985518; Tr. 7/22 A.M. 38:11–39:14 [Greenberg]).  Numerous suitors were interested in acquiring TransCare's paratransit business and MTA Contract, with National Express reiterating their $8-9 million offer on December 16, 2015.  (PFC at 13).  The MTA Contract was particularly desirable because there was virtually no need for capital investment as the vehicles were provided by the MTA.  (Tr. 7/22

---

[5]        *See* Ex. 1 for the Trustee's response to the issues specified in Ex. F to Tilton's Objections.

A.M. 38:3-10; JX 51 at 98518) ("Since there is almost no capital investment the ROI is highly desirable."). Suffice it to say, Tilton repeatedly pointed out the importance of the MTA Contract to TransCare's bottom line, stating several times that TransCare could not survive without it. (Tr. 8/13 A.M. 49:11-17; 85:5-10 [Tilton]).

To operate its New York ambulance services, TransCare held seven certificates of need ("CONs") issued to its various subsidiaries by the New York Department of Health. (PFC at 30, n.15 (each CON authorized the provision of medical ambulance services in specified counties)). TransCare provided the Hudson Valley services through its subsidiary TC Hudson Valley Ambulance Corp., which was headquartered in Poughkeepsie, New York. (*Id.* at 3). TransCare provided the Pittsburgh services through its subsidiary, TransCare Pennsylvania, Inc., which was headquartered in Pittsburgh, Pennsylvania. (*Id.*).

2. <u>TransCare's Debt Structure</u>

Prior to February 2016, TransCare had two senior secured loans, each asserting blanket liens over TransCare's assets: (1) the Term Loan, administered by PPAS, and (2) an asset-backed revolving credit facility (the "ABL") administered by Wells Fargo, N.A. ("Wells Fargo"). Pursuant to an intercreditor agreement between PPAS and Wells Fargo, PPAS had a first priority lien on TransCare's vehicles, the capital stock of the subsidiaries, and certain other physical assets and intellectual property. (PFC at 6). Wells Fargo had a first priority lien on all other assets, including TransCare's accounts receivable and general intangibles. (*Id.*). All of TransCare's receivables, including the payments from the MTA on the MTA Contract, were paid into a lockbox controlled by Wells Fargo. (*Id.* at 7).

On February 10 and 11, 2016, TransCare entered into a new credit agreement with Ark II (the "Ark II Credit Agreement"), dated as of January 15, 2016. (*Id.* at 7). The Ark II Credit Agreement was also secured by a blanket lien on all of TransCare's assets. (*Id.*). Tilton signed an

intercreditor agreement on behalf of both PPAS and Ark II that granted Ark II both structural and payment priority over the Term Loan Lenders (the "2016 Intercreditor Agreement").  (*Id*. at 24). Tilton did not obtain consent from Wells Fargo or Credit Suisse for the Ark II Credit Agreement. (*Id*. at 23).

### 3.   TransCare's Management Structure

On September 29, 2015, TransCare's Chief Financial Officer, Mark Bonilla, resigned, although he served as a consultant until January 8, 2016.  (PFC at 8).  Upon Bonilla's resignation, Tilton instructed Greenberg, a Patriarch credit officer, to take on greater responsibility for TransCare's finances.  (*Id.*).[6]  Greenberg had overseen the TransCare account since 2009, with a hiatus in 2014 (Tr. 7/22 A.M. 15:16-16:12 [Greenberg]).  On January 8, 2016, Tilton terminated TransCare's Chief Executive Officer, Glenn Leland.  (PFC at 8).  On January 7, 2016, the day prior to Leland's departure, TransCare engaged Carl Marks Advisory Group LLC ("Carl Marks") as a financial advisor to TransCare.  (*Id.* at 14).  TransCare's only other officer above a divisional manager during this period was Peter Wolf, who began as TransCare's Chief Operating Officer on November 16, 2015.  (*Id.* at 8).

Tilton operated TransCare pursuant to an Authority Matrix, which vested all material decision-making in Tilton alone.  (*Id*. at 8).  Under the Authority Matrix, only Tilton had authority to "approve an annual [or interim] operating plan," "negotiate the sale or disposition of any assets," "recapitalize or make any other change to the capital structure," "disclose any financial information to a third-party," "enter into any financing or loan arrangement," or "engage any consultant," among numerous other restrictions.  (*Id.*). Under the Authority Matrix, management's

---

[6]      Tilton objects to this finding (Obj. No. 1), but it is directly supported by Greenberg's testimony and a contemporaneous email from Tilton regarding the same.  (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24).

authority was to be dictated through an "Annual Plan", but Tilton approved no such plan during the period in question. (*Id.* at 8-9). Tilton managed TransCare through her Patriarch employees, and in particular, Greenberg, Pelissier, Stephen and Randy Jones, all of whom "reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare." (*Id.* at 9).[7]

### B.  Tilton Maintained Exclusive Control over the Foreclosure (Obj. No. 12)

Tilton objects to the Bankruptcy Court's finding that she "maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare." (Obj. No. 12). She claims that "many people (Wells Fargo, CMAG, and TransCare executives) were involved in the efforts to avoid a free-fall liquidation," and that Tilton was simply "the point person for the timing of the foreclosure and bankruptcy filing." (*Id.*). This is hardly a fair description.

First, Tilton, as sole manager of PPAS, sole director of TransCare, and sole director of Transcendence (PFC at 4) was the only person who made any of the foreclosure decisions. Under the Authority Matrix, Tilton was the only person who could consent or even negotiate for such a transaction on behalf of TransCare or Transcendence. (*Id.* at 8).[8] Tilton admitted she directed the foreclosure and selected the purchase price. (Tr. 8/13 A.M. 4:19-5:13). Tilton directed the foreclosure to occur at 12:07 a.m. on February 24 because she had just gotten the insurance for Transcendence that she had been waiting for. (Tr. 8/13 A.M. 6:16-19). Tilton testified that she made all the decisions for PPAS and the Term Loan Lenders and came up with the terms for the

---

[7]      Tilton does not object to the Bankruptcy Court's findings as to the Authority Matrix, nor does she object to the finding that the Patriarch employees reported to her directly, and independently of TransCare's management, concerning TransCare. Instead, she objects to the Bankruptcy Court's finding that "Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities." (Obj. Nos. 1-2). Tilton is wrong (Ex. 1, Resp. to Obj. Nos. 1-2) all material decisions were made by her.

[8]      Tilton issued the same authority matrix for Transcendence on the day she incorporated it. (*Id.* at 22).

transaction herself.  (Tr. 8/14 A.M. 18:10-11 ("I was responsible for all the lenders as the agent and I came up with the terms.")).  And, of course, there is no evidence of any other person making or even contributing to any part of those decisions.

Second, Tilton did not negotiate the terms of the foreclosure with Wells Fargo, instead she sought to negotiate winddown funding for the remainder of TransCare and a potential purchase of Wells' Fargo's lien on TransCare's receivables.  (Tr. 8/13 A.M. 43:16–44:4).  In the end, she went forward with the foreclosure without an agreement as to the receivables.  (Tr. 8/13 A.M. 15:1-14). Tilton did not negotiate with Carl Marks (who reported to her) for the foreclosure, and she testified that she came to the foreclosure decision because she was dissatisfied with Carl Marks' work on TransCare.  (PFC at 21).[9]  (Tr. 8/13 A.M. 64:1-65:16).  In fact, at trial, Tilton testified that Carl Marks *did not* participate in creating the models for the new company "since they were not able to do the type of work that needed to be done." (Tr. 8/13 A.M. 64:24–65:9).  Tilton "involved" two TransCare executives, Peter Wolf and Glen Youngblood, but they reported directly to her.  (PFC at 75).  On February 10, 2016, Tilton made Youngblood President of Transcendence, even though he was still a Vice President at TransCare.  (*Id.* at 22).

Third, Tilton created the plan and set it in motion herself.  By February 10, 2016, "Tilton planned that 'the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder would be wound down, but it would still continue to operate.'"  (PFC at 22-23, quoting Tr. 7/23 P.M. 30:24– 31:13 [Stephen]).[10]  On that date, Tilton took or directed the following actions:

---

[9]      Tilton objects to this finding (Obj. No. 11), although it is not clear why, as the Bankruptcy Court's citation supports the finding.  In any event, Tilton repeatedly testified that she was led to create the Tilton Plan because she felt that Carl Marks asked for too much money to rectify the entirety of TransCare.

[10]     Tilton does not object to this finding.

- She directed Stephen to create two new Transcendence entities, and to set up bank accounts, tax ID numbers, directors and insurance.  (PFC at 21-22).

- She became the sole director of Transcendence, issued a board resolution adopting the Authority Matrix and appointed TransCare's senior vice president, Glen Youngblood, as president of Transcendence. (*Id.* at 22).

- She directed Stephen (without consulting anyone else from TransCare) to hire the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to advise TransCare on out-of-court or bankruptcy restructuring.  (*Id.* at 22).

- She directed TransCare, without involving Curtis Mallet, to enter into a new Credit Agreement with Ark II, granting Ark II a first priority lien to secure previously unsecured advances, and subordinating the Term Loan Lenders to Ark II's rights.  (*Id.* at 23-24).

- She directed Greenberg to provide financial information to several of TransCare's insurance brokers with a request to bind new insurance policies for Transcendence. (*Id.* at 25).

Tilton does not object to any of *these* findings.

Finally, and contrary to Objection No. 12, the undisputed record shows that Tilton failed to "involve" TransCare's other shareholders.  She kept the foreclosure plan secret from Credit Suisse (the owner and manager of 26% of TransCare's equity), even as Credit Suisse was asking about the financial needs and plans for TransCare.  (PFC at 24-25).[11]  Tilton did not negotiate the foreclosure with Curtis Mallet, TransCare's putative attorneys for out-of-court restructurings, and had Stephen send the foreclosure documents directly to TransCare without sending them to Curtis Mallet.  (*Id.* at 29).[12]  Tilton did not form an independent subcommittee of the Board, engage

---

[11]     On February 11, 2016, Tilton "pretty close to dictat[ed]" the misleading email to Credit Suisse (Tr. 7/22 P.M. 33:14:17), purporting to blame Credit Suisse for causing TransCare's bankruptcy because it would not agree to subordinate its position to a new $6.5 million loan, even though Tilton had *already* entered into the loan and had *already* subordinated their position.  (PFC at 24, citing the testimony above and PX 249 at 77102).

[12]     Tilton does not object to this finding (as she cannot).  Instead, she cites a *later* email after the foreclosure and sale had already occurred, which she sent to Curtis Mallet asking them whether or not Wells Fargo was aware of the foreclosure.  (Obj. Br. at 38).

TransCare's other shareholders, or designate an independent party with whom to negotiate the sale of TransCare, let alone to investigate other options.  (*Id.* at 48-49).

The Court should overrule this objection.

### C.  Tilton Engaged No Independent Advisors to Appraise or Market the Foreclosed Assets (Obj. Nos. 10 and 18)

Tilton objects to the Bankruptcy Court's findings that she did not engage any financial advisors to value or market the assets which she purchased (Obj. Nos. 10 and 18).  Tilton does not actually contest these findings, which she cannot, as she engaged no such financial advisor for the purpose of appraising or marketing TransCare's assets to others.  (PFC at 49; Tr. 8/13 A.M 86:4-13 [Tilton]).  Instead, Tilton makes two unsupported and incorrect arguments:  first, that she engaged Carl Marks to value the foreclosed assets or market them, and second, that Carl Marks told her that they were unmarketable. (Obj. Nos. 10, 18).

Tilton relies on Carl Marks' purported non-recommendation of sale as evidence that such a sale was not possible.  (Obj. Br. at 24).  But no witness, including Tilton, testified that TransCare engaged Carl Marks to explore third-party sale options or third-party financing.  Nor did Carl Marks' engagement agreement call for it.  (DX 106 at §2, *Scope*).  Instead, in Tilton's own words: "You can let Carl Marks know that we never thought we hired them to ask for cash but actually to help rationalize the business, cut expenses and make it work.  Overpaid bill payers."  (DX 123); "You were hired as the CFO…Act in the role and make decisions on what needs to be paid." (JX 88) (responding to Carl Marks' query how to prioritize payments).  In fact, when asked whether Carl Marks was even working on the go-forward models for Transcendence, Tilton testified, "No. We were working all the models. Carl Marks was only reviewing the work that we were doing since they were not able to do the type of work that needed to be done."  (Tr. 8/13 A.M. 65:3-5; *see also* DX 97 (Greenberg reporting to Tilton that Wells Fargo wanted a consultant "to be interim

CFO, and review budget, assist Mark [Bonilla] in managing liquidity, perform a variance analysis of actual v. budget.")).

No one (not Carl Marks, nor any TransCare officer or Patriarch employee) could contact any potential purchaser or lender without Tilton's direction.   (Tr. 7/22 A.M. 46:14–47:19 [Greenberg]) (PFC at 8, citing the Authority Matrix).[13]  And the undisputed testimony – to which Tilton does not object – was that "Tilton specifically prohibited Leland, Greenberg, Pelissier or anyone else from speaking to any of" the companies that had expressed interest in TransCare. (PFC at 13).  During the months leading up to TransCare's bankruptcy, no fewer than six separate suitors contacted Leland, Greenberg and Tilton herself, on multiple occasions, to express interest in purchasing TransCare.  (*Id.* at 11-13, 16).[14]  Tilton "did not even pick up the phone and call any of the ambulance companies or other companies that had been expressing interest in acquiring TransCare since the previous July."  (*Id.* at 49).

Therefore, the Court should overrule these objections.

### D.  The Transcendence Projections Were Well Supported (Obj. No. 27)

Tilton objects to the Bankruptcy Court's determination that Greenberg's financial projections for Transcendence provided the best evidence of the value that TransCare could have realized through an arms-length sale of the assets Tilton sold to Transcendence.  (Obj. No. 27, objecting to PFC at 58).  First, Tilton claims that other people were involved in preparing the projections besides Greenberg.  Second, Tilton cites her own trial testimony for the proposition

---

[13]     Tilton failed to call anyone from Carl Marks to testify, but relies on the *absence* of any evidence showing that Carl Marks attempted to either market the company or suggest a course of action involving anyone beyond Tilton. (Obj. Br. at 24-25, 60-62).  But it was *Tilton* who failed to present evidence that she ever directed Carl Marks to do so.

[14]     National Express, itself at least four times between February and December 2015, plus Alliance Capital Advisors, representing it (*id.* at 11-13), Richmond County Ambulance Service (*id.* at 11), American Medical Response (*id.* at 12), Falck and Enhanced Equity (*id.* at 16).  Greenberg reported all of these to Tilton in his December 18, 2015 email.  (*Id.* at 16).

that she was using a "dynamic model" "to get the foreclosure done" but ultimately "got as comfortable as I could to make a decision."  (Obj. No. 27).

Again, this hardly describes the record evidence.  Tilton testified that she assigned no less than ten Patriarch employees, working in three separate teams, to validate the assumptions behind the Transcendence projections.  (Tr. 8/13 A.M. 39:17–40:18).  Tilton described an effort where her teams conducted "a deep analysis of each separate unit and division of TransCare, on a quantitative – on a quantitative and qualitative basis, to determine whether each of their contracts was profitable, and how to go forward" taken "down to its basic variables …. to understand each contract down to what it takes, labor and ambulances and contractual commitments, in the mathematical model of how many ambulances you'd need under that contract to see if each contract was profitable, and then tried to build up from the profitable contracts, to save as much of the company as was possible."  (Tr. 8/13 A.M. 41:2-15).  Her Patriarch staff had access to the TransCare divisional chiefs to assist them in detailing the value of each division down "to each contract, to each body, to each hour of labor, to each ambulance needed and the mathematics of moving those people, and ambulances and medical staff around." (Tr. 8/13 A.M. 64:8-21 [Tilton]). *see also id.* at 62:7-12; Tr. 8/13 P.M. 80:6–81:4; 94:11-17 [Tilton]; DX 150 (thanking the "35 to 40 people, all of whom were working to save this company").

Tilton's contemporaneous statements and actions describe a chief executive intent on executing her plan as projected.  She authorized Greenberg to provide her financial plan and projections for the new business to insurers for the purpose of binding new insurance policies for Transcendence.  (*See* PFC at 25, describing PX 196, Greenberg's February 10, 2016 email to several of TransCare's insurance brokers projecting $48 million in operating revenue during the remainder of calendar year 2016 (under 11 months) and $3.76 million in EBITDA, derived from

28

five of TransCare's business units).  Tilton tries to minimize the significance of the transmission

of this financial information for Transcendence as only sent to insurers, but as the Bankruptcy

Court found — a finding to which Tilton does not object — "[t]he procurement of insurance for

Transcendence was the final missing element to the success of the Tilton Plan; Transcendence

could not operate without insurance."  (PFC at 25, citing the trial testimony of Greenberg, Pelissier

and Tilton; *see also* PFC at 28 (Tilton waited for the insurance to initiate the foreclosure; "if we

cannot insure we cannot operate.").

On February 11, 2016, Tilton herself wrote to Bobby Siegel, an insurance broker, to

procure insurance from him for Transcendence.  (PFC at 25).  In her own words:

> [T]here is a smaller, less risky transit business that we would like to
> continue in a new company. This would include our NY Transit
> business and our suburban ambulance businesses in Hudson Valley,
> Pittsburgh Pennsylvania and Maryland. It would allow us to
> maintain a profitable, lower risk transit company that would still
> employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately
> $67mm with $4mm of EBITDA and would grow with the additional
> transit business under the contract to $79mm and $7mm of EBITDA
> in 2017. It is because this new business makes sense that I would be
> providing all the new working capital for this business myself,
> personally.

(*Id.* at 26, quoting JX 80 at 92228). On February 13, 2020, Pelissier sent Tilton the "Transcendence

Go Forward Model" that he prepared with Greenberg.  (*Id.* at 26).  This model projected that

Transcendence would take over six of TransCare's divisions and achieve consolidated 2016

operating revenues of $65 million and EBITDA of $5.1 million.  (*Id.*).  The model also projected

an "incremental funding need" of $8 million while the old accounts receivable was paid down —

*i.e.*, the funds owed to Wells Fargo under *TransCare's* ABL — which could be offset by either a

new ABL or cash that built up as Transcendence generated new revenue. (*Id.*).  For this reason,

the $8 million incremental funding need was not listed as a capital expenditure, but instead as a financing adjustment. (*Id*. at 27) (The model called for *just* $120,000 in capital expenditures for Transcendence).

On February 24, 2016, Tilton herself directed Greenberg to submit Transcendence's projected 2016 financials to Todd Trent of Lockton so that Lockton could bind insurance for Transcendence and the sale to Transcendence could occur.   (PFC at 28).   These financial projections encompassed just three of TransCare's divisions — Pittsburgh, Hudson Valley and the MTA Contract — and projected operating revenues of $36 million and $3.2 million of EBITDA for calendar year 2016 (which at that point had ten months plus six days left).   (*Id.* at 28-29).

Greenberg had experience in private equity investment and portfolio management, evaluating capital structure alternatives and making strategic business assessments, as well as extensive experience in valuation and modelling.   (Tr. 7.22 A.M. 13:17-14:9 [Greenberg]).   He had overseen the TransCare account since 2009, with a hiatus in 2013 and 2014 (Tr. 7/22 A.M. 15:16-16:12 [Greenberg]).   Moreover, at the time that Tilton chose these projections for the Tilton Plan, Tilton had overseen TransCare for over twelve years (Tr. 8/13 A.M 47:22–48:3), and so she was well familiar with the earning potential of TransCare's business lines.   (*See also* PFC at 58, n.24).

In fact, the Greenberg projections were consistent with the other financial information in the record.   According to Tilton, "For almost twelve years we had restructured this company from when it was going to be liquidated by the lenders and doing twelve to $14 million of EBITDA a year."   (Tr. 8/13 A.M. 47:22-25).   However, beginning in 2014 and throughout 2015, TransCare experienced difficulties in funding employee payroll and paying vendors.   (PFC at 9).   As discussed above, throughout 2015, numerous potential strategic and financial buyers contacted

Tilton seeking to buy some or all of TransCare's assets. In July 2015, Tilton *herself* took Greenberg's analysis of Environ Healthcare's purchase of Rural/Metro Corp. at a 10x multiple of EBITDA, forwarded it to Kurt Mardsen of Wells Fargo and told him "Just to confirm the active M&A market in the ambulance space. This is why it makes sense to let TransCare make its way back to normalized EBITDA." (PFC at 12). By this, she testified that she meant she "wanted to get TransCare back to the $12-14 million of EBITDA that it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan." (*Id.*).

In November 2015, Greenberg and Pelissier, with Tilton's approval, prepared and submitted a 2016 plan resulting in 2016 EBITDA of $11.5 million with a 9% EBITDA margin for TransCare. (PFC at 10-11).[15] Greenberg testified that the plan constituted a conservative assumption, and was based on purchasing 48 new ambulances and providing $6.4 million in new capital. (PFC at 11). Tilton allowed the plan to be shared with Wells Fargo but never gave final approval to fund the plan by purchasing the new ambulances. (*Id.*). In January 2016, Greenberg and Pelissier built a plan "working independently from TransCare's management and created a scenario they thought was more consistent with Tilton's stated parameters." (PFC at 17, describing the "January 7 Plan"). This plan projected $6.9 million in 2016 EBITDA, with a peak need of $4.5 million in new capital. (*Id.*). Tilton approved Greenberg sending this plan to Carl Marks, but also never "approved" the January 7 Plan. (*Id.*).

The projections that Tilton directed Greenberg to submit to Lockton on February 24, 2016 did represent the best evidence of the value that TransCare could have received through an arms-length sale of the Transcendence assets. Tilton herself had validated them through three separate

---

[15] Tilton also objects to the finding that Greenberg and Pelissier prepared this plan (Obj. Nos. 3 and 4), but Greenberg testified that that he worked with TransCare management to prepare this plan, then validated the numbers himself, that he worked with Pelissier and he presented it to Tilton for review and that Tilton approved sharing it with Wells Fargo. (Tr. 7/22 A.M. 31:21-40:3, discussing JX 51).

teams and almost a month of work, Tilton had repeatedly sent them to insurers for the purpose of inducing their reliance on the projections to bind insurance, Tilton and Greenberg had the competence and expertise with the financial capability of TransCare's assets to make the projections, and the projections were consistent with TransCare's historical performance and numerous other plans that Greenberg had prepared and Tilton had authorized to be submitted to third parties over the previous months.  The Court should overrule this objection.

### E.  After the Sale, Tilton Controlled and Operated Transcendence

Tilton suggests that the foreclosure and sale to Transcendence never really occurred (Obj. Br. at 98), or the extent it occurred it merely happened on "paper."  (Obj. Br. at 5, 45, and 95). That is misleading.  Tilton does not object to the Bankruptcy Court's findings that (a) the foreclosure took effect at 12:07 a.m. on February 24, 2016 (PFC at 29), (b) that the sale of the foreclosed assets to Transcendence took effect later that morning upon execution of the Bill of Sale (*id.* at 31; *see also* Tr. 8/13 A.M. 32:24-33:9 [Tilton], conceding the same) and (c) Tilton operated Transcendence between February 24 and 7 p.m. on February 26, when she made the decision to fire Transcendence's employees (PFC at 32-36).  Tilton's belated suggestion is wrong, and the Bankruptcy Court was right.

#### 1.  Tilton Conceded That the Foreclosure and Sale to Transcendence Took Effect

At trial, Tilton admitted that all of TransCare's ambulances had been transferred to Transcendence as part of the strict foreclosure.  (Tr. 8/13 A.M. 36:25-37:7; *see also* Tr. 7/23 P.M. 72:4-21 [Stephen] (admitting the same)).  Tilton's lawyer, Randy Creswell, told the Trustee the same thing on February 25, 2016.  (PFC at 32).  During TransCare's bankruptcy proceeding, PPAS filed numerous pleadings stating that the foreclosure had occurred.  (Doc. 11 at ¶ 6, Case No. 16-10407 (PPAS "consummated a strict foreclosure" on "all of Debtors' personal property, vehicles (*i.e.* ambulances), certain contracts, certain certificates for operation, and the shares of stock in

certain non-filing subsidiaries of TransCare Corporation."); Doc. 49 at ¶¶ 9, 12, 13, Case No. 16-10407) (claiming that foreclosure occurred and all legal title and equitable interests in the foreclosed property had transferred to Transcendence)).  Finally, in response to the Bankruptcy Court's direct inquiry at trial, Tilton's counsel conceded that nothing more was required under state law to effectuate a transfer of personal property than delivering the bill of sale.  (Tr. 8/13 A.M. 32:24–33:9).

### 2. Transcendence Operated Its Business Lines Until Tilton Decided to Stop

#### a. *Pittsburgh and Hudson Valley Operations*

On the morning of February 24, 2016 (pre-bankruptcy), Transcendence owned the Pittsburgh and Hudson Valley subsidiaries.  (Tr. 7/22 P.M. 67:1-68:3, 70:11-14 [Greenberg]).  The Trustee took no action with respect to the Pittsburgh operations or Hudson Valley operations until weeks later when the entities filed for bankruptcy.  (Tr. 7/24 144:16-145:9 [LaMonica]).[16]  During this period, the manager of TC Pennsylvania, Inc. reported to the president of Transcendence and to Greenberg, Stephen and Pelissier.  (Tr. 7/22 P.M. 70:15–71:3 [Greenberg]; PX 243; PX 247; Tr. 7/23 A.M. 44:14–45:16 [Pelissier]).  TC Hudson Valley owned its own CON necessary to operate in the Hudson Valley, and controlled its own intake, computer mapping and dispatch systems, so that it could operate independently from TransCare.  (Tr. 7/23 A.M. 20:14–21:11 [Pelissier]).

#### b. *Paratransit Operations*

On February 24, 2016, Tilton signed a written consent of the board directing TransCare's COO to assign the MTA Contract to Transcendence II.  (PFC at 34).  Later that day, but just 14

---

[16]    He did so because Creswell, Tilton's lawyer, told him that TransCare's paratransit, Pittsburgh and Poughkeepsie business lines were being operated by the new company.  (Tr. 7/24 136:20–137:9 [LaMonica]).

minutes prior to TransCare's bankruptcy filing, Stephen circulated an executed Agreement of Assignment for the MTA Contract.  (*Id.*).[17]  The assignment was accompanied by an executed Consent to Assignment (PFC at 34), by which TransCare guaranteed the "full performance" of Transcendence II under the MTA Contract.  (JX 100 at 77169).  Counsel for TransCare was not consulted on either the Assignment or the Consent.  (PFC at 34).

Notably, Tilton does not object to the numerous facts found by the Bankruptcy Court concerning Stephen's representations to the MTA about the completeness of the transfer from TransCare's perspective: that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence, that nothing prevented Transcendence from servicing the MTA Contract, and that the foreclosure had taken place.  (PFC at 35).  He represented that: "The bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement."  (PFC at 35, quoting PX 244 at 43521-22 (8:49 p.m. email)).  The email went further and Stephen stated that "[a]ll of the 390 drivers and other TransCare employees necessary for Transcendence Transit II to continue to provide services under the Agreement were transferred to Transcendence II at the time of the foreclosure and are now employees of Transcendence Transit II."  (PX 244 at 43521-22 (8:49 p.m. email)).  At trial, Stephen admitted that Tilton approved this email for him to send to the MTA.  (Tr. 7/23 P.M. 99:2-7).

Tilton objects to the Bankruptcy Court's rejection of her assertion that the Trustee refused to indicate his consent to termination of the MTA Contract with TransCare.  (PFC at 35, Obj. No. 17).  Tilton claims that the Trustee's consent was "untimely" and that she terminated the employees between 5:00 p.m. and 5:07 p.m. when the Trustee emailed her lawyer that he had left him several

---

[17]     Wolf executed the assignment for TransCare and Youngblood for Transcendence.  (JX 100 at 77168).

messages concerning the Trustee's lack of objection to terminating the contract.  (Obj. No. 17).[18]
At 7:01 p.m. on February 26, 2016, Stephen told the MTA that, after speaking with Tilton,
Transcendence would not be continuing to provide services. (PFC at 35).  *Tilton*, not the Trustee,
sent the Transcendence employees their termination notice, instructing them to shut down
operations effective "immediately" and secure their vehicles. (*Id.*).[19]

### F.  Dr. Arnold Provided a Responsible Estimate of Damages

Tilton objects to the Bankruptcy Court's finding that the Trustee's expert, Dr. Jonathan
Arnold, "developed an appropriate multiple of EBITDA to apply to Transcendence's projections
to determine the projected value of the Transcendence business."  (Obj. No. 28, quoting PFC at
59).  Tilton suggests that Dr. Arnold "did not offer an opinion about what the businesses at issue
were worth" (Obj. No. 28) or alternatively that he "failed to actually offer an opinion of the value
of NewCo."  (Obj. Br. at 83).  Neither suggestion is accurate.

Dr. Arnold, in fact, offered an opinion of the value of NewCo based on the plan Tilton
executed when she foreclosed on three of TransCare's divisions to form Transcendence.  (PFC at
60-61; PX 282, ¶ 66; Tr. 7/24 11:10-15; 106:14–107:1 [Arnold]).   Dr. Arnold methodically
explained how he arrived at a multiple of forward-looking annual EBITDA using Tilton's own
plan as a reasonable estimate of the value of Transcendence at the time of sale.  (Tr. 7/24 17:21–
19:22 [Arnold]).

---

[18]    The lawyer, Randy Creswell, likewise confirmed to the Trustee that "Transcendence Transit II has been
providing services under the MTA contract above since the filing date." (JX 105 at 224900, 2:00 p.m. email).

[19]    Tilton argues for a different result than the numerous facts found by the Bankruptcy Court (to which she does
not object) by citing to an administrative proceeding with different parties, different issues, different evidence,
different law and different standards of proof.  (Obj. Br. at 5, n.3).

At trial, Tilton did not challenge Dr. Arnold's qualifications to give an opinion of value. (Tr. 7/24 6:21-25).[20] Instead, Tilton challenges the weight the Bankruptcy Court gave his opinions, not their admissibility. (Obj. Br. at 83). Dr. Arnold explained the common approaches to valuation and which ones he applied in the present case. Dr. Arnold testified that the most preferable approach is generally an income approach, or discounted cash flow analysis, to derive value. Dr. Arnold testified that the data did not exist in this case to conduct a DCF analysis. (Tr. 7/24 14:5–15:20). Tilton's rebuttal expert, Jeffrey Dunn, took no issue with Dr. Arnold's assessment. (Tr. 8/8 10:20–11:8).

In the alternative, Dr. Arnold testified that he applied a multiple derived from publicly available comparable company and precedent transaction data to Tilton's projected annual forward-looking EBITDA. Dr. Arnold testified that the calculation of the multiple by such means and application to forward looking EBITDA was "a very common concept" and "standard way of thinking about EBITDA in this context." (Tr. 7/24 17:25–18:11). Tilton's expert agreed that method was "one of three main approaches to value." (Tr. 8/8 9:21–10:17; 11:2-8). Dunn even acknowledged that there was market evidence to support a multiple of 7 to 8 "for healthy public companies." (Tr. 8/8 73:1-11). Tilton also used the same concept when testifying about value at trial. (Tr. 8/13 A.M 16:3–17:20).

Greenberg, Tilton's in-house financial analyst with coverage responsibility for TransCare, had undertaken such an analysis at Tilton's request in December 2015. All three witnesses, Greenberg, Dr. Arnold and Dunn, arrived at the same conclusions — that Greenberg's initial research had identified the most comparable companies and precedent transactions for which there were publicly available data. None of the three witnesses could identify another comparable

---

[20]     Dr. Arnold holds a Ph.D. in business economics and an MBA in Finance and Accounting from the University of Chicago and has served as an expert in multiple matters over the past decade. (PX 282).

company or precedent transaction that was equivalent or even close to TransCare.  (Tr. 7/22 A.M. 43:17–44:7 [Greenberg]; Tr. 7/24 111:24–112:15 [Arnold]), Tr. 8/8 48:9-25 [Dunn]).

Using market data and precedent transactions identified by Tilton's professionals as most comparable to TransCare, Dr. Arnold opined that Transcendence would command a multiple of between 7.2 to 12.1 of the EBITDA Tilton forecast in her February 24, 2016 plan for it.  Applying the multiple to a slightly more than 10-month projection, Dr. Arnold concluded Transcendence would have commanded values between $22.7 and $39.1 million at the time of the foreclosure. (PFC at 61, citing PX 282 ¶¶ 7, 80, Ex. 12a; Tr. 7/24 13:3-7; 19:15-22; 27:16-22 [Arnold]).   At trial, Tilton failed to dispute that the twelve-month projection under her February 24 model yielded $4 million in EBITDA (Tr. 8/14 A.M 36:23–41:2),[21] which indicates a range of values between $28.8 and $48.4 million under Dr. Arnold's model.

Dunn testified he believed that TransCare, but not Transcendence, as to which Dunn did not express any opinion (Tr. 8/8 71:4–72:1), was worth less than Dr. Arnold had attributed to it. (*Compare* Tr. 8/8 22:12–23:20 (Dunn's discussion of "TransCare" value) *with* 71:4–72:1 (no knowledge or opinion about Transcendence)).  Dunn's criticisms were that Dr. Arnold had relied on others' projections of future performance without taking steps to independently verify their data or conclusions, relied on company projections that were inappropriate for valuation purposes and failed to properly consider risk in the face of TransCare's historical performance, size, low operating margins and capital deficiency relative to the comparables.  (PFC at 61-62; Tr. 8/14 A.M. 47:13-48:3 [Arnold]).   Dunn offered no measures or values of his own (PFC at 62; Tr. 8/8

---

[21]     Tilton objects to this finding (Obj. No. 13), but it is well-supported in the record (*see* Tr. 8/14 A.M 36:23–41:2), and it is mathematically accurate, as the February 24 projection was a projection for only "ten months plus nine days." (Tr. 8/14 A.M. 37:14-15; DX 166, showing same).  Tilton explained why the projection showed an increase over the ten month period:  "Because that is what our projection was that we thought if we could increase the transit revenues which we were discussing with the MTA people to get additional, but that was not the performance of those three divisions at that time.  That was my projection of what we might be able to do that would allow me to be willing to put up $10 million dollars of fresh capital to try to save NewCo." (*Id.* 37:22–38:3).

45:6–46:12), only arguing that Dr. Arnold had failed to undertake such steps and TransCare's value was much less.

Mr. Dunn's criticisms of the appropriate range of multiples to apply to Tilton's EBITDA forecast focused on four risk factors Dunn claimed warranted applying a lower range of multiples: (1) TransCare was small (2) TransCare was distressed; (3) TransCare had low operating margins; and (4) TransCare was undercapitalized.  (Tr. 8/8 53:22-60:6 [Dunn], discussing PX 283 at Ex. 2). According to Dunn, application of these factors would result in a reduced range of values from those identified by Dr. Arnold, though Dunn did not testify to any formula or amount associated with such adjustments. (*Id.*).  On cross-examination, Dr. Arnold explained his understanding of why Tilton's data was reliable, and his understanding that the risks to which Tilton and Dunn referred were embedded in the forecast.  (Tr. 7/24 64:20–65:16; *see also* Tr. 7/24 57:4–58:3).  To address the specific factors Dunn claimed increased the risk and reduced the value, on rebuttal Dr. Arnold undertook a survey of those factors.  To do so, Dr. Arnold employed the same Capital IQ SIC database as Dunn confirmed experts relied upon to locate comparable companies and precedent transactions, albeit using a larger population than simply most comparable. (Tr. 8/14 A.M. 48:7–49:13 [Arnold]; Tr. 8/8 35:12-25 [Dunn]).  Dr. Arnold applied transparent, defined criteria to divide the database of participants in TransCare's classification, identifying 69 originally with available data, and subsequently culling that group down to a subset of 34 for reasons clearly stated in his report, to observe the EBITDA results for the identified entities in either smaller, distressed, lower operating margin or undercapitalized categories that Dunn claimed should have resulted in lower multiples.  (Tr. 8/14 A.M 48:7–58:1).  Dr. Arnold's verifiable results confirmed Greenberg's initial multiples and did not support Dunn's hypotheses.  (Tr. 8/14 A.M 54:1-55:1 [Arnold]).  Tilton offered no rebuttal. (Tr. 8/14 A.M. 79:23–80:8).

More importantly, while it may be true that Transcendence was a smaller company with only three of TransCare's business lines being transferred to it, Transcendence, unlike TransCare, was not distressed.  The whole point of the Tilton Plan was to rid the TransCare assets being sold to Transcendence of the $55,000,000 of debt that left TransCare with low operating margins and undercapitalized, and, of course, put Tilton's security interest in them ahead of the Term Loan Lenders.  Under the Tilton Plan, all of the other debt TransCare owed was essentially wiped out, while Tilton bought the Subject Collateral without obtaining any of the lenders' consent.  Even were Tilton's specific objections credible, which they are not, the combination of all of them would not alter those facts.

## ARGUMENT

**I.     THE COURT SHOULD OVERRULE THE OBJECTION TO THE BANKRUPTCY COURT'S DETERMINATION THAT TILTON BREACHED HER FIDUCIARY DUTY OF LOYALTY**

### A.  Tilton Owed a Duty of Loyalty and Good Faith to TransCare

Tilton does not object to the Bankruptcy Court's conclusion that she owed a duty of loyalty and good faith to TransCare under Delaware law.  (PFC at 41).  Under the internal affairs doctrine, the fiduciary duties of a director are governed by the law of incorporation.  *See Hausman v. Buckley*, 299 F.2d 696 (2d Cir. 1962) (internal affairs doctrine provides that directors duties are governed by the law of incorporation).  Under Delaware law, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument,* 636 A.2d 956 (Del. 1994).  The duty of loyalty is implicated in two separate circumstances: "cases involving a financial or other cognizable fiduciary conflict of interest" and

"cases where the fiduciary fails to act in good faith." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

### B.   The Entire Fairness Test Governs Whether Tilton Breached Her Fiduciary Duty

Tilton concedes that the Bankruptcy Court correctly concluded that Delaware's entire fairness test applies to the Tilton Plan.  (PFC at 42; Obj. Br. at 51).  The Tilton Plan was a "self-dealing" transaction because she was on both sides of the transaction.  *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983) ("It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.'") (internal citations omitted).[22] Therefore, Tilton is liable for breach of the fiduciary duty of loyalty unless she had been able to prove at trial, by a preponderance of evidence, that the transaction was "entirely fair."

"There is no 'safe harbor' for such divided loyalties in Delaware." *Weinberger,* 457, A.2d. at 710; *In re Opus East LLC*, 698 Fed. App'x 711, 718 (3d Cir. 2017) ("A plaintiff alleging a breach of this duty need only show that the director was on both sides of a challenged transaction... The burden then shifts to the director to 'demonstrat[e] the entire fairness of the transaction.'"), citing *In re The Brown Schs.*, 386 B.R. 37, 47 (Bankr. D. Del. 2008) and *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011); *Pereira v. Cogan*, 52 Fed. App'x 536, 538 (2d Cir 2002) ("Under Delaware law, a controlling shareholder 'standing on both sides of a transaction'...'bears the burden of proving its entire fairness."), quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp*

---

[22] This is true whether the transfer of assets from TransCare to PPAS, and then from PPAS to Transcendence are viewed as separate transactions, or whether they are collapsed, the view the Court indicated that it was inclined to take.  (Tr. 8/14 P.M. 6:13-20).  *See, e.g., Strassburger v. Earley*, 752 A.2d 557, 570-71 (Del. Ch. 2000) (when two transactions were part of a single, unified plan, even the non-self-interested transaction was subject to entire fairness review with the burden of proof resting on defendants).

*S.A.*, 137 F. Supp. 2d 502, 508 (S.D.N.Y. 2001) ("'Where a controlling shareholder stands on both sides of a transaction, the standard ordinarily is that the controlling shareholder (and the directors who are subject to that control) will bear the burden of proving the entire fairness of the transaction.'"), quoting *In re MAXXAM, Inc.*, 1997 WL 187317, at *13 (Del. Ch. Apr. 4, 1997); *FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del. Ch. Mar. 11, 2019) ("Entire fairness review arises 'when the board labors under actual conflicts of interest,' such as when a controlling stockholder [or other "controller"] stands on both sides of a challenged transaction." (footnotes omitted)).   *See also* Del. C. § 144 (providing safe harbors when independent parties provide assurances of fairness).  As shown below, Tilton failed to carry her hefty burden of proof that the Tilton Plan was entirely fair.

  1. Tilton Concedes That the Bankruptcy Court Correctly Determined that Entire Fairness Is Delaware's Most Onerous Standard of Review

   It is undisputed that the entire fairness test is Delaware's "most onerous standard" of review.  (PFC at 45).[23]  *See also Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *17 (Del. Ch. June 28, 2019). "The burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira v. Cogan,* 267 B.R. 500, 508 (S.D.N.Y. 2001), quoting *Solomon v. Armstrong,* 747 A.2d 1098, 1138 n.39 (Del. Ch.1999), *aff'd,* 746 A.2d 277 (Del. 2000).

  2. Tilton Concedes That the Bankruptcy Court Correctly Determined that Entire Fairness Is an Objective, Not a Subjective, Test

   Nor does Tilton contest the Bankruptcy Court's determination that entire fairness review depends on Tilton's ability to prove that the transaction was objectively fair, independent of Tilton's subjective beliefs.  "Not even an honest belief that the transaction was entirely fair will be

---

[23] Quoting *Burtch v. Opus, LLC* (*In re Opus E., LLC*), 528 B.R. 30, 66 (Bankr. D. Del. 2015) *aff'd* No. 15-346-RGA, 2016 WL 1298965 (D .Del. Mar. 31, 2016), *aff'd* 698 Fed. App'x 711 (3d Cir. 2017).

sufficient to establish entire fairness.   Rather, the transaction itself must be objectively fair, independent of the board's beliefs."  (PFC at 45, quoting *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del. Ch. 2006)).  "The entire fairness standard is 'exacting,' and requires the director to show that the deal was objectively fair, not just that he believed it to be so."  *See*, *e.g.*, *Opus East*, 698 Fed. App'x at 719.  "Indeed, as to the interested party itself, a finding of unfairness after trial will subject it to liability for breach of the duty of loyalty regardless of its subjective bad faith."  *In re Cornerstone Therapeutics Inc. Stockholder Litig.*, 115 A.3d 1173, 1181 (Del. 2015).   A director's sin in breaching the duty of loyalty is not necessarily one of venality, "but, rather, of indifference to their duty to protect the interests of the corporation and its minority shareholders."  *Strassburger*, 752 A.2d at 581.

Tilton's own subjective beliefs fail to meet the objective measures of fairness that Delaware law demands.  *See, e.g.,* Obj. Br. at 28 ("As of February 9, Tilton believed the only alternative to the OldCo/NewCo Restructuring was the liquidation of all of TransCare," citing her own testimony).  However, "'such frail support as the defendants' own evaluation of their innocence of wrongdoing and on the fairness of the transaction' is insufficient to prove fair dealing."  (PFC at 47, citing *Pereira v. Cogan*, 267 B.R. 500, 509 (S.D.N.Y. 2001), *aff'd* 52 F.App'x 536, 538-39 (2d Cir. 2002), quoting *Merritt v. Colonial Food, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986)).  The Bankruptcy Court did not need to find that Tilton intentionally did anything wrong to find that Tilton did not prove the transaction to have been entirely fair.  Even if the Bankruptcy Court had found that Tilton was sincerely trying to salvage value from TransCare, but did so "with blinders" as to the entire fairness of the Tilton Plan to TransCare and its shareholders, she still would have breached her duty of loyalty.

### 3.   Tilton Concedes That She Bore the Burden of Proof

Tilton does not object to the Bankruptcy Court's determination that she needed to prove both fair dealing and fair price to carry her burden to prove entire fairness.  (PFC 45-46).  *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21; *accord Related Cos., L.P. v. Ruthling*, 2018 WL 3315728, at *14 (S.D.N.Y. July 5, 2018).  While these are distinct concepts, Tilton's "burden to establish them is not bifurcated.  Rather, the Court must evaluate a transaction as a whole to determine if this interested party has met his burden of establishing entire fairness."  (PFC at 46, quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011).)  The Bankruptcy Court correctly found she proved neither.

### C.   **Tilton Failed to Prove Fair Dealing**

#### 1.   Tilton Controlled Every Aspect of the Transcendence Transaction

Tilton agrees that "[f]air dealing 'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.'"  (PFC 46, quoting *Weinberger*, 457 A.2d. at 711; Obj. Br. 53; *see also Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21.)

Here, Tilton did not negotiate the Tilton Plan or the terms of the foreclosure with any other person.  *See* supra at 24-26.  As the Bankruptcy Court found, "Acting through her affiliates, she foreclosed on the Subject Collateral, consented to the strict foreclosure, sold the foreclosed assets to herself and fixed the sale price.  Tilton stood on every side of the transaction and controlled every aspect of the transaction with neither negotiation nor oversight nor approval by an unconflicted person."  (PFC at 48-49).  Tilton does not object to that finding.

Tilton does not object to the Bankruptcy Court determination that "[t]he cornerstone of fair dealing is a process implemented by the board that reflects arm's length bargaining and provides protections for the interests of all shareholders."  (PFC 46-47).  Tilton put on no evidence that she

instituted any procedural protections for any other TransCare shareholder.  She did not appoint a special committee of the board, and she did not negotiate with, or even inform, TransCare's other shareholders about the transaction.  *See Strassburger*, 752 A.2d at 576-77 ("there was no fair dealing because there was no advocate committed to protect the minority's interests…"); *Reis v. Hazelett Strip-Casting*, 28 A.3d at 464 ("Procedural protections were not implemented, and no one bargained for the minority."); *cf. Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 504 (Del. Ch. 1990) ("Built into the process by which the merger terms were set were procedural protections that tended to assure a fair result and to approximate what independent parties would have arrived at in an arm's length bargain.").  Tilton was the sole director and the majority of TransCare, but she was not the sole shareholder.  (PFC at 4).  Tilton failed to obtain the consent of disinterested shareholders, which would have been consistent with fair process (*e.g.*, *Arkansas Teacher Ret. Sys.*, 2019 WL 2714331, at \*21), and concealed the Tilton Plan from TransCare's next largest shareholder, Credit Suisse.  (PFC at 24-25).

### 2.  TransCare's Financial Situation Did Not Relieve Tilton From Fair Dealing

The Bankruptcy Court found, without objection by Tilton, that Delaware law precludes fiduciaries from self-dealing with both solvent and insolvent companies alike.  (PFC at 47, citing *Pereira v. Cogan*, 267 B.R. at 511 ("Self-dealing transactions are improper regardless of whether or not the corporation is solvent.")).  *See also Weinberger*, 457 A.2d at 710 ("Given the absence of any attempt to structure this transaction on an arm's length basis, Signal cannot escape the effects of the conflicts it faced, particularly when its designees on UOP's board did not totally abstain from participation in the matter. There is no 'safe harbor' for such divided loyalties in Delaware.")

Nevertheless, Tilton asserts that the Bankruptcy Court failed to account for TransCare's financial difficulties, as she describes it, "the most important fact in the case" (Obj. Br. at 52).  But the Bankruptcy Court carefully recounted TransCare's growing financial difficulties throughout

2015 and early 2016, as well as Tilton's rejection of the various plans put forth by her own Patriarch team, Wells Fargo and Carl Marks to restructure or sell TransCare in its entirety.  (PFC at 9-20).  By February 5, 2016, Tilton had made the decision to wind down TransCare, rather than supply it with the necessary funding to restructure it or sell in its entirety.  (*Id.* at 21, 43).  Instead, Tilton determined to continue TransCare's profitable business lines, which she deemed worth saving, under a new company.  (*Id.* at 21).[24]

On this Objection, Tilton argues that because TransCare was winding down or — in Tilton's dramatic telling, "had a one-way ticket to liquidation" — the business lines that *she* identified as worth continuing had no going concern value.  (Obj. Br. at 53).  But that is a non-sequitur.  As shown by Tilton's own contemporary projections, statements and actions, the Transcendence assets did have significant value as operating entities.  (*See supra* at 2-3, 32).  Under questioning from her own counsel, Tilton expressly testified that she came up with the Tilton Plan because "to me, it was the most elegant solution given the timeframe and the only scenario *under which I was willing to put in new money because it would have been money going into a company with a future.*"  (Tr. 8/13 P.M. 78:7-10) (emphasis added).  As discussed above, Tilton confirmed that Transcendence would have a future by having her three internal teams prepare and validate the Transcendence projections showing significant going concern value.  (*Supra* at 28-29).  Tilton contemporaneously told counterparties that "[t]here is a smaller, less risky transit business that we would like to continue in a new company" that would generate $4 million of EBITDA in 2016 and $7 million of EBITDA in 2017 (PFC at 25-26).  Tilton put on no evidence as to why other purchasers would not have viewed the Transcendence assets in the same manner.

---

[24]     Tilton's cites to the Bankruptcy Court's determination that Tilton's decision not to seek to restructure TransCare was within the business judgment rule (PFC at 43) as evidence that TransCare could not have been restructured.  (Obj. Br. at 26). The Bankruptcy Court made no findings as to whether or not TransCare could have been restructured.

Tilton relies on *Oliver v. Bos. Univ.*, 2006 WL 1064169, at *30 (Del. Ch. Apr. 14, 2006) to suggest that the entire fairness test's requirement of fair dealing may be loosened if those negotiating a transaction are under "serious time-constraints" and unless an agreement is reached promptly, a company "might run out of money before [a transaction] can be consummated." (Obj. Br. at 54). Unfortunately for Tilton, two sentences after the language she quotes from *Oliver*, the court held that "[u]nfortunately there was no process, and, in the absence of even the most rudimentary measures to protect the interests of the minority shareholders when the participating fiduciaries are conflicted, those fiduciaries should not be surprised that adverse consequences result." *Oliver*, 2006 WL 1064169, at *30.

Tilton also argues in her objection that TransCare's secured lenders, specifically Wells Fargo, prevented her from selling the Transcendence assets in a disinterested manner. (Obj. Br. at 61). But this makes little sense, as Wells Fargo obviously did not prevent Tilton from selling the assets to Transcendence:

> While Tilton contends that TransCare could not have sold the Subject Collateral without the secured parties' consent, at least outside of a bankruptcy sale under Bankruptcy Code § 363(f), she accomplished precisely that result by authorizing PPAS to foreclose and sell the assets to Transcendence without Credit Suisse's, and apparently, Wells Fargo's, consent.

(PFC at 64-65). Furthermore, Wells Fargo actually supported a sale of TransCare's assets (PFC at 16) and *never* varied from its position of being willing to fund TransCare through to a sale. (Husson (*LaMonica*) Tr. 56:14–57:6; Tr. 7/22 A.M. 63:14-20). Wells Fargo was even willing to consider a bankruptcy debtor-in-possession facility for TransCare, but required a budget from Tilton to do so. (JX 84 at 53, 51, 49 and 47). As late as February 19, 2016 —less than a week prior to the foreclosure — Wells Fargo gave Tilton a written proposal for a new $16.5 million ABL to fund a wind-down of TransCare, also subject to appropriate releases and consents, and a

budget.  (PX 219 at 3192 (native)).  Last, but not least, even if Wells Fargo had opposed a sale, and even if Tilton had not proven by her own actions that Wells Fargo's consent would not be required, a disinterested fiduciary would have had the option of "selling the NewCo assets to a third-party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent pursuant to Bankruptcy Code § 363, a common practice." (PFC at 49).

### 3.   Tilton Failed to Explore Disinterested Options

Tilton, who bore the burden of proof, put on no evidence that the Transcendence assets could not have been sold; or even that they could not have been sold in the same manner as she sold them to herself.  She failed to market the assets, or to call any of the numerous interested parties.  She failed to explore financing options.  She submitted no expert valuation testimony. The sweeping generalizations she advances in her Objection about the purported lack of going concern value of the Transcendence assets are without any citation to any record evidence.  (Obj. Br. at 25, 28, 34, 43-44, 45, 51, 53, 54, 57, 70, 79).

Tilton relies on several cases, where after trying every disinterested option, directors approved an arms-length recapitalization, leaving nothing for equity.[25]  Those cases in fact demonstrate why Tilton failed to meet her burden to show fair process here.  In *S. Muoio*, the board (1) formed a special committee of disinterested directors to seek a buyer, (2) retained independent legal and financial advisors to engage in an extensive sales process involving key players in the relevant industry, (3) specifically recruited a new CEO to locate a buyer, plus (4) the controller shareholder directly "engaged in discussions with several potential acquirers or other sources of financing[,]" and when those initiatives failed, (5) the board formed a new special independent

---

[25]     *See S. Muoio & Co. LLC v. Hallmark Entm't Invests. Co.*, 2011 WL 863007, at *14 (Del. Ch. Mar. 9, 2011) ("S. Moio"), relied on in Obj. Br. at 52, 67, 68, 70, 72, 73; *In re Vision Hardware Grp., Inc.*, 669 A.2d 671 (Del. Ch. 1995), relied in Obj. Br. at 70, 73.

committee to consider the controlling shareholder's reorganization proposal, which (6) hired independent legal and financial counsel, (7) who engaged extensive due diligence and prepared a valuation of the company, following which (8) the special committee retained a second financial advisor who issued a fairness opinion, and (9) the special committee conducted an arms-length negotiation with the controlling shareholder, during which they improved the terms of the reorganization. *S. Muoio*, at *3-7. *See also Vision Hardware*, 669 A.2d at 677 (where the company "had exhaustively sought alternative financing but to no avail.")

Tilton undertook *none* — not even a subset — of these acts. Once she decided to sell TransCare, she apprised herself of the going market multiples and then only considered (a) financing TransCare in whole or in part herself or (b) selling selected parts of TransCare to herself at a price she selected. *See In re Loral Space & Comms. Inc.*, 2008 WL 4293781, at *25 (Del. Ch. Sept. 19, 2008) (special committee breached its fiduciary duty by employing "tunnel vision" when negotiating a new round of financing with company's controlling shareholder, not bothering to explore alternative options and not using any leverage to negotiate against the insider).

Tilton cites *Cinerama*, 663 A.2d 1134, 1140-41 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) suggesting that the court found "process entirely fair because, 'while the company was not shopped[,] there is no indication in the record that more money was possible from [a controlling stockholder] or likely from anyone else.'" Obj. Br. at 65. That is misleading. In fact, Tilton quotes only the fifth of five factors the court considered to determine that the process was entirely fair, including: (1) the company's CEO "consistently sought the highest price that Pearlman [a disinterested buyer] would pay; and (4) the negotiations led to a price that was very high when compared to the prior market price of the stock (about 100% premium over unaffected market

price) or when compared to premiums paid in more or less comparable transactions during the period…." As the record evidence shows, that is not at all what happened here.

The truth is that Tilton never explored any option, whether sale or restructuring, that did not involve her. Throughout 2015, Tilton forbade Leland from exploring any sale of TransCare or any alternative sources of financing.[26] Nor did she give that authorization to Greenberg, her financial point person for TransCare. (Tr. 7/22 P.M. 123:7-12 [Greenberg]; Leland Tr. 77:2–78:23; 101:13-20). Nor did she pursue a December 16, 2015 offer. (PX 124 ("National Express called a few times yesterday and I just returned their call. They reiterate that the letter they sent before, offering to buy the TC Paratransit contract, is 'still out there.'"); Tr. 7/23 A.M. 50:22–51:3 [Pelissier]). From the moment of her December decision to sell any portion of TransCare, Tilton only contemplated funding a sale herself.

That is why the Bankruptcy Court correctly relied on Delaware law holding fiduciaries are liable when they tilt the playing field such that the only possible solution is a self-dealing transaction. (PFC at 48, citing *See Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, at *29 (Del. Ch. July 6, 2018) (fiduciary maneuvered the company into "the position of being the sole life line of the Company for money" by blocking alternative transactions); *In re Rural Metro Corp. S'Holders Litig.*, 88 A.3d 54, 101 (Del. Ch. 2014) ("RBC's self-interested manipulations caused the [sale] process to unfold differently than it otherwise would have."); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011) ("But for Barclays' manipulations, the [sale] process would have played out differently."); and

---

[26]     Leland Tr. 77:2–78:20 (CEO prohibited from seeking financing alternatives for TransCare); *id*. 97:11-19 (after bringing one expression of interest, Tilton admonished Leland "'Don't ever' – expletive – 'sell one of my companies.'"); *id*. 101:13-20 (Tilton told Leland that finding funding for TransCare was exclusively her responsibility); *id*. 148:24–149:3 (no permission granted to seek alternative sources of financing); *id*. 604:4-15 (Pelissier directed Leland to not explore a replacement lender)). TransCare could not even sell individual ambulances without Tilton's personal signature. (*Id*. 81:18–82:5).

*Bomarko, Inc. v. Int'l Telecharge, Inc.,* 794 A.2d 1161, 1184-85 (Del. Ch. 1999) ("*Bomarko I*") (director's interference with company's attempts to obtain outside funding was not fair dealing).

Indeed, there is ample evidence in the record of third-party interest in acquiring all or some of TransCare while it was still a going concern (PFC at 11-13), and Tilton herself had recognized that there was an "active [] market in the ambulance space." (PFC at 12, quoting DX 68 at 90469). Tilton does not object to the expressions of interest, or to her recognition of the active market, just to the implications of such interest. (Obj. Nos. 5-8). Tilton advances many hypotheses about what these purchasers would have been willing to pay for which assets, but Tilton will never know because *she* failed to pick up the phone and negotiate with them, or even to check whether they would be willing to pay more than book value.

### 4.  Tilton Did Not Rely on Carl Marks for the Tilton Plan

Tilton's claim that Carl Marks convinced her to not sell TransCare in an arms-length process is wrong. (Obj. Br. at 24-26, 28, 31, 36). Tilton conflates her own reluctance to fund TransCare as a whole with the Tilton Plan to sell certain valuable business lines to herself. For example, page 26 of the Objection purports to cite record evidence supporting that proposition:

> After reviewing the CMAG Executive Summary and meeting with the CMAG team on February 5, 2016, Tilton determined that a sale process would not be viable and should no longer be pursued. (DX_130, at PP–TRBK0028275 ("We have the plan [CMAG] presented to me on Friday [February 5, 2016] . . . [t]hat is the plan that convinced me I could not move forward" with a sale process); Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18-24.)

(Obj. Br. at 26). None of the citations support this proposition. (*Compare* DX 130 ("That is the plan that convinced me I could not move forward *in this manner*.") (emphasis added) *and* Tr. 8/13 P.M. 76:19–77:6 [Tilton] ("And that was the plan *that I knew I could not fund* because there was no real restructuring plan.") (emphasis added) *with* Tr. 8/13 P.M. 40:18–41:1 (Tilton claiming to *never* have believed that TransCare could be sold)).

Tilton did not rely on Carl Marks to make any decision.  Tilton testified that Carl Marks was so incompetent that she *could not* rely on their work product.[27]  Carl Marks was not an investment bank, and Carl Marks was not engaged to explore a sale or alternative sources of financing.  (*See supra 51-53*).

At trial, Tilton disclaimed Carl Marks' projections that TransCare as a whole could achieve $5 million in 2016 EBITDA.[28]  She testified that she rejected Carl Marks' January 27 business plan for the entirety of TransCare because she personally did not want to invest $7.5 million based on the deficiencies she perceived in Carl Marks' analysis, not because Carl Marks convinced her that a third-party sale or restructuring was impossible:

- "Transcare was never getting that eight and a half million because I was not willing to put eight and a half million dollars behind Wells in a black hole of losses with *no true analysis* on how to restructuring [*sic*] the company."  (Tr. 8/13 A.M. 43:6-15) (emphasis added);

- "It was seven and a half million dollars just to survive to try to get a plan together. As I said, I didn't want to fund into a black hole."  (Tr. 8/13 P.M. 71:1-5);

- "There was no availability left in the Zohar funds for TransCare.  So, the only place that money could come from would be my personal funds." (*Id*. 64:6-11);

- "So, to me it [the foreclosure] was the most elegant solution given the timeframe and the only scenario under which I was willing to put in new money because it would have been money going into a company with a future." (*Id*. 78:7-10);

- "Q: And why [was] it important to you for that to happen [Giving Ark II a first lien]? A: Because it was on the only basis that I was willing to put in new money in a company that could end up in liquidation days later." (*Id*. 6:7-10).

---

[27]     See *supra* p. 4 (Carl Marks personnel were "overpaid bill payers," "not able to do the type of work that needed to be done"); *see also* Tr. 8/13 P.M. 85:8-11 [Tilton] ("not, in my opinion, working in the interest of the company"); Tr. 8/13 P.M. 84:3-6 [Tilton] (not getting valid and accurate information from Carl Marks).

[28]     While Tilton cites many times to negative statements in Carl Mark's January 27 Plan, she refused to credit the plan's conclusion that TransCare as a whole could effect a turnaround.  *See* PFC at 19-20, discussing PX 175.

Contrary to Tilton's implication, Carl Marks had no recommendation with respect to either the sale or financing of TransCare, let alone the specific assets of Transcendence, and Tilton points to none in this record.  (Obj. Br. at 24-25).

### 5.   The Timing of the Foreclosure Was Driven by Tilton's Self-Dealing

Finally, the timing of the foreclosure was itself driven solely by Tilton's self-dealing because Tilton waited to consummate her strict foreclosure until February 24, until the eve of TransCare defaulting on its payroll, only because she was waiting for Transcendence's vehicle liability insurance to be bound.  (PFC at 28-29).  As Tilton admitted, that is why she foreclosed on the assets at 12:07 a.m. the night before she put TransCare into bankruptcy.  (Tr. 8/13 A.M. 6:16-19).

Because Tilton alone initiated, structured, negotiated, and timed the foreclosure, because she failed to disclose it to TransCare's other shareholders, because she failed to set any procedural safeguards for the transaction, and because she failed to explore any alternative options for the assets she foreclosed upon, Tilton failed to meet her burden to prove that she engaged in fair dealing.

### D.  Tilton Failed to Prove Fair Price

"[T]he 'fair price' aspect of an entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.'"  *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1163 (Del. 1995), quoting *Cede & Co.,* 634 A.2d at 361.  *See also* PFC at 50.  As a matter of law, it was Tilton's burden to prove that no higher price was available, not the Trustee's to prove that a higher price was available.  *See e.g., Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 408 (Del. 1988).  *Bomarko I*, 794 A.2d at 1161 ("I realize that this involves proving a negative and is a difficult burden for [defendant] to meet.  Yet it is the only fair way to proceed…."); *HMG/Courtland*

*Props., Inc. v. Gray,* 749 A.2d 94, 116-17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio…. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *In re DSI Renal Holdings, LLC,* 574 B.R. 446, 472 (Bankr. D. Del. 2017) (defendants' failure to seek the highest value reasonably available for the company during the sales process supported the inferences that the defendants breached the duty of loyalty by, *inter alia*, engaging in a self-interested decision-making process or by acting with gross negligence.); *Reis,* 28 A.3d at 467 (when the "price is entirely fair, but the process is faulty," plaintiff can be entitled to a "fairer" price).

Tilton presented no evidence that book value was an appropriate measure of value of the assets transferred given TransCare's business. (*See* PFC at 53-54, quoting *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 36 (2d Cir. 1996) ("[B]ook values are not ordinarily an accurate reflection of the market value of an asset.")). Book value is an accounting construct that, among other things, deducts depreciation and has no necessary connection to market value. (Tr. 8/14 P.M. 32:8-11). Valuation based on book value "arguably" makes sense where, unlike TransCare, "a business…derives significant value from its physical assets," *Reis*, 28 A.3d at 476. Even then, naked "book value" is rarely, if ever, accepted as a valuation without adjustment, at least an adjustment to the lower of cost or market so that, after deducting associated costs, it produces a liquidation value and, thus, "a floor value of the business." *Id.* at 477. *See, e.g., Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 173 (Del. 1991).

Tilton did not negotiate the $10 million credit bid, nor did she set it based on third-party advice as to value. In fact, Tilton failed to provide any contemporaneous documentation showing

how she calculated the $10 million.  (Tr. 8/14 A.M. 20:24-21:22).  As the Bankruptcy Court found, her trial testimony was riddled with inconsistencies: (a) she did not include the book value for the plant, property and equipment (which she had foreclosed upon) (PFC at 53);[29] (b) she did not ascribe any value to the two CONs owned by TC Hudson Valley or TC Ambulance Corp. (whose stock she foreclosed on) (*id*. at 53); and (c) she failed to ascribe any value to the MTA Contract, which had recently been extended through October 2019 (*id*. at 54).  Tilton presented no evidence that she made any effort to ascertain whether a better price was available from third parties.

Tilton does not object to the Bankruptcy Court's determination that "where the fair dealing element reveals a process infected by the actions of directors, the defendant may be unable to show that any price was entirely fair." (PFC at 51, relying on *William Penn*, 13 A.3d at 758 ("Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process."); *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("But here, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 467 ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test.  The converse is equally true:  process can infect price."); *Gesoff v. IIC Indus.*, 902 A.2d at 1154; *Bomarko I*, 794 A.2d at 1183 (director failed to meet burden of proving fair price where "the unfairness of the process also infects the fairness of the price.")  (*See supra* Fact Section B, 23).

---

[29]     Tilton objects to this finding on the grounds that the $3.6 million in net book value PPE referenced in the OldCo winddown plan represented "*all* of TransCare's assets."  (Obj. No. 23) (emphasis in original).  But in addition to TransCare's Hudson Valley, Pittsburgh and MTA divisions, Tilton also foreclosed on all of TransCare's personal property.  (PFC at 29; JX  96; PX 237).  Therefore, as the Bankruptcy Court explained, the book value calculation was wrong because "the Subject Collateral on which PPAS foreclosed and sold to Transcendence was not limited to the three TransCare divisions that Transcendence would operate." (PFC at 53).

Tilton was required to demonstrate, through evidence, what TransCare's assets could have been worth had Tilton conducted a disinterested process, contacted buyers, engaged disinterested professionals, conducted an appraisal or other prepared financial materials to share with potential suitors, and appointed a disinterested special committee to negotiate with her.  Tilton put on no evidence of what *that* price would be.

## II.   THE COURT SHOULD OVERRULE THE OBJECTION TO THE BANKRUPTCY COURT'S DETERMINATION OF DAMAGES

### A. The Bankruptcy Court Correctly Determined Delaware Law for Damages for Breach of the Duty of Loyalty

Tilton does not object to the Bankruptcy Court's analysis of the law of damages for breach of fiduciary duty of loyalty under Delaware law.  (PFC at 55-57).  She does not object to the determination that "Delaware law dictates that the scope of damages for breach of the duty of loyalty is not to be determined narrowly[.]" (PFC at 55, quoting *Thorpe*, 676 A.2d at 445).  Nor does she object to the determination that breach of loyalty damages are distinct from the damage remedy in appraisal cases.  (PFC at 55, quoting *Reiss*, 28 A.3d at 468 and *Cede,* 634 A.2d 345, 371 (Del. 1993), *modified in part on other grounds*, 636 A.2d 956 (Del. 1994)).

Nor does Tilton object to the Bankruptcy Court's determination that while Plaintiff has the burden of proving its damages, in the duty of loyalty of context that burden is reduced: "responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimation of damages" and "uncertainties in awarding damages are generally resolved against the wrongdoer." (PFC at 57, quoting *Basho*, 2018 WL 3326693, at *50).  Under Delaware law, the responsible estimation of damages may be proved "by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court."  (PFC at 57, quoting *Weinberger*, 457 A.2d at 713).  *See also Henkel of*

*America, Inc. v. Bell*, -- Fed.App'x.– 2020 WL 4919998, at *9-10 (6th Cir. Aug. 21, 2020) (summarizing Delaware's law for determining damages for the breach of the duty of loyalty).

Tilton claims that the Trustee "failed to prove causation" (Obj. Br. at 79) but, as discussed above, Delaware law does not require strict causation for duty of loyalty damages. As the Bankruptcy Court properly concluded, uncertainties in awarding damages are resolved against the wrongdoer. (PFC at 57, quoting *Basho*, 2018 WL 3326693, at *50).[30] Thus, consistent with Delaware law, the Bankruptcy Court valued Transcendence on the basis of the very plans and projections Tilton employed to exercise her foreclosure and sale of TransCare's assets to Transcendence.

For her "causation" argument, Tilton cites two cases: a footnote from a District of Delaware case that does not address damages at all,[31] and a bankruptcy case, subsequently reversed on appeal, which dismissed a complaint that had pled only "brief, conclusory statements" concerning the loss opportunity of the corporation.[32] Neither case addresses the well-developed law cited above and relied upon by the Bankruptcy Court. Moreover, Tilton's "causation" argument depends on Tilton's ipse dixit assertion that the Transcendence assets had no going concern value because TransCare was "on the verge of liquidation." (Obj. Br. at 79). As discussed throughout this brief, Tilton selected the Transcendence assets to foreclose upon because she determined that those business lines had significant going concern value.

---

[30]      *See also Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (holding that "breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages[,]" and citing numerous authorities for the same).

[31]      Obj Br. at 79, citing *Continuing Creditors Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460, n.9 (D. Del. 2004).

[32]      *Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Park Cap. Advisors, LLC* (*In re Katy Indus., Inc.*), 590 B.R. 628, 640 (Bankr. D. Del. 2018), *reversed* by 607 B.R. 398 (D. Del. 2019).

### B.  Loyalty Breaches Entitle the Plaintiff to Rescissory Damages

Tilton does not object to the Bankruptcy Court's determination that Delaware law permits

an award of rescissory damages for breaches of the duty of loyalty.  (PFC at 55-56, relying on

*Bomarko II* for the proposition that the Delaware Supreme Court affirmed "a grant of rescissory

damages based on the estimated value of plaintiffs' shares at the time of the challenged merger if

the defendant had not breached his fiduciary duties.").  Tilton's breach of fiduciary duty caused

TransCare's affairs to unfold differently than they otherwise would have, and while no one can

say what would have happened, a disinterested board of TransCare had numerous opportunities to

achieve a superior result.  As explained in *Rural Metro*:

> RBC's self-interested manipulations caused the Rural process to
> unfold differently than it otherwise would have. *See [In re Del
> Monte Foods Co. Shareholders Litig.*, 25 A.3d 813, 833 (Del. Ch.
> 2011)] ('But for Barclays' manipulations, the Del Monte process
> would have played out differently'). RBC's actions led to an ill-
> timed sale of Rural that did not capture value attributable to its
> acquisition strategy; (ii) a mismanaged sale process that generated
> only one final bid by a bidder that knew it had the upper hand in
> bidding and price negotiations; and (iii) uninformed board approval
> based on manipulated valuation analyses. To be sure, '[n]o one can
> tell what would have happened had unconflicted parties negotiated
> the Merger. That is beyond the capacity of humans.' *In re El Paso
> Corp. Shareholder Litig.*, [41 A.3d 432, 447 (Del. Ch. 2012)].
> Nevertheless, but for RBC's actions, a fully-informed Board would
> have had numerous opportunities to achieve a superior result.

*Rural Metro*, 88 A.3d at 101. Because Tilton's unilateral actions made it impossible to know what

TransCare's assets would have sold for in a fair and arms-length process, the Trustee valued those

assets based upon the available information compiled by Tilton's own employees as to their

expectations of their earning potential.  *See Bomarko I,* 794 A.2d at 1184-85 (what would have

happened absent the breach of fiduciary duty is "inherently unknowable" and, therefore, the court

valued the company as though it had been successfully found financing and restructured its debt

without a breach of duty); *cf. Rural Metro*, 88 A.3d at 101 ("a disinterested board…would have

received valuation materials periodically throughout the process, rather than getting a valuation deck for the first time after 9:30 p.m.…and approving the merger shortly after midnight.").

Finally, the Trustee is also entitled to rescissory damages because the foreclosure cannot be unwound as the assets transferred to Transcendence were returned to the bankruptcy estate in a non-operating state.  (*See* PFC at 56; *supra* 33 (fact section E)).  As the Bankruptcy Court found, Delaware law provides that "the disloyal fiduciary who wrongfully takes property from the beneficiary is liable for changes in value while the wrongfully taken property is under the disloyal fiduciary's control."  (PFC at 56, quoting *Basho*, 2018 WL 3326693, at *50).  Here, the evidence is undisputed that Tilton alone determined to shut the operations which she had sold to Transcendence.  (*See* supra at 7, 35-36).

### C.  The Trustee Made a Responsible Estimation of Damages

Dr. Arnold's analysis had two major components:  the selection of an appropriate EBITDA multiple and the financials projections with which to apply the projections.  The Bankruptcy Court determined that Dr. Arnold "developed an appropriate multiple of EBITDA to apply to Transcendence's projections to determine the projected value of the Transcendence business, and hence, TransCare's damages resulting from the stripping of that business through an unfair, tainted process."  (PFC at 59).  Tilton objects to that finding on the grounds that Dr. Arnold did not opine as to the value of the Transcendence assets.  (Obj. No. 28).  As discussed above, (supra Fact Section F), Tilton's objection is simply wrong.   Dr. Arnold extensively testified to the value of the Transcendence assets under Tilton's projected business plan for those assets.

#### 1.  The Transcendence Projections Provided a Responsible Basis Upon Which to Value the Foreclosed Assets

Tilton argues that Dr. Arnold's reliance on Tilton's projections for Transcendence because such he did not independently verify her projections.  (Obj. Br. at 85).  Tilton makes three errors:

Delaware law affords great weight to such projections, Tilton herself relied on the projections, and Dr. Arnold correctly assumed Tilton's disinterestedness in opining on damages.

> a.   *The Projections Were the Best Evidence of Value*

Management projections are ordinarily the preferred projections to use because they reflect the most knowledgeable assessment of what is expected.  *See Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *3, 7 (Del. Ch. Dec. 31, 2003), *aff'd in relevant part, rev'd in part,* 884 A.2d 26 (Del. 2005).  Tilton does not object to the Bankruptcy Court's determination that "Delaware law affords great weight to contemporaneous management projections in determining value, when available."  (PFC at 57, citing numerous authorities).  That is particularly true here where:

- Greenberg (i) had been involved in managing TransCare for many years and preparing their financials, (ii) took increased responsibility for TransCare's financial reporting after TransCare's CFO resigned in September 2015 and (iii) worked for Patriarch for many years, assessing and modeling the future financial performance of portfolio companies, including TransCare on several occasions.

- Tilton had assigned no less than ten Patriarch employees, working in three separate teams over the course of a month, to validate the assumptions used for a company that she had controlled for over a decade (Tr. 8/13 A.M. 39:5–41:15).  Tilton directed this plan to be sent to insurance brokers to induce their reliance for the purpose of procuring insurance for Transcendence, and submitted versions of the same plan to other insurers for the same purpose.

- All of Tilton's projections, including those for the assets taken by Transcendence, were well within the range of what TransCare's assets had earned historically.

*See supra*, fact section D.

Tilton misreads several Delaware appraisal cases for the proposition that Dr. Arnold was required to independently come to a different conclusion than Greenberg and Tilton concerning the reliability of the projections.  Tilton conflates the use of a discounted cash flow ("DCF") analysis in those cases with the use in a comparable company or precedent transaction approach

used here.  But Dr. Arnold testified that the projections in the record were *not* sufficient to conduct a DCF analysis.  ("[T]he ingredients or the ability to create [a sufficient cash flow forecast] from granular pieces of information is also not available in the record.  So there are many reasons why DCF could not be implemented here and, therefore, I did not."  (Tr. 7/24 A.M. 15:17-20); PFC 60).  Therefore, Dr. Arnold used the comparable company approach.

Contrary to Tilton's reliance on *Doft & Co. v. Travelocity.com Inc.*, (Obj. Br. at 90-91, 94), the comparable company approach that Dr. Arnold employed is exactly the process endorsed by the *Doft* court.  2004 WL 1152338, at *7 (Del. Ch. May 20, 2014).  Tilton's Objection removes the phrase "DCF analysis" from the quote to make it seem as it the court rejected a comparable company approach based upon the reliability of projections.  (Obj. Br. at 90-91).  (As *Travelocity.com* explained, "The goal of the DCF method of valuation is to value future cash flows." *Id*.)  Instead, just as Dr. Arnold determined here, the *Doft* Court concluded that the absence of reliable projections "make the DCF analysis of marginal utility as a valuation technique in this case."  *Doft*, 2004 WL 1152338 at *7.  Because of that, the *Doft* court — like Dr. Arnold — went on to apply a comparable company approach.  *Id*. at *9.

Similarly, *In re PetSmart, Inc.*, 2017 WL 2303599, at *32-34 (Del. Ch. May 26, 2017) (Obj. Br. at 88) concerned the application of a DCF analysis.  The Court discounted five-year cash flow projections for four independent reasons, including that "management engaged in the process of creating the auction-related projections in the midst of intense pressure from the Board to be aggressive, with the expectation that the projections would be discounted by potential bidders." *Id*. at 33.  *Three* witnesses testified that the auction-projections "were designed to be aggressive

because the Board [] were convinced that potential bidders would discount whatever projections were put in front of them." *Id*. at 34.[33]

No one gave any such testimony here. Instead, Greenberg testified that the projections were based on his honest and best effort to independently project earnings for TransCare. *Cf. Prescott Group Small Cap, L.P. v. Coleman Co. Inc.*, 2004 WL 2059515, at *22 (Del. Ch. Sept. 8, 2004) (projections delivered to purchaser's bank were "management's honest and best effort, at that time, to predict Coleman's performance for the year 2000"). More importantly, Tilton testified that the projections were validated by three separate, experienced teams working with TransCare's management in her offices to assure herself of the accuracy of the model she was prepared to put $10 million of her own money behind. She claimed to have herself worked with the separate teams of analysts from her offices and company management, to develop a model that "took it down to its basic variables that had not been done by the company or Carl Marks, to understand each contract down to what it takes, labor and ambulances and contractual commitments, in the mathematical model of how many ambulances you'd need under that contract to see if each contract was profitable, and then tried to build up from the profitable contracts, to save as much of the company as was possible, as we were losing contracts on a daily basis." (Tr. 8/13 A.M. 39:9–40:7, 41:8-15; *see also* Tr. 8/13 P.M. 80:6–80:23 ("We were finally doing it ourselves with the help of certain managers from TransCare…, not numbers put together by anyone else.")

Finally, as far as Dr. Arnold not vetting the plans for reasonableness, Tilton fails to explain why he would be more qualified to do so than she and her Patriarch team. *Cf. Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.,* 847 A.2d 340, 360 (Del. Ch. 2004) (rejecting expert's decision

---

[33]     Thus, contrary to Defendants' assertion, the Court did not reject the projections merely because they were designed to "aid in the pursuit of strategic alternatives." (Obj. Br. at 88).

to reduce management's projected variable costs because management was in the best position to estimate such costs).

    b.   *Tilton Relied on the Projections*

The Transcendence projections were not outliers. Greenberg and Pelissier's January 7 Plan had projected 2016 revenues of $120 million and EBITDA of $6.9 million. (JX 67 at 196574). With the loss of $2.5 million from the Bronx/Westchester Operations (*see* Tr. 8/13 P.M. 99:11-20) and the $500,000 to $750,000 Tilton claimed the February 24 plan omitted in administrative overhead (*see* Tr. 8/13 A.M. 14:15-25; Tr. 8/14 A.M. 34:15–35:1), Tilton's February 24 plan projected a consistent $4 million in annual EBITDA for Transcendence (*see* Tr. 8/14 A.M. 38:4-20).

Tilton may not have "approved" of any plan formally (*see, e.g.,* Tr. 7/22 A.M. 123:3-19 (Tilton never "approved" any plan between November 14, 2015 and February 24, 2016); *id.,* 80:6-15 (even though Tilton did not "approve" plans, her team still judged the company against those plans), but that was her practice as the Board of TransCare. (*See* PX 3 (Authority Matrix); Tr. 7/23 P.M. 15:16-17:11; *see also* Leland Tr. 84:9-16; JX 11 (without a "Designated Executive" or "Annual Plan" referred to in the Matrix, most decisions had to be made by Tilton personally)). Tilton relied on those plans when she: (i) on January 12, 2016, offered raises and change of control bonuses to TransCare's divisional VPs for paratransit and Hudson Valley (DX 108 at 23057; Tr. 8/13 A.M. 54:19–55:10).; (ii) on January 15 and 29, 2016, funded a portion of the financing called for by the January 7 Plan (and confirmed to Wells Fargo that the funds were part the "go forward business plan being developed") (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575; PX 170, 2:06 pm email); (iii) committed $10 million in financing secured by Transcendence's accounts receivable (PFC at 31), and (iv) and actually funded $658,000 of that loan towards Transcendence's operations (JX 101 at 8673; Tr. 7/22 P.M. 59:13–61:12 [Greenberg]; Tr. 8/13 A.M. 24:15-24 [Tilton]).  It is hard

to find more concrete "approval" than Tilton's commitment of these funds.  As Tilton explained in a January 14, 2015, email (PX 165 at 00925), she would not have provided additional funding if she did not believe that the plan was viable: "I am being asked to provide money and make decisions on the future of the company….  I do not want to keep funding into a black hole that cannot be filled or a company that cannot generate sufficient cash to cover its expenses.  It makes me sad but it is more important that I understand the reality before I fund more and more cash . . . ."[34]

Tilton's continued investment in TransCare speaks volumes.  *See Gentile v. Rossette,* 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness — even though admittedly marked at times by grave doubts — to pour his ultimately limited resources into the Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion.").  *See also In re Appraisal of Dole Food Co., Inc.,* 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument[.]").  Finally, Tilton's own contemporaneous statements belie her positions on this Objection.  As she wrote to an insurer to induce to bind insurance: "It is because this new business makes sense that I would personally be providing all the new working capital for this business myself, personally." (PFC at 59).

Objecting to these findings, Tilton makes the novel argument that because the trial exhibit copy of the Ark Angels III loan to Transcendence was unexecuted, Tilton may not really have been

---

[34]    Tilton relies on the Carl Marks' response to her email at PX 165 in which Marc Pfefferle stated that "the EBITDA numbers we were originally given are significantly overstated."  Not only is the statement relied upon hearsay, but Tilton presented no testimony from Pfefferle or anyone else as to what EBITDA projections he was referring or how he made that determination.  (Obj. Br. at 23, 89).

committed to the loan. (Obj. No. 15). But at trial, Tilton testified that she was committed to the loan. (Tr. 8/13 A.M. 23:11-3).[35] Moreover, Ark Angels III actually advanced $658,000 to Transcendence under that loan facility in order pay the New York State Insurance Fund and lease the paratransit facility on Foster Avenue in Brooklyn. (JX 101 at 8673; Tr. 7/22 P.M. 59:13–60:10, 61:7-8 [Greenberg]; Tr. 8/13 A.M. 24:15-24 [Tilton]). Tilton also relies on boilerplate language in the Ark Angels III loan agreement to suggest that the loan was conditional. (Obj. No. 15). This too is incorrect. Tilton herself testified that the Ark Angels III loan funds would be used to either purchase TransCare's receivables from Wells Fargo or "go in or about day one as soon as cash was needed." (Tr. 8/13 A.M. 22:23–23:8).

### c. Dr. Arnold Valued the Transcendence Assets Assuming Tilton's Disinterestedness

Dr. Arnold was not appraising TransCare, he was opining as to damages assuming the hypothetical situation that Tilton successfully sold or refinanced TransCare without breaching her duty of loyalty. *See, e.g., Bomarko I*, 794 A.2d at 1183, 1184-85 ("what plaintiffs are entitled to receive is, at a minimum, what their shares would have been worth at the time of the Merger if [the controlling shareholder] had not breached his fiduciary duties" and accounting for the effects of the breach of fiduciary duty in considering both entire fairness and damages while noting that "were this an appraisal action, I might reach a different result on this issue.").

Therefore, Tilton's reliance on numerous appraisal cases is misplaced. Appraisals require a higher bar for certainty than damage calculations because both parties have the burden of proof, and because the Court is independently required to appraise the value of the company. *PetSmart*,

---

[35]     Under the Bill of Sale, Transcendence agreed to borrow from and repay $10 million to Ark Angels III to finance the purchase of the assets from PPAS. (PFC at 31, relying on JX 102 (Bill of Sale) at Recital E and Section 3). Similarly, Greenberg told Todd Trent, the Lockton insurance broker, that part of the $10 million purchase price for Transcendence would be the Ark Angels II revolving loan. (PX 228, Tr. 7/22 P.M. 63:8-24 [Greenberg]).

2017 WL 2303599, at *1.  "[U]nlike the more exact process followed in an appraisal action, the law does not require certainty in the award of damages where a wrong has been proven and injury established.  Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages."  *Bomarko I*, 794 A.2d at 1184 (citations omitted).  Where "issues of loyalty are involved, potentially harsher rules come into play.  'Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.... The strict imposition of penalties under Delaware law are designed to discourage disloyalty.'" *Id*., quoting *Thorpe v. CERBCO Inc*., 676 A.2d 436, 445 (Del. 1996).[36]

## 2.   Dr. Arnold Selected a Responsible Range of EBITDA Multiples

Dr. Arnold identified a range of responsible market EBITDA multiples on the basis of the comparable company and precedent transactions first identified by Greenberg.  (PFC at 59-61; JX 55).  Dr. Arnold subsequently confirmed that Greenberg's companies were the most comparable.  Dunn testified that it was also his understanding that Greenberg's companies were the most comparable.  (Tr. 8/8 48:9-25).  Greenberg concluded that the average EBITDA multiple was 10.1.  (PFC at 60).  Both Dunn and Tilton testified that there was market evidence of EBITDA multiples of 7-8 for "healthy companies." (Tr. 8/8 73:1-11 [Dunn]; Tr. 8/13 A.M. 17:1-20 [Tilton]).  Dr. Arnold's findings were consistent as he identified a range of multiples of between 7.1 and 12.2 based on the same data, as of February 24, 2016.  (Tr. 7/24 20:10-21:4).

Tilton asserts that Dr. Arnold relied on "the testimony of Tilton and Greenberg concerning industry multiples; however, they merely testified to multiples that could apply to TransCare *if it*

---

[36]     Tilton also relies on two cases that having nothing to do with fiduciary duties:  *Chemipal Ltd. v. Slim-Fast*, 350 F. Supp. 2d 582, 589-91 (D. Del. 2004) (Obj. at 84-85) and *General Motors Corp. v. City of New Castle,* 2000 WL 33113802 (Del. Super. Ct. Dec. 16, 2000) (Obj. at 84).  *Chemipal* was a breach of contract action concerning the sale of products in Israel, where the damages expert failed to understand the methodology used to gather the information in third-party marketing materials.  *General Motors* involved a tax case.  Neither has anything to do with Arnold's analysis or the standards involved with damages for breach of the fiduciary duty of loyalty

*were a healthy company*, not to TransCare as it stood in January and February 2016." Obj. Br. 75, 96 emphasis Tilton's).   Tilton's expert, Mr. Dunn, opined that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would result in TransCare fetching lower multiples than those market comparables. (Tr. 8/8 55:20–56:2, 56:22–57:2, 57:25–58:13, 59:3-20).  But Mr. Dunn did not analyze any data to support his hypothesis that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would actually have resulted in a lower multiple using a market company approach.  (Tr. 8/8 56:3-7, 58:17-20, 60:1-16, 62:24–63:2).   In rebuttal, Dr. Arnold performed such an analysis and determined that the market data in TransCare's SIC category market showed that size, undercapitalization, distressed history, and low EBITDA margins would not have any observable effect on the EBITDA multiples used to value companies within the health care space. (Tr. 8/14 A.M. 49:15-24; DX 196 at 35).  In fact, in each case, Dr. Arnold found that adjusting for these factors would actually lead to higher multiples. (Tr. 8/14 A.M. 54:1–58:1; DX 196 at 35).

Tilton's rebuttal to Dr. Arnold fails, however, because there was no evidence Transcendence was not a "healthy company", and certainly why it would not be so in the hands of an unrelated buyer.  Even Tilton's sale and foreclosure had relieved the selected assets of $55 million in secured debt.  Even Dunn, Tilton's expert, said of Transcendence: "That is of a company that is capitalized. That is a different company" (Tr. 8/8 64:6-10).  Tilton's Objection tries to obscure this distinction between the Transcendence assets and TransCare, by repeatedly referring to TransCare and then placing, in parentheses, the phrase (and/or NewCo).[37]

---

[37]    *See e.g.* "TransCare (comprised of both OldCo and NewCo)" (Obj. Br. at 44-45); "TransCare (or at least the NewCo business lines)" (*id.* at 64); "TransCare (or the NewCo business lines)" (*id.* at 65, 79); "TransCare (and NewCo)" (*id.*); "TransCare (and thus NewCo)" (*id.*); "TransCare (and thus the NewCo business lines within TransCare)" (*id.* at 80, n. 56); "TransCare (and the NewCo business lines)" (*id.*); TransCare (or any part of it)" (*id.* at 83); and "TransCare (or at least NewCo)"(*id.* at 97).

While Tilton objects to Dr. Arnold's range, Tilton does not object to the Bankruptcy Court's selection of 11x EBITDA from within the range.  Nevertheless, the Bankruptcy Court detailed its reasoning by the selection of 11x out of the 7x-12x range identified by Dr. Arnold. (PFC at 63-64).  In particular, the Bankruptcy Court relied on the fact — again not objected to by Tilton — that a strategic buyer would not incur many of the projected operating expenses, or at least in the same amount as Transcendence would, thus increasing the EBITDA to be gained from the same assets.  *Id*.

In connection with a different point, Tilton makes the nihilistic argument that one can never value a company because one can never know how the potential purchaser might project the company's earnings.  (Obj. Br. at 87).  However, this merely restates the reasonableness of Tilton's projections for Transcendence — a company with three simple business lines, including a long-term government contract.  (*See supra at 18-19, 30-31*).  Moreover, as the Bankruptcy Court found (again with no objection), Tilton failed to engage in a fair process to discover what potential purchasers would be willing to pay, and indeed prohibited her staff from contacting the potential purchasers who did express interest.  (PFC at 31; *see also id.* at 11-13).

Finally, choosing a multiple above the mid-point but below the high end of the range is in keeping with Delaware breach of the duty of loyalty law, which makes Tilton bear the burden of uncertainty.  *See, e.g., Paradee v. Paradee,* 2010 WL 3959604, at *13 (Del. Ch. Oct. 5, 2010) ("Although it would be improbable (bordering on impossible) for the Trust to have sold precisely at the top of the market, the faithless fiduciary must bear that risk, not the innocent beneficiary."); (*See also supra at 58*).

### D.  Tilton Offered No Competing Methodology to Value the Transcendence Assets

Tilton criticizes the Trustee for relying on all the evidence discussed above.  She claims that her own projections are not reliable to approximate the value of TransCare.  (Obj. Br. at 90-

91).  She claims that the market multiples which Greenberg reported to her, and which Dr. Arnold

validated, were only for "healthy" companies.  (Obj. Br. at 74-75).  But Tilton does not offer any

competing projections, financial statements or market information which they believe Dr. Arnold

*should* have used.  Tilton offers no competing approach or methodology to approximate the value

of the Transcendence in an arms-length sale.  Tilton accuses the Bankruptcy Court of burden

shifting, however, that misses the mark in a breach of loyalty case for all the reasons discussed

above.  Here, the Trustee is attempting to value what TransCare's assets could have obtained had

Tilton acted in a disinterested manner and prepared the very analyses, reports and market tests the

lack of which Tilton claims doom the analysis.

This is the tactic that Judge Engelmayer rejected in *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F.

Supp. 3d 447, 467 (S.D.N.Y. 2014), and which the Bankruptcy Court relied upon.  (PFC at 63).

Courts typically reject this too-good-to-be-true tactic.   *Meyer v. Berkshire Life Ins. Co.*, 250 F.

Supp. 2d 544, 572-73 (D. Md. 2003) ("as Berkshire is a fiduciary which breached its duties, '[a]ny

doubt or ambiguity should be resolved against [it].'  *Donovan v. Bierwirth*, 754 F.2d 1049, 1067

(2d Cir. 1985).  Finally, it is significant that Berkshire provided no damages calculation of its own

[on plaintiffs' breach of fiduciary duty claim].  Accordingly, the only substantial evidence

presented on the extent of damages is that offered by the plaintiffs' experts …"); *Brundle ex rel.*

*Constellis Employee Stock Ownership Plan v. Wilmington Trust N.A.*, 241 F. Supp. 3d 610, 645

(E.D. Va. 2017) (Messina [plaintiff's expert witness] is the only witness who provided a

comprehensive estimate of damages…Wilmington's expert…testified that Messina's method was

conceptually flawed .…  Although there is some merit to Tarbell's concern, his failure to provide

any alternative method for calculating damages leaves Messina's estimates as the only evidence

as to damages.  Therefore, the Court will use those estimates as its baseline…."), *reconsideration*

*denied*, 258 F. Supp. 3d 647 (E.D. Va. 2017) ("defendant's newly offered competing theory of the appropriate [damages] methodology does not make the evidence upon which the Court relied 'false'"). *See also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004) ("affirm[ing] the district court's determination of the reasonable royalty in this case" based on "Golight['s] expert testimony regarding a hypothetical licensing negotiation" where "Wal-Mart presented no expert testimony of its own regarding a reasonable royalty").

This reasoning is all the more applicable as Tilton's own expert admitted that (a) he had no opinion about the reasonableness of the business plans valued by Dr. Arnold (Tr. 8/8 69:17-22 [Dunn]) and (b) the market comparables employed by Dr. Arnold were *the most comparable* public companies to TransCare (*id*. 47:23–49:7); and (c) Dunn and Tilton's belief there was "market evidence" for multiples of 7 to 8 "for healthy companies." (*id.* 73:1-6). Tilton provided no other documentation or methodology upon which the Bankruptcy Court should have assessed damages, and all of her criticisms of Dr. Arnold would apply to any valuation of TransCare given Tilton's failure to undertake the steps necessary to sell TransCare in a disinterested manner.[38]

### E.  The Bankruptcy Court's Other Damages Rulings Were Correct

Tilton does not object to the Bankruptcy Court's determination to deduct $1 million from the damage amount for the short-term revolving loan that Transcendence envisioned taking out to achieve its business plan. (PFC at 65-67). However, Tilton does object to the Bankruptcy Court's determination that Dr. Arnold's testimony was "unrefuted" when he explained that a "short to medium term loan" would not result in "a dollar for dollar dilution" to shareholder value so as to be deducted from the purchase price. (PFC at 66-67, Obj. No. 30). She claims that Dunn testified

---

[38]     *Cf. Oliver*, 2006 WL 1064169, at *30 (relied upon by Tilton, Br. at 81) where the defendants submitted an expert valuation testimony valuing the derivative claims at zero in support of their burden to prove they paid a fair price. Tilton put on no such evidence here.

that a potential purchaser "needs to account for what else they would need to contribute to TransCare in order to reach a total value of the company." (Obj. No. 30, quoting Tr. 8/8 23:12-14 [Dunn]).  First, Dunn's general statement has nothing to do with *how* a short-term loan (as opposed to a capital investment) would factor into purchase price.  Second, Dunn admitted that he had no knowledge of any of the details of the Transcendence transaction (Tr. 8/8 71:4–72:1), admitting it was a "different company" (*id*. 64:6-10) and believing it was "capitalized" as compared to TransCare.  (*id.* 64:6-10).

Nowhere in Tilton's 99-page Objection does she identify what the capital need required for Transcendence was, where the Court might look to find it, nor where the Bankruptcy Court erred in its determination that much of the proposed initial funding was largely to pay off TransCare's debts which a third-party buyer would not pay.  (PFC at 65).  Nor does Tilton dispute the Bankruptcy Court's determination that the projections for Transcendence projected only $120,000 in capital expenditures, with the remaining funding characterized as a "incremental funding needs" which Tilton's models assumed "can be offset if a new ABL line is secured or by cash that builds throughout the year, and which listed the cash as a financing adjustment and not as a capital expenditure. (PFC at 26-27).  Nor does she object to the finding that the Ark III loan extended to Transcendence represented a "revolving line of credit rather than [an] invest[ment] of new capital."  (PFC at 66).  Therefore, the Court should overrule Objection No. 30.

Tilton also objects to the Bankruptcy Court's deduction of $1.2 million from the damage amount on account of liquidation sales achieved by the Trustee for the foreclosed assets once they were returned to the estate.  (Obj. No. 31).  Tilton maintains that the Bankruptcy Court should have deducted $2 million, and that the Bankruptcy Court wrongfully deducted $800,000 from the deduction in such a way as to provide the Trustee with a double recovery.  But this makes no sense,

because while the Trustee liquidated the Transcendence assets for $2 million, he paid $800,000 back to PPAS so that the estate received only $1.2 million.  Therefore, the Bankruptcy Court deducted $1.2 million from the damage amount.  The Court should overrule Objection No. 31.

Finally, Tilton offers no other competing deduction which the Bankruptcy Court should have deducted but did not.  Therefore, the Court should adopt the Bankruptcy Court's damages calculation.

<u>**CONCLUSION**</u>

Tilton certainly contests the result reached by the Bankruptcy Court.  However, as shown herein, Tilton cannot show where the Bankruptcy Court erred in applying each of the steps required by Delaware law.  Tilton's real objection is not to the Bankruptcy Court's determinations, but to Delaware fiduciary law which prevented her from making decisions for TransCare in the manner that she did.  That is why, to escape the conclusions required by Delaware law, Tilton is forced over and over again to disclaim her own contemporaneous analyses, projections, statements and actions.

Respectfully, the Court should overrule Defendant Tilton's Objection and enter final judgment against Tilton as provided for in the PFC.

Dated: New York, New York
      September 9, 2020

AMINI LLC

By: _/s Avery Samet_
    Bijan Amini
    Avery Samet
131 West 35th Street, 12th Floor
New York, New York 10001
Tel: (212) 490-4700
bamini@aminillc.com
asamet@aminillc.com

*Attorneys for Plaintiff Salvatore LaMonica,
as Chapter 7 Trustee*