# Exhibit 1

**Trustee's Response to Tilton's Specific Objection (Ex. F)[1]**

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| 1 | P. 8 | "Mark Bonilla served as TransCare's Chief Financial Officer ('CFO') from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016, (Stipulation No. 25), but per Tilton's instructions, Michael Greenberg, a Patriarch Partners credit officer, took on the responsibility for TransCare's finances. (DX 73 at 58180; Tr. 7/22 A.M. 18:19–24.)" | This finding implies that, after Bonilla's resignation and/or while he served as a consultant, Greenberg was primarily responsible for TransCare's finances. That is not so. Greenberg did not serve in any operational role for TransCare. He did not prepare the general ledger or financial statements; rather, responsibility for TransCare's financials belonged to TransCare's CEO and CFO. (Leland II Tr. 377:19–378:14; July 23 AM Tr. 61:14-25.) Moreover, Greenberg did not decide what suppliers were paid and when. (*See, e.g.*, JX_46 (email from Pelissier indicating that he and Greenberg had no authority to "dictate what has to be paid and when" and that TransCare management was responsible.)

DX_73 shows Greenberg provided temporary assistance to TransCare, while simultaneously trying to find a replacement CFO for the company, in the wake of Bonilla's departure in September 2019. The exhibit also demonstrates that TransCare's controller had significant involvement in the areas of accounting and finance at TransCare upon Bonilla's resignation.

The bankruptcy court selectively cites to a portion of Greenberg's testimony and ignores other portions of the testimony showing Greenberg was one of several people assisting with TransCare's finances after Bonilla's | The finding is accurate and makes no implication.  Mr. Greenberg did take on responsibility for TransCare's finances, as Tilton instructed Greenberg to take on responsibility vis-à-vis TransCare's finances. (DX 73 at 58180; Tr. 7/22 A.M. [Greenberg] 18:19-24) (Greenberg testified that "as result of" Bonilla's resignation: "Q: You had to take over many of the things that you had relied upon him for previously, is that not correct?  A: Yes, more so. Yes.").

During the year prior, Michael Greenberg oversaw TransCare's financial matters, payment of vendors and negotiations with Wells Fargo . (Tr. 7/22 A.M. 14:10–16:15; Leland Tr. 59:5–61:14, 144:13–145:17, 245:22–246:24).

Tilton tasked Greenberg to work with management at TransCare to prepare a 2016 budget for TransCare that would be acceptable to Wells Fargo and convince them to extend the ABL. (Tr. 7/22 A.M. 26:11-24; 27:5-28:11, 31:5-20 [Greenberg]). She also tasked Greenberg with developing the plan based upon his own assessment of TransCare's business. (Tr. 7/22 A.M. 31:21-33:12 [Greenberg]; JX 51).  Accordingly, when Greenberg took information from TransCare management, he confirmed the assessment himself before presenting it to Tilton. (Tr. 7/22 A.M. 38:11–40:3 [Greenberg]). |

---

[1]       This table reproduces Tilton's Exhibit F, but provides a number for each objection in the left column, and the Trustee's response to that objection in the right column.  Citations to the trial record are set defined in the Glossary. (Plaintiffs' Response to Defendant Lynn Tilton's Objections ("Response Br.") at vii).

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | resignation. (*See* July 22 AM Tr. 17:18–18:24.)<br><br>The bankruptcy court finding also ignores that the day *before* Bonilla's consultancy ended, CMAG was hired to "[p]erform normal duties of the position of TransCare CFO," among other things. (DX_106.) | |
| 2 | PP. 8-9 | "Under an Authority Matrix issued by Tilton as the sole director of the Board, the officers of TransCare did not have authority to [take certain actions] . . . [a]ccordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities." | These findings are inaccurate with respect to the scope and function of the Authority Matrix and/or are contradicted by the evidence adduced at trial.<br><br>The Authority Matrix set forth discrete actions for which TransCare's CEO had to secure Tilton's approval, primarily in respect of significant financial and operational decisions with long-term consequences for the company. (PX_3, at 24172–75.)<br><br>This includes, for example, major decisions such as new financings and/or long-term leases. (*See id.*) The Authority Matrix nowhere required Tilton's consent for day- to-day decision-making at TransCare or running the business in the normal course, including maintaining the company's financial statements. (*Id.*)<br><br>Tilton did not make day-to-day decisions for TransCare. (Aug. 13 AM Tr. 41:23– 24.) Nor did Tilton manage TransCare through Greenberg or Pelissier. Rather, Greenberg and Pelissier were only called upon to assist with issues at TransCare during specific moments of crisis. (*See*, e.g., July 23 AM Tr. 8:15–23; JX_44; DX_72.) Greenberg and Pelissier had no authority over TransCare management with respect to paying bills. (*See* JX_46 (email from | The finding is accurate.  Tilton's quotation omits the PFC's full listing of the actions requiring Tilton's approval:<br><br>"Under an Authority Matrix issued by Tilton as the sole director of the Board, the officers of TransCare did not have authority to: (a) approved annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing agreement; (g) dispose of any unuseable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force. (PX 3; Tr. 7/23 P.M. 15:16-17:11.)  Some items below certain dollar amounts could be authorized by a "Designated Executive" or an "Annual Plan (PX 3), but during the Relevant Period there was no Designated Executive and no Annual Plan.<br><br>Accordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities." |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | Pelissier to Bonilla and Leland: "We are not here to dictate what has to be paid and when, it remains your duty and decision as per the capabilities you have and your duties to satisfy creditors as the management team.").)<br><br>To the extent Pelissier made suggestions to TransCare management on operational issues, TransCare management was not obligated to follow his advice. (July 23 AM Tr. 54:21–55:2.) And in fact, TransCare management often ignored his suggestions. (*See, e.g.* July 23 AM Tr. 56:6–17, 61:4–9.) | (PFC at 8-9, citing Authority Matrix, PX 3; *see also* Tr. 7/23 P.M. 15:16-17:11 [Greenberg]).<br><br>As explained by Brian Stephen, Tilton's inhouse legal counsel at Patriarch Partners, even matters that were not specifically prohibited still required Board approval: "for instance, Item [(f)] prohibits entering into financing transactions without Tilton's approval, but it does not specifically prohibit laying the groundwork for these types of transactions by making preliminary calls or taking other actions prior to providing financial data, which would be prohibited by Item [(d)]. However, we are absolutely sure that Lynn would want to know and approve the company's exploration of other financing sources." (JX 11 at 87751). |
| 3 | P. 11 | "Working primarily with Pelissier, Greenberg submitted a presentation for Tilton's review and approval on November 14, 2015 to share with Wells Fargo at a meeting scheduled for two days later. (JX 51; Tr. 7/22 A.M. 32:6–25.)" | The cited evidence does not support finding that referenced presentation was created by Pelissier and Greenberg.<br><br>The presentation Greenberg transmitted to Tilton was created by TransCare management (JX_51; DX_89 (Greenberg, describing revised 2016 plan, states, "Jean-Luc and I first saw the revised plan this past Monday. We will work to write something up on it as management believes this plan is one they can manage.").)<br><br>As Pelissier testified:<br><br>TRUSTEE'S COUNSEL: "Is this—I mean I don't know if you know because I don't know, if this was the plan that was given to [Wells Fargo] in November at the November meeting or some other plan?" | The finding is correct. Greenberg admits he submitted the presentation to Tilton after working on it with Pelissier. (JX 51; Tr. 7/22 A.M. 32:6-25.).<br><br>Explaining why he did not copy anyone from TransCare on the email submitting the presentation to Tilton, Greenberg testified that "in this particular case, there was also a period of time where Jean-Luc [Pelissier] and I were tasked with coming up with a plan that the Board could get comfortable with based on our own assessment of the business." (Tr. 7/22 A.M. 33:1-12). |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | PELISSIER: "I believe it's that plan, yeah." | |
| | | | TRUSTEE'S COUNSEL: "And you prepared that plan, did you not, with the company? The November plan." | |
| | | | PELISSIER: "*I don't prepare anything.*" | |
| | | | TRUSTEE'S COUNSEL: "You didn't work with –" | |
| | | | PELISSIER: "I review them, I opinion them, I give my feedback, I check, you know, to see if they are correct and so on. *But those are not my plans.*" | |
| | | | TRUSTEE'S COUNSEL: "Okay. And you do -- when you go through that process the purpose is that process is so when the plan is presented by management to Lynn Tilton – " | |
| | | | PELISSIER: "Yes." | |
| | | | TRUSTEE'S COUNSEL: "—it's in the proper form?" | |
| | | | PELISSIER: "*That it is in the proper form, yes.*" | |
| | | | (July 23 AM Tr. 80:24–82:21; *see id.* at 82:5–21 (emphases added).) | |
| 4 | P. 11 | "Tilton agreed the plan could be shared with Wells Fargo, but never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6– 9; Leland Tr. 547:13–549:9, 583:9-584:25; Tr. 7/22 P.M. 123:13– | The testimony cited by the bankruptcy court does not support finding or inference that the plan was actually shared with Wells Fargo.  Neither Greenberg nor Pelissier thought the management presentation referenced by the bankruptcy court was actually a workable plan. (DX_89; July 23 AM Tr. 66:1–68:17; July 22 PM Tr. 94:14–96:12.) | The finding is correct.  Tilton does not dispute that she agreed the plan could be shared with Wells Fargo or that she never gave final approval to the plan and did not fund new ambulances.  Tilton had tasked Greenberg to work with management at TransCare to prepare a 2016 budget for TransCare that would be acceptable to Wells Fargo and convince them to extend the ABL. (Tr. 7/22 A.M. 26:11-24; 27:5-28:11, 31:5-20 [Greenberg]).  She also tasked Greenberg with developing the plan based upon his |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | 19.).” | 7/22 AM Tr. 102:6–9 refers to a January 27 meeting based on a presentation prepared by CMAG; it has nothing to do with Wells Fargo.<br><br>Glenn Leland only testified that a presentation was shared with Wells Fargo, he did not recall what version was shared. (See Leland Tr. 547:13–549:9, 583:9–58:25; July 22 PM Tr. 123:13–19.) | own assessment of TransCare's business.  (Tr. 7/22 A.M. 31:21-33:12 [Greenberg]; JX 51).  Accordingly, when Greenberg took information from TransCare management, he confirmed the assessment himself before presenting it to Tilton. (Tr. 7/22 A.M. 38:11–40:3 [Greenberg]).  Greenberg worked closely with Pelissier on the development of the plan, and Brian Stephen was involved as well. (Tr. 7/22 A.M. 26:11–28:14).  See generally Tr. 7/22 A.M. 31:21-40:3 for Greenberg's work preparing the plan and his validation of the assumptions. |
| 5 | P. 11 | “On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division. (JX 12 at 04260; Leland Tr. 85:9–86:14.).” | This finding is incomplete and is not corroborated by contemporaneous written evidence.<br><br>The only written proposal received by TransCare from National Express, the July 2015 LOI, was for nearly half this amount – i.e., $6-7 million paid out over time. (See JX_40.)<br><br>National Express's “offer” in February 2015 was made before any due diligence had been conducted. (July 23 AM Tr. 63:2–64:7; Aug. 13 AM Tr. 48:8–16.)<br><br>National Express's outreach in February 2015 predated the renewal of the MTA contract in mid-2015. (JX_67, at 106572.) The renewed contract was less profitable (id.) and, in fact, EBITDA generated by the paratransit business fell in July and the months that followed. (Id. at 106586 (“Region Rev-EBITDA by Month” Tab).) | The finding is complete and supported by contemporaneous written evidence.  See JX 12 at 04260-61, Leland email dated February 5, 2015:<br><br>“Under this alternative we would sell our most valuable asset [the MTA contract] for an estimate $15 to $18 million, and use that cash (as opposed to new investment by Patriarch Partners) to fund a modified version of the Slow Path to Profit and Growth model I've been conceiving and introducing over the past two weeks….Today I was approached by executives of National Express, an international transit services leader…” who proposed to (1) partner with TransCare on its contract renewal with the MTA, (2) introduce the new alliance of TransCare and National Express to the MTA, (3) have TransCare execute the renewed contract and (4) transfer ownership to National Express.<br><br>See also Leland Tr. 85:9–86:14 (testifying as to JX 12). |
| 6 | P. 11 | “Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also | This finding is incomplete.<br><br>This “offer” was made without any due diligence and was | The finding is complete, the exhibit and testimony support the finding. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | offered to consider an operational management arrangement. (PX 44 at 90486; Tr. 8/13 A.M. 45:7–15.)." | premised on a misimpression of TransCare's current EBITDA. (*See* JX_29, at 0071450; Leland I Tr. 174:8-12.)<br><br>At the time, TransCare's EBITDA was "zero" to "maybe slightly positive level":<br><br>"Q Do you see the part where he says that RCA must assume TransCare has EBITDA in the ten-million-dollar range?<br><br>A Yes.<br><br>Q To your recollection, what was TransCare's EBITDA and on a 9 last 12-months- basis in March of 2015?<br><br>A In the—somewhere in the neutral to maybe slightly positive level. Q What do you mean by neutral?<br><br>A Neutral being zero."<br><br>(See July 22 PM Tr. 83:22-84:13; *see also id.* 81:8-9.)<br><br>Leland expressed that the 8x EBITDA multiple used by RCA was "high for the industry." (JX_29, at 0071450.)<br><br>Leland also testified that in November 2014, nearly a year before Wells issued the Non-Renewal Notice, it would have been a stretch to sell TransCare at a multiple of 5x EBITDA. (Leland II Tr. 313:3–24; see id. at 313:15–22 ("[TransCare's] profitability is declining, they're accumulating negative equity, and if they're to turn that around, there's -- even if they were to sell the company at a multiple of five times, the company is worth a third of its | The email from Michael Weinberg, COO of RCA, to Tilton, dated March 3, 2015, states: "Before getting into details on financials RCA is prepared to offer up to eight times the EBITDA…We would also consider an operational management arrangement." (PX 44 at 90486). Tilton received the email, and did not object to its submission into evidence. (Tr. 8/13 A.M. 45:7–15 [Tilton].) |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | negative equity. So it's got a negative equity.") | |
| 7 | P. 12 | "Even after the payroll default, TransCare continued to receive expressions of interest." | This finding is incomplete, and the inference drawn is not supported by the record evidence.<br><br>Third parties were not interested in TransCare *in spite of* the missed payroll, but rather *because of it (because they assumed the company was vulnerable and could be bought 'on the cheap'.* (*See, e.g.*, Leland I Tr. 171:23–25; id. 172:22–24 ("The point is, a lot of industry contacts started to express interest in TransCare's plight and ways to capitalize on that." (emphases added); *see also* July 22 PM Tr. 89:1– 90:2 (describing TransCare as being in a "vulnerable position" after the missed payroll).)<br><br>The July 2015 LOI from National Express, sent shortly after the payroll miss, offered half of the alleged $15-18 million allegedly proposed by National Express in February. (See JX_40.) | The finding is accurate.<br><br>For the expressions of interest, *see* PX 73 and Tr. 8/13 A.M. 45:17-24 [Tilton] (July 15, 2015); JX 40 (July 10, 2015); PX 83; Tr. 7/22 P.M. 74:8-17 [Greenberg] (July 13, 2015); PX 111; Tr. 8/14 A.M. 26:19-27:1 [Tilton] (December 8, 2015); PX 124; Tr. 7/23 A.M. 50:22-51:3 (December 16, 2016).<br><br>As Tilton did not explore any of the expressions of interest, she has no basis to opine on the underlying motivations of the potential purchasers. |
| 8 | PP. 12-13 | "On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express called him that morning about purchasing the paratransit business and asked whether he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M. 26:19–27:1.) On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him 'a few times' that day to | The cited testimony does not support the finding, and the finding is incomplete.<br><br>The July 2015 LOI from National Express had lapsed by December 2015. (*See* JX_40, at 30764 (noting that, if TransCare did not return a signed copy of the [LOI] within seven days, "the offer set forth herein shall cease to be valid").<br><br>Moreover, Leland's statements are not corroborated by contemporaneous written evidence. There is no evidence in the record, beyond Leland's unsupported statements in an | The emails and transcript referenced in the PFC directly support the findings. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | reiterate that its offer to buy TransCare's paratransit contract was 'still out there.' (PX 124; Tr. 7/23 A.M. 50:22– 51:3.)." | email, to demonstrate National Express's continued interest.<br><br>The testimony (Aug. 14 AM Tr. 26:19–27:1) cited by the bankruptcy court relates to National Express's *July* LOI of $6-7 million, not an alleged indication of interest from December. | |
| 9 | P. 14 | "[Tilton] also instructed Greenberg to find investment bankers to market TransCare. (Tr. 7/22 A.M. 41:6–13, 42:21–23; see DX 96.)." | The finding misstates Tilton's request. Tilton's request was part of a process to determine whether TransCare was saleable; not reflective of a decision to sell some or all of TransCare. (Aug. 13 PM Tr. 52:17–53:7 ("Q Why did you send Mr. Greenberg DX-96? A Because I wanted to see who were the investment bankers working in this industry, to see if there would be some way to piece together a sale process and who I should go to if we were able to do that.").) | The finding is accurate.  (*See* DX 96; *see also* Tr. 7/22 A.M. 41:6-13 [Greenberg] ("Q: And what were you tasked with, if anything, in that [considering a sale of TransCare] connection? A: Of course I, you know, was stilled [sic] tasked with trying to improve the business. But then in addition to that we were looking at potential investment banks to get a sense for, you know, what investment banks were out there that could market the company.  In addition also looking at transactions and multiples in the market.") (emphasis added)).<br><br>For Greenberg's testimony on Tilton's request to him *see generally* 7/22 A.M. 40:14-41:13.<br><br>Further, the agreement being negotiated between Tilton and Wells Fargo contained a timetable for a sale, by August 15, 2016, including dates for the submission of budgets, hiring of investment bankers, offering memorandums, and purchase documents (JX 65). |
| 10 | P. 16 | "Tilton, however, never hired an investment banker to pursue a possible sale." | Tilton did not hire an investment banker because, based on CMAG's work, it was apparent that the company could not engage in a sale process without a substantial infusion of new money, an investment that CMAG itself described as very risky. (See PX_175, at 02114 (noting that "time has run out and the decision to risk significant capital must be | Tilton does not challenge the finding, which is accurate.<br><br>The documents cited by Tilton refer to Tilton's determination that the sale process for TransCare as a whole was not viable, they do not refer to pursuit of a possible sale of specific assets. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | made before a turnaround can show meaningful positive results" and that "[p]lan execution risk is high").) As a result, she determined that a sale process would not be viable. (DX_130, at 28275; Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18–24.)<br><br>The bankruptcy court intimates that the decision was made in bad faith despite expressly finding later in the PFC that Tilton *"made a good faith determination that the company as a whole was not saleable."* (PFC at 43 (emphasis added).) | Finally, Tilton did not trust or rely upon Carl Marls' work. *See* response to Obj. No. 11 directly below. |
| 11 | P. 21 | "Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company… (Tr. 8/13 A.M. [Tilton] 64:1–16.)." | The cited testimony does not support the finding. In the cited testimony, Tilton simply described the deep dive her team was conducting as of February 5 to determine "if there was something to be saved." (Aug. 13 AM Tr. 64:16.) Tilton did not approve a restructuring plan, or the potential for such a plan, before February 9, after engaging in discussions with Wells Fargo representatives and soliciting the assistance of CMAG. (*See, e.g.* DX_127, at 46297; July 23 AM Tr. 73:16–24; Aug. 13 PM Tr. 65:12–20; DX_130.) | Tilton's testimony supports the finding:<br><br>"Q:  From your testimony, and I understand, that you were not satisfied with the results of the February 5th meeting?<br><br>A :  I did not believe that [Carl Marks] did what I asked them to and all they did was present me a thirteen week cash-flow statement asking for eight and a half million dollars with no restructuring, or cutting of expenses or look to the details of a business on how to rebuild it.<br><br>Q :  All right.  And so between February 5th and the next week or so you worked with your own staff and came up with what was the beginnings of the NewCo plan?<br><br>A:  I worked with my own staff and people from the TransCare divisional chiefs to try to understand each division down to each contract, to each body, to each hour of labor, to each ambulance needed and the mathematics of moving those people, and ambulances and medical staff around so that we could figure out if there was something to be saved here. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | Q: And when you say work with your staff, and you mentioned all those divisional chiefs, your staff was working with them to get the data that you felt you needed to do it? |
| | | | | A: We wanted the information directly from the enterprise software system and Glenn Youngblood as well as . . . . |
| | | | | Q: Go with me to DX – at the same time was Carl Marks working on an OldCo where you [were] going to take part of the company and put in into NewCo and put the OldCo part into Chapter 11? Was that the plan? |
| | | | | A: No. We [Patriarch Partners] were working all the models. Carl Marks was only reviewing the work that we were doing since they were not able to do the type of work that needed to be done. So, we had an OldCo plan that actually was an orderly wind-down outside of Chapter 11 and then after sixty to ninety days would have been put into a Chapter 7 and the NewCo which was the product of an Article 9 straight foreclosure sale…." (Tr. 8/13/A.M. 64:1-65:16 [Tilton].) |
| 12 | P. 27 | "Tilton maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare. (Tr. 7/23 A.M. [Greenberg] 17:17–24)." | The cited testimony does not support the finding; the finding is incomplete; and the inference drawn is not supported by the record evidence.<br><br>The cited testimony relates to an operational listing of action items among Tilton, Patriarch Partners and PPMG personnel, and TransCare management. (PX_206.)<br><br>Many people (Wells Fargo, CMAG, and TransCare executives) were involved in the efforts to avoid a free-fall liquidation. (*See infra* at 17–18.)  The cited document only indicates that Tilton was the point person for the timing of | The finding is accurate and complete.<br><br>Tilton admitted she directed the foreclosure and selected the purchase price.  (Tr. 8/13 A.M. 4:19-5:13).  Tilton directed the foreclosure to occur at 12:07 a.m. on February 24 because she had just gotten the insurance for Transcendence that she had been waiting for.  (Tr. 8/13 A.M. 6:16-19).  Tilton testified that she made all the decisions for PPAS and the Term Loan Lenders and came up with the terms for the transaction herself.  (Tr. 8/14 A.M. 18:10-11 ("I was responsible for all the lenders as the agent and I came up with the terms.")). |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | the foreclosure and bankruptcy filings.<br><br>Pelissier never testified that Tilton "maintained exclusive control" over either decision (July 23 AM Tr. 17:17-24); it would have been impossible for her to do so. Wells Fargo had the power to cease funding at any point during the two-week period at issue and thereby cause the company to shut down. (*See, e.g.*, Aug. 13 PM Tr. 94:23–24; id. at 95:3–11; DX_150; JX_83.) | Tilton did not negotiate the terms of the foreclosure with Wells Fargo, Carl Marks or TransCare management, and presented no evidence of any such negotiations or resulting terms. |
| 13 | P. 28 | "Tilton testified that EBITDA would increase to $4 million if annualized over a full twelve months. (Tr. 8/14 AM [Tilton] Tr. 38:4–12.)" | The cited testimony does not support the finding; the testimony attributed to Tilton actually comes from the Trustee's counsel:<br><br>"TRUSTEE'S COUNSEL: But based on this model that your people or you created if you add those a month and a half your EBITDA is four million, perhaps even more.<br><br>TILTON: No, because it actually lost money in the first two months."<br><br>(Aug. 14 AM Tr. 38:4–11; *see also id*. at 38:4–40:25.) | The finding is correct, and the same point is mathematically confirmed by the document itself.  For the full colloquy concerning this point (including the cross, re-cross and the Court's own questioning) *see* Tr. 8/14 36:23-41:2 [Tilton] discussing DX 166, the Transcendence projections.<br><br>Included in the above citation is Tilton's confirmation that the projections covered only "ten months plus nine days."  (*See* Tr. 8/14 37:14-15).  Tilton does not contest that if the projections were annualized from February 21, 2016 through February 21, 2017, that the full year EBITDA projections would be $4 million.  (*Id*. at 36:23-40:25).  Instead, Tilton debated the use of projections to value a company.  (*Id*. at 37:16-38:20; 40:12-41:2).<br><br>However, Tilton confirmed that she projected Transcendence to earn more EBITDA as the months progressed.  (Tr. 8/14 37:16-38:3).  Included in that citation is her explanation as to why she made that projection:<br><br>"Because that is what our projection was that we thought if we could increase the transit revenues which we were discussing |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | with the MTA people to get additional, but that was not the performance of those three divisions at that time.  That was my projection of what we might be able to do that would allow me to be willing to put up $10 million dollars of fresh capital to try to save NewCo" (*Id*. 37:22-38:3). |
| 14 | PP. 28-29 | "The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million EBITDA shown on the earlier forecast, (PX 286), resulted from the decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions, (PX 286 at 105516)" | The difference in EBITDA was not the result of a "decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions," but rather the fact that those divisions had lost key customers as the company continued to fall apart on a minute-to-minute basis.<br><br>Between February 13 and February 24, TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland. (DX_157, at 05291 ("[T]he company just received a 90 day notice from Bronx Lebanon, a contract that we were taking with Newco. This was an important and valuable contract to the new entity."); *id*. at 05291 ("This company is unraveling by the minute. I do not think it is a coincidence that we received 2 unexpected cancellations today."); Aug. 13 PM Tr. 99:8–101:12; *see also* July 22 PM Tr. 119:23–120:4.) It was apparent that customers and others in the industry were aware of TransCare's dire situation. | Tilton does not contest that the difference between the $3.2 million EBITDA shown on February 24, 2016 and submitted to Lockton and the 3.7 on the other forecast were a result of Maryland, Westchester, and Bronx 911/Montefiore divisions being dropped from the plan, while Tilton waited to obtain insurance for Transcendence.  (PX 228 and PX 286 at 105516). |
| 15 | P. 31 | "As consideration for the purchase of the Subject Collateral, Transcendence agreed to pay PPAS $10 million. Ark Angels III, a Tilton affiliate, would finance the purchase under a Purchase Credit | The finding is inaccurate and/or incomplete. Ark Angels was not "deemed to have loaned Transcendence $10 million." Ark Angels III also did not pay PPAS $10 million, or any other amounts. The Subject Collateral was paid for by a credit bid by the Term Loan lenders, using a portion of its loans as payment for the Subject Collateral. (PX_209; | The finding is accurate and complete.  As consideration for the Subject Collateral, Transcendence agreed to pay $10,000,000 to Ark Angels III. (JX 102 (Bill of Sale)):<br><br>a. Recital E ("The consideration for the transfer of the Subject Collateral to [Transcendence] pursuant to this Bill of Sale shall be $10,000,000 such amount to be financed by Ark Angels III, |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | Agreement and was deemed to have loaned Transcendence $10 million." (JX_101.) | Aug. 13 PM Tr. 118:6–12; JX_110, at 9 ("Schedule 1").)<br><br>JX_101 (the Ark Angels credit agreement with Transcendence) is unexecuted. The contemplated Ark Angels facility was a working capital revolver whereby Ark Angels would loan *up to* $10 million to Transcendence through intermittent loan draws. (*Id.*) Ark Angels was only required to provide funding to Transcendence upon the satisfaction of certain conditions precedent, including conditions related to Transcendence's financial performance and solvency. (*Id.*, § 3.2.) | through [Transcendence's] agreement to pay, under the terms of the Purchaser Credit Agreement as such term is defined below, a portion of the amounts outstanding in respect of the Loans as of the date hereof as described below."); and<br><br>b. Section 3 ("[Transcendence] hereby agrees to pay $10,000,000, constituting a portion of the principal amount outstanding of under the TransCare Credit Agreement as of the date hereof prior to giving effect to the foreclosure described in the Foreclosure Notice… (the "Closing Date Obligations"). Such Closing Date Obligations shall be owing by [Transcendence] on and after the date hereof and will be governed exclusively by the Credit Agreement, dated as of the date hereof, by and between Administrative Agent, the lenders party thereto and [Transcendence] (the "Purchaser Credit Agreement")...")<br><br>Tilton's reference to the conditional nature of the Ark Angels III loan is not accurate for three reasons:<br><br>(1) Tilton testified that notwithstanding the lack of execution on the exhibit copy that she was committed to the loan. (Tr. 8/13 23:11-24:3);<br><br>(2) Ark Angels III actually advanced $658,000 to Transcendence under that loan facility in order pay the New York State Insurance Fund and lease the paratransit facility on Foster Avenue in Brooklyn. (JX 101 at 8673; Tr. 7/22 P.M. 59:13–61:12 [Greenberg]; Tr. 8/13 A.M. 24:15-24 [Tilton]);<br><br>(3) Tilton testified that the Ark Angels III loan funds would be used to either purchase TransCare's receivables from Wells Fargo or "go in or about day one as soon as cash was needed." |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | (Tr. 8/13 A.M. 22:23–23:8). |
| 16 | P. 34 | "Historically, the paratransit business was TransCare's second biggest revenue producer accounting for 26% of TransCare's operating revenue, (JX 67 at 106572), and $4 million of EBITDA. (JX 12 at 04260.)" | The finding is incomplete and misstated. The discussion is around EBITDA and not revenues, and the EBITDA is overstated.<br><br>"The Transit contract was renewed in mid-2015 through October 2019 but the MTA moved away from a commercial contract to a municipal contract where it limited profitability." (JX_67, at 106572.)<br><br>"The MTA also demanded a rebate of $225k per month beginning in October (for at least 9 months) due to an interim extension where they believed they were overcharged." (*Id.*)<br><br>"During the 3rd and 4th quarters of 2015, Transit lost routes due to challenged performance and concerns about . . . TransCare's stability due to the delayed payment of insurance bills and other obligations." (*Id.*)<br><br>*See also* July 22 PM Tr. 105:9–107:19 (Greenberg discussing decrease in profitability of MTA contract after mid-2015 contract renewal).<br><br>By the fourth quarter of 2015, EBITDA for the paratransit business had dropped from approximately $4 million to $2.17 million. (PX_191, at 04699.) (JX_12, cited by the bankruptcy court, is an email dated February 6, 2015 detailing historical profitability of the MTA Contract.) | The finding describing the historical performance of TransCare's paratransit business is supported by the record:<br><br>*See* JX 67 at 106572 ("Overview of 2014 and 2015 performance by division:… Transit – (26% of revenue)").<br><br>*See* JX 12 at 04260 ("TransCare enjoys a contract with the Metropolitan transit Authority for paratransit services. It is one of the most profitable businesses and is include in both our Fast and Slow Path plans. The contract produces $4 million of EBITDA and has very little capital demand (fleet provided by the MTA).")<br><br>Tilton refers to portions of the record that relate to a time after JX 12 was created in February 2015.<br><br>However, Greenberg confirmed the financial information of the Contract in his November 2015 presentation to Tilton, including his five-year projection of EBITDA from the MTA Contract. (Tr. 7/22 39:1-14, discussing JX 51 at 985518). |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| 17 | P. 35 | "At the same time, Randy Creswell (counsel to PPAS) asked the Trustee to consent to termination of the MTA Contract. (JX 105.) At trial, Tilton blamed Transcendence's loss of the MTA Contract on the Trustee's refusal to consent per the MTA's insistence, (see Tr. 8/13 A.M. 26:21–25), but the Trustee was willing to consent to the termination of the MTA Contract as long as it was without prejudice to amounts due to TransCare, (JX 105), and informed the MTA's lawyer of his consent. (Tr. 7/24 148:2–5.)." | The finding is incomplete and ignores the importance of the timeline of events. The Trustee's consent to the termination of the MTA contract was untimely. (JX_105; Creswell writes "Salvatore [LaMonica], With apologies for this final message, but if you do have a position or thoughts on the termination of the contract, please let me know. We need to respond to the city if this will work.  If you cannot respond *before 5*, then we won't be able to proceed with the case." Creswell received a responsive email from the Trustee giving conditional consent after 5pm. (*Id.* (emphasis added).) By the time the Trustee responded, employees had been sent home and the vehicles, belonging to the MTA but used by TransCare had been picked up by the MTA. (PX_245; July 23 PM Tr. 123:8–12.) | The finding is complete and supported by the record evidence.<br><br>The Trustee's response to Mr. Creswell's request was sent at 5:07 p.m., and states: "Randy. ..I tried to call you several times.  I spoke to the attorneys for the NYCTA.  I have no problem terminating the contract as long as it is without prejudice to the amount due to Transcare under the contract.  I also told them that if they want the vehicles back they have to remove the plates and the Transcare name form [sic] the side so that the estates are not in Jeopardy.  Please let me know when you can speak."  (JX105).<br><br>There is no evidence that Tilton sent employees home, responded to the MTA or took any other steps between 5:00 p.m. and 5:07 p.m.  Instead, the evidence showed that at 7:01 p.m. that evening Stephen told the MTA that he had spoken with Tilton and that Tilton had determined to shut Transcendence.  (PX 245). |
| 18 | P. 49 | "Tilton did not retain a financial advisor to seek out possible third-party interest in purchasing the assets or investing in TransCare." | The finding ignores the purpose of hiring CMAG, a financial advisor hired by Tilton, and CMAG's duties under its consulting agreement. Tilton retained CMAG in connection with her discussions with Wells Fargo to "extend the ABL so as to facilitate a sale of TransCare." (*See* PFC at 14.) The work that CMAG performed in January 2016 and that was discussed on February 5, 2016 was an integral part of the process to determine if TransCare was saleable or if it could even survive a sale process. (See, e.g., PX_165, at 00926 (CMAG providing analysis comparing "cost of a [bankruptcy] filing versus the cost of bridging to a sale"); July 22 AM Tr. 77:15–19.)<br><br>The scope of CMAG's assignment was set forth in a | Tilton does not dispute the accuracy of this finding.<br><br>Tilton misdescribes the scope of Carl Mark's engagement. (DX106 at PP-TRBK0043438, at ¶ 2 ("CMAG will report directly to [Tilton] and will assist TransCare by providing and overseeing the implementation of process of recommendations intended to manage, secure, improve its financial performance and liquidity.  In that connection, CMAG will provide Carl Landeck, a Managing Director to perform in the role of Interim Chief Financial Officer and provide the associated services therewith.") (emphasis added).)  *See also* Trustee's Responses to Obj. Nos. 9-11, which are hereby incorporated by reference.<br><br>In short, Carl Marks did not serve as "a financial advisor to seek |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | consulting agreement between TransCare and CMAG. (DX_106.) It provided that CMAG would "assist TransCare by providing and overseeing the implementation process of recommendations intended to manage, secure [and] improve [TransCare's] financial performance and liquidity." (*Id.* at 43438.) It further provided that CMAG's services were to include, without limitation: (i) "[p]erform[ing] normal duties of the position of TransCare CFO"; (ii) "[a]nalyz[ing] the Company's financial and capital needs in detail"; (iii) "review[ing] and updat[ing] as necessary existing financial projections and internal budget"; and (iv) "assist[ing] with further identification of actionable opportunities to improve profitability . . . intended to improve the Company's performance." (*Id.* at 43439.) | out possible third-party interest in purchasing the assets or investing in TransCare" and Tilton never used the firm for that purpose. |
| 19 | P. 49 | Tilton "did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice." | The findings ignore the record evidence showing that such alternatives were explored and were not feasible, based on Wells Fargo objections, the absence of sufficient time and the lack of funds to support them.<br><br>There was no money available for a Chapter 11. By February, Wells had already reached the conclusion it would not provide any long-term funding to TransCare. (*See, e.g.*, DX_92, at 75263.) Tilton did broach with Wells the subject of providing DIP financing for the OldCo businesses, through her personal investment funds, but those negotiations ended when Wells refused to agree to subordinate its liens and indebtedness to a DIP loan. (*See* JX_82, at 48227; Aug. 13 PM Tr. 86:3–8.) Moreover, CMAG warned *against* pursuing a bankruptcy, noting that a bankruptcy filing would result in "customers and employees | The finding is correct. Tilton never explored any of the alternatives.<br><br>First, the Bankruptcy Court refers to "debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo." The cited references (while incorrect), relate solely to OldCo.<br><br>Second, Tilton does not object to the finding that she did not "entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice."<br><br>Third, Wells Fargo actually supported a sale of TransCare's assets (PFC at 16, to which Tilton does not object) and never |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | . . . abandon[ing] TC." (*See* PX_175, at 002116.) | varied from its position of being willing to fund TransCare through a sale. (Husson (*LaMonica*) Tr. 56:14–57:6; Tr. 7/22 A.M. 63:14-20). |
| | | | | Fourth, Wells Fargo was willing to consider a bankruptcy debtor-in-possession facility for TransCare (OldCo) but required a budget from Tilton to do so.  (JX 84 at 53, 51, 49 and 47).  As late as February 19, 2016 — less than a week prior to the foreclosure — Wells Fargo gave Tilton a written proposal for a new $16.5 million ABL to fund a wind-down of TransCare, also subject to appropriate releases and consents, and a budget. (PX 219 at 3192 (native)). |
| 20 | P. 49 | "Moreover, [Tilton] did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July." | The findings ignore the record evidence showing that such alternatives had already been considered and determined to be infeasible.<br><br>Tilton commenced exploration of and conceived the design for the OldCo/NewCo Restructuring on February 9, **four days** after making a good faith determination that TransCare could not survive a sale process, based largely on CMAG's work. (PFC at 43; DX_130.)<br><br>That is because there was neither the time nor the money to sell to a third party. Wells would have to keep funding to keep the doors open long enough for diligence and the negotiation of an asset purchase agreement that Wells would have to consent to. (*See, e.g.*, JX_64; *see also* JX_60, at 00145.)<br><br>There was no evidence showing Tilton could have sold the NewCo business lines on an expedited basis without any | Tilton does not deny that she did not pick up the phone and call any of the ambulance companies that had previously expressed interest in TransCare.<br><br>Tilton does not point to any evidence that she considered selling the Transcendence assets to "any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July."<br><br>Tilton failed to provide any evidence of what Tilton "could have sold the NewCo business lines for[]" had she conducted a disinterested process. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | due diligence process by potential buyers. (*See, e.g.*, JX_40 (National Express LOI, expressly conditioning its interest on completion of a due diligence period).) | |
| 21 | P. 49 | "Instead, she made the determination that no one other than herself would lend to NewCo . . ." | This finding is inaccurate and is contradicted by the bankruptcy court's own findings that TransCare "was unable to borrow money elsewhere" (PFC at 90) and "bankrupt companies are generally short of cash and the shareholders are often the only source." (*Id.*)<br><br>The only new funding Wells Fargo or CMAG proposed was from Tilton herself. (DX_92, at 75263; PX_175, at 02123; id. at 02114; Aug. 13 PM Tr. 70:16–20; *id.* at 69:21–23; PX_175, at 02114; *see also* JX_82, at 48227.)<br><br>TransCare could not realistically obtain third-party financing. TransCare's assets were already pledged in full as security to multiple secured lenders; both Wells Fargo and the Term Loan Lenders had blanket liens in all of TransCare's assets (which, by definition, included the NewCo assets. (JX_1, at 00069, § 6.16; JX_2, at 00785; PX_197.) TransCare was also in default under the Wells Fargo ABL Agreement and the TLA. (PX_132, at 46849–50; JX_96.)<br><br>A prospective new lender would also discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015. (Aug. 13 AM Tr. 52:3–6; PX_132, at 46849–50.) CMAG highlighted the limits of TransCare's financial reporting, cautioning that it had "worked diligently to develop the most accurate financial picture of the Company | The finding, which is not quoted in full, is accurate.<br><br>The finding is that Tilton determined that no one other herself would lend to NewCo, not TransCare:   "Instead, she made the determination that no one other than herself would lend to NewCo or buy its assets even though she viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money."  (PFC at 49 (citing JX 80 at 92228); Tr. 8/13 A.M. 38:5-39:13, 44:5-10 [Tilton]).<br><br>The record citation for those acts is accurate and not challenged by Tilton.<br><br>(1)  Carl Marks worked for Tilton, and Wells Fargo had no discussions with Tilton regarding lending to NewCo.<br><br>(2)  Tilton prohibited TransCare management and her team from seeking out alternative financing.<br><br>(3)  Wells Fargo supported a sale of TransCare's assets (PFC at 16, to which Tilton does not object) and never varied from its position of being willing to fund TransCare through a sale. (Husson (*LaMonica*) Tr. 56:14–57:6; Tr. 7/22 A.M. 63:14-20).  And Tilton herself showed that the assets could be sold to a new company by selling them to Transcendence.<br><br>(4)  While Tilton had not issued financial statements, she put on no evidence of any inaccuracy in any of TransCare's financial |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | *possible given the limitations of the Company's accounting systems and financial reporting."* (PX_175, at 02118 (emphasis added).) | records. |
| 22 | P. 49 | "Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value." | The finding is inaccurate. Ark Angels III's commitment of $10 million was conditional and effectively tied to whether (or not) NewCo was financially successful. (JX_101, at 08703, § 3.2 (detailing conditions precedent the borrower was required to satisfy before it could draw down on the facility).) Tilton testified that the transaction was very risky and the success of Transcendence uncertain. (*See, e.g.,* Aug. 13 PM Tr. 126:23–25 ("[G]iven the condition the company was in and the continued loss of people and contracts, it was a very high-risk transaction").) Tilton was the only person or entity willing to take that level of financial risk in the hope of saving parts of this company and hundreds of jobs. (*See, e.g.,* Aug. 13 AM Tr. 40:11–18; Aug. 13 PM Tr. 126:11–25.) That willingness is not evidence of "substantial value"; at best it is evidence of potential future value with a new working capital investment. | Tilton's objection fails to include the Bankruptcy Court's citation, in the very next sentence, to *Gentile v. Rossette*, 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) for the proposition that "defendant's 'persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the Company' was the most persuasive evidence of the company's value, notwithstanding his trial testimony that 'the Company was worthless and on a path to oblivion.'" (PFC at 49). Ark Angels III's commitment was not conditional on the financial success of Transcendence. *See* Response to Obj. 15: Tilton had committed to the loan, actually advanced $658,000 under the loan and planned to inject the funds on "day one." |
| 23 | P. 53 | "The 13-week wind down plan valued OldCo's plant, property and equipment ('PPE') at approximately $3.6 million, and this did not account for the wind down value of the PPE owned by Maryland, Westchester and Bronx 911/Montefiore 911." | The finding is inaccurate. The value of the OldCo PPE was not $3.6 million; rather, $3.6 million represented the net book value of the PPE of all of TransCare's assets. (PX_191, at 04695, 04706; Aug. 13 PM Tr. 129:1–5 ("Q: Ms. [T]ilton, do you know what PX–191 [is]? A: It's a financial package from TransCare for October financials that were issued on February 5 [2016]. Q And this is for the whole company? A: Yes.").) | Tilton objects to this finding on the grounds that the $3.6 million in net book value PPE referenced in the OldCo winddown plan represented "all of TransCare's assets." But in addition to TransCare's Hudson Valley, Pittsburgh and MTA divisions, Tilton also foreclosed on all of TransCare's personal property. (PFC at 29; JX_96; PX_237.) Therefore, as the Bankruptcy Court explained, the book value calculation was wrong because "the Subject Collateral on which PPAS foreclosed |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | and sold to Transcendence was not limited to the three TransCare divisions that Transcendence would operate." (PFC at 53). |
| 24 | P. 53 | "Although PPAS did not foreclose on the CONs, it foreclosed on the stock of these two entities and transferred the stock to Transcendence. The CONs they owned allowed them to operate their ambulances and increased the value of their stock. The Trustee sold the two CONs for the aggregate sum of $3.2 million at a liquidation sale after they filed for bankruptcy." | The finding is inaccurate and relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment.<br><br>The ability to use the CONs could only increase the value of the stock of TC Hudson Valley and TC Ambulance Corporation if the CONs could be used in a going concern business. None of TransCare's business lines—including those that were contemplated to become NewCo—could operate as a going concern on the day of the foreclosure, absent a significant infusion of new working capital. (*See, e.g.* July 24 Tr. 156:9–157:8).) Any potential increase in stock value would be attributable to a substantial working capital investment in *NewCo*. (JX_101.) It is improper to include in fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *39–40 (Del. Ch. Sept. 4, 2014). | Tilton does not challenge the finding that PPAS did not foreclose on the CONs and that they were valuable to the business as a going concern. Additionally, Tilton does not dispute that she foreclosed on the assets, including the stock, as a going concern, and she valued them as such.<br><br>As shown by Tilton's own contemporary projections, statements and actions, the Transcendence assets did have significant value as operating entities. Tilton testified that she came up with the Tilton Plan because "to me, it was the most elegant solution given the timeframe and the only scenario under which I was willing to put in new money because it would have been money going into a company with a future." (Tr. 8/13 P.M. 78:7-10) (emphasis added). Tilton confirmed that Transcendence would have a future by having her three internal teams prepare and validate the Transcendence projections showing significant going concern value. (Tr. 8/13 A.M. 39:17–40:18 [Tilton]; Tr. 8/13 A.M. 41:2-15; Tr. 8/13 A.M. 64:8-21 [Tilton]). *See also* Tr. 8/13 A.M. 62:7-12 [Tilton]; Tr. 8/13 P.M. 80:6–81:4; 94:11-17 [Tilton]; DX 150 (thanking the "35 to 40 people, all of whom were working to save this company")). Tilton contemporaneously told counterparties that "[t]here is a smaller, less risky transit business that we would like to continue in a new company" that would generate $4 million of EBITDA in 2016 and $7 million of EBITDA in 2017 (PFC at 25-26, findings to which Tilton does not object). Tilton proffered no evidence as to why other purchasers would not have viewed the Transcendence assets in the same manner. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | Finally, Tilton understood that, by foreclosing on the stock of these corporations, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence. (Tr. 8/14 A.M. 23:12–15 [Tilton]). |
| 25 | P. 54 | "Book value may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors that were liquidating, but the strict foreclosure contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence." | The finding relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment.<br><br>TransCare's assets could not be valued as a going concern as it did not have the capital to continue operations on its own. On February 24, the three TransCare divisions that were slated to comprise NewCo could not operate as a going concern (and were worth only what they could be liquidated for) because there was no working capital to fund their operations. (July 24 Tr. 156:9–157:8.) Any potential future value of the assets in operation would be attributable to a substantial working capital investment in *NewCo*. (JX_101.) It is improper to include in fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *Nine Systems*, 2014 WL 4383127, at *39–40.<br><br>Moreover, buyers in an open-market transaction look at a company's current EBITDA and current financial status—not potential future values. (*See, e.g.*, Aug. 14 AM Tr. 38:17–20.) Leland's belief that RCA's proposed price was based on RCA's (albeit mistaken) impression of TransCare's then current earnings is consistent with Tilton's testimony that prospective buyers look to actual earnings, not projections, when valuing a potential | Tilton presented no evidence that book value was an appropriate measure of value of the assets transferred given TransCare's business.  (*See* PFC at 53-54, quoting *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 36 (2d Cir. 1996) ("[B]ook values are not ordinarily an accurate reflection of the market value of an asset.")).  Book value is an accounting construct that, among other things, deducts depreciation and has no necessary connection to market value.  (Tr. 8/14 P.M. 32:8-11).<br><br>Tilton does not identify what capital was needed for Transcendence nor where the Bankruptcy Court erred in its determination that much of the proposed initial funding was largely to pay off TransCare's debts which a third-party buyer would not pay.  (PFC at 65).  Nor does Tilton dispute the Bankruptcy Court's determination that the projections for Transcendence projected only $120,000 in capital expenditures, with the remaining funding characterized as a "incremental funding needs" which Tilton's models assumed "can be offset if a new ABL line is secured or by cash that builds throughout the year, and which listed the cash as a financing adjustment and not as a capital expenditure. (PFC at 26-27).  Nor does she object to the finding that the Ark III loan extended to Transcendence represented a "revolving line of credit rather than [an] invest[ment] of new capital."  (PFC at 66).<br><br>Dr. Arnold testified that the industry standard was that anyone buying the company would be interested in forward looking |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | acquisition. (*See* JX_29, at 71450; Aug. 14 AM Tr. 38:17–20.) | value.  No one is interested in buying the past. (Tr. 7/24 17:25–18:11). |
| 26 | P. 54 | "Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence." | The finding is inaccurate and relies on an improper assumption that in conducting a fair price inquiry, the value of an asset or property should reflect the future value that could be achieved through a new money investment. The MTA Contract only had value if it could be used in a going concern business. None of TransCare's business lines—including those that were to become "NewCo"—could operate as a going concern on the day of the foreclosure, absent a significant infusion of working capital. Any potential increase in value of corporate stock could only occur if there was a substantial working capital investment in NewCo. (JX_101.) It is improper to include in a fair value analysis potential future value made possible through "new money" TransCare had no ability to raise. *Nine Systems*, 2014 WL 4383127, at *39–40. | Tilton admits that "she did not attribute any value to the MTA Contract," (Tr. 8/14 A.M. 26:8-11 [Tilton]). <br><br> (Tilton is correct that the MTA Contract had a liquidation value of zero, that is why Tilton should have sought to sell it as going concern in a disinterested manner). <br><br> The MTA Contract was to be the crown jewel of Transcendence and was desirable because there was virtually no need for capital investment as the vehicles were provided by the MTA. (Tr. 7/22 A.M. 38:3-10 [Greenberg]; JX 51 at 98518 ("Since there is almost no capital investment the ROI is highly desirable.")). Greenberg reported to Tilton that conservative estimates of revenue indicated that the MTA Contract would generate EBITDA of $1.87 million, $2.73 million, $2.77 million and $2.81 million over the four years, respectively, between November 2015 and October 2019.  (JX 51 at 985518; Tr. 7/22 A.M. 38:11–39:14 [Greenberg]).  Also, numerous suitors were interested in acquiring TransCare's paratransit business and MTA Contract, with National Express reiterating their $8-9 million offer on December 16, 2015. (*Supra* 5-7 (Obj. 5), 9-10 (Obj. 8); PX 124). |
| 27 | P. 58 | "Greenberg's projections provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo. At the time he issued them [February 2016], he, along with Pelissier, were essentially | These findings are inaccurate. Greenberg and Pelissier never "essentially function[ed]" as TransCare's senior management; rather, they helped Tilton analyze information from the company's management team. (*See, e.g.*, July 23 AM Tr. 8:15–23, 54:21–55:2, 56:6–17, 61:4–9; JX_44; DX_72; JX_46.) As of February 2016, CMAG was "[p]erforming normal duties of the position of TransCare | The findings are accurate and supported by the record. *See* Response to Objection No. 1; *see also* Response Br. at 28-32. <br><br> Greenberg had extensive experience in private equity investment and portfolio management, evaluating capital structure alternatives and making strategic business assessments, as well as extensive experience in valuation and modelling. (Tr. 7.22 A.M. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | functioning as TransCare's senior management reporting directly to Tilton." (citing PX_196 and PX_228.) | CFO." (DX_106.)<br><br>The pro forma financial information shared with an insurance broker (PX_196) does not "provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo" and was not created by Greenberg or Pelissier. Instead, the summary pro forma information is derived from a spreadsheet prepared by Jonathan Killion of CMAG. (PX_193, at 08557 ("P&L" Tab).) In his transmittal email, Killion wrote: "I just generally need to review the balance sheets to make sure they make sense. All this has been done on the fly without time to really review with a clear mind." (*Id.* at 08556.) Killion continued: "Also, to be clear, these models are directional. With the cluttered balance sheets in New York it is hard to tell what is and what isn't an asset / liability that would be part of the go forward entity." (*Id.*)<br><br>The February 24 Projections sent to another insurance broker (PX_228), similarly do not "provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo" on February 24. Tilton was clear that these projections involved substantial risk and uncertainty. She testified: "It was a dynamic model, and everything was changing by the minute. So, ultimately, to get the foreclosure done, I had to make decisions in the minute, and *certainly things were not settled because contracts were being lost and people were being lost every minute.* But I got as comfortable *as I could* to make a decision that would try to save as much of this company and as many jobs as I could." | 13:17-14:9 [Greenberg]).  He had been assigned to the TransCare credit for several of his years at Patriarch.  Greenberg worked with TransCare management to prepare TransCare's plans, and validated the numbers himself, working closely with Pelisser and Brian Stephen.  *See supra*, Response to Obj. No. 1, which is hereby incorporated by reference.<br><br>Greenberg's projections were consistent with the other financial information in the record.  According to Tilton, "For almost twelve years we had restructured this company from when it was going to be liquidated by the lenders and doing twelve to $14 million of EBITDA a year."  (Tr. 8/13 A.M. 47:22-25 [Tilton]).  Between October 2015 and February 2016 Greenberg reviewed, revised and circulated multiple financial plans and projections for first, TransCare, and by February 10 what would become Transcendence.  (For the Nov. plan, *see* Resp. to Obj. No. 3 above; for the Jan. plan *see* PFC at 17 (without objection); for the Feb. plan *see* PFC at 26 (without objection).<br><br>The projections which Tilton directed Greenberg to submit to Lockton on February 24, 2016 were the result of Tilton's efforts to "validate" a go-forward plan through three separate teams, one led by Greenberg, and almost a month of work.  Tilton repeatedly sent the plan to insurers for the purpose of inducing their reliance on the projections to bind insurance.  *See supra*, Response to Obj. No. 24, which is hereby incorporated by reference; see also Tr. 8/13 AM 39:5-41:15 [Tilton]; Tr. 8/13 PM 80:6-81:4; 90 [Tilton]). |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | (Aug. 13 AM Tr. 40:11–18 (emphasis added).) | |
| 28 | P. 59 | "The Trustee's damages expert, Jonathan Arnold, developed an appropriate multiple of EBITDA to apply to Transcendence's projections to determine the projected value of the Transcendence business." | This finding is inaccurate. Arnold freely acknowledged he did not offer any opinion at all about what the businesses at issue were actually worth. (July 24 Tr. 106:15– 20.) Instead, he performed a mathematical calculation using other people's projections about what NewCo could be worth under certain hypothetical assumptions. (*Id*. at 106:21– 107:1.) Arnold declined to say whether those projections, or the result of his calculations, were reasonable. (*Id*. at 57:9– 13.) | The finding is accurate.  Dr. Arnold identified a range of responsible market EBITDA multiples on the basis of the comparable company and precedent transactions first identified by Greenberg.  (PFC at 59-61; JX 55).  Dr. Arnold subsequently confirmed that Greenberg's companies were the most comparable.  Tilton's expert, Dunn, testified that it was also his understanding that Greenberg's companies were the most comparable.  (Tr. 8/8 48:9-25).  Greenberg concluded that the average EBITDA multiple was 10.1.  (PFC at 60).  Both Dunn and Tilton testified that there was market evidence of EBITDA multiples of 7-8 for "healthy companies." (Tr. 8/8 73:1-11 [Dunn]; Tr. 8/13 A.M. 17:1-20 [Tilton]).  Dr. Arnold's findings were consistent as he identified a range of multiples of between 7.1 and 12.2 based on the same data as of February 24, 2016.  (Tr. 7/24 20:10-21:4).

Dr. Arnold offered an opinion of the value of NewCo based on the plan Tilton executed when she foreclosed on three of TransCare's divisions to form Transcendence.  (PFC at 60-61; PX 282, ¶ 66; Tr. 7/24 11:10-15; 106:14–107:1 [Arnold]).  Dr. Arnold explained how he arrived at a multiple of forward-looking annual EBITDA using Tilton's own plan as a reasonable estimate of the value of Transcendence at the time of sale.  (Tr. 7/24 17:21–19:22 [Arnold]).

That analysis is in accordance with Delaware law which awards rescissory damages where corporate fiduciaries engage in self-dealing.  *See Bomarko II*, 766 A.2d at 440;  *Bomarko I*, 794 A.2d at 1184-85; *Rural Metro*, 88 A.3d at 101; *Basho*, 2018 WL |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | | 3326693, at \*50. |
| 29 | P. 62 | "[I]f better financial information was unavailable, it is only because TransCare did not generate better financial information under Tilton's watch." | These findings are inaccurate with respect to Tilton's alleged "control" over TransCare's daily operations and financial reporting.<br><br>Responsibility for TransCare's financials belonged to TransCare's CEO and CFO. (Leland II Tr. 377:19–378:14; July 23 AM Tr. 61:14–25.)<br><br>Tilton did not serve as the CEO of TransCare, nor did she make day-to-day decisions for TransCare. (Aug. 13 AM Tr. 41:23-24.) Moreover, she did not supervise the Company's financial reporting or operations. (*See* Aug. 13 PM Tr. 34:9–18 (Tilton testifying that she relies on the CFO and controller at each portfolio company to produce their own financial statements).).<br><br>Bonilla served as TransCare's CFO from April 2014 through September 2015 and, following his resignation, served as a consultant to TransCare until early January 2016. (Stipulation No. 25.) During his tenure, Bonilla was responsible for managing TransCare's financials. (*See, e.g.*, JX_45, at 30459-60; JX_52, at 83108; DX_88, at 109644; see also JX_46 (email from Pelissier to Bonilla and Leland: "We are not here to dictate what has to be paid and when, it remains your duty and decision as per the capabilities you have and your duties to satisfy creditors as the management team.").)  After Bonilla's departure in January 2016, Carl Landeck of CMAG took on the role of CFO. (JX_88; DX_106; July 22 AM Tr. 18:6-18, 55:1-11, 75:2-6.) | The finding is accurate.<br><br>Only Tilton could approve an annual plan, disclose any financial information or engage an auditor.  *See* Authority Matrix (PX 3) in Resp. to Obj. No. 2 above. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| 30 | PP. 66-67 | Dr. Arnold's testimony regarding "whether it was appropriate to deduct required funding from the purchase price a third party would be willing to pay" was "unrefuted." | This finding is inaccurate. Defendants' expert Jeffrey Dunn testified that any third-party buyer looking to purchase a company would factor into the sale price the cash the buyer would need to contribute to keep the company operating. (July 8 Tr. 22:12– 23:14; *id.* at 23:12–14 ("[A]ny market participant looking to acquire TransCare . . . needs to account for what else they would need to contribute to TransCare in order to reach a total value of the company.").) | The Bankruptcy Court is correct. <br><br> Dunn testified that he had no knowledge of any of the details of the Transcendence transaction (Tr. 8/8 71:4-72:1) and gave no testimony concerning the short-term ABL which Tilton envisioned using to get Transcendence off the ground. <br><br> Arnold gave his testimony concerning the propriety of deducting such a loan from the purchase price (8/14 A.M. Tr. 78:9-79:22 [Arnold]) and Tilton offered no rebuttal 80:4-8. <br><br> Finally, the cited testimony concerns different types of investment proposed for *TransCare* under the various proposed plans.  As the Bankruptcy Court found without objection from Tilton, the Transcendence projections forecast a need for only $120,000 in capital expenditures during 2016, (PFC at 27), with most of the other projected funding needs unlikely to be required by an arms-length buyer (PFC at 64-65). |
| 31 | P. 67 | On adjustments to proposed damages award: "Only $2 million (net) was attributable to the sale of the physical assets, (see PX 282, Ex. 13), and the Trustee paid $800,000 of those proceeds to PPAS. Accordingly, the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million." | This finding is factually incomplete and incorrect as a matter of law. <br><br> PPAS turned the $800,000 in proceeds over to Ark II, and Ark II then applied the $800,000 to its claim against the bankruptcy estates, thus reducing its indebtedness. (Aug. 13 AM Tr. 36:19–24; JX_109 at ECF p. 5 of 9.) These facts are acknowledged in the PFC. (PFC at 37.) <br><br> A debtor is entitled to only a single satisfaction of claims. See, e.g., McCord v. Agard, et al. (In re Bean), 252 F.3d 113, 115 (2nd Cir. 2001). Any damages award must be reduced by $800,000 to avoid a double recovery. *Dollar* | The finding is factually accurate and complete and correct as a matter of law. While the Trustee liquidated the Transcendence assets for $2 million, he paid $800,000 back to PPAS so that the estate received only $1.2 million.  Therefore, the Bankruptcy Court deducted only $1.2 million from the damage amount, not $2,000,000, and therefore the Trustee did not receive a double recovery of the $800,000 the Trustee paid to PPAS. |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | *Time Group, Inc. v. Sasson (In re Dollar Time Group, Inc.),* 223 B.R. 237, 249 (Bankr. S.D. Fla. 1998) ("To award the Trustee an amount Dollar Time has already received would equate to a double recovery and a windfall to the debtor.") | |
| 32 | P. 75 | "In addition, the entire transaction was conducted in haste and under a veil of secrecy." | This finding is inaccurate. The record shows that the OldCo/NewCo Restructuring was transparent, developed in plain sight and in the light of day, and with the active participation of multiple stakeholders including (i) Wells Fargo and its counsel, (ii) CMAG, (iii) TransCare executives and (iv) TransCare's counsel. (*See, e.g.*, PX_206; PX_234 at 47552–63; DX_137; DX_163 (Tilton authorizing Greenberg to share models with TransCare employees).) After first discussing it with Kurt Marsden, of Wells Fargo, on February 9, Tilton continued to engage in daily communications with Wells Fargo personnel about the potential restructuring. (Aug. 13 AM Tr. 67:10–16; Aug. 13 PM Tr. 87:7–8.) Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned Article 9 foreclosure, the potential purchase by Tilton of accounts receivable, and the need for NewCo to bind insurance. (*See, e.g.*, DX_147; JX_84; JX_86; JX_93; PX_219; Aug. 13 PM Tr. 81:7–15 ("[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); id. at 83:14–84:4 ("[W]e were all looking at the exact same information to try to make the best decisions."); *id.* at 91:2–7.) TransCare and Wells were represented by separate counsel who communicated with each other throughout the two-week period preceding the Article 9 foreclosure. (JX_77; JX_84, at 00051; July 23 PM Tr. | The finding is accurate. While Tilton objects to the Bankruptcy Court's ultimate conclusion that entire transaction was conducted in haste and under a veil of secrecy, she does not dispute the findings that underlie the Bankruptcy Court's conclusion: Tilton kept the foreclosure plan secret from Credit Suisse (the owner and manager of 26% of TransCare's equity), even as Credit Suisse was asking about the financial needs and plans for TransCare. (PFC at 24-25). On February 11, 2016, Tilton personally crafted the misleading email to Credit Suisse, purporting to blame Credit Suisse for causing TransCare's bankruptcy because it would not agree to subordinate its position to a new $6.5 million loan, even though Tilton had already entered into the loan and had already subordinated their position. (*Id.* at 24). Tilton did not negotiate the foreclosure with Curtis Mallet, TransCare's putative attorneys for out-of-court restructurings, and had Stephen send the foreclosure documents directly to TransCare at 12:07 a.m. without sending them to Curtis Mallet. (*Id.* at 29). Tilton did not form an independent subcommittee of the Board, engage TransCare's other shareholders, or designate an independent party with whom to negotiate the sale of TransCare, let alone to investigate other options. (*Id.* at 48-49). |

| Obj. No. | PFC Cite | Finding | What Tilton Argues the Evidence Shows and/or Applicable Law Demonstrates | Trustee's Response |
|---|---|---|---|---|
| | | | 99:8–16, 149:20–150:11.)<br><br>The CMAG team also assisted with the analysis of the Article 9 foreclosure (DX_132, at 02317 (CMAG emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); July 22 PM Tr. 114:14–115:7) and prepared financial models in connection with the OldCo/NewCo Restructuring. (PX_206, at 91292; July 23 AM Tr. 75:13–21.) CMAG and Wells Fargo personnel interacted directly about the OldCo/NewCo Restructuring. (July 22 PM Tr. 116:5–8.)<br><br>TransCare management also participated in the OldCo/NewCo Restructuring. (*See, e.g.*, PX_206; July 23 AM Tr. 23:14–23, July 23 PM Tr. 159:14–160:16.) | Tilton secretly granted a lien to Ark II, without informing any other party or involving counsel, and then subordinated all of the Term Loan Lenders to Ark II's new lien.  (*Id*. at 23-24.)  Tilton never issued stock for Transcendence but purported to provide Ark II with a 55% equity stake in Transcendence, the same percentage of equity Ark II owned in TransCare.  (*Id*. at 75, also 50).  Thus, Ark II would have preserved its equity interest, but in a company without any debt.  (*Id*.) |